CR-07-00871-PHX-ROS, May 13, 2008 (EXCERPT)

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3

**UNITED STATES OF AMERICA**,          )
4                                       )
                            Plaintiff,  )
5   vs.                                 )
                                        )  CR 07-00871-ROS
6   **HANOI BARBARO ACOSTA**,           )
                                        )
7                           Defendant.  )
                                        )  May 13, 2008
8                                       )  2:03 p.m.
_____  )
9

10       **BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE**

11            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                (Minor's name redacted)

13        **JURY TRIAL - Day 1 (Vela & Bellows excerpt)**

14             **A P P E A R A N C E S**

15  For the Government:
            TRACEY A. BARDORF, ESQ.
16          STEVEN PAUL LOGAN, ESQ.
            U.S. Attorney's Office
17          40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004-4408
18          602.514.7500
    For the Defendant:
19          BARBARA LYNN HULL, ESQ.
            Law Office of Barbara L. Hull
20          637 North 3rd Avenue, Suite 3
            Phoenix, AZ  85003
21          480.834.0002/(fax) 480.834.0003
    Official Court Reporter:
22  Elaine Cropper, RDR, CRR, CCP
    Sandra Day O'Connor U.S. Courthouse, Suite 312
23  401 West Washington Street, Spc. 35
    Phoenix, Arizona  85003-2151
24  (602) 322-7249
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

                United States District Court

CR-07-00871-PHX-ROS, May 13, 2008 (EXCERPT)

1

**I N D E X**

2

**EXAMINATION**

3

**Page   Line**

4    LORENZO VELA, JR.

5    LORENZO VELA, JR. - Direct
     BY MR. LOGAN                          4     20
6
     LORENZO VELA, JR - Cross
7    BY MS. HULL                          31     20

8    LORENZO VELA, JR - Redirect
     BY MR. LOGAN                         47     14
9
     JALYN BELLOWS
10
     JALYN BELLOWS - Direct
11   BY MR. LOGAN                         50     18

12   JALYN BELLOWS - Cross
     BY MS. HULL                          65     7
13

14

**RECESSES**

15

Page   Line

16   (Recess at 3:14; resumed at 3:33.)    50     4

17

18

19

20

21

22

23

24

25

United States District Court

CR-07-00871-PHX-ROS, May 13, 2008 (EXCERPT)

1                    **E X H I B I T S**

2

3    Number                                    Ident   Rec'd

4    16    Photograph                          10      12

5    17    Photograph                          10      12

6    18    Photograph                          10      12

7    19    Photograph                          11      12

8    26    Photograph                          16      18

9    27    Photograph                          16      18

10   28    Photograph                          16      18

11   29    Photograph                          17      18

12   1     Gray Motorola Razor phone           24

13   5     Black wallet                        27      28

14   5A    ID card of Defendant Acosta         27      28

15   5C    Defendant Acosta's social security card   28   28

16   34    Photograph of Zuriela Payes         29

17   31    Photograph                          61      63

18   33    Photograph                          61      63

19

20

21

22

23

24

25

United States District Court

CR-07-00871-PHX-ROS, May 13, 2008 (EXCERPT)

1                    P R O C E E D I N G S

2          (The following is an excerpt from the proceedings

3   beginning at 2:03 p.m.)

4               THE COURT:  All right.  Please be seated.

5               And your first witness?                        02:03:36

6               MR. LOGAN:  Your Honor, the United States calls

7   Officer Vela.

8               COURTROOM DEPUTY:  Can you please come forward, sir?

9                    LORENZO VELA, JR.

10  called as a Witness herein by the Government, having been first   02:04:16

11  duly sworn and/or affirmed by the Courtroom Deputy, testified

12  as follows:

13              COURTROOM DEPUTY:  Come forward, please, sir.  State

14  your name for the record and spell your last name.

15              THE WITNESS:  Officer Lorenzo Vela Jr. V, as in    02:04:27

16  Victor, E-L-A.

17              COURTROOM DEPUTY:  Thank you.  Please have a seat

18  over here.

19                   **DIRECT EXAMINATION**

20  BY MR. LOGAN:                                                02:04:56

21  Q.   Officer, if you would please restate your full name,

22  spelling each name.

23  A.   Officer Lorenzo Vela, Jr.  L-O-R-E-N-Z-O.  V, as in

24  Victor, E-L-A.

25  Q.   And we can see that you're a police officer.  How long   02:05:12

United States District Court

LORENZO VELA, JR. - Direct

| | | |
|---|---|---|
| 1 | have you been on the force? | 02:05:13 |
| 2 | A.    14 years. | |
| 3 | Q.    Which one? | |
| 4 | A.    City of Mesa. | |
| 5 | Q.    If you would, describe to the members of the court exactly | 02:05:20 |
| 6 | what your responsibilities are? | |
| 7 | A.    I drive a patrol vehicle.  I respond to calls, whether it | |
| 8 | be domestic violence, suicides, traffic accidents, dogs at | |
| 9 | large, loud parties, things of that nature. | |
| 10 | Q.    And which police department are you a member of? | 02:05:32 |
| 11 | A.    The City of Mesa. | |
| 12 | Q.    Now, can you describe just the area of responsibility that | |
| 13 | you have in Mesa? | |
| 14 | A.    Currently I patrol from Center Street East to Horne and | |
| 15 | from Broadway north to Eighth Street. | 02:05:52 |
| 16 | Q.    And have you been a patrol officer your entire career? | |
| 17 | A.    No, sir.  I did one year in narcotics. | |
| 18 | Q.    And do you recall when that was? | |
| 19 | A.    From '98 to '99. | |
| 20 | Q.    And for the court, can you give us some information about | 02:06:07 |
| 21 | your training and experience? | |
| 22 | A.    I went through the City of Mesa Police Department Academy, | |
| 23 | which is 20 weeks long, followed by 16 weeks of street | |
| 24 | evaluation by a seasoned officer. | |
| 25 | Q.    Have you attended any colleges? | 02:06:21 |

United States District Court

LORENZO VELA, JR. - Direct

1  A.   Yes, I have.  I attended Pan American University in

2  southern Texas.

3  Q.   Now, did you graduate from college?

4  A.   I did.  I have a bachelor's degree in criminal justice.

5  Q.   And what year was that?

6  A.   I graduated in 1988.

7  Q.   And, Officer, was that before you became a Mesa police

8  officer?

9  A.   Yes, it was.

10 Q.   Are you familiar with the Royal Mesa Inn?

11 A.   I am.

12 Q.   And where is that located that?

13 A.   Is located at 951 West Main in the City of Mesa.

14 Q.   Officer, is that part of your patrol?

15 A.   At the time it was not but I was dispatched to a call

16 there.

17 Q.   So you're familiar with that area?

18 A.   Yes, I am, sir.

19 Q.   Do you know if the hotel is still called the Royal Mesa

20 Inn?

21 A.   No, sir.  It has a new name.

22 Q.   What is the new name?

23 A.   American Value Inn I believe.

24 Q.   Now, do you recall if you were on duty on the third of

25 July in 2007?

United States District Court

LORENZO VELA, JR. - Direct

A.    I was.                                                    02:07:24

Q.    And you're familiar with the area of Main Street in Mesa
and Alma School?

A.    Yes, sir, I am.

Q.    How familiar are you?                                    02:07:32

A.    That neighborhood is pretty prevalent for prostitution,
gang activity, and small-time narcotics dealing.

Q.    And do you ever have officers or have you actually
patrolled that area?

A.    Yes, I have.                                             02:07:48

Q.    If you could for the court approximate how many times.

A.    I have been to that hotel approximately 10 to 15 times.

Q.    Now, do you know if the Royal Mesa Inn or America's Best
Value Inn, which is what it's called right now, do you know if
Mesa PD patrols that often?                                    02:08:08

A.    We do.

Q.    Describe that.

A.    It's a two-level or two-story hotel.  There is a lot of
foot traffic, lots of vehicle traffic in and out of that hotel.
There are gang members that frequent that area along with       02:08:24
prostitutes.

Q.    Now, when you say "a lot of foot traffic," what does that
mean?

A.    Usually prostitutes will rent a room and will take their
guests or their clients into that hotel.                       02:08:39

United States District Court

LORENZO VELA, JR. - Direct

Q.   Now, you just described prostitution there.  Do you recall    02:08:41
that?

A.   Yes, sir.

Q.   Is it limited to a certain time of the day?

A.   No, sir.  It's rampant throughout the night and through    02:08:49
the day.

Q.   Certain days of the week?

A.   No, sir.  It's an ongoing business that we have very
little control over as far as the patrol officers.  Our
undercover officers do make attempts to curtail the activity,    02:09:08
but we don't have the assets to stop it completely.

Q.   Now, Officer, on the third of July 2007 you already
testified that you were on duty; is that right?

A.   Yes, sir.

Q.   Were you called that night to -- or dispatched to the    02:09:25
Royal Mesa Inn?

A.   I was.

Q.   Do you recall why?

A.   We received a call from a woman in Oregon who told
dispatch --    02:09:38

          MS. HULL:  Objection.  Hearsay.

          THE COURT:  Sustained.

BY MR. LOGAN:

Q.   That night, the third of July, did you make it over to the
Royal Mesa Inn?    02:09:48

LORENZO VELA, JR. - Direct

1    A.    I did.                                                              02:09:50

2    Q.    Do you recall if any type of investigation was going on?

3    A.    Yes.  We were looking for a runaway juvenile from Oregon.

4    Q.    Was that runaway juvenile found?

5    A.    Yes, she was.                                                       02:10:01

6    Q.    Do you recall what her name was?

7    A.    XXXXXXXXX XXXXXXX.

8    Q.    Now, when you arrived on scene, Officer, what did you see?

9    A.    We made -- we attempted to make contact with the

10   management to find out if XXXXXXXXX was a guest of the hotel.            02:10:13

11   As we made entry into the office, I observed a black female

12   running from the east side of the building to the officers that

13   were in the parking lot.

14   Q.    And was that black female actually running towards you?

15   A.    She was running towards the officers that were still in            02:10:38

16   the parking lot.  I was already inside the office.

17   Q.    And if you could describe the black female.

18   A.    About five seven, five eight, wearing a yellow top, brown

19   hair.

20         MR. LOGAN:  Your Honor, request permission to show                 02:10:57

21   the witness Government Exhibits 16, 17, 18, and 19, please.

22   They are in front of him.

23         THE COURT:  Yes.

24   BY MR. LOGAN:

25   Q.    Officer, once you've retrieved those Government exhibits,          02:11:16

LORENZO VELA, JR. - Direct

1  I want you to look at all four and look up at me when you've          02:11:19

2  finished, please.

3          Officer, I want to focus your attention on photograph

4  number 16.  What's depicted in the photo?

5  A.   This is a picture of the runaway juvenile XXXXXXXXX          02:12:07

6  XXXXXXX.

7  Q.   And have you seen that woman before?

8  A.   Yes, sir.  I saw her that night.

9  Q.   And can you describe what she's wearing in that

10  photograph?          02:12:18

11  A.   Yellow blouse, necklace, short brown hair.

12  Q.   And you're familiar with how XXXXXXXXX XXXXXXX looked the

13  night of the third of July 2007?

14  A.   Yes, sir, I am.

15  Q.   Does that photograph accurately depict exactly how she          02:12:31

16  looked that day?

17  A.   It does.

18  Q.   Can you focus your attention to Government Exhibit No. 17,

19  please.  Again, describe what you're looking at, please.

20  A.   It is a closeup picture of XXXXXXXXX XXXXXXXXX face.          02:12:58

21  Q.   And, again, does that depict the photograph?  Does that

22  accurately depict what you saw the third of July 2007?

23  A.   It does.

24  Q.   Can you retrieve number 18, please.

25          Can you describe what's depicted in number 18?          02:13:23

United States District Court

11

LORENZO VELA, JR. - Direct

| | | |
|---|---|---|
| 1 | A.    Bruising on XXXXXXXXXXX right eye. | 02:13:25 |
| 2 | Q.    Officer, when you say bruising, did you actually notice | |
| 3 | that the night of the third of July? | |
| 4 | A.    I did. | |
| 5 | Q.    And do you recall if that photograph was actually taken | 02:13:37 |
| 6 | that night? | |
| 7 | A.    It was. | |
| 8 | Q.    And, again, is that a fair depiction of exactly what you | |
| 9 | saw on that day? | |
| 10 | A.    It is. | 02:13:47 |
| 11 | Q.    I would like to focus your attention on Government Exhibit | |
| 12 | Number 19, please.  Officer, again, what's depicted in | |
| 13 | Government Exhibit Number 19? | |
| 14 | A.    An abrasion to the left side of XXXXXXXXX XXXXXXXXX face. | |
| 15 | Q.    And, again, that night did you actually see XXXXXXXXX | 02:14:14 |
| 16 | XXXXXXX? | |
| 17 | A.    I did. | |
| 18 | Q.    And, Officer, earlier during your testimony you described | |
| 19 | a runaway female.  Do you recall that? | |
| 20 | A.    I do. | 02:14:24 |
| 21 | Q.    Is XXXXXXXXX XXXXXXX the individual that you classified as | |
| 22 | the runaway female? | |
| 23 | A.    It is. | |
| 24 | Q.    Officer, is it your testimony that photographs 16, 17, 18, | |
| 25 | and 19 accurately depict exactly what you saw that night? | 02:14:41 |

United States District Court

LORENZO VELA, JR. - Direct

1   A.   They are.                                                   02:14:45

2   Q.   Do they appear to be an exact replication of exactly what

3   you witnessed and saw the night of the third of July 2007?

4   A.   They are.

5             MR. LOGAN:   Your Honor, the government offers        02:14:56

6   Government Exhibit Nos. 16, 17, 18 and 19.

7             MS. HULL:   No objection.

8             THE COURT:   They are admitted.

9             (Exhibit Numbers 16 through 19 were admitted into

10  evidence.)                                                      02:15:09

11            MR. LOGAN:   Your Honor, the government would request

12  permission to retrieve those.

13            THE COURT:   Yes.

14  BY MR. LOGAN:

15  Q.   Now, Officer, during direct examination minutes ago you    02:15:48

16  described Government Exhibit Number 16.   Do you recall that?

17  A.   I do.

18  Q.   Do you recall if the juvenile XXXXXXXXX was wearing

19  anything besides what she has on in this photo?

20  A.   No.                                                        02:16:04

21  Q.   Officer, if you would describe exactly what you see in

22  Government Exhibit Number 17, please.

23  A.   It's a closeup photo of XXXXXXXXXXX face.

24  Q.   And you testified earlier that when you saw this juvenile

25  you remembered some bruising above her eye.                     02:16:51

United States District Court

LORENZO VELA, JR. - Direct

1  A.   Yes, sir.                                                        02:16:54

2  Q.   And which eye was that?

3  A.   Her right eye.

4  Q.   Now, officer, I want to take a step back to when you first

5  arrived at the hotel.                                                 02:17:16

6          You said that other police officers were present; is

7  that right?

8  A.   Yes, sir.

9  Q.   Now, when you were at the hotel, what, if anything, did

10 you hear from the juvenile?                                           02:17:32

11 A.   XXXXXXXXX appeared scared.  Her eyes were really wide.

12 She was breathing heavily.  She kept looking around.  She said

13 that we need to get out of the light --

14          MS. HULL:  Objection.

15          THE WITNESS:  -- he may be coming.                           02:17:47

16          THE COURT:  Ms. Hull, I can't hear you.  You need to

17 get in front of the microphone.

18          MS. HULL:  Objection.  Hearsay.

19          THE COURT:  Overruled.

20 BY MR. LOGAN:                                                         11:59:57

21 Q.   Officer, if you would repeat what you just stated on the

22 record, please.

23 A.   XXXXXXXXX said, "We need to get out of the light.  He's

24 coming."

25 Q.   Now, when she said this, you described that she had come        02:18:10

United States District Court

LORENZO VELA, JR. - Direct

1  from the left portion of the hotel entryway?                      02:18:12

2  A.   Yes, sir.   She was on the east side beyond the building.

3  There are some oleanders along that side of the complex.

4  Q.   And it's your testimony that she appeared to be scared?

5  A.   Yes, it is.                                                   02:18:27

6  Q.   Now, during the course of this investigation did you find

7  out why she appeared to be scared?

8  A.   Yes.   XXXXXXXXX said that she was being held against her

9  will, that there were two other females and a male in the hotel

10 room and that the male was probably beating the two females.      02:18:51

11 Q.   Did you ever hear what this male's name was?

12 A.   Not from XXXXXXXXX.

13 Q.   During the course of this investigation and that night,

14 which was the third of July, did you find out who the male was

15 that was involved?                                                 02:19:08

16 A.   I did.

17 Q.   Do you recall his name?

18 A.   Hanoi Acosta.

19 Q.   Do you recall what he looked like?

20 A.   Hispanic male, five eight, black hair, brown eyes.           02:19:18

21 Q.   Officer, do you see Mr. Acosta in this courtroom?

22 A.   I do, sir.

23 Q.   Where?

24 A.   He's seated to your right behind you wearing a blue suit.

25

United States District Court

LORENZO VELA, JR. - Direct

1          MR. LOGAN:  Your Honor, let the record reflect that                    02:19:34

2     the witness has identified the defendant as wearing a blue suit

3     sitting to the right of government's counsel table.

4          THE COURT:  It will.

5     BY MR. LOGAN:

6     Q.   Officer, you testified earlier that the juvenile appeared

7     to have some bruising above her right eye.  Do you recall that?

8     A.   I do.

9     Q.   And when you described that, you meant exactly what is

10    depicted in what's been shown on Government Exhibit Number 18        02:20:16

11    which is on the screen?

12    A.   Yes, that is.

13    Q.   Officer, I'm publishing what has been marked as Government

14    Exhibit Number 19.  Describe what you see in this photograph.

15    A.   It's the abrasion I observed on the left side of                      02:21:00

16    XXXXXXXXXXX face.

17    Q.   And you actually saw that in person?

18    A.   I did.

19          MR. LOGAN:  Your Honor, the government would request

20    that Exhibits 26, 27, 28, and 29 be shown to the witness,                02:21:45

21    please.

22          THE COURT:  I think they are there already, aren't

23    they?

24          MR. LOGAN:  Yes, Your Honor.

25          THE COURT:  You may review them.                                    02:21:54

United States District Court

LORENZO VELA, JR. - Direct

| | | |
|---|---|---|
| 1 | BY MR. LOGAN: | 02:21:55 |
| 2 | Q.   Officer, I'd like to focus your attention to Government | |
| 3 | Exhibit Number 26, please.  What's depicted in that photograph? | |
| 4 | A.   It's the marquis for America's Best Value Inn. | |
| 5 | Q.   Are you familiar with the America's Best Value Inn? | 02:22:44 |
| 6 | A.   Yes, sir. | |
| 7 | Q.   How was that? | |
| 8 | A.   That is the new name for Mesa Royal Inn. | |
| 9 | Q.   Is that the hotel that you responded to on the third of | |
| 10 | July 2007? | 02:22:57 |
| 11 | A.   It is. | |
| 12 | Q.   Is that photograph an accurate representation of exactly | |
| 13 | how that building is standing to this day? | |
| 14 | A.   It is. | |
| 15 | Q.   I would like to focus your attention to number 27, please. | 02:23:14 |
| 16 | Can you describe what is depicted in that photo? | |
| 17 | A.   It's the hotel itself with the driveway to the right-hand | |
| 18 | side of the office door. | |
| 19 | Q.   Now, you say the hotel itself.  What hotel? | |
| 20 | A.   The Mesa Royal Inn. | 02:23:43 |
| 21 | Q.   And is that approximately at Alma School and Main Street? | |
| 22 | A.   Yes, sir, it is. | |
| 23 | Q.   I would like to focus your attention to number 28, please. | |
| 24 | What's depicted in that photo? | |
| 25 | A.   The door to room 231. | 02:24:10 |

United States District Court

LORENZO VELA, JR. - Direct

1   Q.   Now, you testified earlier, Officer, that you were          02:24:15

2   involved in this investigation; right?

3   A.   Yes, sir.

4   Q.   When you got to the Royal Mesa Inn, what were your

5   responsibilities?                                               02:24:30

6   A.   Initially to find the runaway juvenile XXXXXXXXX.

7   Q.   Did you accomplish that?

8   A.   We did.

9   Q.   After that what happened?

10  A.   Based on XXXXXXXXXXX comments about being held against her  02:24:41

11  will and the possibility of two other females being hurt or

12  injured in the hotel room, we went up to that hotel room to

13  investigate.

14  Q.   Now, Officer, if you know, what is the significance of

15  room 231?                                                       02:24:59

16  A.   When we made contact at the hotel room, Mr. Acosta was

17  inside that hotel room.

18  Q.   And who provided you with the information that the

19  defendant was in that room?

20  A.   Hotel management.                                          02:25:13

21  Q.   I would like to focus your attention on Government Exhibit

22  Number 29, please.  Officer, what is depicted in photograph

23  number 29?

24  A.   The rear of the hotel.

25  Q.   And are you familiar with that?                            09:37:18

United States District Court

LORENZO VELA, JR. - Direct

| | | |
|---|---|---|
| 1 | A.   Yes, sir, I am. | 09:37:19 |
| 2 | Q.   And, again, Government Exhibits 26, 27, 28, and 29, are | |
| 3 | you familiar with the hotel that is depicted in those | |
| 4 | photographs? | |
| 5 | A.   I am, sir. | 09:37:22 |
| 6 | Q.   Now, do the photos accurately represent exactly what you | |
| 7 | saw the third of July 2007? | |
| 8 | A.   They do. | |
| 9 | MR. LOGAN:   Your Honor, at this time the government | |
| 10 | offers Exhibits 26, 27, 28 and 29. | 09:37:39 |
| 11 | MS. HULL:   No objection. | |
| 12 | THE COURT:   They are admitted. | |
| 13 | MR. LOGAN:   We request permission to retrieve those | |
| 14 | documents. | |
| 15 | THE COURT:   Yes. | 02:26:58 |
| 16 | (Exhibit Number 26 through 29 were admitted into | |
| 17 | evidence.) | |
| 18 | BY MR. LOGAN: | |
| 19 | Q.   Officer, I'm publishing Exhibit Number 26.  What is | |
| 20 | depicted in number 26? | 02:27:12 |
| 21 | A.   That is the marquis for America's Best Value Inn. | |
| 22 | Q.   And you testified earlier that there was a Royal Mesa Inn; | |
| 23 | is that correct? | |
| 24 | A.   Yes. | |
| 25 | Q.   Now, earlier when you testified I believe you commented | 02:27:24 |

United States District Court

LORENZO VELA, JR. - Direct

1  that there was a lot of foot traffic in the area.  Do you                    02:27:28

2  recall that?

3  A.   Yes, sir.

4  Q.   What did you mean about that again?

5  A.   There's traffic in and out of that hotel and in the                     02:27:35

6  neighborhood.

7  Q.   Now, if you look at the photograph where the front of the

8  vehicle faces outward, is that a street that is perpendicular

9  to the way the car is facing?

10 A.   Yes, sir.  That's the Main Street.                                       02:27:53

11 Q.   The Main Street where?

12 A.   In the City of Mesa.

13 Q.   Is that the same Main Street that you talked about earlier

14 as it relates to Main Street and Alma School?

15 A.   Yes, sir, it is.                                                         02:28:06

16 Q.   And I believe you testified that that street is known for

17 prostitution; is that right?

18 A.   It is, sir.

19 Q.   And your testimony was it's around the clock every day of

20 the week?                                                                     02:28:20

21 A.   Yes, it is.

22 Q.   And that Main Street depicted in this photograph, is that

23 a street that the Mesa police drive up and down regularly?

24 A.   It is.

25 Q.   Officer, I'm about to publish Government Exhibit                         02:29:08

United States District Court

LORENZO VELA, JR. - Direct

1  Number 27.  Officer, in Government Exhibit Number 27 describe          02:29:09

2  what that is a picture of, please.

3  A.   That is a picture of the hotel itself facing southward

4  from Main Street with the driveway on the right-hand side of

5  the photograph.                                                       02:29:44

6  Q.   Now, officer, you testified earlier that you're a veteran

7  of the Mesa Police Department of 14 years; is that right?

8  A.   Yes, sir.

9  Q.   And you also testified that you're very familiar with this

10  area.  Is that true?                                                  02:29:59

11  A.   Yes, sir.

12  Q.   Now, you're familiar with other hotels in the area; right?

13  A.   Yes, sir.

14  Q.   Is this one of the upscale Mesa hotels?

15  A.   No, sir, it's not.                                               02:30:12

16  Q.   And why is that?

17  A.   Because of the activity that goes on in there.

18  Q.   Now, as a 14-year police officer, you've investigated drug

19  cases before?

20  A.   Yes, sir, I have.                                                02:30:29

21  Q.   If you would for the court estimate how many times.

22          MS. HULL:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  BY MR. LOGAN:

25  Q.   Not necessarily that location.  Just in 14 years, how many      02:30:41

United States District Court

LORENZO VELA, JR. - Direct

1  times have you investigated?                                    02:30:44

2  A.   About 200 cases.

3  Q.   Did you say 200?

4  A.   Yes, sir.

5  Q.   How about prostitution cases?                              02:30:54

6  A.   About 10 or 15.

7  Q.   Now, you testified that this is not one of the nicer

8  hotels; is that right?

9  A.   Yes, sir.

10 Q.   Well, you'll note in Government Exhibit Number 27, look at  02:31:04

11 the right side, the first white vehicle.  Can you tell what

12 that is?

13 A.   Not from the picture but I know what kind of vehicle it

14 is?

15 Q.   What kind of vehicle is it?                                 02:31:18

16 A.   It's a Mercedes.

17 Q.   Now, Officer, you just testified that this is not one of

18 the nicer hotels in Mesa.  Is that true?

19 A.   Yes, sir.

20 Q.   Now, in your training and experience, is it common when     02:31:29

21 you have a hotel that is known for prostitution and drugs that

22 you have such a nice vehicle?

23 A.   No, sir, it's not.

24 Q.   Now, earlier you testified that the juvenile had walked up

25 to or run up to law enforcement -- I forgot how you described   02:31:55

United States District Court

LORENZO VELA, JR. - Direct

1    it.  Can you show us on the screen exactly which direction she          02:31:59

2    came from?  And on your screen, the technology is such in here

3    that you can point and touch and move your finger and it will

4    trail in whichever direction you want to go.

5    A.   She ran from the left side of the picture, the east side,          02:32:19

6    to the right and then to the officers that were here.

7         MR. LOGAN:  Your Honor, my understanding was we had

8    the capability to draw on the screen.

9         THE COURT:  He does but he just touched it along the

10   way.                                                                      02:32:38

11   BY MR. LOGAN:

12   Q.   Officer, touch your finger and drag across the screen.

13   Can you see the trail on your screen?

14   A.   I can, sir.

15   Q.   So explain to us where the juvenile was on the screen,             02:33:06

16   where she came from if you would?

17   A.   She came from an area farther to the left of where the

18   vehicle is parked, ran westbound and then southbound towards

19   the officers that were in the Sally port area.

20   Q.   So what you described is her basically running from what          02:33:27

21   appears to be the front area going towards the back where that

22   Mercedes is, that direction?

23   A.   Yes, sir.

24   Q.   And if you would point out where law enforcement was

25   located, please.                                                         02:33:41

United States District Court

LORENZO VELA, JR. - Direct

```
 1   A.   (Witness complies) Right here.                        02:33:49
 2   Q.   Now, Officer, I'm going to ask you to clear the screen.   I
 3   believe there's a button that says clear the screen.
 4             THE COURT:  You need to press the screen.  There you
 5   go.                                                        02:34:08
 6   BY MR. LOGAN:
 7   Q.   Officer, you provided testimony earlier that you actually
 8   went to room 231; is that correct?
 9   A.   Yes, sir.
10   Q.   Did you have an occasion to talk to the defendant at 231?  02:34:49
11   A.   I did.
12   Q.   How did that happen?
13   A.   Officer Baker and I stood outside the hotel room door and
14   listened.  We heard normal conversation from between a male and
15   a female.  We knocked on the door.  The door was open by    02:35:09
16   Mr. Acosta and then Miss Payes came out a few minutes later,
17   Zuriela.
18   Q.   Now, when you say "normal conversation," what does that
19   mean?
20   A.   There was no yelling or screaming coming from inside the   02:35:28
21   hotel room.
22   Q.   Was anyone outside the door, number 231, when you
23   approached it?
24   A.   As we were standing there listening, we were approached by
25   Amanda Garrett who said that -- who told us there was one    02:35:41
```

United States District Court

LORENZO VELA, JR. - Direct

 1   female and one male inside the hotel room and that she was also                02:35:46
 2   staying in that hotel room.
 3   Q.   That she was also staying in 231?
 4   A.   Yes, sir.
 5   Q.   Did the victim or actually the juvenile in the case, did                  02:36:07
 6   she provide information about who was in 231?
 7   A.   Just what she said was that it was two females and a male.
 8   Q.   Officer, in front of you you have Government Exhibit
 9   Number 1.  Can you retrieve that, please.
10            Officer, describe Government Exhibit Number 1,                        02:36:54
11   please.
12   A.   It's a gray Motorola Razor phone.
13   Q.   A cellular telephone?
14   A.   Yes, sir.
15   Q.   Have you seen it before?                                                  02:37:04
16   A.   Yes, sir.
17   Q.   When?
18   A.   XXXXXXXXX had it in her possession.
19   Q.   And who is XXXXXXXXX?
20   A.   The runaway juvenile.                                                     02:37:13
21   Q.   Did she give to it law enforcement?
22   A.   Yes, she did.
23   Q.   Are you familiar with who the owner of the phone was?
24   A.   Yes.
25   Q.   Who?                                                                      02:37:30

United States District Court

LORENZO VELA, JR. - Direct

```
 1   A.    The account is --                                    02:37:32

 2              MS. HULL:  Objection.  Hearsay.

 3              THE COURT:  Sustained on foundation.

 4   BY MR. LOGAN:

 5   Q.    Officer, you testified that you're familiar with the 02:37:42

 6   phone; is that right?

 7   A.    Yes.

 8   Q.    Did you have an occasion where you actually looked through

 9   the phone?

10   A.    I did.                                                02:37:51

11   Q.    And was that on the third of July 2007?

12   A.    It was.

13   Q.    What do you recall seeing in the phone?

14   A.    Several pictures of nude females to include six nude

15   pictures of XXXXXXXXX.                                      02:38:07

16   Q.    And XXXXXXXXX is the juvenile?

17   A.    Yes, she is.

18   Q.    If you would describe in as much detail as you can what

19   you saw in those six photographs?

20   A.    XXXXXXXXX is topless.  She's wearing black thong      02:38:22

21   underwear.  She's in various poses in the photos.

22   Q.    Now, Officer, you testified earlier that this runaway

23   juvenile had run up to Mesa police; is that right?

24   A.    Yes, sir.

25   Q.    Now, you also testified that you recognized that cellular 02:38:43
```

United States District Court

LORENZO VELA, JR. - Direct

1  phone; is that right?                                              02:38:49

2  A.   Yes, sir.

3  Q.   Did you take the juvenile female to the side of the

4  building and take naked photos of her without clothing?

5  A.   No, sir.                                                      02:38:58

6  Q.   Are you sure?

7  A.   Yes, sir.

8  Q.   Now, you described nude photos of other females.  Can you

9  describe those as well?

10  A.   No, sir.                                                     02:39:13

11  Q.   Do you recall if they were females different from

12  XXXXXXXXX, the juvenile?

13  A.   They were.

14  Q.   During the course of this investigation, did you see any

15  of those additional females?                                     02:39:22

16  A.   Yes, sir.  It was Amanda and Zuriela.

17  Q.   Officer, did you see any nude photos of the defendant on

18  the cell phone?

19  A.   No, sir.

20  Q.   Did anyone provide you during the investigation with any    02:39:54

21  information that he was acting as a male prostitute?

22  A.   No, sir.

23  Q.   Officer, I'd like you to retrieve Government Exhibit

24  Number 5.

25         MR. LOGAN:  May I have a moment, Your Honor?              02:40:46

United States District Court

LORENZO VELA, JR. - Direct

```
 1              THE COURT:  Yes.                              02:40:48

 2   BY MR. LOGAN:

 3   Q.   Officer, what is Government's Exhibit Number 5?

 4   A.   5A, sir?

 5   Q.   No, 5.  It's in a binder.                          02:41:44

 6              THE COURT:  I don't believe there's a binder there.

 7              MR. LOGAN:  Sorry about that.

 8              May I approach, Judge?

 9              THE COURT:  Yes.

10   BY MR. LOGAN:                                           02:42:11

11   Q.   What is Government Exhibit Number 5?

12   A.   It's a black wallet, sir.

13   Q.   And have you ever seen that black wallet?

14   A.   Yes, sir.

15   Q.   How do you recognize it?                           02:42:35

16   A.   I obtained it from Mr. Acosta.

17   Q.   Are you sure?

18   A.   Yes, sir.

19   Q.   Does it appear to be the same wallet that you actually

20   seized from Mr. Acosta?                                 02:42:47

21   A.   Yes, sir.

22   Q.   Now, I would like you to look at Exhibit 5A, please, and

23   describe what 5A is.

24   A.   It appears to be an ID card of Mr. Acosta.

25   Q.   Do you know if it has his name on it?              02:43:13
```

United States District Court

LORENZO VELA, JR. - Direct

| | | |
|---|---|---|
| 1 | A.   Yes, sir, it does. | 02:43:15 |
| 2 | Q.   Photograph? | |
| 3 | A.   Yes, sir. | |
| 4 | Q.   I would like to focus your attention to 5C, please.  What | |
| 5 | is 5C? | 02:43:28 |
| 6 | A.   Mr. Acosta's Social Security card. | |
| 7 | Q.   Now, do you recall if those items were actually in his | |
| 8 | wallet when you took possession of the wallet? | |
| 9 | A.   They were. | |
| 10 | MR. LOGAN:  Your Honor, the government offers | 02:43:44 |
| 11 | Government Exhibit Number 5, 5 alpha and 5 Charlie. | |
| 12 | MS. HULL:  No objection. | |
| 13 | THE COURT:  They are admitted. | |
| 14 | (Exhibit Numbers 5, 5A and 5C were admitted into | |
| 15 | evidence.) | 02:43:51 |
| 16 | BY MR. LOGAN: | |
| 17 | Q.   Why was the wallet seized? | |
| 18 | A.   At the time we were looking at charging Mr. Acosta with -- | |
| 19 | MS. HULL:  Objection.  Relevance. | |
| 20 | THE COURT:  I can't hear you, Ms. Hull. | 02:44:21 |
| 21 | MS. HULL:  I apologize.  Objection.  Relevance as to | |
| 22 | what they were thinking about. | |
| 23 | THE COURT:  Sustained. | |
| 24 | BY MR. LOGAN: | |
| 25 | Q.   At some point did you take possession of the wallet? | 02:44:31 |

United States District Court

LORENZO VELA, JR. - Direct

| | | |
|--|--|--|
| 1 | A.   I did. | 02:44:33 |
| 2 | Q.   And was Mr. Acosta subsequently questioned by Mesa PD? | |
| 3 | A.   No, sir. | |
| 4 | Q.   He was never questioned? | |
| 5 | A.   No, sir. | 02:44:45 |
| 6 | Q.   Now, in the wallet you describe 5A being a card with a | |
| 7 | photograph and his name; is that right? | |
| 8 | A.   Yes, sir. | |
| 9 | Q.   Is that the same picture of the defendant you identified | |
| 10 | today? | 02:45:04 |
| 11 | A.   Yes, sir, it is. | |
| 12 |       MR. LOGAN:  May I retrieve 5A, Your Honor? | |
| 13 |       THE COURT:  Yes. | |
| 14 | BY MR. LOGAN: | |
| 15 | Q.   Officer, I would like you to retrieve government Exhibit | 02:45:59 |
| 16 | Number 34, please.  What is Government Exhibit Number 34? | |
| 17 | A.   A picture of Zuriela. | |
| 18 | Q.   Who is Zuriela? | |
| 19 | A.   Zuriela is the female we located inside room 231. | |
| 20 | Q.   Did you actually see this Zuriela person? | 02:46:37 |
| 21 | A.   Yes, sir, I did. | |
| 22 | Q.   So you recognize who is depicted in that photo? | |
| 23 | A.   Yes, sir. | |
| 24 | Q.   Is it a fair depiction of exactly what she looked like on | |
| 25 | the third of July 2007? | 02:46:54 |

LORENZO VELA, JR. - Direct

1  A.   Yes, sir, it is.                                        02:46:56

2          MR. LOGAN:  Your Honor, the government would offer

3  Government Exhibit Number 34, please.

4          MS. HULL:  I would object as to foundation and

5  relevance at this point, Your Honor.                        02:47:04

6          THE COURT:  Are you going to connect this up?

7          MR. LOGAN:  Yes, Your Honor, we can.

8          THE COURT:  At a later time?

9          MR. LOGAN:  Yes, Your Honor.

10         THE COURT:  Based upon what I have heard previously,  02:47:17

11 I am going to overrule the objection.

12 BY MR. LOGAN:

13 Q.   Officer, how do you know that's a picture of Zuriela?

14 A.   Because I recognize her from that night.

15         MR. LOGAN:  Your Honor, may I retrieve Government     02:47:41

16 Exhibit Number 34?

17         THE COURT:  Yes.

18 BY MR. LOGAN:

19 Q.   Officer, you testified earlier that you had a chance to

20 talk to Zuriela; is that right?                             02:48:21

21 A.   Yes, sir.

22 Q.   Now, do you recall anything out of the ordinary that was

23 on her face?

24 A.   She had small bruises or a small cut on the bridge of her

25 nose.                                                       02:48:37

LORENZO VELA, JR. - Direct

1    Q.   Is it a bruise or a cut?                                    02:48:38

2    A.   A cut.

3              MR. LOGAN:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5    BY MR. LOGAN:

6    Q.   Officer, we talked about Government Exhibit Number 1.  Do

7    you recall that?  You described it as a Razor telephone.

8    A.   Yes.

9    Q.   Is that the Razor telephone that was seized from XXXXXXXXX

10   on the third of July 2007?                                      02:49:45

11   A.   Yes, it is.

12             MR. LOGAN:  Your Honor, the government offers

13   Government Exhibit Number 1.

14             MS. HULL:  No objection.

15             THE COURT:  It's admitted.                            02:49:51

16             (Exhibit Number 1 was admitted into evidence.)

17             MR. LOGAN:  No further questions, Your Honor.

18             THE COURT:  Cross?

19                    **CROSS EXAMINATION**

20   BY MS. HULL:                                                    02:50:28

21   Q.   Good afternoon, sir.  Sir, do you recall the time you were

22   dispatched on July 3 of 2007?

23   A.   About 20 minutes after midnight.

24   Q.   So about 12:20?

25   A.   12:20.                                                     02:50:41

LORENZO VELA, JR - Cross

1    Q.    After midnight.                                                   02:50:44

2    A.    Yes, ma'am.

3    Q.    How long did it take you to arrive?

4    A.    About five minutes.

5    Q.    And within those five minutes, by the time you got there,        02:50:54

6    who else was there?  What other law enforcement?

7    A.    Officer Baker, Officer Shock, and Officer Burnside.

8    Q.    Officer Burnside and who was the other one?

9    A.    Shock.

10   Q.    Shock.  And what were they doing?                                 02:51:15

11   A.    They were getting out of their patrol vehicles.

12   Q.    And did you see XXXXXXXXX when you arrived?

13   A.    No.

14   Q.    Did they see XXXXXXXXX?

15   A.    No.                                                              02:51:26

16   Q.    Did you observe any movements on her part that would make

17   you believe that she was running from the police?

18   A.    No.

19   Q.    Did you see any movements that she made that would lead

20   you to believe that she was running from you or any of the            02:51:39

21   other law enforcement officers?

22   A.    No.

23   Q.    Do you recall if you when you responded to the scene, do

24   you recall listening to the call reports on your radio?

25   A.    I do.                                                            02:52:00

United States District Court

LORENZO VELA, JR - Cross

Q.   Okay.  And was the person calling still on the radio when          02:52:01
you arrived at the scene?

A.   I don't understand the question.

Q.   Was dispatch indicating that there was someone still on
the line calling for police to respond to that address?          02:52:12

A.   Yes.

Q.   Do you remember for how long?

A.   No, I don't.

Q.   You said you've done a lot of responding to gang calls
where gang members are involved.          02:52:47

A.   Yes, ma'am.

Q.   But only a dozen or two of prostitution cases?

A.   Yes, ma'am.

Q.   Did you have any indication that this was a prostitution
case when you were called out?          02:52:56

A.   No, ma'am.

Q.   At what point did you think it was a prostitution case?

A.   When XXXXXXXXX told us about it.

Q.   So your call didn't come in as any sort of kidnapping.  It
came in as a runaway?          02:53:15

A.   Yes, ma'am.

Q.   So there was no allegation that anybody has been
kidnapped; correct?

A.   No, ma'am.

Q.   What was XXXXXXXXX wearing that night?          02:53:26

United States District Court

LORENZO VELA, JR - Cross

1  A.   A yellow blouse but I can't remember what kind of bottoms    02:53:31

2  she had on.

3  Q.   Do you remember her wearing any shoes?

4  A.   No, ma'am.

5  Q.   If she were barefoot, is that something you would    02:53:41

6  remember?

7  A.   Yes, ma'am.

8  Q.   So do you believe she was wearing shoes?

9  A.   Yes.

10 Q.   And was it pants, skirt?  What was she wearing on the    02:53:52

11 bottom half of her body?

12 A.   I can't remember.

13 Q.   Do you remember her wearing a white fishnet outfit?

14 A.   No.

15 Q.   What color was her hair?    02:54:08

16 A.   Brownish.

17 Q.   Did you see her wearing any blonde wigs?

18 A.   No, ma'am.

19 Q.   Did you take her clothing?

20 A.   No.    02:54:25

21 Q.   You said that she said something to the effect that, "We

22 need to get out of the light.  He's coming."  Do you remember

23 that statement?

24 A.   Yes, ma'am.

25 Q.   He wasn't, was he?    02:54:48

United States District Court

LORENZO VELA, JR - Cross

1  A.   No.                                                          02:54:49

2  Q.   And when you said earlier on direct examination that you

3  heard a male and female voice inside the room, did you find any

4  other males inside the room other than my client?

5  A.   No, ma'am.                                                   02:55:04

6  Q.   So you didn't see any indication that he was coming, did

7  you?

8  A.   No.

9  Q.   Did you search the room?

10 A.   No.                                                          02:55:30

11 Q.   Who searched the room?

12 A.   I don't know.

13 Q.   Do you remember seeing any condoms in the room?

14 A.   No, I do not.

15 Q.   Do you remember if XXXXXXXXX had any condoms on her?        02:55:37

16 A.   No, I do not.

17 Q.   Do you remember seeing any other phones either in the room

18 or on XXXXXXXXX XXXXXXX other than the one that you've already

19 described?

20 A.   No, ma'am.                                                   02:55:51

21 Q.   Did you look for phones?

22 A.   No, ma'am.

23 Q.   Did you hear Miss XXXXXXXXX XXXXXXX say that her own

24 phone, as she described it, had naked pictures of her and

25 others?                                                          02:56:03

United States District Court

LORENZO VELA, JR - Cross

1    A.   No.                                                          02:56:05

2    Q.   You don't remember hearing that?

3    A.   No, ma'am.

4    Q.   When this other woman approached you as you were going up

5    to room 231, she didn't say anything about beatings going on,   02:56:19

6    did she?

7    A.   No, ma'am.

8    Q.   She didn't say anything about being held against her will,

9    did she?

10   A.   No.                                                         02:56:27

11   Q.   When Zuriela came out of the room, she didn't say anything

12   about beatings, did she?

13   A.   No.

14   Q.   She didn't say anything about being held against her will,

15   did she?                                                         02:56:35

16   A.   No.

17   Q.   Who showed you the phone?

18   A.   Officer Burnside.

19   Q.   So XXXXXXXXX did not show you the phone?

20   A.   Yes and no.  She had it in her possession but she had       02:56:56

21   showed Officer Burnside the photos first.  Officer Burnside

22   told me about the photos and then I got the phone from

23   XXXXXXXXX.

24   Q.   And you created a report on this case; correct?

25   A.   Yes, ma'am.                                                 02:57:16

United States District Court

LORENZO VELA, JR - Cross

1   Q.   And have you reviewed it recently?                    02:57:16

2   A.   Yes, ma'am.

3   Q.   Okay.   Who showed you the photographs on the phone?

4   A.   Sergeant Bellows and I looked at them together.

5   Q.   So XXXXXXXXX did not show them to you?             02:57:39

6   A.   No.   She just gave me the phone.

7   Q.   And of the people that responded to your -- when you went

8   to room 231, no one said anything about anyone being under age

9   or having any knowledge of that, did they?

10  A.   No, they did not.                                     02:58:13

11  Q.   In fact, did you see any of the witnesses show any

12  surprise at information indicating that XXXXXXXXX XXXXXXX was

13  under 18?

14  A.   Yes.

15  Q.   Please explain.                                       02:58:28

16          MR. LOGAN:   Objection.   Hearsay.

17          THE COURT:   Well, foundation.

18  BY MS. HULL:

19  Q.   Did Zuriela show you surprise at any statement that

20  XXXXXXXXX was under the age of 18?                         02:58:38

21  A.   Yes, she did.

22  Q.   Okay.   And how did she do that?

23  A.   She told us she thought she was 20 years old and had two

24  children.

25  Q.   Okay.   Did you check XXXXXXXXX for IDs?             02:58:50

LORENZO VELA, JR - Cross

1   A.   No.                                                          02:58:53

2   Q.   Why not?

3   A.   Because she was a minor child and usually minors don't

4   have ID cards.

5   Q.   How did you know she was a minor?                            02:59:08

6   A.   She told us she was.

7   Q.   And you believed her?

8   A.   Yes, ma'am.

9   Q.   Did you have any other reason to believe that she was

10  minor other than what she told you?                              02:59:18

11  A.   No.

12  Q.   Did you ever or are you aware of any one of the other

13  officers who confiscated any sort of identification from

14  XXXXXXXXX?

15  A.   No.                                                         02:59:35

16  Q.   Have you seen identification that purports to be XXXXXXXXX

17  or has her photograph on it?

18  A.   No.

19  Q.   Did you arrest Zuriela?

20  A.   We took her into custody, yes.                              02:59:52

21  Q.   Did you determine that the vehicle they were all in was

22  Zuriela's?

23  A.   Yes.

24  Q.   Did you determine that there was a laptop inside the

25  vehicle and a cell phone that also belonged to Zuriela?          03:00:09

United States District Court

LORENZO VELA, JR - Cross

1   A.   A laptop, yes.  No cell phone.                          03:00:15

2   Q.   You're saying that's XXXXXXXXXXX cell phone?

3   A.   I'm aware of only one cell phone and that is the cell

4   phone that I took from XXXXXXXXX.

5   Q.   So Zuriela didn't tell you that that was her cell phone?   03:00:43

6   A.   Zuriela told who?

7   Q.   You.

8   A.   Zuriela told me that the gray cell phone was under her

9   name, under her account, but that Hanoi owned it or it was

10  Hanoi's personal use phone.                                  03:01:03

11  Q.   And did she tell you that everyone there had a cell phone?

12  A.   No, she did not.

13  Q.   Were you aware that everyone there had a cell phone?

14  A.   No, I was not aware.

15  Q.   So you didn't look or collect any cell phones or anything   03:01:15

16  like that?

17  A.   Just the one from XXXXXXXXX.

18  Q.   And did you at any time see any guns?

19  A.   No, ma'am.

20  Q.   Is that something that you would have looked for?        03:01:27

21  A.   Not in this particular case, no.

22  Q.   Why not?

23  A.   There was no mention of any guns being involved as we

24  talked to XXXXXXXXX and Zuriela.

25  Q.   So XXXXXXXXX said nothing to you about any guns being     03:01:44

United States District Court

LORENZO VELA, JR - Cross

1  involved?                                                    03:01:49

2  A.   Not to me.

3  Q.   Did you hear her tell anyone that guns were involved that

4  night?

5  A.   No, ma'am.                                              03:01:53

6  Q.   Would you think that if she was afraid if there was a gun

7  being used or was somewhere in the proximity, that if she was

8  truly afraid, that's something that she would tell the police?

9        MR. LOGAN:  Objection, Your Honor.  Calls for

10  speculation.                                                03:02:05

11        THE COURT:  Sustained.

12  BY MS. HULL:

13  Q.   Based on your training and experience, you have already

14  testified that this young girl seemed really frightened.  Do

15  you remember talking about that?                            03:02:14

16  A.   Yes, ma'am.

17  Q.   In fact, you said that her eyes were really big.  She was

18  running and she was running a lot and you said that she seemed

19  scared; correct?

20  A.   Yes, ma'am.                                            03:02:26

21  Q.   Would you expect that someone under those circumstances

22  would tell you if there was a gun?

23  A.   Yes, ma'am.

24  Q.   Because you're the police.  You had guns with you; right?

25  A.   Yes, ma'am.                                            03:02:41

LORENZO VELA, JR - Cross

1   Q.   And you could have done something about these guns or a                03:02:41

2   gun; correct?

3   A.   Yes.

4   Q.   Did you hear XXXXXXXXX say that she on her own phone had

5   nude photographs of herself and others --                                  03:03:02

6   A.   No, I did not.

7   Q.   -- on a cell phone other than the one that you

8   confiscated?

9   A.   No, I did not.

10  Q.   You don't remember hearing anything like that?                        03:03:09

11  A.   No.

12  Q.   So she just showed you this one cell phone; correct?

13  A.   Yes.

14  Q.   In fact, you asked Zuriela if you could look at her

15  laptop; correct?                                                           03:03:43

16  A.   We did, yes.

17  Q.   When was that?

18  A.   After we had seen the photographs of XXXXXXXXX.

19  Q.   About how long from the time you said you responded or

20  you -- I apologize.  I think you said you were called out about            03:03:53

21  12:20, responded within five minutes I believe was your

22  testimony; is that right?

23  A.   Yes, ma'am.

24  Q.   How long after that did you approach Zuriela and ask if

25  you could look at her laptop computer?                                     03:04:05

United States District Court

LORENZO VELA, JR - Cross

1   A.   Half an hour, 45 minutes later.                        03:04:09

2   Q.   And did she allow you to do that?

3   A.   No.

4   Q.   In fact, she indicated she wanted you to get a search

5   warrant; correct?                                            03:04:23

6   A.   Yes, she did.

7   Q.   And she refused to let you look at either her vehicle or

8   the laptop; correct?

9   A.   That's correct.

10  Q.   And the laptop was inside the car?                      03:04:30

11  A.   Yes, ma'am.

12  Q.   Because when XXXXXXXXX -- did you determine where she had

13  run to you from?

14  A.   No, ma'am.

15  Q.   Did you see a car in the parking lot that matched the    03:04:43

16  description that Zuriela -- that was Zuriela's car?

17  A.   Yes, we did.

18  Q.   And that is where the laptop was; correct?

19  A.   Yes, ma'am.

20  Q.   Did XXXXXXXXX tell you she had come from that car?       03:04:54

21  A.   No, ma'am.

22  Q.   She didn't tell you that?

23  A.   No, ma'am.

24  Q.   I would like to make sure I have your timing correct.  You

25  said that you would have arrived about 12:25 a.m.; correct?  03:05:17

United States District Court

LORENZO VELA, JR - Cross

1   A.   Yes, ma'am.                                                    03:05:26

2   Q.   And within 30 to 45 minutes Ms. Payes told you you would

3   have to get a warrant to look at the laptop or vehicle;

4   correct?

5   A.   Yes, ma'am.                                                    03:05:36

6   Q.   What was done -- when she said that -- with the laptop and

7   the car?

8   A.   We towed the vehicle to the Mesa Police Department's

9   impound lot until a search warrant could be obtained.

10  Q.   Do you remember how long that took?                           03:05:55

11  A.   No, ma'am.

12  Q.   Would it be safe to say that the towed vehicle came about

13  3:30?

14  A.   There's a tow sheet filled out.  I'm not sure what the

15  times are on it.                                                   03:06:09

16  Q.   Do you have the tow sheet with you?

17  A.   No, I don't.

18  Q.   Okay.  Do you have any reason to dispute that it would

19  have been around 3:30 in the morning?

20  A.   No.                                                           03:06:18

21  Q.   Okay.  And during the time from the point where Zuriela

22  said the search warrant and the car was towed, what happened to

23  that car and the laptop inside?

24  A.   It was parked in the parking lot.

25  Q.   Did anyone touch it?                                          03:06:31

United States District Court

LORENZO VELA, JR - Cross

1   A.   Not that I'm aware.                                        03:06:32

2   Q.   And is that something that you would have noticed?

3   A.   Yes.

4   Q.   Why is that?

5   A.   Because at the time that we were transporting people to   03:06:42

6   the main police station we were all standing in the parking

7   lot.

8   Q.   So from the time she said get a search warrant to the time

9   that it was towed, basically, it was -- you considered it

10  evidence; correct?                                             03:06:57

11  A.   Yes, ma'am.

12  Q.   And you would not allow anyone to tamper with it; correct?

13  A.   No, ma'am.

14  Q.   That is correct, you would not allow anyone to tamper with

15  it?  Let me rephrase the question.                             03:07:05

16  A.   Yes, we would not have allowed anybody to tamper with it.

17  Q.   Perfect.   Thank you.

18              Did you see Mr. Acosta's hands?

19  A.   Yes.

20  Q.   There were no marks on his hands, were there?            03:07:29

21  A.   Not that I remember.

22  Q.   That's something you would have photographed; correct?

23  A.   Yes.

24  Q.   Was one of the officers who responded from Mesa considered

25  in charge of this investigation?                               03:08:00

United States District Court

LORENZO VELA, JR - Cross

1    A.    Yes.                                                          03:08:05

2    Q.    Who was that?

3    A.    Me.

4    Q.    You were.  Okay.  So all of the other officers that

5    responded reported back to you and gave you the information        03:08:10

6    that they had received?

7    A.    Yes, ma'am.

8    Q.    Okay.  And you don't remember anything about a gun?

9    A.    No, ma'am.

10   Q.    Is that something that the officers are supposed to report   03:08:23

11   to you?

12               MR. LOGAN:  Objection.  Asked and answered.

13               THE COURT:  Overruled.

14   BY MS. HULL:

15   Q.    Is that something that the other officers are supposed to    03:08:30

16   tell you?

17   A.    Yes.

18   Q.    And how about the search of the room, was anything else

19   discovered?  If there were any condoms or guns or any other

20   cell phones, that's something that would have been brought to      03:08:48

21   your attention as well?

22   A.    The search of the room was done after I had left the

23   scene.

24   Q.    Who was responsible for that?

25   A.    I'm not sure who did the search of the room.                 03:08:57

United States District Court

LORENZO VELA, JR - Cross

1   Q.   Was it done at your direction?                          03:08:59

2   A.   No, ma'am.

3   Q.   Okay.  Who did that?

4   A.   The detectives did.

5   Q.   Did they report back to you?                            03:09:07

6   A.   No.

7   Q.   Did they -- are you aware whether they impounded anything

8   additional from the room?

9   A.   No.

10  Q.   You're not aware that they did or they did not?         03:09:14

11  A.   I'm not aware of anything being impounded from the room.

12  Q.    If anything else was impounded from the room, it would

13  have been brought to your attention as the lead on this case;

14  correct?

15  A.   Yes.                                                    03:09:26

16  Q.   One last question, Officer.  You said on direct

17  examination when you were talking about the photographs of the

18  hotel, Mr. Logan questioned you about the pictures marked as

19  26, 27, 28, and 29, talking about the hotel, and if you recall

20  on direct examination asked you several questions about whether 03:09:54

21  or not those were accurate photographs.  And his last question

22  is those photographs exactly depict the hotel as it was on July

23  3 and you said correct.  Do you remember that?

24  A.   Yes, ma'am.

25  Q.   Okay.  That is not true, is it, because it was not called 03:10:11

LORENZO VELA, JR - Cross

| | | |
|---|---|---|
| 1 | that at the time, was it? | 03:10:15 |
| 2 | A.    No. | |
| 3 | Q.    So but for that, the name -- | |
| 4 | A.    The name change. | |
| 5 | Q.    -- everything else appears the same? | 03:10:24 |
| 6 | A.    Yes, ma'am. | |
| 7 | Q.    No paint jobs, no reconstruction or remodeling? | |
| 8 | A.    No. | |
| 9 | Q.    Okay. | |
| 10 | MS. HULL:  No further questions.  Thank you. | 03:10:32 |
| 11 | THE COURT:  Redirect? | |
| 12 | MR. LOGAN:  Yes, Your Honor. | |
| 13 | **REDIRECT EXAMINATION** | |
| 14 | BY MR. LOGAN: | |
| 15 | Q.    Officer, during cross-examination, defense counsel talked | 03:10:50 |
| 16 | to you about the status of the juvenile.  Do you recall that? | |
| 17 | A.    Yes, sir. | |
| 18 | Q.    You were asked about did you know -- did you hear anything | |
| 19 | about what her age was and I think there was some discussion | |
| 20 | about she was 20.  Do you remember that? | 03:11:04 |
| 21 | A.    Yes. | |
| 22 | Q.    Now, you testified during direct examination that you have | |
| 23 | been an officer for 14 years with Mesa; right? | |
| 24 | A.    Yes, sir. | |
| 25 | Q.    Have you ever had any dealings with runways before? | 03:11:14 |

United States District Court

LORENZO VELA, JR - Redirect

1    A.    Yes, sir.                                                      03:11:16

2    Q.    Are they often scared when you come across them?

3    A.    They are.

4    Q.    In your training and experience can you tell us why you

5    believe so?                                                         03:11:23

6              MS. HULL:  Objection.

7              THE WITNESS:  We believe they are getting in trouble

8    for running away.

9              THE COURT:  Overruled.

10   BY MR. LOGAN:                                                       03:11:29

11   Q.    Can you repeat your answer, please.

12   A.    They are afraid of getting in trouble for running away.

13   Q.    Now, Ms. Hull, during cross-examination, they talked about

14   Government Exhibit Number 1 which is the cellular telephone; is

15   that right?                                                         03:11:44

16   A.    Yes, sir.

17   Q.    And I believe she asked you a question and you stated that

18   Zuriela said the gray cell phone was under her name but it was

19   for Hanoi's personal use.  Are you aware of any other gray

20   cellular phone?                                                     03:12:06

21   A.    No, sir.

22   Q.    So when you responded to her question, you were talking

23   about the phone that is in your possession; is that right?

24   A.    Yes, sir.

25   Q.    Now, she questioned you about this laptop computer and the    03:12:17

United States District Court

LORENZO VELA, JR - Redirect

```
 1   vehicle.                                                      03:12:20
 2               Now, as a 14-year police officer, is it customary
 3   when you get to a scene of a crime or something that has been
 4   reported, do you sometimes have large numbers of officers that
 5   show up?                                                      03:12:35
 6   A.   Yes, sir.
 7   Q.   Do you have large numbers of officers that show up with
 8   different areas of responsibility?
 9   A.   Yes, sir.
10   Q.   So it's possible that when you left somebody else was    03:12:45
11   responsible for securing the room?
12   A.   Yes, sir.
13   Q.   Officer, if you had seen one of your officers access the
14   gray car, or whatever the defense counsel described it as, and
15   play with the laptop, is that something you would have        03:13:13
16   reported?
17   A.   Yes, sir.
18   Q.   Are you aware of any officer that took possession of the
19   cell phone, which is government Exhibit 1, and used the cell
20   phone to download information to that laptop?                 03:13:27
21   A.   No, sir.
22               MR. LOGAN:  Nothing further, Your Honor.
23               THE COURT:  You may step down.
24               Ladies and gentlemen, we'll take a 20-minute break.
25   We'll see you back here at 3:30.                              03:13:37
```

United States District Court

LORENZO VELA, JR - Redirect

1        We're in recess.                                         03:13:39

2        (Witness excused.)

3        (Jury departs.)

4        (Recess at 3:14; resumed at 3:33.)

5        (Court was called to order by the courtroom deputy.)     03:34:10

6        THE COURT:  Please be seated.

7        Mr. Logan?

8        MR. LOGAN:  Your Honor, the government calls Sergeant

9    Bellows, please.

10                        JALYN BELLOWS                           03:34:32

11   called as a Witness herein by the Government, having been first

12   duly sworn and/or affirmed by the Courtroom Deputy, testified

13   as follows:

14        COURTROOM DEPUTY:  Please state your name for the

15   record and spell your last name, please.                     03:34:37

16        THE WITNESS:  Jalyn Bellows, B-E-L-L-O-W-S.

17                      **DIRECT EXAMINATION**

18   BY MR. LOGAN:

19   Q.   Sergeant Bellows, for the record, I'm going to ask you to

20   repeat your name and spell it for the record.                03:35:09

21   A.   It's Jalyn, J-A-L-Y-N, Bellows, B-E-L-L-O-W-S.

22   Q.   And, Sergeant, if you would, pull the microphone a little

23   closer to your face so we can all hear you.

24        How are you currently employed?

25   A.   I work for the Mesa Police Department.                  03:35:26

                    United States District Court

JALYN BELLOWS - Direct

1   Q.   For how long?                                              03:35:29

2   A.   Just over 14 years.

3   Q.   And how long have you been a Sergeant of police officers?

4   A.   Just over two years.

5   Q.   Describe for us your responsibilities with Mesa, please.   03:35:37

6   A.   I currently supervise central's gang squad in the central

7   district of our police department.

8   Q.   When you say "the central district," what does that mean?

9   A.   Our city is broken up into four corridors.  The central

10  district is comprised of the northwest portion of the city.    03:35:55

11  Q.   Now, are you familiar with Main Street and Alma School in

12  Mesa?

13  A.   Yes.

14  Q.   Is that part of your area of responsibility?

15  A.   Yes.                                                       03:36:06

16  Q.   Now, do you have any special training with Mesa PD?

17  A.   Yes.

18  Q.   What is it?

19  A.   I'm currently a primary sniper on our SWAT team and have

20  been for the last 10 years.  I also again supervise the gang   03:36:18

21  squad and I've received numerous gang trainings, classes

22  involving gangs and that kind of stuff.

23  Q.   Did you attend college before you became a police officer?

24  A.   Yes.  I have the equivalent of a two-year degree, an

25  associate's degree, from Gilbert Community College and Rio     03:36:39

JALYN BELLOWS - Direct

1   Salado.                                                           03:36:42

2   Q.   Now, Sergeant, during your time with Mesa, have you ever

3   worked on any teams that investigated prostitution in Mesa?

4   A.   Yeah.  For the -- originally I worked patrol for a few

5   years and then I went to our Special Investigations Division.     03:36:55

6   In the Special Investigations Division I worked for six years

7   as a gang detective and then I worked about four years as an

8   undercover narcotics detective.  Part of my responsibilities

9   working in special investigations was to assist our special

10  crimes apprehension team which worked vice crimes.               03:37:14

11  Q.   Now, if you would, describe what a vice crime is.

12  A.   It's crimes that have to do with prostitution:  Loitering

13  for the purpose of prostitution, prostitution itself and then

14  working call girls and stuff like that from the "New Times" and

15  out of the Internet.                                             03:37:32

16  Q.   What do you mean by out of the "New Times" or the

17  Internet?

18  A.   Girls that -- girls and guys that place ads on the

19  Internet or in the "New Times" to solicit prostitution.

20  Q.   Do you see a fair amount of that going on in Mesa?         03:37:47

21  A.   Yes.

22  Q.   How much, if you know?

23  A.   On a nightly basis.

24  Q.   Now, the area of Main Street and Alma School, is that

25  known to be one of the areas for prostitution?                   03:38:03

United States District Court

JALYN BELLOWS - Direct

1   A.   Yes.                                                          03:38:05

2   Q.   And how often does -- if you know, are there prostitutes

3   just walking around that area?

4   A.   Nightly.

5   Q.   Every day of the week?                                       03:38:15

6   A.   Yes, sir.

7   Q.   In the same area that we just talked about, do you see

8   drug activity on a regular basis there as well?

9   A.   Yes.   That area is known for -- it's known for drug --

10  having drug problems and people that use drugs hang out in that   03:38:29

11  area along with prostitution and many other various crimes that

12  are committed go hand in hand with those two things.

13          MR. LOGAN:   Your Honor, permission to retrieve

14  Government Exhibits 16 through 19 and 26 through 29, please.

15          THE COURT:   Yes.                                          03:38:53

16  BY MR. LOGAN:

17  Q.   Sergeant, on the third of July 2007 were you on duty?

18  A.   Yes.

19  Q.   Are you familiar with what used to be called the Royal

20  Mesa Inn?                                                         03:40:05

21  A.   Yes.

22  Q.   And how is that?

23  A.   I've conducted numerous investigations at that property

24  and in that area.

25  Q.   When you say "numerous," estimate?                           03:40:13

United States District Court

JALYN BELLOWS - Direct

1   A.   I would say between 50 and 100.                               03:40:19

2   Q.   And when you say you've investigated in the area, what

3   types of crimes have you investigated?

4   A.   Aggravated assaults, stolen vehicles, prostitution,

5   possession of dangerous drugs, possession of narcotic drugs,     03:40:34

6   possession of marijuana.

7   Q.   I'm publishing Government Exhibit No. 26.   Are you

8   familiar with the marquis that is depicted in Government

9   Exhibit Number 26?

10  A.   Yes.                                                         03:41:06

11  Q.   And is that the same place that you described as the Royal

12  Mesa Inn?

13  A.   That's correct.

14  Q.   Now, on the third of July 2007 did you have an occasion to

15  go out to that area?                                             03:41:18

16  A.   Yes.

17  Q.   Do you recall why?

18  A.   I was asked by an officer that was on the scene of an

19  investigation there that needed a supervisor to respond to that

20  area to brief them on what was going on and then get some        03:41:29

21  direction.

22  Q.   Now, Sergeant Bellows, when you're actually called to a

23  scene, do you sometimes have other officers present that have

24  their own responsibilities?

25  A.   That's correct.                                             03:41:47

United States District Court

JALYN BELLOWS - Direct

1    Q.    Even if it's the same crime scene?                                    03:41:47

2    A.    That's correct.

3    Q.    When you have larger crime scenes, is it possible that if

4    you are working on one area and someone is working another

5    area, you may not know what the other party is doing?             03:42:00

6    A.    That is correct.

7    Q.    When you made it to the Royal Mesa Inn, do you recall what

8    you did first?

9    A.    Yeah.  Upon arrival I spoke with Officer Shock and Officer

10   Burnside who were in the parking lot next to their patrol car,    03:42:23

11   and they basically briefed me on what they had up to that

12   point.

13   Q.    And what was your understanding of what they had?

14   A.    They had responded to that location from a 911 call from

15   out of state.  A girl by the name of XXXXXXXXX had called her    03:42:42

16   mother, didn't know where she was at the time but gave her mom

17   the address, told her mom that she thought she was in Arizona

18   and that she needed help and that she had been kidnapped --

19              MS. HULL:  Objection.

20              THE COURT:  Sustained.                                  03:43:01

21   BY MR. LOGAN:

22   Q.    Now, when you actually made it to the Royal Mesa Inn, did

23   you, in fact, participate as one of the investigators?

24   A.    That's correct.

25   Q.    And did you encounter a juvenile at that point?            03:43:16

JALYN BELLOWS - Direct

1    A.    Yes.                                                          03:43:21

2    Q.    Do you recall her name?

3    A.    Yes.

4    Q.    What was it?

5    A.    XXXXXXXXX.                                                    03:43:27

6    Q.    Have you seen this person before?

7    A.    Yes.

8    Q.    Who is she?

9    A.    That's XXXXXXXXX --

10          MS. HULL:  Your Honor, can I ask which exhibit we're        03:43:41

11   publishing?

12          THE COURT:  Yes.

13          MR. LOGAN:  I'm sorry.  We just published Government

14   Exhibit Number 17 that's admitted into evidence.

15   BY MR. LOGAN:                                                      03:43:50

16   Q.    Now, the night of the third of July of 2007, was XXXXXXXXX

17   the individual that Mesa received information on as a runaway?

18   A.    That's correct.

19   Q.    Now, what were your responsibilities that night?

20   A.    My responsibilities, once I went on scene, was to evaluate  03:44:12

21   the situation and figure out where we were going to go from

22   there, the direction we were going to take with the

23   investigation.

24   Q.    Did you actually make that decision?

25   A.    Yes.                                                         03:44:26

United States District Court

JALYN BELLOWS - Direct

| | |
|---|---|
| 1 | Q.   I'm sorry. |
| 2 | A.   Yes. |
| 3 | Q.   And your understanding was to investigate what? |
| 4 | A.   Subjects being held against their will and forced to |
| 5 | participate in acts of prostitution. |
| 6 | Q.   Officer, I'm publishing Government Exhibit Number 18.  As |
| 7 | you can see, it's an up-close photograph of a face.  Do you |
| 8 | know who that is? |
| 9 | A.   Yes.  That's XXXXXXXXX XXXXXXX. |
| 10 | Q.   Is that the juvenile you described earlier? |
| 11 | A.   Yes. |
| 12 | Q.   Now, do you recall the condition of her right eye when you |
| 13 | saw her on the third of July of 2007? |
| 14 | A.   Yes. |
| 15 | Q.   Describe it, please. |
| 16 | A.   She had bruising over her eyelid and over the eye on the |
| 17 | right side. |
| 18 |          MR. LOGAN:   The government is publishing Exhibit |
| 19 | Number 19. |
| 20 | BY MR. LOGAN: |
| 21 | Q.   In Government Exhibit Number 19, Sergeant, do you know who |
| 22 | that is? |
| 23 | A.   Yes. |
| 24 | Q.   And describe what you see. |
| 25 | A.   It's bruising and redness on the left side of XXXXXXXXX |

03:44:28

03:44:39

03:45:35

03:45:45

03:46:28

United States District Court

JALYN BELLOWS - Direct

1   XXXXXXXXX face.                                                    03:46:30

2   Q.   Is that what you recall seeing the third of July 2007?

3   A.   Yes.

4          MR. LOGAN:   The government counsel is publishing

5   Government Exhibit Number 34.                                      03:47:05

6   BY MR. LOGAN:

7   Q.   Sergeant, do you know who that is?

8   A.   Yes.

9   Q.   Who is it?

10  A.   Zuriela.                                                      03:47:22

11  Q.   Did you see her that night?  When I say "that night," I

12  mean the third of July of 2007.

13  A.   Yes.

14  Q.   Was there anything that you noticed on her face?

15  A.   Yes.  She had a distortion on the bridge of her nose and     03:47:32

16  what appeared to be a small laceration on the bridge of her

17  nose.

18  Q.   May I have a moment, Your Honor?

19         MR. LOGAN:   Yes.  Your Honor, permission to give the

20  witness Government Exhibit Number 1.                               03:48:36

21         THE COURT:   Yes.

22  BY MR. LOGAN:

23  Q.   Sergeant, if you would, take a moment to look at what's

24  actually in the envelope which is Government Exhibit Number 1,

25  please.                                                            03:49:02

United States District Court

JALYN BELLOWS - Direct

```
 1          Have you seen Government Exhibit Number 1 before    03:49:26
 2   which is a cellular telephone?
 3   A.   Yes.
 4   Q.   And tell us when you saw that, please.
 5   A.   During the investigation I was given this phone by Officer   03:49:34
 6   Shock and notified that this phone actually contained nude
 7   photographs of all three of the girls that were in question in.
 8   Q.   Do you recall who the girls were?
 9   A.   Amanda, XXXXXXXXX, and Zuriela.
10   Q.   Did you have an occasion to actually look through the    03:49:56
11   phone?
12   A.   Yes.
13   Q.   Did you see any nude photographs on that phone?
14   A.   Yes.
15   Q.   And who were those photographs of?    03:50:04
16   A.   There were nude photographs of all three girls:   Amanda,
17   Zuriela, and XXXXXXXXX.
18   Q.   Now, do you recall how that phone came into law
19   enforcement's possession?
20   A.   XXXXXXXXX was given the phone and she had the phone in her    03:50:26
21   possession and was told to go downstairs, get on the
22   Internet --
23          MS. HULL:   Objection.   Hearsay.
24          THE COURT:   Sustained.
25
```

United States District Court

60

JALYN BELLOWS - Direct

1   BY MR. LOGAN:

2   Q.   Were you actually present at the time one of the officers

3   took possession of the phone?

4   A.   Yes.

5   Q.   Do you recall if once the phone was taken in possession by      03:50:47

6   one of the Mesa police officers, was it ever given back to

7   XXXXXXXXX?

8   A.   No, it was not.

9   Q.   Was it kept by law enforcement?

10  A.   That's correct.                                                 03:51:02

11  Q.   Now, Sergeant, at any point did you use that phone to take

12  nude photographs of any of those females that you described?

13  A.   No.

14  Q.   Now, Sergeant, are you aware that there was also a

15  computer that was seized in the case?                               03:51:18

16  A.   Yes.

17  Q.   And did you ever have possession of that computer?

18  A.   No, I did not.

19  Q.   Officer, at any point, did you send any photographs from

20  Government Exhibit Number 1, which is a cellular telephone, to      03:51:33

21  the computer that was in the possession of one of the ladies?

22  A.   No, I did not.

23  Q.   When you looked through the cellular telephone, Government

24  Exhibit Number 1, do you recall if you saw any nude photos of

25  the defendant?                                                      03:51:53

JALYN BELLOWS - Direct

1  A.   No, there was not.                                          03:51:55

2  Q.   Did you receive any information that the defendant was a

3  prostitute?

4  A.   No.

5             MR. LOGAN:  Can I have a moment, Your Honor?          03:52:04

6             THE COURT:  Yes.

7             MR. LOGAN:  Your Honor, we would ask that the witness

8  be given Government Exhibits 31 and 33, please.

9             THE COURT:  Yes.

10 BY MR. LOGAN:                                                    11:59:57

11 Q.   Sergeant Bellows, what's depicted in Government Exhibit

12 Number 31?

13 A.   It's a picture of Zuriela standing by a wall dressed in a

14 multicolored top and some blue pants and a white belt, some

15 sunglasses.                                                      03:54:08

16 Q.   And how do you know that?

17 A.   This is one of the photos that was in the camera.

18 Q.   In the camera?  Was that the camera on the cell phone?

19 A.   Yes.

20 Q.   You testified earlier that you had viewed some nude        03:54:31

21 photographs on Government Exhibit No. 1 which is the Motorola

22 telephone, cellular phone.  Was that one of the photos that was

23 also on there?

24 A.   That's correct.

25 Q.   I would like to focus your attention to Government Exhibit 03:54:50

                    United States District Court

JALYN BELLOWS - Direct

| | |
|---|---|
| 1 | Number 33, please.  Do you recognize what's depicted in 33? | 03:54:52 |
| 2 | A.    Yes. |
| 3 | Q.    Who is it? |
| 4 | A.    It's a photograph of XXXXXXXXX, a nude photograph of |
| 5 | XXXXXXXXX laying on a bed. | 03:55:10 |
| 6 | Q.    And when was the first time you saw that photograph? |
| 7 | A.    In the cellular phone. |
| 8 | Q.    So you're familiar with Government Exhibits 31 and 33? |
| 9 | A.    That's correct. |
| 10 | Q.    And it's a fair depiction of exactly what you saw that | 03:55:31 |
| 11 | night, which is a third of July 2007, exactly what you saw in |
| 12 | the Government Exhibit No. 1? |
| 13 | A.    That's correct. |
| 14 | Q.    And it's a fair depiction of both of those ladies on the |
| 15 | third of July 2007? | 03:55:45 |
| 16 | A.    That's correct. |
| 17 | MR. LOGAN:  Your Honor, the government offers |
| 18 | Exhibits 31 and 33. |
| 19 | MS. HULL:  Your Honor, may I just see which ones |
| 20 | we're talking about again?  I just have the list.  May I look | 03:55:56 |
| 21 | at them? |
| 22 | THE COURT:  You don't have copies? |
| 23 | MS. HULL:  Thank you.  No objection further, Judge. |
| 24 | THE COURT:  All right.  Thank you. |
| 25 | They are admitted. | 03:56:30 |

United States District Court

JALYN BELLOWS - Direct

1          (Exhibit Numbers 31 and 33 were admitted into          03:56:38

2   evidence.)

3   BY MR. LOGAN:

4   Q.   During the investigation, did you have an opportunity talk

5   to Zuriela?          03:56:43

6   A.   Yes.

7   Q.   When you first started talking to her, can you describe

8   her demeanor?

9   A.   She was scared.  She was nervous to talk to me.  I was

10  asking her fairly simple questions.  She was at a loss for          03:56:55

11  words, didn't have -- some of the questions she didn't answer

12  at all.  Other questions she would just stare at the floor and

13  give me short, brief answers.  She would either answer yes or

14  no but again when she went to answer, she would look at the

15  floor, look away from you when she answered.          03:57:14

16  Q.   How about Amanda's demeanor?

17  A.   The same thing.  I spoke to Amanda and asked her basically

18  the same questions that I asked the other three, the other

19  girls that were involved in this.

20          Amanda denied any -- again, she seemed scared and          03:57:31

21  apprehensive to answer my questions.  At one point when she was

22  in eyeshot and earshot of the defendant, she wouldn't answer my

23  questions without looking to him as if permission to answer

24  them, fairly simple questions.

25          MS. HULL:  Objection.  Speculation.          03:57:49

United States District Court

JALYN BELLOWS - Direct

| | |
|---|---|
| 1 | THE COURT:  Sustained. | 03:57:51 |
| 2 | BY MR. LOGAN: |
| 3 | Q.   Sergeant, during your 14-year career, you stated that you |
| 4 | had investigated prostitution cases before; is that right? |
| 5 | A.   That's correct. | 03:58:12 |
| 6 | Q.   Have you ever been part of an investigation where pimps |
| 7 | were involved as well as the actual prostitutes? |
| 8 | A.   That's correct. |
| 9 | Q.   During those investigations, have you ever had an occasion |
| 10 | where the prostitute is afraid of the pimp? | 03:58:25 |
| 11 | A.   Almost always. |
| 12 | Q.   Do you think you have enough training in 14 years and |
| 13 | experience in this area where you could tell us why you believe |
| 14 | that occurs? |
| 15 | MS. HULL:  Objection.  Relevance.  Foundation. | 03:58:42 |
| 16 | THE COURT:  Overruled. |
| 17 | THE WITNESS:  Yes. |
| 18 | BY MR. LOGAN: |
| 19 | Q.   You can go ahead and answer. |
| 20 | A.   The pimps a lot of times, again, their goal is to make | 03:58:49 |
| 21 | money and they use the girls to make them money.  They don't -- |
| 22 | there's no -- they don't care for the girls.  The only thing |
| 23 | they provide the girls is protection and the way that they will |
| 24 | use the girls is they will intimidate them.  They will let them |
| 25 | know, "If you don't do what I want you to do, then you're going | 03:59:11 |

JALYN BELLOWS - Direct

```
 1   to get beat.  You're not going to get taken care of and if      03:59:14
 2   something happens to you, then I'm not going to come stick up
 3   for you."
 4            MR. LOGAN:  Nothing further, Your Honor.
 5            THE COURT:  Cross?                                      03:59:28
 6                     CROSS EXAMINATION
 7   BY MS. HULL:
 8   Q.   Good afternoon, Sergeant.  Would you say it's safe to say
 9   that you are very eager to help in this case?
10   A.   Yes.                                                       03:59:45
11   Q.   And, in fact, you just talked about something that you
12   would typically expect to hear from an expert witness.  Would
13   you agree?
14   A.   Not necessarily.
15   Q.   Okay.  Well, let's talk about that.  Okay.  Your           04:00:02
16   experience, 14 years, how many prostitution cases have you
17   investigated?
18   A.   Probably -- do you mean personally investigated or
19   assisted with the investigation?
20   Q.   Both.                                                      04:00:20
21   A.   Between 50 and 100.
22   Q.   And of those, how many of those were you called to
23   testify?
24   A.   I have not testified in prostitution cases.
25   Q.   Ever?                                                      04:00:31
```

JALYN BELLOWS - Cross

1    A.    Not to this date, no.                                    04:00:31

2    Q.    How would you characterize your record-keeping?

3    A.    Pretty good.

4    Q.    Okay.  Pretty good as in do you remember details?

5    A.    In certain cases, yes.                                   04:00:42

6    Q.    In which cases, which certain cases do you remember

7    details?

8    A.    Ones that stand out in my mind.  If I don't remember the

9    details, then I can refer to my police reports that I write to

10   help refresh my memory.                                        04:00:56

11   Q.    All right.  And, in fact, a lot of prostitutes just

12   prostitute without pimps, don't they?

13   A.    That's correct.

14   Q.    What percentage would you say of the prostitution cases

15   that you have investigated were prostitutes alone, not working  04:01:11

16   with pimps?

17   A.    Maybe half.

18   Q.    Okay.  And have you ever come across a case where one

19   prostitute goes out, works, makes money and gives money to

20   another prostitute?                                            04:01:31

21   A.    I don't know.

22   Q.    Have you ever come across a case like that?

23   A.    No, I have not.

24   Q.    Have you ever come across a case -- let me rephrase that.

25         If you had come across a case where one prostitute        04:01:42

United States District Court

JALYN BELLOWS - Cross

1  goes out and works for money, for sex for money and brings the        04:01:46

2  money back to another prostitute, would that prostitute be a

3  pimp also?

4  A.    I don't know if I can answer in hypothetical situations.

5  I'm not exactly sure what you're asking.                             04:02:01

6  Q.    But you just testified that you're an expert on this

7  because you know the characteristics between pimps and

8  prostitutes, did you not?

9  A.    Correct.

10 Q.    In 14 years of experience you're saying that you've never     04:02:09

11 come across a case where a prostitute makes money and then

12 gives that money or some or all of it to another prostitute;

13 correct?

14 A.    Not where they came forth and told me that that's what

15 they were doing it for, no.                                         04:02:22

16 Q.    Define pimp for me.

17 A.    It would be someone who has a girl that is working,

18 prostituting for him and then giving the money to him for

19 protection.

20 Q.    Only a him?                                                   04:02:35

21 A.    It could be a her.

22 Q.    So you would agree that some pimps are female?

23 A.    I would agree that it doesn't always have to be a him.

24 Q.    Okay.  So if, under your definition, a prostitute goes out

25 and she makes money prostituting and gives that money to a          04:02:54

68

JALYN BELLOWS - Cross

1   woman, is that woman a prostitute?                          04:03:00

2   A.   I couldn't answer that question.

3   Q.   I think that you can.   I think you just defined pimp, did

4   you not?

5   A.   That's correct.                                        04:03:11

6   Q.   Okay.   And your definition was that a pimp gets money from

7   the prostitutes; correct?

8   A.   Correct.

9   Q.   So if a woman gets money from another prostitute, she's a

10  pimp, too?                                                  04:03:24

11  A.   Yes.   That could be correct.

12  Q.   Okay.   And based on your training and experience or just

13  your experience, 14 years on the job and your extensive

14  experience with prostitution, you would agree that sometimes

15  prostitutes get beat up by johns or customers; correct?     04:03:43

16  A.   That's correct.

17  Q.   In fact, it's pretty regular, isn't it?

18  A.   I can't answer to the regularity of it but I know that it

19  does happen.

20  Q.   What would you say would be the percentage?   How often    04:03:55

21  does that happen?

22  A.   I couldn't tell you.

23  Q.   Have you investigated any cases where a prostitute

24  complained to you about having been beaten by one of her

25  customers?                                                  04:04:08

JALYN BELLOWS - Cross

1    A.    No.                                                              04:04:09

2    Q.    You never have?

3    A.    No.

4    Q.    Are you ever involved in anything or any of your training

5    and experience teach you that not only pimps get money whether    04:04:18

6    they are male or female from prostitutes but the prostitutes,

7    part of the risk of being a prostitute is that you get beat up?

8    A.    I would imagine that's one of the risks of being a

9    prostitute is that you could get beat up, yes.

10   Q.    Okay.                                                          04:04:33

11         And you said that the prostitutes are almost always

12   afraid of the pimps.  Do you remember saying that on direct

13   examination?

14   A.    Yes.

15   Q.    But you also said that the pimps provide them safety,          04:04:47

16   protection; correct?

17   A.    In their mixed-up world, yes, I would imagine they feel

18   some type of protection as long as they were loyal to him.

19   Q.    Okay.

20   A.    Protection from outside predators but not necessarily from    04:05:03

21   him.

22   Q.    Okay.  So it's possible that this pimp that you talk

23   about, this pimp relationship or this pimp definition, that

24   that person actually affords protection and that the prostitute

25   feels safe with the pimp is one reason they stayed with them;       04:05:21

United States District Court

JALYN BELLOWS - Cross

1  correct?                                                    04:05:24

2  A.   Correct.

3  Q.   Okay.  Did you talk to Zuriela before Officer Vela talked

4  to her?

5  A.   No, after.                                             04:05:40

6  Q.   Okay.  And at what point did you access this phone that

7  has been marked as Exhibit 1?

8  A.   I went up and spoke to the defendant and to Amanda and

9  Zuriela and once I had spoke to them, I walked back down

10 towards the vehicle where Officer Shock was and where XXXXXXXXX  04:05:59

11 was and that's when Officer Shock gave me the phone.

12 Q.   And whose phone was it that -- your understanding?

13 A.   When I was given the phone, XXXXXXXXX told me the phone

14 belonged to the defendant.

15 Q.   In fact, she said that the phone belonged to -- I'm sorry.  04:06:21

16 Zuriela told you the phone was hers; correct?

17 A.   That is correct.

18 Q.   The account was in her name; correct?

19 A.   That's correct.

20 Q.   And Zuriela also indicated that the car involved here was  04:06:31

21 hers; correct?

22 A.   Correct.

23 Q.   And she also -- Zuriela also told you that the laptop in

24 the car was hers; correct?

25 A.   That's correct.                                        04:06:43

United States District Court

JALYN BELLOWS - Cross

1   Q.   Okay.  And did you believe her?                        04:06:44

2   A.   Yes.

3   Q.   Okay.  So you believed when you had that cell phone with

4   you, it was not XXXXXXXXXXX?

5   A.   At the time I had the phone, I wasn't sure whose it was.   04:06:57

6   I actually took the phone, went back up and spoke to the

7   defendant and Zuriela and they confirmed that, yes, the phone

8   did belong to Zuriela.

9   Q.   Okay.  And as part of your involvement as Sergeant, and I

10  believe you stated words to the effect of -- that you were     04:07:16

11  consulted as to how to proceed next once you got on scene.  Do

12  you recall talking about that?

13  A.   Yes.

14  Q.   If you believe that that cell phone belonged to Zuriela,

15  why did you not get a search warrant before opening it?        04:07:32

16  A.   When the phone was handed to me, the phone was already

17  open.  It had been given to Officer Shock and the phone -- the

18  pictures were already open and XXXXXXXXX had given Officer

19  Shock permission to look through them.

20  Q.   But if she was not the owner, she didn't have the right to  04:07:50

21  give permission, did she?

22          MR. LOGAN:  Objection.  Relevance.

23          THE COURT:  Wait.  We haven't heard the question,

24  have we?

25          What's the question?                                   04:08:02

United States District Court

JALYN BELLOWS - Cross

```
 1   BY MS. HULL:
 2   Q.   The question is:  Isn't it true if XXXXXXXXX didn't own
 3   the phone, she didn't have the right to give permission or
 4   anyone permission to look on that phone; isn't that right?
 5            MR. LOGAN:  This is not relevant because she's asking       04:08:11
 6   a question about obtaining a search warrant, Judge.
 7            THE COURT:  Well, I'm going to sustain the objection
 8   on foundation.
 9            MS. HULL:  Okay.
10   BY MS. HULL:
11   Q.   Let me back up.
12            Whose decision was it that -- was it you that talked
13   to Zuriela and asked her about the laptop and her car --
14   A.   That's correct.
15   Q.   -- and getting a search warrant.  She told you you would    04:08:36
16   have to get a search warrant?
17   A.   That's correct.
18   Q.   So that was your decision to ask her about that?
19   A.   Yes.
20   Q.   And why did you ask her about that?                         04:08:44
21   A.   Because she needed to give consent to search her vehicle
22   and computer.
23   Q.   She did not give you consent?
24   A.   That's correct.  She did not wish to give consent.
25   Q.   Did you ask her about the phone?                            04:08:57
```

United States District Court

JALYN BELLOWS - Cross

1   A.   No.                                                          04:08:58

2   Q.   Why not?

3   A.   Because at the time I looked through the phone, that was

4   prior to me knowing whose phone it was.   XXXXXXXXX gave me the

5   phone.   I was under the impression it was her phone until we    04:09:06

6   started trying to figure out actually whose phone it was.   It

7   was in XXXXXXXXXXX -- she had possession of it and she had free

8   right to use it, so Zuriela had given that right to her.

9            Once I started asking XXXXXXXXX, "Who does this phone

10  belong to," she said it belongs to the defendant.               04:09:23

11  Q.   And that was before or after you showed the pictures to

12  Officer Vela?

13  A.   That was -- that was before.

14  Q.   So before you showed the pictures to Officer Vela, you

15  determined the ownership of that phone?                          04:09:43

16  A.   Officer Vela was down by the car with me when we first saw

17  pictures of the phone.   I was told the phone belonged to the

18  defendant.   I then took the phone, went up to where the

19  defendant was still at the room to question who owned the

20  phone, if he, in fact, owned the phone because I was told by     04:09:59

21  XXXXXXXXX that the defendant used the phone to take the photos

22  of her and that they were the same photos that were on the

23  computer in the car.

24  Q.   Who is responsible for gathering the written statement

25  from XXXXXXXXX that day?                                         04:10:13

United States District Court

JALYN BELLOWS - Cross

A.    The investigation was taken over by our sex crimes       04:10:20

detectives so I couldn't answer that question.  I'm not sure.

Q.    Did you she tell you or did you hear her tell any of the

officers on the scene that she had nude photographs of herself

and a bunch of other women on her phone which was different       04:10:34

than the phone you looked at?

A.    I'm not aware of any other phone that was involved in this

investigation.

Q.    Was it your responsibility as well to determine whether or

not the room should be searched?                                 04:10:47

A.    That's correct.

Q.    Okay.  So would you -- do you consider yourself the case

agent on this investigation once you arrived?

A.    No.  I was the supervisor of the investigation but, again,

part of that -- when I made a statement to say that I choose     04:11:01

the direction is that we have to call other units out.  Our sex

crime unit would come and take over the investigation because I

was supervising patrol at the time.

Q.    So it would have been your decision, though, to have

searched the room?                                               04:11:18

A.    It would be my decision to call sex crimes.  If they

decided to get a search warrant for the room, then that would

be the decision of the sex crimes sergeant.

Q.    And are you aware of any search of the room?

A.    No.                                                        04:11:29

United States District Court

75

JALYN BELLOWS - Cross

1    Q.    Was any search of the room done while you were there?          04:11:30

2    A.    No.

3    Q.    Did you -- in contacting XXXXXXXXX, did she ever say

4    anything to you about a gun?

5    A.    No.                                                           04:11:40

6    Q.    Is this the first time you've ever heard anything about

7    any gun?

8    A.    That's correct.

9    Q.    Okay.  So no mention in any of your involvement of any gun

10   ever?                                                               04:11:48

11   A.    No.

12   Q.    Okay.

13           If there had been a mention of a gun or if there had

14   been a gun found either in the room or on any of the people

15   involved, that is something you would recall?                       04:12:03

16   A.    That's correct.

17   Q.    Okay.  How about condoms?  Were condoms found on my

18   client, on Zuriela, on Amanda or on XXXXXXXXX?

19   A.    I didn't search any of the people involved.  I couldn't

20   answer that question.                                               04:12:19

21   Q.    Okay.  Do you recall anything about it?  You said you

22   don't recall anything about a gun.  Would condoms be something

23   that you would recall?

24   A.    Probably not.  They are fairly common but, again, if I

25   would have searched any of the people involved, I would            04:12:35

United States District Court

JALYN BELLOWS - Cross

1   probably recall what they had in their pockets.  But, again, I        04:12:37
2   didn't so I don't recall those.
3   Q.   How about other phones?
4   A.   I don't recall any other phones.
5   Q.   Is that something that you would remember?        04:12:45
6   A.   Again, if I searched any of the other people, I probably
7   would recall if I took a phone out of their property or off of
8   their person.
9   Q.   How about if you saw any of the other officers do any of
10  that, if they had condoms or phones, is that something that you     04:12:57
11  would remember?
12  A.   I don't know that I would remember it unless you directed
13  me to one of their reports.  I can -- like I said, I could read
14  it but it's not common for me to -- if an officer searches
15  somebody, go through the property they have, especially            04:13:14
16  personal property, it would just go to the jail with them and
17  be put in their personal property.
18  Q.   And if it wasn't, would you assume that there was never a
19  gun or condom or other cell phones?
20  A.   If they didn't find any, I would assume there weren't any.     04:13:31
21  Q.   Did you run any fingerprints on that phone?
22  A.   No, I did not.  Again, the investigation was turned over
23  to the sex crimes unit and as far as any follow-up would have
24  been done, they would have done that.
25  Q.   Did you wear any gloves when you handled the phone?           04:13:59

United States District Court

JALYN BELLOWS - Cross

1    A.    No.                                                        04:14:02

2    Q.    Did you see any of the other officers wear gloves handling

3    the phone?

4    A.    No.

5    Q.    In fact, none of the other people that you talked to that   04:14:20

6    night said there was anything wrong.   Isn't that true?

7    A.    That's not correct.

8    Q.    Amanda said there was no problem, didn't she?

9    A.    Yes, she did say there was no problem.

10   Q.    Zuriela said there was no problem, didn't she?            04:14:33

11   A.    Originally and then she changed her story.

12   Q.    How many times did she change her story?

13   A.    Just once.

14   Q.    In fact, Zuriela just told you she was on a trip with her

15   friends, didn't she?                                            04:15:07

16   A.    That was her original story.

17   Q.    In fact, XXXXXXXXX told you that my client had forced her

18   to put items -- to prostitute herself on Craigslist; correct?

19   A.    That's correct.

20   Q.    So you never got to ask her how it is that these          04:15:33

21   photographs got on her own personal cell phone other than the

22   one that is marked as Exhibit 1?

23   A.    No, I did not.

24   Q.    In fact, Ms. XXXXXXX produced the keys to that car, didn't

25   she?                                                            04:15:55

JALYN BELLOWS - Cross

1   A.   She had the keys with her.  She was told by the defendant          04:15:56

2   to get the computer that was in the vehicle --

3   Q.   I didn't ask you that.  Did she give you the keys?

4   A.   Yes.

5   Q.   She had the keys to the car with her; correct?                     04:16:05

6   A.   That's correct.

7   Q.   In fact, she had been out in the car when the police

8   arrived; is that true?

9   A.   No, that's not true.

10  Q.   She was out in the car with the laptop, cell phones, and           04:16:16

11  keys to the car; correct?

12  A.   That's not correct.

13  Q.   So if she says that, that would be untrue?

14  A.   She was outside when I arrived.  The information that I

15  got is that she came from in the shadows where the bushes --           04:16:32

16  where she was hiding.  She did have the keys in her possession

17  but I did not hear her tell me that she was in the vehicle at

18  any time.

19       MR. LOGAN:  Your Honor, objection.  Relevance.

20  Request sidebar, please.                                                04:16:46

21            (At sidebar.)

22       MR. LOGAN:  Your Honor, more than one time Miss Hull

23  has gone into information about an additional cell phone.

24  There is no other cell phone that was seized in this case.  The

25  first time she did it we believed it was a mistake.  She just           04:17:11

United States District Court

JALYN BELLOWS - Cross

1   did it again.  The jury should be cautioned that there is no                    04:17:14

2   other cellular phone.  She's basically misstating what the

3   evidence is in the case.  There's no record of this.  She may

4   have had a cellular phone in her name, but there was no

5   cellular phone that was actually seized, a second phone.                        04:17:28

6          MS. HULL:  Judge, apparently they haven't read all of

7   the interviews of their witnesses because the witnesses will

8   testify -- or at least told at least some of the officers and

9   FBI -- that each and every one of these people had their own

10  cell phone.  And, in fact, XXXXXXXXX wrote a written statement                  04:17:45

11  to the Mesa Police Department where she said that in addition

12  to this phone, she had on her own personal cell phone copies --

13  nude pictures of her and other girls and it's right in her

14  written statement that they gave to me.

15         THE COURT:  All right.  Overruled.                                       04:18:03

16         (End sidebar.)

17  BY MS. HULL:

18  Q.   So XXXXXXXXX had the keys to the car and she was down on

19  the ground, on the ground floor.  She was out in the parking

20  lot; correct?                                                                   04:18:25

21  A.   That's correct.

22  Q.   And this room 231 was on the second floor?

23  A.   That's correct.

24  Q.   What was the distance from where she was with these car

25  keys to where room 231 is?  What's the distance?                               04:18:31

United States District Court

80

JALYN BELLOWS - Cross

 1  A.   Probably 125 yards, 100 yards.                          04:18:38

 2  Q.   And since this was -- did you respond -- what time did you

 3  respond to the scene?

 4  A.   Probably about 0040 hours, about 10 minutes after the

 5  original officers arrived.                                   04:18:53

 6  Q.   So was Officer Vela already there when you arrived?

 7  A.   That's correct.

 8  Q.   So were you aware that the call came out about 12:20?

 9  A.   That's correct.

10  Q.   Okay.  And you knew about that.  Did you hear the call?   04:19:02

11  A.   No, I did not.

12  Q.   Okay.  Where did you get your information on the call?

13  A.   From Officer Shock once I got on scene.

14  Q.   Okay.  And what was Officer Shock's duty there?

15  A.   She's a field training officer and she had an officer in   04:19:20

16  training, Officer Burnside, and she was assisting Officer Vela

17  with the call.

18  Q.   Okay.  And have you had an opportunity to listen to the

19  call that came in?

20  A.   No, I have not.                                           04:19:34

21  Q.   Have you had an opportunity or taken an opportunity to

22  read the CAD report on the calls?

23  A.   No, I have not.

24  Q.   What is a CAD report?

25  A.   The CAD report is what dispatch actually -- the notes they   04:19:42

United States District Court

JALYN BELLOWS - Cross

1  take on the 911 call and then as the investigation continues,       04:19:46
2  when an officer goes on scene, leaves and that kind of stuff,
3  just basically keeping track of the officers and their
4  locations.
5  Q.   All right.  And when you saw XXXXXXXXX, she wasn't          04:19:59
6  bleeding or anything, was she?
7  A.   She wasn't bleeding.
8  Q.   And when you saw my client, you didn't see any blood or
9  marks on his hands, did you?
10 A.   No.                                                         04:20:09
11 Q.   And nothing on Amanda?
12 A.   No.
13 Q.   And you talked about this photograph.  Did you take the
14 photograph of Zuriela?
15 A.   No, I did not.                                              04:20:17
16 Q.   Do you recall this mark on her nose?
17 A.   That's correct.
18 Q.   Okay.
19        And so when XXXXXXXXX showed you the keys to the car,
20 she actually pointed out which car they belonged to; correct?   04:20:46
21 A.   That's correct.
22 Q.   And it was a distance away from where you were standing?
23 A.   It was parked in the front there but, yes, it was a few
24 feet away, maybe 15, 20 feet away.
25 Q.   So were you standing between the car and room 231?          04:20:59

United States District Court

JALYN BELLOWS - Cross

1   A.   To get to room 231 you kind of have to go through the            04:21:04
2   lobby and down the stairs and down the hallway toward the back
3   of the property.
4   Q.   Okay.  So would you say -- how long do you think it would
5   take to walk from that car to room 231?                              04:21:14
6   A.   45 seconds, a minute.
7   Q.   And you didn't see anybody else outside the room.   In
8   fact, you said that you saw my client inside the room; correct?
9   A.   That's correct.
10  Q.   Okay.  And Zuriela was inside the room?                          04:21:32
11  A.   That's correct.
12  Q.   Okay.  And you didn't hear Zuriela or Amanda or my client
13  make any threats to XXXXXXXXX?
14  A.   No.
15  Q.   Did you ask her why -- she had the keys, why she didn't          04:21:50
16  just leave?
17  A.   No, I didn't.
18  Q.   Why not?
19  A.   She seemed scared and upset and I wasn't going to ask
20  her -- when someone is victimized, we don't want to try to make      04:22:03
21  it worse to ask them, "Why didn't you empower yourself and do
22  this in the situation?"  She did what she was supposed to.  She
23  called 911 and that's what we did came and offered her help.
24  Q.   Actually, she didn't call 911, did she?
25  A.   She called her mother.                                          04:22:23

United States District Court

JALYN BELLOWS - Cross

1   Q.   And her mom didn't call 911 either, did she?                04:22:24

2   A.   That was the information that I received, is that the call

3   came from Oregon.

4   Q.   Let's talk about the information you received.  You said

5   on direct examination something about a kidnap.  Do you         04:22:31

6   remember that?

7   A.   That's correct.

8   Q.   Where did you get that?

9   A.   Officer Shock notified me when I originally was briefed

10  that XXXXXXXXX had told her that she was being held against her  04:22:41

11  will.

12  Q.   So the word "kidnap" was never mentioned, was it?

13  A.   Held against her will, kidnap are synonymous when we are

14  talking about that kind of stuff.  It would be the same thing.

15  Q.   Did you ask her why she didn't call 911?                    04:22:56

16  A.   I didn't.

17  Q.   Did you ask her why she didn't since she had a cell phone

18  and was out in the car 130 some yards away and had the keys to

19  the car and no one else was around, why she didn't either call

20  911 or take off?                                                 04:23:09

21  A.   Again, when I -- when you are dealing with these

22  situations and you have a young girl who is scared and upset,

23  I'm not going to ask her a whole bunch of questions on why --

24  on what she didn't do when we are there to help her.

25  Q.   And, in fact, when you did talk to her, you said she was    04:23:23

United States District Court

JALYN BELLOWS - Cross

1   already out of the car?                                        04:23:29

2   A.   When I arrived on scene, she was sitting in the back seat

3   of Officer Shock's car.

4   Q.   Was it your understanding that she wasn't in the car when

5   officers arrived?                                              04:23:41

6   A.   That's my understanding.

7   Q.   Okay.  Did you see anything about that car, since she had

8   the keys in her hand, that would have prevented her from

9   getting in that car?

10  A.   No.                                                       04:23:52

11  Q.   Did you see anything -- when you had that cell phone in

12  your possession, did you see anything about that cell phone

13  that would have prevented her from calling for help?

14  A.   No.

15  Q.   In fact, wasn't it your impression from talking to Zuriela  04:24:32

16  that she had no idea that XXXXXXXXX was under 18?

17  A.   That's correct.

18  Q.   And you're the one who specifically asked her for -- to

19  search the car and the computer?

20  A.   That's correct.                                           04:24:53

21  Q.   And she told you get a warrant?

22  A.   That's correct.  She asked me in the phrase of a question.

23  Do I need to have a warrant to search the cell phone -- I mean,

24  to search the computer and the vehicle.

25  Q.   What did you tell her?                                    04:25:04

United States District Court

JALYN BELLOWS - Cross

1   A.   I told her I didn't have to have a warrant if she gave me          04:25:05

2   consent.   If she owned the vehicle and owned the computer, that

3   she could consent to a search of it.

4   Q.   And she refused?

5   A.   That's correct.                                                     04:25:14

6   Q.   Did you also determine that the hotel room they were in

7   was in Zuriela's name?

8   A.   That's correct.

9   Q.   XXXXXXXXX, in fact, told you that she had prostituted just

10  the night before; correct?                                              04:26:01

11  A.   She told me she was forced to have sex with a subject in

12  California.

13  Q.   Okay.   She told you she had been forced to have sex with

14  another man in Inglewood?

15  A.   That's correct.                                                     04:26:33

16  Q.   And if that's not in your report, where is that coming

17  from?   Memory?

18  A.   It's in my report.

19  Q.   What did she tell you about the sex she had had the night

20  before?                                                                 04:26:44

21  A.   She said that it was in Inglewood, California, is the best

22  she could remember and that that was one of the times that he

23  forced her to have sex.   He stated that basically --

24  Q.   Who is he?

25  A.   Your defendant.   He would basically tell them take the            04:26:57

United States District Court

JALYN BELLOWS - Cross

1   phone calls from the Craigslist and then once somebody would          04:27:01
2   call --
3   Q.   Let me stop you here.  I'm not talking about my client.
4   I'm talking about another incidence.  She had been with another
5   man the night before, turned a trick.  Do you remember her          04:27:18
6   talking about that?
7   A.   Are you talking about XXXXXXXXX?
8   Q.   Franchesca.
9   A.   Yes.
10  Q.   In fact, with two men?                                          04:27:25
11  A.   She didn't say two men.  She said she was forced to turn a
12  trick in Inglewood California the night prior.
13  Q.   Did she tell you who it was with?
14  A.   She didn't.
15  Q.   Did you ask her?                                                04:27:35
16  A.   No.
17  Q.   Why?
18  A.   Because at that point I knew that we were going to have to
19  get somebody else involved in this because it involved things
20  that were outside of Arizona.                                       04:27:44
21  Q.   And she also had sex with my client?
22  A.   That's what she said.
23  Q.   Consensual?
24  A.   Yes.
25  Q.   In fact, Amanda not only said nothing was going on, she        04:28:30

United States District Court

JALYN BELLOWS - Cross

1   indicated she had never been involved in any type of          04:28:33
2   prostitution; correct?
3   A.    Correct.
4   Q.    Okay.  And so did Zuriela; correct?
5   A.    Originally.                                              04:28:42
6   Q.    How long did you talk to Zuriela?
7   A.    Probably five minutes.
8   Q.    Do you remember what time she told you you would have to
9   get a warrant for the car and for the laptop?
10  A.    I don't remember the exact time.  It was probably 15, 20   04:29:24
11  minutes after I arrived.  I arrived at about 0050 hours or
12  12:50 in the morning.
13  Q.    So from 12:50 until --
14  A.    Maybe just after one.
15  Q.    Okay.  And 1:15, 1:10?                                   04:29:46
16  A.    1:10 is fine.
17  Q.    So at 1:10 she told you to get a search warrant for the
18  car and the laptop?
19  A.    That's correct.
20  Q.    And what did you do with the car and the laptop at that    04:29:56
21  point?
22  A.    I didn't do anything with it.  When I was relieved of my
23  responsibilities, as far as I know, the vehicle was still
24  there.
25  Q.    Okay.  Is it practice to -- when something is a piece of    04:30:08

United States District Court

JALYN BELLOWS - Cross

1  evidence such that you want to search it, was it your intent to          04:30:14

2  get a search warrant?

3  A.   It was my intent to find out what the sex crimes sergeant,

4  how they wanted to proceed with it and let them handle that.

5  Q.   And who was the sex crimes sergeant?                                04:30:27

6  A.   Tom Shields.

7  Q.   Do you know what time he arrived?

8  A.   I don't.

9  Q.   Isn't it true, Sergeant, that you were aware that the call

10 came in as a runaway, not a kidnap?                                      04:30:43

11 A.   That wasn't the information that I received.

12 Q.   You would agree that runaway and kidnap are two different

13 things?

14 A.   That's correct.

15 Q.   Runaway is voluntary, would you agree, as opposed to               04:30:52

16 kidnapping?

17 A.   Not always.

18 Q.   If she ran away from home, would that be voluntary?

19 A.   I guess what I make reference to is if I was a parent and

20 my child wasn't home, then it's the parent usually that calls           04:31:09

21 in and reports the child as missing.  What actually is going on

22 with the child, it could be something different.  They would be

23 listed in the computer as a runaway or a missing child.  I know

24 that when we have children that are gone from home, if they

25 habitually -- if they have run away in the past, that that               04:31:26

United States District Court

JALYN BELLOWS - Cross

1   might be commented on there.  But, again, in Arizona we list                04:31:29
2   them as missing children.  I can't speak for how Oregon enters
3   a child in when they are not accounted for.
4   Q.   But you are aware that it wasn't XXXXXXXXX who contacted
5   the police?  You're aware of that?                                          04:31:42
6   A.   That's correct.
7   Q.   Okay.
8        You also said in your experience you have worked with
9   gang-related cases; correct?
10  A.   That's correct.                                                        04:31:55
11  Q.   Any cases where prostitutes are also gang members?
12  A.   I have had contact with prostitutes who have gang
13  associates and gang ties.  I don't recall a specific case where
14  they were actually a documented gang member.
15  Q.   Never?                                                                 04:32:17
16  A.   No.
17  Q.   Okay.  Did XXXXXXXXX say anything to you about being a
18  gang member?
19            MR. LOGAN:  Objection, Your Honor.  Relevance.
20            THE COURT:  Sustained.                                            04:32:31
21  BY MS. HULL:
22  Q.   Mr. Logan asked you about a larger crime scene.  You may
23  not know what the other officers are doing.  Was this a large
24  crime scene?
25  A.   Yes.                                                                   04:32:41

United States District Court

JALYN BELLOWS - Cross

1   Q.   How do you characterize a large crime scene?          04:32:42

2   A.   Well, again, it spanned from the parking lot, encompassed

3   most of the property.  Room 231 is near the back of the

4   property and we were in the parking lot near Main Street.

5   Q.   Which is a distance of how much again?                04:32:57

6   A.   Maybe 125, 115 yards.

7   Q.   Okay.  What would you characterize as a small crime scene?

8   A.   Inside a vehicle, just on a person, something that is --

9   or where I'm standing in one place I can view the entire area.

10  Q.   And isn't it true that if there is a large crime scene and  04:33:17

11  there's a lot of officers involved that there is either a case

12  agent or someone who is in charge?

13  A.   That's correct.

14  Q.   And who is it on this scene?

15  A.   Once I arrived, I was in charge.                      04:33:28

16  Q.   Okay.  And so it's the job of the other officers to report

17  to you?

18  A.   Yes.

19  Q.   And so you would have been in charge of determining that

20  those -- the vehicle and laptop be impounded and taken away?  04:33:40

21  A.   If we had decided to impound them while I was on scene,

22  then, yes, that would have been my direction.  However, again,

23  when we turned it over to the sex crimes detectives, that

24  becomes his responsibility at that point so I was no longer

25  involved in that.                                          04:34:01

United States District Court

JALYN BELLOWS - Cross

1   Q.    Your testimony is when you arrived at 12:50 you took over          04:34:02

2   from Officer Vela?

3   A.    Yes.   I didn't take it over but I supervise Officer Vela

4   but it's under my direction.   Once I get on scene, if Officer

5   Vela is not going the direction I would want him to, then I          04:34:14

6   would have a huddle and we would go in a different direction.

7   Q.    Okay.   So, in other words, it's your responsibility to see

8   to it that that vehicle maintained integrity as a piece of

9   evidence?

10  A.    That's correct.          04:34:27

11  Q.    Who did you give that responsibility to?

12  A.    We were in eyeshot of it from where we were sitting with

13  XXXXXXXXX, so Officer Shock and his OIT kept an eye on the

14  vehicle and nobody came near the vehicle while we were there.

15  Q.    And the laptop was in the vehicle?          04:34:42

16  A.    That's correct.

17  Q.    So when you were there, nobody accessed that vehicle or

18  the laptop?

19  A.    That's correct.

20  Q.    From 10:10 on?          04:34:52

21  A.    That's correct.

22  Q.    How long were you there?

23  A.    A few hours.   I would have to check the CAD to tell you

24  exactly when I left.   We were there a couple of hours.

25  Q.    Were you there when the vehicle was towed?          04:35:00

United States District Court

JALYN BELLOWS - Cross

1    A.    No, I was not.                                                    04:35:04

2    Q.    Do you know when that occurred?

3    A.    I don't.

4    Q.    Would it be safe to say that you were there past 3

5    o'clock?                                                               04:35:09

6    A.    I would again have to check the CAD to find out exactly

7    when I left.

8              THE COURT:  How much more time do you need?

9              MS. HULL:  15 minutes maybe.

10             THE COURT:  All right.  Ladies and gentlemen, we're          04:35:25

11   going to take a break and we'll see you tomorrow and we will be

12   starting at 9 o'clock sharp so please come here a little

13   earlier.  If you arrive at nine, you're late.

14             Please do not discuss the case and we'll see you

15   tomorrow and have a nice evening.                                      04:35:43

16             And you may step down.

17             (Jury departs.)

18             (Witness excused.)

19             THE COURT:  Counsel, we'll see you here at 8:30

20   tomorrow.  We are in recess.                                           04:36:27

21             COURTROOM DEPUTY:  All rise.

22             (Whereupon, these proceedings recessed at 4:36 p.m.)

23                         * * * * *

24

25


                    United States District Court

JALYN BELLOWS - Cross

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 18th day of May, 2008.

s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP

I certify that the foregoing is a true and correct copy of the transcript originally filed with the Clerk of the Court on May 29, 2008, and incorporating redactions of personal identifiers in accordance with Judicial Conference policy. Redacted characters appear as blanks or a black box in the transcript.

s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP

United States District Court