CR-07-00871-PHX-ROS, May 14, 2008 (EXCEPT)

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3

**UNITED STATES OF AMERICA**,            )
4                                    )
                          Plaintiff,  )
5     vs.                              )
                                       )   CR 07-00871-ROS
6     **HANOI BARBARO ACOSTA**,          )
                                       )
7                          Defendant.  )
                                       )   May 14, 2008
8     _____ )   9:04 a.m.

9

10        BEFORE:   THE HONORABLE ROSLYN O. SILVER, JUDGE

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                 (Minor's name redacted)

13          **JURY TRIAL - Day 2 (Bellows excerpt)**

14               A P P E A R A N C E S

15    For the Government:
              TRACEY A. BARDORF, ESQ.
16            STEVEN PAUL LOGAN, ESQ.
              U.S. Attorney's Office
17            40 North Central Avenue, Suite 1200
              Phoenix, AZ  85004-4408
18            602.514.7500
      For the Defendant:
19            BARBARA LYNN HULL, ESQ.
              Law Office of Barbara L. Hull
20            637 North 3rd Avenue, Suite 3
              Phoenix, AZ  85003
21            480.834.0002/(fax) 480.834.0003
      Official Court Reporter:
22    Elaine Cropper, RDR, CRR, CCP
      Sandra Day O'Connor U.S. Courthouse, Suite 312
23    401 West Washington Street, Spc. 35
      Phoenix, Arizona  85003-2151
24    (602) 322-7249
      Proceedings Reported by Stenographic Court Reporter
25    Transcript Prepared by Computer-Aided Transcription

                 United States District Court

CR-07-00871-PHX-ROS, May 14, 2008 (EXCEPT)

1                        <u>**I N D E X**</u>

2                       **EXAMINATION**

3                                              **Page   Line**

    JALYN BELLOWS

4

    JALYN BELLOWS - Cross (Continued)

5   BY MS. HULL                                  3     21

6   JALYN BELLOWS - Redirect
    BY MR. LOGAN                                 34     2

7

    JALYN BELLOWS - Recross

8   BY MS. HULL                                  40     19

9

10                     <u>**E X H I B I T S**</u>

11

12  Number                                    Ident    Rec'd

13  139  Photograph                             5       6

14  140  Photograph                             5       6

15

16  120  Receipt from Royal Mesa Inn; Farmers    23
         insurance card; Oregon driver's license
         for Zuriela Payes

17

18

19

20

21

22

23

24

25

                  United States District Court

CR-07-00871-PHX-ROS, May 14, 2008 (EXCEPT)

<u>**P R O C E E D I N G S**</u>

1

2          (Jury enters.)

3          (Court was called to order by the courtroom deputy.)

4          THE COURT:  Please be seated.

5          Good morning, ladies and gentlemen -- lady and          09:06:10

6  gentlemen.

7          Are you ready to proceed?

8          MR. LOGAN:  Yes, Your Honor.

9          MS. HULL:  Good morning, Your Honor.  We're ready

10  also.          09:06:23

11          THE COURT:  Good morning.  Okay.  Let's proceed.

12          MR. LOGAN:  Your Honor, the United States calls

13  Sergeant Bellows back to the stand for continued

14  cross-examination.

15          THE COURT:  Thank you.          09:06:34

16                          JALYN BELLOWS

17  called as a Witness herein by the Government, having been

18  previously duly sworn and/or affirmed by the Courtroom Deputy,

19  further testified as follows:

20                 **CROSS EXAMINATION** (Continued)          09:06:36

21  BY MS. HULL:

22  Q.   Good morning, sir.

23  A.   Good morning.

24  Q.   After you left the stand yesterday, did you talk to anyone

25  from the prosecutor team since that time?          09:07:34

United States District Court

JALYN BELLOWS - Cross (Continued)

1    A.   No.                                                                09:07:37

2    Q.   Did you talk to Agent Bergey since that time?

3    A.   Yes.

4    Q.   Okay.  And when did you talk to her?

5    A.   A minute ago, a few minutes ago.                                   09:07:48

6    Q.   What did you discuss?

7    A.   That I needed to come in and testify.

8    Q.   Before that what did you discuss?

9    A.   She said hi this morning.  We haven't discussed the case

10   at all.                                                                 09:08:02

11   Q.   Okay.  So you didn't discuss anything about your testimony

12   or anticipated questions --

13   A.   No.

14   Q.   -- with her or either of the prosecutors or anyone there

15   at the U.S. Attorney's Office?                                          09:08:11

16   A.   The only thing that we talked about was that I would

17   probably be asked questions in reference to one of the

18   witnesses or victims.

19   Q.   Okay.  And what was that?  Give us specifics, please.

20   A.   That was all that was said.                                        09:08:28

21   Q.   What did they tell you to anticipate?

22   A.   That I would be asked questions about Zuriela.

23   Q.   Okay.  And did you review your reports again or any

24   reports again since testifying yesterday?

25   A.   Yes.                                                               09:08:43

United States District Court

JALYN BELLOWS - Cross (Continued)

1  Q.   What reports did you review?                                      09:08:44

2  A.   My supplement to the case.

3  Q.   When did you review that?

4  A.   This morning.

5  Q.   Now that you've had an opportunity to review that report,        09:09:02

6  any additions or corrections you would like to make to it?

7  A.   No.

8  Q.   Have you had an opportunity to review the CAD report?

9  A.   No.

10 Q.   Sergeant, isn't it true at one point you took my client on        09:09:26

11 a cigarette break?

12 A.   No.

13 Q.   Do you recall taking his Boost mobile cell phone from him?

14 A.   No.

15 Q.   Do you remember taking his wallet from him?                       09:09:38

16 A.   No.

17        MS. HULL:  I would ask that Exhibits 139 and 140 be

18 shown to the witness, please.

19        MR. LOGAN:  Your Honor, the U.S. would like to look

20 at the exhibits, first.                                                09:10:03

21 BY MS. HULL:

22 Q.   Have you had an opportunity to review them?

23 A.   Yes.

24 Q.   Can you tell us what they are?

25 A.   It's an aerial photograph of 951 West Main.                       09:10:48

United States District Court

JALYN BELLOWS - Cross (Continued)

1  Q.   Which is the hotel that we're talking about in this case?   09:10:52

2  A.   That's correct.

3  Q.   And does it appear to you to be accurate or particularly

4  in proportion and size as to what you recall it being?

5  A.   That's correct.   09:11:08

6        MS. HULL:  If I post this on here, he can touch his

7  screen for the jury or does he need it there?

8        COURTROOM DEPUTY:  No, he can't.

9        MS. HULL:  All right.  The defense moves for

10  admission of 139 and 140.   09:11:29

11        MR. LOGAN:  No objection, Your Honor.

12        THE COURT:  They are admitted.

13        (Exhibit Number 139 was admitted into evidence.)

14        (Exhibit Number 140 was admitted into evidence.)

15        MS. HULL:  May I have the exhibits, please.   09:11:37

16  BY MS. HULL:

17  Q.   I am showing here what has been admitted as Exhibit 139,

18  sir.  On your screen, can you mark where you first or you spoke

19  to XXXXXXXXX?

20        THE COURT:  And you can just touch the screen and it   09:12:16

21  will show.

22        THE WITNESS:  There was a patrol car that was parked

23  right in this area a little bit farther to the west, right

24  there (Indicating).

25        THE COURT:  You can place your finger across there.   09:12:36

United States District Court

JALYN BELLOWS - Cross (Continued)

1    THE WITNESS:  Like right in that area.                    09:12:41

2   BY MS. HULL:

3   Q.   Towards the top of the screen, which direction is that?

4   A.   The top of the screen is going to be to the north.  To the

5   right would be east and to the left would be west straight to   09:12:52

6   the bottom, to the south.

7   Q.   So the parking lot where Ms. XXXXXXX was talking to law

8   enforcement is where you have the red highlighted on the north

9   parking lot?

10  A.   That's correct.                                         09:13:05

11  Q.   Can you point to room 231 on that drawing?

12  A.   We had to come through the office and then go up a flight

13  of stairs and down the hallway.  It was in this area about the

14  end of where I drew that line.

15  Q.   So about half the distance of the length of the hotel; is   09:13:23

16  that --

17  A.   There's a long hallway that runs to the south.  I remember

18  we went down that hallway and then his room was just an

19  east-west hallway.  It was just the corner room.

20  Q.   And that distance you said was one hundred and some yards    09:13:39

21  you thought?

22  A.   In my mind I estimated that I walked about 100 yards, yes,

23  again, up a flight of stairs and down a hallway.

24  Q.   Okay.  And looking at that aerial photograph, does that

25  change your position on the distance at all?                    09:13:55

United States District Court

8

JALYN BELLOWS - Cross (Continued)

1  A.   It might be a little bit better than 100 but, no.  It's    09:14:01

2  about what I remembered.

3  Q.   Okay.

4         Do you remember -- here I'm showing what has been

5  marked No. 140 -- I'm sorry.  You need to -- can you touch your    09:14:26

6  screen and blank out the red?

7         THE COURT:  At the bottom right just press.

8  BY MS. HULL:

9  Q.   This is 140 now, sir.  And is this just a closer aerial

10  view of the last photograph?    09:14:49

11  A.   That's correct.

12  Q.   Okay.  And, once again, can you put a mark where XXXXXXXXX

13  was in the parking lot and where room 231 is on this

14  photograph?

15  A.   (Witness complies).    09:15:13

16  Q.   And where is the flight of stairs?

17  A.   Up here near the office, like right in this area

18  (indicating).

19  Q.   Okay.  So the room was on the second floor; correct?

20  A.   That's correct.    09:15:24

21  Q.   Can you mark your path that you had to travel to go to

22  that room on this photograph?

23  A.   We walked in the office and then up the flight of stairs,

24  down the hallway.

25  Q.   Okay.  Thank you.    09:15:37

United States District Court

JALYN BELLOWS - Cross (Continued)

1    MS. HULL:  I would ask the witness be shown

2  Exhibit 105.

3    COURTROOM DEPUTY:  Sir, that should be in front of

4  you right on top.

5  BY MS. HULL:

6  Q.    Thank you, sir.  Can you tell us what that exhibit is?

7  A.    In the folder there's a CD and I don't know what is on the

8  CD but it's marked as this incident so it's probably the radio

9  traffic of the incident and then this is just the CAD printout

10  that our dispatch enters information on to keep track of where

11  the officers are and what's going on with the case.

12  Q.    Okay.  And that's because of the radio traffic going into

13  dispatch and they keep track of times as part of their duties;

14  correct?

15  A.    That's correct.

16  Q.    And that's reflected in that report?

17  A.    That's correct.

18  Q.    And on review of that do you recall your time or does it

19  change your testimony as the time that you arrived at the

20  scene?

21  A.    No.

22  Q.    What time did you arrive at the scene?

23  A.    Like I said, about 10 minutes after the original officers

24  were on scene so I would have said it was about 0050 hours,

25  0045 or '50 hours.  12:45 or 12:50.

United States District Court

09:16:26

09:18:44

09:18:56

09:19:08

09:19:22

JALYN BELLOWS - Cross (Continued)

1   Q.   And the CAD confirms that; correct?                              09:19:27

2   A.   The first place I see my designator on here it says 1:13.

3   But, again, I received a phone call from one of the officers

4   that asked me to respond to the scene, so dispatch would have

5   probably not known I was there until I spoke on the radio.          09:19:41

6   When she heard me speak on the radio, she probably noted that I

7   was on seen so that would be reflective of that 1:13; but I was

8   probably there a few minutes earlier than that.

9   Q.   Because you said yesterday that you had talked to Zuriela

10  about her laptop and her car about that time, right, about 10       09:19:59

11  or so after 1 o'clock?

12  A.   I was on scene, like I said, probably about 10 minutes,

13  then I went up and spoke to Zuriela.  So, yeah, that would have

14  been about that time.

15  Q.   And what is a 601 code?                                         09:20:22

16  A.   A 601 is a designator for a missing juvenile.

17  Q.   And did you run -- as part of your investigation, did you

18  run any sort of reports, run any of these individuals on a

19  computer to see if there were any warrants?

20  A.   I didn't myself but I'm sure that the officers on scene        09:20:50

21  did.

22  Q.   Did they report back to you as to whether or not there

23  were any warrants?

24  A.   Yes.

25  Q.   Was there a warrant out on XXXXXXXXX?                           09:20:57

United States District Court

JALYN BELLOWS - Cross (Continued)

1    A.    There wasn't a warrant but she was listed in the NCIC     09:21:00

2    computer as a missing juvenile.

3    Q.    Okay.  Did you take any written statements from XXXXXXXXX?

4    A.    No.

5    Q.    Have you seen written statements that XXXXXXXXX prepared?     09:21:36

6    A.    No.

7    Q.    Did you direct her or any other officers on your behalf to

8    prepare a written statement?

9    A.    No.

10   Q.    Did she show you her cell phone?     09:21:48

11   A.    The only cell phone that I saw that evening was the one

12   that she gave Officer Shock and Officer Shock gave to it me.

13   Q.    Okay.  But she said that wasn't her phone, didn't she?

14   A.    That's correct.

15   Q.    So she didn't show you any other phones with any other     09:22:03

16   sort of photographs or nude photographs of women or anything

17   like that?

18   A.    No.

19   Q.    If she would have done that, she would have done that to

20   some other officer?     09:22:19

21   A.    I can't answer that.  I don't know.

22   Q.    It wasn't you, though?

23   A.    It was not me.

24   Q.    Did you at any time after you looked at the cell phone in

25   question, did you direct that anyone else get a search warrant     09:22:37

United States District Court

JALYN BELLOWS - Cross (Continued)

1   to look at that phone?

2   A.   No.

3   Q.   Did you see a subsequent search warrant for that phone?

4   A.   No.

5   Q.   So if a subsequent search warrant was obtained for that

6   phone, that was neither at your direction nor have you seen it?

7   A.   That's correct.

8   Q.   And you said it was Detective Shields I believe that took

9   over.

10  A.   When I arrived that morning at the substation, Tom Shields

11  was at the interview or on the third floor.  The sex crimes

12  sergeant that I contacted by phone that night was Sergeant

13  Glenn Shock; but, again, once we got to the station, Tom

14  Shields was the one that I spoke to there and that gave me

15  direction and took over the case from me.

16  Q.   When you say that gave you direction, what do you mean by

17  that?

18  A.   He just let me know that they would take the investigation

19  from this point forward.

20  Q.   So you didn't interview XXXXXXXXX?

21  A.   No, I did not.

22  Q.   Did you turn over to him everything that you had collected

23  from the scene?

24  A.   I didn't collect anything from the scene.

25  Q.   Was it your responsibility to turn -- as part of turning

United States District Court

09:22:41

09:22:48

09:23:07

09:23:28

09:23:39

09:23:56

JALYN BELLOWS - Cross (Continued)

1   over the investigation to him, seeing to it that any evidence                09:24:00

2   collected at the scene fell under his jurisdiction or control

3   from then on?

4   A.   That's correct.

5   Q.   Okay.  And do you remember whether or not there was any                 09:24:10

6   fishnet outfit turned over to him?

7   A.   I don't recall.

8   Q.   Is that something that you would remember either seeing or

9   hearing about, a fishnet outfit?

10  A.   Yes.                                                                    09:24:24

11  Q.   How about a blonde wig?

12  A.   I had no -- there was never a blonde wig when I was there.

13  I don't have any recollection of a blonde wig.

14  Q.   Okay.  And in your expertise in prostitution cases, what

15  kind of evidence would you consider relevant for a prostitution             09:24:45

16  case such as, for example, cash.  Would you consider that

17  relevant?

18  A.   Yes.

19  Q.   Did you check to see if XXXXXXXXX had any cash on her?

20  A.   I did not.                                                             09:25:04

21  Q.   Okay.  Do you know if she had any cash on her?

22  A.   I do not.

23  Q.   And did you see anything or did you consider it relevant

24  to a prostitution investigation to determine if you had seen

25  photographs that the items of clothing in those photographs                 09:25:24

United States District Court

14

JALYN BELLOWS - Cross (Continued)

1    might be relevant to collect?                                    09:25:30

2    A.   I don't understand your question.

3    Q.   Okay.  Well, you said that you saw photographs in the cell

4    phone.

5    A.   That's correct.                                             09:25:44

6    Q.   And women in a series of dress or undress; correct?

7    A.   That's correct.

8    Q.   Did you look for the items of clothing that appeared in

9    those photographs?

10   A.   No, I did not.                                              09:25:54

11   Q.   Why is that?

12   A.   Because at that point in the investigation, I knew that it

13   was going to be turned over to sex crimes and that that would

14   be probably something that would happen farther on in the

15   investigation.  That would not be my responsibility.            09:26:09

16   Q.   You were in the room 231; correct?

17   A.   That's correct.

18   Q.   Did you see any indicia of prostitution in that room?

19   A.   When I was in the room I was asked -- Zuriela had invited

20   me in and I did not search the room or look through the room    09:26:21

21   for any of that stuff.  Again, while I was in the room I was

22   only speaking to Zuriela while she sat at a chair that she was

23   originally at when we knocked on the door.

24   Q.   Okay.  And while you were in that room, did you see

25   anything even remotely indicative that prostitution was going   09:26:36

United States District Court

JALYN BELLOWS - Cross (Continued)

1   on?

2   A.   There was a lot of stuff in the room.   Again, I did not

3   look through the room.

4   Q.   And you did not consider that part of your phase of the

5   investigation?

6   A.   That's correct.

7   Q.   If you had seen some indicia in the room when you were

8   there, some indicia of prostitution, would you recall it?

9   A.   Yes.

10  Q.   Okay.  So you didn't see anything?

11  A.   No.

12  Q.   How about identification from XXXXXXXXX, did you get any

13  of that?

14  A.   I did not but I don't know if she gave Officer Shock

15  identification or not.

16  Q.   Did you see yourself any identification?  Did she provide

17  you or show you any identification?

18  A.   No.

19  Q.   So -- did you ever determine through identification her

20  true identity?

21  A.   No, not me personally.

22  Q.   Okay.  Did she ever tell you what her name was?

23  A.   Yes.

24  Q.   What name did she use that day?

25  A.   XXXXXXXXX.

United States District Court

JALYN BELLOWS - Cross (Continued)

1   Q.   XXXXXXXXX what?                                    09:27:43

2   A.   XXXXXXX.

3   Q.   Didn't she tell you how old she was?

4   A.   Yes.

5   Q.   And you did not confirm that by identification?    09:27:56

6   A.   No, I did not personally.

7   Q.   Did you see anyone else do that?

8   A.   No.

9   Q.   Did you see anyone else collect an ID, photo ID, anything

10  of identification from XXXXXXXXX XXXXXXX?                09:28:08

11  A.   Me personally, I did not.

12  Q.   That would have been something -- since you took over from

13  Officer Vela, that would have been something that you would

14  have known about; correct?

15  A.   Again, when I arrive on scene, I'm there to supervise, not  09:28:20

16  necessarily take over individual officers' responsibilities.

17  If Officer Vela did, in fact, receive identification from her,

18  that is what he would have done.  And, again, I would not have

19  taken that identification from him.  He would have documented

20  that in his individual report.                          09:28:39

21  Q.   And if he didn't prior to your coming onto the scene, then

22  if someone else did after that, that would have been something

23  they would have reported to you; correct?

24  A.   Not necessarily.  It would depend on when it happened in

25  the investigation.  If in fact they verified her identity after  09:28:55

United States District Court

JALYN BELLOWS - Cross (Continued)

1  sex crimes took over, that would be something they would have          09:29:00
2  documented in their report.

3       If it was something that one of the officers did,
4  which is standard for us, they would have documented it in
5  their report.                                                          09:29:10
6  Q.   Okay.  And if she had -- you've shown us other items of
7  identification that were taken -- that you would consider that
8  an item that is worthy of collecting if she had an
9  identification with her, wouldn't you?
10 A.   Correct.                                                          09:29:28
11 Q.   Okay.  And certainly if she told officers that she had a
12 fake ID, that is certainly something that would be collected;
13 correct?
14 A.   Correct.
15 Q.   Okay.  Have you seen a fake ID from this girl?                    09:29:39
16 A.   No.
17 Q.   And in your review of reports have you seen any indicia of
18 a fake ID from this girl?
19 A.   No.
20 Q.   So if she had a fake ID with her on July 3, nobody found         09:29:57
21 it.  Is that a safe statement?
22 A.   I can't answer for what the other officers or detectives
23 did in the investigation.  I did not have an interaction with a
24 fake ID from XXXXXXXXX XXXXXXX.
25 Q.   What time did you meet with Detective Shields?                    09:30:19

JALYN BELLOWS - Cross (Continued)

1   A.   It was early in the morning, probably 5:30, 6 in the                09:30:22
2   morning.
3   Q.   Up until that point, you had no indication there was a
4   fake ID involved?
5   A.   No.                                                                 09:30:29
6   Q.   Okay.
7           Do you remember collecting any wallet or purse from
8   XXXXXXXXX?
9   A.   No.
10  Q.   Do you remember seeing her with either of these items?            09:30:48
11  A.   No.
12  Q.   Did you search my client?
13  A.   No.
14  Q.   When you looked at this cell phone that XXXXXXXXX gave
15  you, how did you access the cell phone to look at the pictures?        09:31:14
16  What did you do exactly?
17  A.   The -- again, when I was handed the phone, it was from
18  Officer Shock and the photos were already there and then it has
19  like a little round toggle switches with arrows that you can
20  toggle through the pictures.  But it was already -- as far as          09:31:32
21  accessing the digital media, it was already on the screen when
22  I was given the phone.
23  Q.   By Officer Shock?
24  A.   You would have to ask her.
25  Q.   No.  No.  No.  She gave you the phone?                            09:31:46

United States District Court

JALYN BELLOWS - Cross (Continued)

1   A.   Yes.  I'm sorry.  She handed me the phone.                    09:31:48

2   Q.   Okay.  So sometime prior to her handing it to you it had

3   been accessed?

4   A.   That's correct.

5   Q.   But you don't know who accessed it?                          09:31:54

6   A.   I do not.

7   Q.   Okay.  Did you have to push any buttons or do any

8   scrolling of any nature to look through photographs?

9   A.   To proceed through the different photographs you had to

10  toggle the switch, the arrows, which would take you from         09:32:07

11  picture to picture.

12  Q.   And do you recall how many times you pushed the toggle

13  switch?

14  A.   I don't.

15  Q.   Can you estimate?                                            09:32:17

16  A.   20.

17  Q.   So did you look at about 20 pictures?

18  A.   Yes.

19  Q.   And were they all of women?

20  A.   Yes.                                                         09:32:28

21  Q.   Did you interview my client?

22  A.   No.

23  Q.   You testified about seeing XXXXXXXXX and you were shown

24  photographs of her.  Have you seen those photographs before

25  yesterday?                                                        09:33:25

United States District Court

JALYN BELLOWS - Cross (Continued)

1   A.   I saw them when I spoke to the prosecutor the day prior.          09:33:27

2   Q.   So before you took the stand yesterday you talked to the

3   prosecutor and you were shown some exhibits?

4   A.   Yes.

5   Q.   And one of them included or some of them included these          09:33:39

6   photographs?

7   A.   That's correct.

8   Q.   Okay.  And did you discuss what was seen on those

9   photographs?

10  A.   No.                                                              09:33:49

11  Q.   Did you tell them what you thought you saw on those

12  photographs?

13  A.   Yes.

14  Q.   Did you take those photographs?

15  A.   No.                                                              09:33:55

16  Q.   Did you contact the FBI to get involved in this case?

17  A.   No, I did not.

18  Q.   Do you know who did?

19  A.   I do not.

20  Q.   Did the FBI get involved at any time while you were             09:34:16

21  involved in the case prior to turning it over to Detective

22  Shields?

23  A.   No.

24  Q.   Did you have any involvement with any sort of consent to

25  search the room at the hotel?                                        09:34:40

United States District Court

JALYN BELLOWS - Cross (Continued)

1    A.    No.                                                        09:34:43

2    Q.    Or any consent to search anything else?

3    A.    The only issue with the consent to search originally that

4    when I was speaking with Zuriela, I had asked her if she would

5    consent to us looking through the computer in her vehicle and    09:34:56

6    her vehicle.  Again, when I asked her that, she phrased the

7    question in reply to me and asked me if I needed a search

8    warrant.

9            I told her that she could consent to that and she

10   said she would rather not have me look through her computer or   09:35:11

11   her vehicle.

12   Q.    And after that point you didn't see either Hanoi Acosta,

13   Zuriela, Amanda, or XXXXXXXXX access either the vehicle or the

14   laptop, did you?

15   A.    While I was there, nobody accessed the vehicle or the      09:35:27

16   laptop.

17   Q.    Okay.  Have you seen the tow records on that vehicle?

18   A.    I have not.

19   Q.    Would you have any dispute that that vehicle would have

20   been towed sometime after you left at three or so?               09:36:19

21   A.    Yeah.  I wouldn't dispute that -- I actually don't know.

22   I couldn't tell you but I imagine that it probably was.

23   Q.    Okay.  And, sir, I'm going to ask you something because

24   you did this yesterday.  When I ask you a question, oftentimes

25   you look at the prosecutor before answering.  Is that because    09:36:38

United States District Court

JALYN BELLOWS - Cross (Continued)

1   you're looking at them to -- for some sort of insight how to          09:36:41

2   answer?  There you did it again.  Is there some reason you look

3   at them when I ask you a question?

4   A.    No.  He stood up and I just wanted to make sure that if he

5   needed to say something, I give him the opportunity.  I'm not        09:36:56

6   looking to the prosecutor for insight.

7   Q.    And when he doesn't stand up and you look at him, why are

8   you looking at him?

9   A.    No reason.

10  Q.    So you're not looking at him or looking at the prosecution     09:37:12

11  table to try to determine if it's okay to answer or how to

12  answer; correct?

13  A.    That's correct.

14  Q.    Did you collect any identification or evidence that --

15  additional evidence that belonged to Zuriela?                        09:38:07

16  A.    No.

17  Q.    Did you at any time see a hotel receipt or did you collect

18  a hotel receipt from that hotel for that particular room 231?

19  A.    No.

20  Q.    You've not seen one?                                           09:39:00

21  A.    No.

22  Q.    Do you know anything about who paid for that room?

23  A.    I was told by Officer Vela that he contacted the

24  management.  Actually, it could have been Officer Baker.

25  Either one of the two, Baker or Vela, notified me that they          09:39:13

United States District Court

JALYN BELLOWS - Cross (Continued)

1   contacted the management and management notified them that the                    09:39:17

2   room had been registered to Zuriela.

3   Q.   And paid for in cash?

4   A.   I didn't get how it was paid for.  I just know that it was

5   registered to her.                                                                09:39:27

6           MS. HULL:  I would ask that the witness be shown

7   Exhibit Number 120, please.

8   BY MS. HULL:

9   Q.   Can you tell us what those are, please, sir?

10  A.   They appear to be a receipt from Royal Mesa Inn.  It looks                    09:40:45

11  like the insurance card from Farmers and then an Oregon

12  driver's license for Zuriela.

13  Q.   And you did not collect any of those pieces of evidence?

14  A.   No, I did not.

15  Q.   Do you know who did?                                                          09:41:00

16  A.   I couldn't tell you.

17  Q.   When you look at the identification in that exhibit which

18  appears to be an Oregon driver's license, do you recognize the

19  person in the picture?

20  A.   Yes.                                                                          09:41:58

21  Q.   Who is it?

22  A.   Zuriela.

23  Q.   And how about the hotel receipt, does that -- is that for

24  the same room and is that also under Zuriela's name, the same

25  hotel?                                                                             09:42:06

United States District Court

JALYN BELLOWS - Cross (Continued)

1  A.   I don't know how they do the receipts.  It says room 126          09:42:13

2  but, again, I'm not familiar with how they mark their rooms and

3  that kind of stuff.

4          So it does -- on the name it says guest number and it

5  has Zuriela's name.                                                     09:42:28

6  Q.   Did you ever go to room 126?

7  A.   No.

8  Q.   Do you know where room 126 is?

9  A.   I don't.

10 Q.   Did you search room 126?                                           09:42:35

11 A.   No.

12         MS. HULL:  Can I have a moment, Your Honor, please.

13         THE COURT:  Yes.

14 BY MS. HULL:

15 Q.   Okay.  So just for clarification, there's no indication            09:43:32

16 anywhere on that receipt for room 231 that you can see?

17 A.   Again, you would have to have somebody from the hotel come

18 in and decipher this thing for you.  I've never seen this

19 receipt before.  It says room, there's a colon and it says 126.

20 But, again, I'm not sure if that's the room number or how              09:43:53

21 they -- you would have to ask somebody from the hotel because I

22 can't answer that.

23 Q.   Okay.  If that was collected by your officers from the

24 hotel, would you think that maybe a search of room 126 might be

25 appropriate?  Would you agree with that statement?                     09:44:09

25

JALYN BELLOWS - Cross (Continued)

1   A.   No, not necessarily.                                    09:44:13

2   Q.   Why is that?

3   A.   If -- you know, if they had collected that and we

4   determined that there was -- that wasn't the room where the

5   people that we were investigating.  So I don't think that would   09:44:22

6   be necessarily relevant.

7   Q.   Do you know if that was done?

8   A.   I don't know.

9   Q.   Sir, did you instigate any sort of juvenile referral on

10  that day or the next day for XXXXXXXXX XXXXXXX?              09:45:15

11  A.   No.

12  Q.   What is a juvenile referral?

13  A.   In the Maricopa County, a juvenile referral is the form

14  that we would use to refer a juvenile or file charges in

15  juvenile court if a juvenile had committed a crime.          09:45:29

16  Q.   Do you know if it was done in this case?

17  A.   I don't.

18  Q.   And do you know if XXXXXXXXX -- was she in custody or what

19  was -- what was her status as far as you were concerned once

20  she was at the scene?  Was she in custody?  Was she -- what   09:45:48

21  happened?

22  A.   She was a victim.

23  Q.   Okay.  And was she -- do you know if she was locked up or

24  detained or anything of that nature?

25  A.   She was not locked up or detained.  She was placed in a   09:46:05

United States District Court

JALYN BELLOWS - Cross (Continued)

1   patrol car to protect her because originally when we were on                09:46:07

2   scene, she was scared to the point where she was trying to

3   direct us to move because she was in fear of -- that the

4   defendant was going to come to where she was which, again, to

5   ease her mind, we actually told her to go ahead and take a seat          09:46:22

6   in the car so that you're out of eyeshot of anybody that you're

7   concerned about.

8   Q.   How about after leaving the scene, what was done with her?

9   A.   I don't know.  She was transported to our main police

10  station and the sex crimes detectives were there at that point           09:46:40

11  and they took her and I'm not sure where she went at that

12  point.

13  Q.   So if she was not returned to Portland for well over a

14  week, almost two weeks, do you know what happened to her?

15  A.   I don't.                                                            09:46:57

16  Q.   Do you have Exhibit 121 with you by chance?

17         MS. HULL:  He does.  Okay.  I would ask that the

18  witness be shown Exhibit 121, please.

19  BY MS. HULL:

20  Q.   Sir, can you tell us what that is?                                  09:48:49

21  A.   I can tell you what it says.  I don't know what it

22  actually is.

23  Q.   Have you ever seen it before?

24  A.   I have not.

25  Q.   Do you know if that -- if that was collected as evidence            09:48:56

United States District Court

JALYN BELLOWS - Cross (Continued)

1  in this case, do you know anything about from where or by whom?   09:48:59

2          MR. LOGAN:  Objection.  That calls for speculation,

3  Your Honor.

4          THE COURT:  Sustained.

5  BY MS. HULL:   09:49:08

6  Q.   Do you know if there was -- were there any miscellaneous

7  papers that were collected?  Do you recall any miscellaneous

8  papers of Ms. Payes that were collected?

9  A.   Again, I didn't search the room or take anything from the

10 room so no.   09:49:21

11 Q.   Did XXXXXXXXX tell you why she was out in the parking lot

12 and not in the room with everyone else?

13 A.   Yes.

14 Q.   What did she tell you?

15 A.   She told me that she was asked by the defendant to go down   09:50:17

16 to the office where they had access to the Internet so that

17 they could post their profiles that were created with the nude

18 photos to solicit prostitution to that location.

19 Q.   And did she tell you what phone number she was to use?

20 A.   No.   09:50:37

21 Q.   So you don't know if it was to be posted to that cell

22 phone that she had with her or her cell phone or another cell

23 phone?

24 A.   That's correct.  I do not know.

25 Q.   Okay.  And did she tell you if she was sent to the front   09:50:47

United States District Court

JALYN BELLOWS - Cross (Continued)

1  office for that purpose why she had the car keys?                    09:50:52

2  A.   Because the computer that she needed access and she needed

3  to connect to the Internet was in the vehicle.

4  Q.   Okay.  Do you know if she ever went or did she tell you

5  whether she ever went to the front office?                           09:51:03

6  A.   No, she did not.

7  Q.   Did she tell you whether or not she got that cell phone

8  from the car or she brought it with her from the room?

9  A.   I did not ask her.  She did not tell me.

10 Q.   Did Amanda Garrett have any money?                              09:51:32

11 A.   No.

12 Q.   How do you know?

13 A.   Because I asked her.

14 Q.   How about Zuriela, did she have any money?

15 A.   I don't know.                                                   09:51:41

16 Q.   Why don't you know?

17 A.   I didn't ask Zuriela.

18 Q.   Okay.  Did my client have any money?

19 A.   I didn't ask him.

20 Q.   Okay.  Can you tell us why you asked Amanda and no one          09:51:50

21 else why they had any money?

22 A.   Yes.  Amanda was having a hard time answering questions

23 and, originally, again, she denied any of the prostitution

24 stuff.  She denied that there were photos of her on the phone.

25       Once she came back and sat down in the hallway, at            09:52:14

United States District Court

JALYN BELLOWS - Cross (Continued)

1   that point I was done talking to her, I was asking her very          09:52:17

2   simple questions thinking maybe she's confused or scared and I

3   started to ask her why she even came to Arizona.  She couldn't

4   answer me.

5        I asked her if she had any money, had she contributed          09:52:32

6   anything to the trip, because her original story was that she

7   was on a trip with her friends to Arizona.  I asked her how she

8   was providing for herself because there was allegations of

9   prostitution which would be a way for her to be able to provide

10  for herself.                                                         09:52:47

11       I asked her if she had any money.  She said no.  The

12  subsequent questions I asked her, she didn't answer at all.

13  She just looked to the defendant.  He answered for her.  He

14  would tell her, "I'll take care of the money.  I'll take care

15  of your food."                                                       09:53:04

16       So it was at that point where I was just trying to

17  find out is she capable of answering questions on her own at

18  all, so that was the reason that I asked about the money.

19  Q.   And so when you would ask her questions, would she look at

20  Mr. Acosta before answering?                                         09:53:14

21  A.   That's correct.

22  Q.   Somewhat along the lines of how you look at the prosecutor

23  before answering or was it different?

24  A.   No, not like that.

25  Q.   Okay.                                                           09:53:26

United States District Court

JALYN BELLOWS - Cross (Continued)

1      You said that Amanda never changed her story.      09:53:32

2   Throughout your conversation with her she indicated she was not

3   engaged in any type of prostitution; correct?

4   A.   That's what she maintained.

5   Q.   Throughout your contact with her?                 09:53:53

6   A.   My original contact with her, that was prior to the phone.

7   After I brought the phone back, I confronted her with the

8   photos that were in the phone, the nude photos of her, which

9   she absolutely told me she was not in the phone, and she just

10  wouldn't answer me.  She would look at the floor and still      09:54:07

11  maintain that it's not against the law to have nude photos and

12  that she was not engaged in prostitution.

13  Q.   Okay.  So the answer is yes, she maintained throughout

14  your contact with her that she was not involved in any kind of

15  prostitution?                                          09:54:23

16  A.   That's correct.

17  Q.   Was she arrested?

18  A.   No.

19  Q.   And she was not searched as far as you know?

20  A.   As far as I know, she was not searched.           09:54:29

21  Q.   And do you know what happened to her?

22  A.   Yeah.  When Zuriela was placed under arrest and the

23  defendant agreed to come down to the station and talk, she

24  broke down and started crying and told me that she didn't have

25  anywhere to go and what was I supposed to do with her.  I told      09:54:50

United States District Court

JALYN BELLOWS - Cross (Continued)

1   her that she's an adult and she's here -- she can do whatever          09:54:54

2   she wants.  She was free to go.  She broke down and started

3   crying and asked me if she could come down to the station just

4   to stay with the other people that she was with which I found a

5   little bit peculiar.  But she ended up coming down to the             09:55:10

6   station with the rest of us.

7   Q.   On her phone free will?

8   A.   On her own free will.

9   Q.   With all of these police present?

10  A.   That's correct.                                                  09:55:23

11  Q.   And she still followed you and Zuriela and Hanoi and

12  everybody down to the station even though she was free to

13  leave?

14  A.   That's correct.

15  Q.   Okay.  Did you ask her why?                                      09:55:30

16  A.   Yeah.  And she said she didn't have anywhere to go.

17  Q.   Did she stay at the station the entire time you were

18  involved with this?

19  A.   I don't know.  I left at this point.

20  Q.   Around 5 a.m. I think you said when you turned it over to        09:55:48

21  Detective Shields?

22  A.   Somewhere in that range.

23  Q.   She was still at the station?

24  A.   As far as I know.

25  Q.   So nobody asked her to come to the station that you know         09:56:00

United States District Court

JALYN BELLOWS - Cross (Continued)

1   of?                                                                      09:56:02

2   A.   She asked to come with us.

3   Q.   She never said anything about being held against her will,

4   did she?

5   A.   No.                                                                 09:56:14

6   Q.   At what point did Zuriela, as you said yesterday, change

7   her story?

8   A.   Once she was placed in handcuffs.

9   Q.   And arrested?

10  A.   That's correct.                                                     09:56:30

11  Q.   Then she changed her story?

12  A.   Yes.

13  Q.   So up until this point until she's placed in handcuffs her

14  story was what?

15  A.   Her story was that they were on a trip with friends and           09:56:38

16  that there was no prostitution going on.  They were just

17  hanging out.

18  Q.   And she didn't look at my client for answers, did she?

19  A.   Your client wasn't in eyeshot of her.  She was inside the

20  hotel room but she was -- she definitely was looking for            09:56:54

21  answers.  She couldn't tell me why they were even in Arizona.

22  She didn't refuse.  She just didn't have an answer.

23  Q.   But she did give you some answers?

24  A.   Some answers she did.

25  Q.   Okay.  And then when she was placed in handcuffs -- is it      09:57:06

United States District Court

JALYN BELLOWS - Cross (Continued)

1   your experience that some people -- that people tend to, once       09:57:14

2   they are placed under arrest, change their story?

3   A.    It's my experience that sometimes when an individual is

4   hoping that if they just act like they are not involved in

5   something that maybe it will go away.  A lot of times when the      09:57:31

6   realization is that this isn't going to go away, then they

7   start being a little more honest and tell actually what is

8   going on.

9   Q.    Or else they try to blame somebody else, don't they?

10  A.    In some cases.                                                09:57:50

11  Q.    So if somebody is facing the prospect, even if they are

12  telling you the truth and the truth is not going to keep them

13  out of handcuffs, once you put them in handcuffs, isn't it your

14  experience that at least sometimes people will tell you a lie

15  to try to get you to take them out of handcuffs?                    09:58:04

16  A.    That's correct.

17  Q.    Okay.

18             MS. HULL:  No further questions.

19             THE COURT:  Redirect?

20             MR. LOGAN:  Your Honor, the government would like to      09:59:59

21  retrieve Government Exhibit Number 35 to show it to defense

22  counsel.

23             THE COURT:  Yes.

24             MR. LOGAN:  Your Honor, may I approach the clerk?

25             THE COURT:  Yes.                                         10:01:21

United States District Court

JALYN BELLOWS - Redirect

**REDIRECT EXAMINATION**                                        10:01:21

BY MR. LOGAN:

Q.   Sergeant Bellows, if you would take a moment and look at

Government Exhibit Number 35, please.

A.   Okay.                                                      10:03:01

Q.   Sergeant, the last page of Government Exhibit Number 35,

have you seen that before?

A.   I have not.

Q.   Do you see one of the pages has information that the

defense counsel was talking to you about during              10:03:12

cross-examination?

A.   That's correct.

Q.   And that's about the Royal Mesa Inn?

A.   Yes.

Q.   What else is included in Government Exhibit Number 35?    10:03:20

A.   It's a face sheet from Sergeant Tom Shields of his

supplement that he wrote involving this investigation.   It's

also the narrative that he wrote reference investigations, a

consent to search form for the location in question.

Q.   Now, Sergeant, when you say "for the location in         10:03:45

question," does it detail room 231 and room 126?

A.   Yes, that's correct.

Q.   Do you recall what it says?

A.   It says the premises located at 951 West Main, number 231,

which is the room that I responded to and spoke to everybody   10:03:59

United States District Court

JALYN BELLOWS - Redirect

1   involved in this investigation.                                    10:04:03

2   Q.   From Government Exhibit Number 35, can you tell if 126 was

3   searched?

4   A.   Yes.

5   Q.   And the result was what?                                      10:04:11

6   A.   It's written next to -- it says room 126 and it's written

7   next to it that that room was empty.

8   Q.   Now, during cross-examination defense counsel made much of

9   the fact that you were looking at defense counsel table.  Do

10  you recall that?                                                   10:04:35

11  A.   Yes.

12  Q.   Have I ever told you what to say when you were to come

13  into this courtroom under oath and testify?

14  A.   Absolutely not.

15  Q.   Has co-counsel, Ms. Bardorf, ever told you what to say in    10:04:43

16  this federal courtroom?

17  A.   Absolutely not.

18  Q.   Has the special agent ever told you what to say in this

19  courtroom when you testified?

20  A.   Absolutely not.                                               10:04:56

21  Q.   Have you ever been disciplined in your 14 years with Mesa

22  for fabricating evidence?

23  A.   No.

24  Q.   Have you -- do you have any disciplinary action in your

25  folder?                                                            10:05:05

United States District Court

JALYN BELLOWS - Redirect

A.   The only disciplinary action I have in if my folder was a    10:05:06

result of a minor traffic accident.  And as operating standard

procedure for the Mesa Police Department, if a vehicle is

damaged and they have to pay money to repair the vehicle, which

in this case was a leased vehicle, then you receive a complaint    10:05:19

and I received a verbal reprimand.

Q.   Yesterday during cross-examination the defense counsel

talked to you about the procedure of turning over an

investigation.  Do you recall that?

A.   That's correct.    10:05:49

Q.   And you testified about it was turned over to the sex

crimes unit.  Why was it turned over to the sex crimes unit?

A.   Investigations that involve juveniles especially and have

to do with sex crimes.  The detectives that work in the sex

crimes unit, they have special training and our standard    10:06:06

operating procedure for the Mesa Police Department is that we

are not, as patrol officers or patrol sergeants, not to

interview victims of sex crimes.

Q.   Yesterday on several occasions the defense counsel was

asking you questions about Zuriela.  Do you recall that?    10:06:26

A.   Yes.

Q.   And on several occasions you kept telling this jury and

the court that that was her first story.  Do you remember that?

A.   Yes.

Q.   What was the rest of the story?    10:06:42

JALYN BELLOWS - Redirect

A.    The rest of the story was that once -- again, once she was    10:06:43

placed under arrest, she broke down and started to cry and told

me that everything that XXXXXXXXX had told me that I had asked

her about was true and that they were being held against their

will and at times being forced to engage in prostitution by the    10:06:58

defendant.

Q.    Now, Officer -- I'm sorry, Sergeant, some of the questions

at the end of the cross-examination dealt with witnesses being

placed in handcuffs and then changing stories.  Do you recall

that?    10:07:19

A.    Yes.

Q.    Now, you testified that you had been on the force for 14

years; is that right?

A.    That's correct.

Q.    And you've had many opportunities to arrest people; is    10:07:26

that right?

A.    That's correct.

Q.    Is it common for people to say, "I did nothing"?

A.    Yes.  That's usually their original story.

Q.    You talked about where you were located when you arrived    10:07:54

on the scene.  Do you remember that?

A.    That's correct.

Q.    And there was much discussion during cross-examination

about Zuriela's vehicle or the vehicle where the computer was

located.  Do you remember that?    10:08:04

JALYN BELLOWS - Redirect

1   A.   Correct.                                                    10:08:06

2   Q.   While you were present, did you see any Mesa police

3   officer or anyone access the computer that was in the vehicle?

4   A.   No.

5   Q.   Are you sure?                                               10:08:22

6   A.   I'm positive.

7   Q.   When you had possession of the telephone that was given to

8   you by the victim, did you obtain an e-mail address and send

9   nude photographs to the computer?

10  A.   No.                                                         10:08:37

11          MR. LOGAN:   Your Honor, may I have a moment?

12          Your Honor, the government requests permission to

13  retrieve Defense Exhibit 140, please.

14          THE COURT:   Yes.

15  BY MR. LOGAN:                                                    11:59:57

16  Q.   Government counsel is publishing Defense Exhibit 140.

17  Sergeant Bellows, earlier during cross-examination do you

18  recall defense Exhibit 140?

19  A.   Yes.

20  Q.   Do you remember marking on 140?                             10:10:49

21  A.   That's correct.

22  Q.   Now, you testified earlier that there were many different

23  officers that arrived at the Royal Mesa Inn; is that right?

24  A.   That's correct.

25  Q.   When you say many different officers arrived, are you       10:11:01

United States District Court

JALYN BELLOWS - Redirect

1   aware of a bus arriving, a police bus where all of the officers      10:11:04

2   got out of a police bus?

3   A.   No.

4   Q.   Do they typically come in police vehicles?

5   A.   Yes.                                                             10:11:13

6   Q.   Do you know if there were multiple vehicles at the Royal

7   Mesa Inn when you got there, police vehicles?

8   A.   I assume there was.

9   Q.   You assume there was?  You didn't see any other ones?

10  A.   There were more than the vehicle that I was standing by,        10:11:26

11  yes.

12  Q.   Do you recall where any of these vehicles were located?

13  A.   The only vehicle that I remember clearly is the vehicle

14  that I was standing by when I was speaking originally to

15  XXXXXXXXX.                                                           10:11:38

16  Q.   During cross-examination defense counsel elicited some

17  information from you about Amanda.   Do you remember that?

18  A.   Yes.

19  Q.   And there was discussion that Amanda had told you that the

20  group had made it to Mesa and they were just -- I forgot how        10:12:13

21  you described it, just hanging out or visiting.

22  A.   Their explanation was they were just on a trip with their

23  friends, on a road trip.

24  Q.   Do you actually live in Mesa, Sergeant?

25  A.   Yes.                                                            10:12:30

United States District Court

JALYN BELLOWS - Redirect

1    Q.    How long have you lived there?                                    10:12:30

2    A.    37 years.

3    Q.    Is the Royal Mesa Inn considered a tourist spot?

4    A.    No.

5    Q.    Is it considered -- does it have any amusement parks or           10:12:44

6    anything?

7    A.    No.

8    Q.    Do you know if it has a bowling alley in that area?

9    A.    No, there is no bowling alley in that area.

10   Q.    Movie theater?                                                    10:12:57

11   A.    No.

12             MR. LOGAN:  May I have a moment, Your Honor?

13             THE COURT:  Yes.

14             MR. LOGAN:  Nothing further, Your Honor.

15             MS. HULL:  Permission to recross on the reprimand,            10:13:20

16   Your Honor?

17             THE COURT:  All right.  I'm allowing it.

18                      **RECROSS EXAMINATION**

19   BY MS. HULL:

20   Q.    Sir, you said you received a complaint and reprimand.  Can        10:13:51

21   you tell us more about that, please.

22   A.    Yes.  At the time I was working as an undercover detective

23   in our Special Investigations Unit.  I was preparing to leave

24   out of town and --

25   Q.    Can I stop you?  What is Special Investigations Unit?             10:14:04

United States District Court

JALYN BELLOWS - Recross

1   A.   The Special Investigations Division of our department, at   10:14:07

2   the time when I worked there, it housed our undercover

3   narcotics detectives.   It housed our gang detectives, our

4   intelligence unit and the asset forfeiture unit.   So it's an

5   off-site location that's not marked as a police building that   10:14:23

6   we operated out of for the undercover roles.

7   Q.   Okay.   Thank you.   Continue, please.

8   A.   Anyway, I was preparing to leave out of town and I had

9   pulled my vehicle -- at the time it was a leased vehicle.   It

10  was a Pontiac Grand Am.   I had parked it on -- in front of my   10:14:39

11  house and I took the garbage can out because I was going to be

12  gone for a couple of days so I set the garbage can on the curb.

13  Trying to be a nice guy to the garbage man, I was trying to get

14  it as close as I could to the curb for him so he didn't have to

15  reach out.   10:14:59

16       Before I left I wanted to park my undercover vehicle

17  up under the porch.   When I backed up, I caught the edge of the

18  plastic mirror, the plastic mirror, on the edge of the garbage

19  can and it made a small little crack in the housing of the

20  mirror.   10:15:15

21       I contacted my supervisor at the time and told him

22  about it and he said, "Due to the fact that you were actually

23  on the roadway when this happened, we would have to make an

24  accident report."   An officer responded to my house, took an

25  accident report and as -- you know, it's a leased vehicle so   10:15:25

United States District Court

JALYN BELLOWS - Recross

1  when it was returned to the lease company, we had to pay the          10:15:31

2  $55 to replace the mirror.  And as a result of that, my

3  commander at the time told me, "Our policy is that if we have

4  to pay money out, that you get a complaint."

5          He wasn't concerned about it.  The reprimand I got          10:15:44

6  was:  Be more careful because we don't want to have to pay

7  money out to fix vehicles.

8  Q.   So it had nothing to do with truth-telling or correct

9  reporting or anything like that?

10 A.   No.                                                           10:15:59

11 Q.   So when you put in this report that my client happily

12 exited the hotel room, you didn't falsify any of that, did you?

13 A.   No.

14         MS. HULL:  Nothing further.

15         THE COURT:  You may step down.                            10:16:12

16         And, ladies and gentlemen, we'll take a 20-minute

17 break.  We'll see you back here at 25 minutes of 11.

18         We're in recess.

19         (Jury departs.)

20         COURTROOM DEPUTY:  All rise.                              10:16:21

21         (Witness excused.)

22         (Whereupon, these proceedings recessed at 10:18

23 a.m..)

24                    *  *  *  *  *

25

                    United States District Court

JALYN BELLOWS - Recross

C E R T I F I C A T E

1       I, ELAINE M. CROPPER, do hereby certify that I am

2   duly appointed and qualified to act as Official Court Reporter

3   for the United States District Court for the District of

4   Arizona.

5       I FURTHER CERTIFY that the foregoing pages constitute

6   a full, true, and accurate transcript of all of that portion of

7   the proceedings contained herein, had in the above-entitled

8   cause on the date specified therein, and that said transcript

9   was prepared under my direction and control, and to the best of

10  my ability.

11      DATED at Phoenix, Arizona, this 19th day of May,

12  2008.


                            s/Elaine M. Cropper

                            _____
                            Elaine M. Cropper, RDR, CRR, CCP


        I certify that the foregoing is a true and correct

copy of the transcript originally filed with the Clerk of the

Court on May 29, 2008, and incorporating redactions of personal

identifiers in accordance with Judicial Conference policy.

Redacted characters appear as blanks or a black box in the

transcript.

                            s/Elaine M. Cropper
                            _____
                            Elaine M. Cropper, RDR, CRR, CCP

                    United States District Court