CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3

**UNITED STATES OF AMERICA**,          )
4                                        )
                            Plaintiff,   )
5      vs.                               )
                                         )   CR 07-00871-ROS
6      **HANOI BARBARO ACOSTA**,           )
                                         )
7                           Defendant.   )
                                         )   May 20, 2008
8                                        )   8:40 a.m.
_____         )
9

10          **BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE**

11          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12              **JURY TRIAL - Day 4 (REDACTED - Minor)**

13                   **A P P E A R A N C E S**

14   For the Government:
             TRACEY A. BARDORF, ESQ.
15           STEVEN PAUL LOGAN, ESQ.
             U.S. Attorney's Office
16           40 North Central Avenue, Suite 1200
             Phoenix, AZ  85004-4408
17           602.514.7500

18   For the Defendant:
             BARBARA LYNN HULL, ESQ.
19           Law Office of Barbara L. Hull
             637 North 3rd Avenue, Suite 3
20           Phoenix, AZ  85003
             480.834.0002/(fax) 480.834.0003
21   Official Court Reporter:
     Elaine Cropper, RDR, CRR, CCP
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 35
23   Phoenix, Arizona  85003-2151
     (602) 322-7249
24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription
25

                    United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1

**I N D E X**

2

**TESTIMONY**

3                                                               **Page   Line**

4    AMANDA GARRETT
     AMANDA GARRETT - Direct
5    BY MS. BARDORF                                              657    22

6    AMANDA GARRETT - Cross
     BY MS. HULL                                                 658    19

7

     AMANDA GARRETT - Redirect
8    BY MS. BARDORF                                              668    20

9    XXXXXXXXX XXXXXXX
     XXXXXXXXX XXXXXXX - Direct
10   BY MR. LOGAN                                                689    23

11   XXXXXXXXX XXXXXXX - Cross
     BY MS. HULL                                                 776    11

12

13                              **RECESSES**

14                                             Page   Line

15   (Recess at 9:10; resumed at 9:16.)        657     7
     (Recess at 11:27; resumed at 11:45.)      744     3
16   (Recess at 12:27; resumed at 1:14.)       770    17
     (Recess at 2:30; resumed at 2:48.)        818    23
17   (Recess at 4:38; resumed at 4:48.)        893    24

18

19

20

21

22

23

24

25

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1                          **E X H I B I T S**

2

3    Number                                        Ident    Rec'd

4    10    XXXXXXXXX XXXXXXXXX birth certificate    715      718

5    11    Nevada identification for Jacqueline     712      714
           Acosta

6
     12    Oregon ID card, Jacqueline Acosta        718

7
     119   Las Vegas records re Jacqueline Acosta   795
8          incident on 8-26-2007

9    128   Washington County Sheriff's Office       803
           Reports, A through K
10
     100   Subpoenaed records from Cricket          825
11         Communications

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

**P R O C E E D I N G S**

1

2          (Court was called to order by the courtroom deputy.)

3          (Jury out.)

4          THE COURT:  Please be seated.

5          All right.  Counsel, I have received both of your        08:40:59

6   notices and we're going to talk about that in a moment.

7          MS. HULL:  The defense withdraws its trial schedule.

8          THE COURT:  When you say "withdraw," what do you

9   mean?

10         MS. HULL:  It cannot stand given the circumstances of   08:41:20

11  all of the documentation provided to me after close of business

12  last evening.

13         THE COURT:  Well, I'm glad you're going to withdraw

14  because you're going to reduce it substantially.

15         All right.  Now, let me ask the government if you       08:41:31

16  have resolved the situation with the witnesses who are going to

17  testify.

18         MR. LOGAN:  Your Honor, we have.  We were granted

19  formal immunity yesterday.  I've talked to the defense counsel

20  who are present.  They are just waiting for Your Honor's order.  08:41:49

21  Both witnesses are actually present.  However, Zuriela has yet

22  to be located, Your Honor.

23         THE COURT:  Fine.  So both witnesses, meaning the

24  previous witnesses who have now been provided counsel, that

25  would be --                                                    08:42:08

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1      MR. LOGAN:  Amanda Garrett and XXXXXXXXX XXXXXXX,      08:42:10

2  Your Honor.

3      THE COURT:  And so we are going to continue with

4  Ms. Garrett's testimony; correct?

5      MR. LOGAN:  That's correct, the cross-examination,     08:42:17

6  Judge.

7      THE COURT:  And how much time do you think that will

8  take?

9      MR. LOGAN:  Your Honor, I don't know how much for

10 cross-examination.                                          08:42:27

11     THE COURT:  You don't have any additional questions

12 to ask her on direct examination in view of the fact that she

13 now is represented by counsel; is that right?

14     MR. LOGAN:  That's correct, Judge.

15     THE COURT:  Okay.  So then cross-examination we don't   08:42:36

16 know how long that's going to take but you have -- have you

17 provided the information to Ms. Hull concerning her immunity

18 status?

19     MR. LOGAN:  Yes, Your Honor we have.

20     THE COURT:  And so that information would be that you   08:42:53

21 have given her, as soon as I order it, use immunity?

22     MR. LOGAN:  That's correct, Judge.

23     THE COURT:  Is she here?

24     MR. LOGAN:  Amanda is here and my understanding -- I

25 haven't seen XXXXXXXXX but I can check.                     08:43:06

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    THE COURT:  All right.  Well, let's start with Amanda          08:43:08

2  since she's our first witness.

3    MR. EISENBERG:  Your Honor, she's here.

4    THE COURT:  That's right but don't you want me to

5  determine whether or not she will testify so that I can order   08:43:20

6  her to testify.

7    MR. LOGAN:  Yes, Your Honor, we do.

8    THE COURT:  All right.  Please bring her forward.

9    MS. HULL:  Your Honor, for the record, the notice

10 provided to me about this information was not filed until after  08:43:28

11 5 o'clock last evening.  I did not receive it until after 5

12 o'clock last evening.

13   MR. LOGAN:  Your Honor, the United States just

14 received the information about an hour or an hour and a half

15 before it was provided to the defense counsel.                   08:43:41

16   THE COURT:  Who now represents Miss Roquez?

17   MR. LOGAN:  Your Honor, her testimony was completed.

18 Your Honor didn't provide her with a lawyer.  However, we did

19 seek formal immunity for her as well.

20   THE COURT:  Thank you.                                         08:44:18

21   Ms. Garrett.  Please come forward and Mr. Eisenberg.

22   (Whereupon, Ms. Amanda Garrett enters the proceedings

23 represented by her attorney, Mr. David Eisenberg.)

24   MR. EISENBERG:  Thank you, Your Honor.

25   THE COURT:  And you are, you continue to be, under             08:44:28

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    oath so you may take the witness stand.                          08:44:30

2              (Whereupon, Ms. Amanda Garrett enters the

3    proceedings retakes the witness stand.)

4              THE COURT:  All right.  Please place yourself in

5    front of the microphone and move it forward or backwards and up   08:44:45

6    and down so that we can hear you; all right?

7              Now, are you now represented by counsel; correct?

8              THE WITNESS:  Yes.

9              THE COURT:  And go ahead and ask her some questions.

10             MR. EISENBERG:  Your Honor, for the record, I'm David    08:45:01

11   Eisenberg and I was assigned the other day to represent

12   Miss Garrett.

13             I'll proffer to the court or do it through Q and A,

14   however you wish, Your Honor, but we have gone over the

15   application.  She understands it.  She understands what it        08:45:13

16   means to testify with a grant of immunity.  She's prepared to

17   go forward.  The only thing that I would ask is that either the

18   order be made available to me or the court verbally direct her,

19   pursuant to the order, to give testimony and to direct that the

20   meaning of it is that she is required to give testimony but       08:45:32

21   nothing that she says can be used against her directly or

22   indirectly.

23             THE COURT:  All right.

24             And Ms. Garrett, is that all correct?

25             THE WITNESS:  Yes.                                      08:45:44

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1      THE COURT:  And so you've had sufficient time to talk      08:45:44

2  with Mr. Eisenberg about your rights and your obligations under

3  the law?

4      THE WITNESS:  Yes.

5      THE COURT:  Do you understand, then, what an      08:45:54

6  application for immunity is that is made by the United States

7  government?

8      THE WITNESS:  Yes.

9      THE COURT:  So do you understand that if I grant --

10  first of all, let me ask you this:  If you were asked questions      08:46:04

11  in the nature of what occurred previously and your involvement

12  in this case, do you anticipate that you would be taking the

13  Fifth Amendment?

14      THE WITNESS:  Wait.  What?

15      THE COURT:  If you were asked questions by the      08:46:22

16  government or anything about what occurred, would you tell me

17  and the court that you were going to take the Fifth Amendment?

18      THE WITNESS:  Would I now?

19      THE COURT:  Yes.

20      THE WITNESS:  No.      08:46:41

21      MR. EISENBERG:  I believe that's because she believes

22  she would be ordered to testify pursuant to an order.

23      May I inquire, then, Your Honor?

24      Ms. Garrett, prior to being ordered by the court to

25  give testimony, did we -- is it your understanding that you      08:46:57

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1   have a Fifth Amendment privilege not to testify about certain    08:47:02

2   things in this case?

3          THE WITNESS:  Yes.

4          MR. EISENBERG:  And without getting into it, have we

5   discussed the nature of that privilege?    08:47:12

6          THE WITNESS:  Yes.

7          MR. EISENBERG:  The court is about to order you, I

8   believe, to give testimony pursuant a section of United States

9   law, Section 6002, Title 18.  Have you and I discussed what

10   that means if you are ordered to give testimony?    08:47:27

11          THE WITNESS:  Yes.

12          MR. EISENBERG:  Are you prepared to do that if the

13   court orders to you give testimony?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.  So let me just back up a little    08:47:37

16   bit.  Before I can order you to do that, the law requires that

17   I understand -- that I conclude that if you are asked questions

18   about this case you would say in response.  For example, if

19   Mr. Logan or Ms. Bardorf or Ms. Hull asked you questions about

20   what occurred, you would say, "I refuse to answer on the    08:48:01

21   grounds of my Fifth Amendment privilege."  Is that what you

22   would do today?

23          THE WITNESS:  No.

24          MR. EISENBERG:  I'm sorry.  Your Honor?

25          If you weren't ordered to testify, you would invoke    08:48:15

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    your Fifth Amendment privilege, would you not?                    08:48:17

2            THE WITNESS:  What?

3            THE COURT:  Okay.  Let me see if we can get a little

4    bit further down the way here.

5            Do you understand what it is to incriminate yourself?     08:48:31

6            THE WITNESS:  Yeah.

7            THE COURT:  Do you understand that if you answered

8    questions that say about what you did in Las Vegas that that

9    information could be used against you for prosecution purposes?

10           THE WITNESS:  Yeah, I do.                                  08:48:47

11           THE COURT:  You understand that?

12           THE WITNESS:  Yeah.

13           THE COURT:  But you also understand you don't have to

14   answer those questions.  Do you understand that?

15           THE WITNESS:  Okay.                                        08:48:57

16           THE COURT:  You need to answer yes or no.

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.  And if, let's say, Mr. Logan asked

19   you what you did in Las Vegas, you could say in answering it,

20   "I take the Fifth Amendment."  Do you understand that?            08:49:13

21           THE WITNESS:  Yes.

22           THE COURT:  So if Mr. Logan asked you today what you

23   did in Las Vegas, what you did in California, what you did in

24   Oregon, would you take the Fifth Amendment before I ordered

25   you?  You would now take the Fifth Amendment because I haven't    08:49:33

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1  ordered you to do anything.  Would you?                    08:49:35

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  But if I order you to answer and

4  I, as such, provide you immunity for your testimony, will you

5  then testify after I order you?                            08:49:48

6          THE WITNESS:  Yes.

7          THE COURT:  Any other questions from the government?

8          MR. LOGAN:  No, Your Honor.

9          THE COURT:  And, Ms. Hull, any questions regarding

10 this?                                                       08:49:58

11         MS. HULL:  Not for those purposes, Judge, no.

12         THE COURT:  All right.  I have received an

13 application for immunity for Ms. Amanda Garrett to give

14 testimony and provide other information in this proceeding,

15 CR-07-871-PHX-ROS; and that the government has told me that it  08:50:26

16 is their understanding that if the witness would testify, she

17 would claim the Fifth Amendment privilege and that the

18 testimony of this witness is necessary to the public interest

19 and that the application is made in good faith and is based

20 upon the declaration of Ms. Bardorf.                       08:51:16

21         According to the application, Ms. Garrett previously

22 stated that counsel -- counsel for Ms. Garrett that his client

23 will refuse to testify on the basis of the Fifth Amendment

24 privilege.  That has been established, supported by what she

25 has said under oath today.                                 08:51:40

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1        So as a consequence of that, I am ordering and I am          08:51:45

2  instructing Ms. Garrett to give testimony and provide

3  information in this matter and any further proceedings

4  resulting therefrom or ancillary thereto pursuant to 18 United

5  States Code, Section 6002 through 6003.                          08:52:06

6        And you will have use immunity.  That means that your

7  testimony and anything as a result of that testimony cannot be

8  used against you.  Do you understand?

9               THE WITNESS:  Yes.

10              THE COURT:  Now, knowing that, are you prepared to    08:52:27

11  testify?

12              THE WITNESS:  Yes.

13              THE COURT:  All right.

14        It is ordered that you give testimony and provide

15  other information that you would not have given except for your  08:52:36

16  Fifth Amendment privilege, and that it is further ordered that

17  the testimony and information compelled by this order directly

18  or indirectly derived from it cannot be used against the

19  witness.

20        All right.  You may step down.                             08:52:58

21        Anything else?

22              MR. EISENBERG:  Your Honor, there would be one caveat

23  to that.  She does understand that there is an exception for

24  that.

25              THE COURT:  Oh.  Yes.                                 08:53:09

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1        Let me make this clear to you, too.  Your testimony          08:53:10

2   cannot be used against you but if you don't tell the truth, in

3   other words, if you misrepresent anything you say or you lie,

4   then that constitutes perjury and you could be prosecuted for

5   lying.  Do you understand?                                        08:53:37

6        THE WITNESS:  Yes.

7        THE COURT:  Okay.  Any question about that?

8        THE WITNESS:  No.

9        THE COURT:  And has your attorney talked to you about

10  it?                                                               08:53:43

11       THE WITNESS:  Yes.

12       THE COURT:  And if at any time during the colloquy,

13  that is the questions and answers between you and counsel, you

14  would like to talk to Mr. Eisenberg, then you let me know.  Do

15  you understand?                                                   08:54:05

16       THE WITNESS:  Yes.

17       THE COURT:  I'm not going to have him stand up here.

18  He will be in the courtroom, however, and available for you.

19  Do you understand?

20       THE WITNESS:  Yes.                                           08:54:12

21       THE COURT:  All right.

22       We're going to start with the trial with you in about

23  10 minutes; okay?

24       THE WITNESS:  Yeah.

25       THE COURT:  Anything else?                                   08:54:21

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1     MR. EISENBERG:  No, Your Honor.                          08:54:22

2     THE COURT:  Anything else on this issue?

3     MS. BARDORF:  Simply that we would ask if we could

4  simply redirect for a minute or two just on this issue.

5     THE COURT:  Yes.                                          08:54:32

6     All right.  You may step down.

7         (Ms. Garrett is excused and departs the proceedings.)

8     THE COURT:  Okay.  All right.  Let me see counsel at

9  the sidebar.

10    Now, this is the first one that we are resolving and   08:54:54

11 then we have we also will have the juvenile, XXXXXXXXX and

12 before she testifies -- I see Mr. Carpenter is not here but we

13 will do the same thing.  All right.  Let me see counsel.

14        (At sidebar.)

15    THE COURT:  All right.  You've withdrawn your notice   08:55:34

16 of the amount of time that you anticipate you will take for

17 cross-examination, direct, et cetera, and, Ms. Hull, you are

18 asking for too much time.

19    I am going to -- and I am sure you don't want me to

20 do this.  I am going to exercise the discretion in favor of the 08:55:55

21 government instead of in your favor and the exquisite balance

22 of whether or not to give you as liberal discretion as I have

23 been on your cross-examination.

24    You obviously have asked some substantive questions

25 that are important to your defense but you have asked them over 08:56:19

United States District Court

648
CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1   and over again.                                                08:56:22

2          So my -- I'm going to order you to reassess how much

3   time you're going to need to cross-examine these witnesses and

4   how much time you're going to need for the witnesses you intend

5   to call because we have, essentially, 18 hours before this     08:56:38

6   trial is over.  And based upon the schedule that I have here,

7   we're not going to make it.

8          Now, I intend to bring the jury in early.  We are

9   going to start at 8:30 in the morning instead of 9 o'clock.

10  We're going to only take either between a half an hour and 45   08:56:57

11  minutes for lunch and we will finish at the end of the day

12  closer to five.  So that will give us more time.

13         But the amount of time that you're asking for here is

14  way out of order.  We have six days.  Both sides knew that and

15  there's no reason for a delay beyond that.                      08:57:24

16         Do you think that Miss Payes will be here or not?

17         MR. LOGAN:  Your Honor, I know the FBI was looking

18  for her and the difficult part is she quit her job apparently

19  and she has -- no one knows where she lives in Portland.  If I

20  was guessing, I would say no but I don't have any direct        08:57:49

21  knowledge that she will not appear.

22         THE COURT:  Okay.  Now, is this conservative or is

23  that liberal, the three hours for her testimony on direct?

24         MR. LOGAN:  That's liberal.

25         THE COURT:  So it could be less?                         08:58:06

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1        MR. LOGAN:  It could be.  That's worst case scenario,    08:58:07

2   three hours.

3        THE COURT:  And then the 10 minutes for Ms. Garrett.

4        MR. LOGAN:  On redirect and then we need probably two

5   or three minutes just to lay the foundation about the other    08:58:20

6   issue we discussed this morning.

7        THE COURT:  That's fine.  All right.  Anything else

8   at the sidebar?

9        MS. HULL:  I don't know if you want to take it up on

10  sidebar or not but part of the basis of my rescinding of the    08:58:31

11  trial schedule is considerable disclosure that was provided to

12  me last night after 6 p.m., reports that are clearly relevant,

13  and I would like to go further on the record as to what

14  occurred in my absence on the issue of ex parte and in camera

15  review of reports and what the orders were.    08:59:03

16       THE COURT:  I don't know what you're talking about.

17  I reviewed the reports.  I received them yesterday.  I

18  disclosed them.  You have them apparently.

19       MS. HULL:  Well, now, Judge, the record that I need

20  to make is that I was not notified and every time there's been    08:59:18

21  an ex parte proceeding held for the defense, the government has

22  been notified, been here and asked to leave for that

23  discussion.

24       I was not notified about the hearing yesterday.

25       THE COURT:  We didn't have a hearing.    08:59:38

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    MR. LOGAN:  There was no hearing and the defense          08:59:40

2  counsel received the 302s about this issue on Friday.

3         THE COURT:  There was no hearing.

4         MS. HULL:  Okay.

5         THE COURT:  Let me make sure the record is clear, and  08:59:47

6  I don't know if you guys have talked but you need to.  I

7  received yesterday afternoon, somewhere between 3 and 5

8  o'clock, an ex parte submission under seal of the 302s or

9  whatever they are and also some reports concerning Ms. XXXXXXX.

10        And the information I received in writing was that     09:00:14

11 these were provided to me under seal out of an abundance of

12 caution because they were juvenile records.  I reviewed them

13 and I decided they should be turned over.  I had my judicial

14 assistant prepared an order which was signed so that you could

15 have them as soon as possible.  There was no hearing.         09:00:34

16        MS. HULL:  Judge, was any explanation given as to

17 why, halfway through the trial, this was provided because these

18 reports talk about this juvenile posting on Craigslist.  There

19 are recordings of her interviews.  There's recordings, there's

20 web pages posted of Craigslist postings that she did in October 09:00:55

21 of 2006 for sexual services.  There are contacts.  There are

22 prostitution logs and fees written that were confiscated.  Her

23 clothes were confiscated.  She was flown back to Portland

24 without a physical exam.  She apparently claims to have called

25 911.  None of those records have been provided.                09:01:20

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1   This was all, again, provided by e-mail last evening.   09:01:24
2   Mr. Logan has my cell phone.  Nobody called me.  I happened
3   upon it this morning right before heading to court.  Otherwise,
4   I would not have known about the reports.  They are extensive.
5   They require extensive follow-up and investigation and I will   09:01:38
6   tell the court if this court is going to proceed at this point,
7   without us being able to investigate this, I cannot be
8   effective.  They are talking about relevant -- and by the way,
9   my client is named in these reports.

10   THE COURT:  I'm aware of it and I've read it.  And as   09:02:00
11   far as I know, this information just surfaced.  Why it just
12   surfaced I don't know other than she's got a lawyer now.

13   MR. LOGAN:  Your Honor, when the juvenile was on the
14   stand Thursday and Your Honor talked to her on the stand, when
15   you excused her from the courtroom, we received notice at   09:02:16
16   counsel table that she wanted to talk to me.  I had my agent go
17   back to find out what was going on and that was when she stated
18   that she had remembered something else.  My understanding was
19   that --

20   THE COURT:  Hold on.  Was this before she got an   09:02:31
21   attorney or after?

22   MR. LOGAN:  This was after she got her attorney.

23   THE COURT:  That's what I thought.  She got an
24   attorney, as typical, she starts coming up with a variety of
25   different things.  It looks like even without an attorney   09:02:47

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1   Ms. Garrett has suddenly remembered things.      09:02:50

2          So that appears to be the reason and there has been

3   no holding back.

4          So this is information that's new to the government

5   also; correct?                                    09:02:59

6          MR. LOGAN:  That's correct.

7          MS. HULL:  We have evidence to the contrary, Judge.

8   This apparently would have been entered into NCIC according to

9   the reports that we received.  It was also forwarded to -- the

10  mother was made aware of it because she apparently made plane   09:03:14

11  reservations to get her daughter back.  All of these people --

12  in fact, there are six other individuals who are specifically

13  named and interviewed as either suspects or investigative leads

14  that were likewise interviewed and researched and placed on

15  NCIC, including my client's name, and that, in fact, my         09:03:34

16  understanding is that the government -- obviously they had to

17  have been notified.

18         If they have an obligation -- then Mr. Logan can

19  shake his head.  But if they have an obligation, they have had

20  days of interviews of this girl and now they are saying that    09:03:57

21  not until then does it come out, then I need a continuance.  I

22  need an opportunity to investigate this.  Number one, to

23  determine whether or not I even want to use the information.  I

24  may want to because it is a pattern of conduct that evidences

25  that she was posting on Craigslist long before this incident    09:04:14

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    occurred, that she was -- in fact, from the reports it appears          09:04:17

2    that she told my client that she didn't feel like prostituting

3    anymore and left and hooked up with some other men and started

4    prostituting herself and taking trips to California and

5    prostituting herself there.                                            09:04:32

6          THE COURT:  Well, all of that is in the record and

7    you can file a motion, whatever you need to do, and the

8    information was turned over late.  We'll just have to deal with

9    it.

10         MS. BARDORF:  If I can just respond briefly as well,             09:04:45

11   Your Honor.  The NCIC issue, I believe it's in our pleading but

12   Ms. XXXXXXX was not a suspect in those reports and so it does

13   not figure on her NCIC, nor does it figure on Mr. Acosta's NCIC

14   because she was simply a person named in the report and his

15   name was spelled wrong.  He wasn't contacted in connection with       09:05:04

16   that as far as we know and there was no more biographical data

17   about him.  So it doesn't figure on his NCIC either.

18         And as far as the pattern of conduct, I think

19   Ms. Hull has already proffered exhibits, frankly, that well

20   document Ms. XXXXXXXXX past and that's going to be gone into at        09:05:20

21   great length when she takes the stand on direct and I'm sure on

22   cross as well.

23         MS. HULL:  Again, Judge, there's a 404 issue.  If the

24   government is now saying that they intend to use this

25   information, they have not disclosed that and if they are             09:05:33

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1    talking about --                                                      09:05:39

2          THE COURT:  Well, I presume they don't intend to.

3    You don't intend to use the information concerning Mr. Acosta

4    that came up?  If you do that is 404(b) evidence.

5          MR. LOGAN:  That came up in terms of this new            09:05:53

6    information.

7          THE COURT:  Right.

8          MR. LOGAN:  Judge, if the defense counsel claims that

9    she's disadvantaged, we have no objection if you want all of

10   that information excluded and we can caution the witness that   09:06:01

11   she cannot go into it and it cures the whole thing.

12         MS. HULL:  Well, it doesn't cure the whole thing as

13   to determining whether or not I want to use the other

14   information, Judge.  Again, apparently she may have testified

15   as well because Mr. Woods, who is the individual that          09:06:17

16   supposedly was arrested in this incident, was charged.  There's

17   testimony apparently on that as well.  I don't know if this is

18   the man that she was talking about when she was on Dr. Phil

19   talking about her old boyfriend is in prison now.  I don't

20   know.                                                          09:06:34

21         This is the first time we have received any names

22   like this.  There are cell phone numbers and telephone numbers

23   in this information that is completely new to us and we cannot

24   possibly investigate that to even determine whether or not we

25   want to use it, if portions need to be excluded.  I can't tell  09:06:48

655
CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1   how to proceed unless I have an opportunity to investigate it.    09:06:56
2   And if the court is going to --

3            THE COURT:  All right.  You can -- first of all, I
4   don't see that there has been any misconduct by the government
5   in failure to disclose this information.  It's a consequence of    09:07:14
6   her having had an attorney.  Perhaps she should have had an
7   attorney previously.  I mentioned that before.

8            Secondly, you can present to me in any subpoenas that
9   you believe are necessary for witnesses, for exhibits; but as I
10  see it, you can have a field day with her on this information    09:07:40
11  now and ask her questions.

12           And by the way, in asking her these questions, as you
13  know, if it is 608(b) material, that is information that
14  relates to her credibility because we're talking about other
15  evidence.  Also, if she denies it, you're stuck with the answer    09:08:07
16  unless you can establish some other basis for it.

17           MS. HULL:  And how am I going to do that without the
18  investigation and reports?  I mean, that doesn't cure it.  How
19  does that cure it?

20           THE COURT:  You're going to have to proffer to me    09:08:21
21  some reason other than speculation as to why you believe this
22  information, if you follow it up, is going to surface or is
23  going to reveal something which is going to allow you a
24  rigorous cross-examination that's going to break her down and
25  impeach her.  I don't see it.    09:08:43

United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

 1          MS. HULL:  Again, the Craigslist issue -- and without      09:08:46
 2   investigating further, the Craigslist issue, there was postings
 3   on Craigslist that she said she used a cell phone number that
 4   she got from one of Mr. Woods' associates to post on it.  And
 5   this was, again, nine months prior.                              09:09:03

 6          Additionally, I would point out that I asked the
 7   government in December, to appoint this woman an attorney,
 8   December and in response the government only asked for an
 9   attorney for Ms. Payes.  I suggested they get an attorney for
10   all of these women and here we are halfway through trial and     09:09:24
11   now that she gets an attorney, she's disclosing additional
12   information that could have been disclosed presumably, if she
13   had an attorney, six months ago.

14          THE COURT:  All right.  Somehow I think this works to
15   your advantage.  As I said to you, my ruling is the same.  If    09:09:38
16   you need subpoenas, if you can establish for me that additional
17   time is necessary, then I'll give it to you.

18          MS. HULL:  I will need that, Judge.

19          (End sidebar.)

20          THE COURT:  Okay.  Let's get the jury in.                 09:10:01

21          MS. HULL:  Judge, for the record, also, I do need a
22   subpoena and I will need a subpoena for Agent Bergey who is
23   present here today.  I would ask the court to sign it.

24          THE COURT:  Well, she's -- I don't think you're going
25   to need a subpoena.  She'll be here.                             09:10:12

                      United States District Court

CR-07-00871-PHX-ROS, May 20, 2008 (REDACTED)

1          Correct?                                                      09:10:15

2          AGENT BERGEY:  Yes, ma'am.

3          THE COURT:  All right.  Let's get the jury in.

4          MS. HULL:  Judge, may my client have a quick bathroom

5    break, according to the U.S. Marshals?                              09:10:29

6          THE COURT:  All right.  Yes.

7          (Recess at 9:10; resumed at 9:16.)

8          (Jury enters.)

9          (Court was called to order by the courtroom deputy.)

10         THE COURT:  Please be seated.                                 09:16:55

11         Good morning, ladies and gentlemen.  We're ready to

12   go.

13         All right.

14         MS. BARDORF:  The United States will recall Amanda

15   Garrett.                                                            09:17:05

16         THE COURT:  Thank you.

17                        AMANDA GARRETT

18   called as a Witness herein by the Government, having been

19   previously duly sworn and/or affirmed by the Courtroom Deputy,

20   further testified as follows:                                      09:17:56

21             **DIRECT EXAMINATION** (Continued)

22   BY MS. BARDORF:

23   Q.   Amanda, is it your understanding that after you testified

24   on Thursday, you were granted immunity for your testimony in

25   this case?                                                         09:18:04

United States District Court

658
AMANDA GARRETT - Direct

1    A.    Yeah.                                                      09:18:06

2    Q.    And is it your understanding that nothing you tell the

3    jury here today or that you've told the jury on Wednesday and

4    Thursday can be used against you?

5    A.    Yes.                                                       09:18:17

6    Q.    Is it your understanding, however, that you have to tell

7    the truth?

8    A.    Yes.

9    Q.    What do you believe would happen if you do not tell the

10   truth?                                                          09:18:23

11   A.    I could get in a lot of trouble.

12   Q.    Do you think the immunity extends to not telling the truth

13   on the stand today?

14   A.    No.

15   Q.    Thank you.                                                09:18:34

16            THE COURT:  All right.

17            Ms. Hull?

18                        **CROSS EXAMINATION**

19   BY MS. HULL:

20   Q.    Good morning, Ms. Garrett.  When we spoke last week, we   09:19:07

21   were in the middle of cross-examination.  Do you recall that?

22   A.    Yes.

23   Q.    And do you recall that when you first took the stand on

24   Thursday, you admitted to perjuring yourself?

25   A.    Yes.                                                      09:19:28

United States District Court

AMANDA GARRETT - Cross

1    Q.   And you understand that that is not covered under your          09:19:28

2    immunity agreement; correct?

3    A.   Yes.

4    Q.   So is it your understanding that you can be subject to

5    prosecution for the perjury that you committed last week?           09:19:38

6    A.   Yes.

7    Q.   Do you have any agreements as to whether or not you're

8    going to be prosecuted for perjury?

9    A.   No.

10   Q.   Have you been charged with perjury since Thursday or at        09:19:51

11   any time for this trial?

12   A.   No.

13   Q.   You also admitted last week that you -- under oath you

14   said that you were actually -- you talked about facts where you

15   were guilty of transporting minor interstate for prostitution.     09:20:14

16   Do you remember that?

17            MS. BARDORF:   Objection.   Misstates the testimony.

18            THE COURT:   Sustained.

19   BY MS. HULL:

20   Q.   Do you remember talking about your testimony driving from     09:20:21

21   Portland to Las Vegas where everybody drove?

22   A.   Yes.

23   Q.   Do you recall that?

24   A.   Yes.

25   Q.   Including yourself?                                            09:20:29

United States District Court

660

AMANDA GARRETT - Cross

1   A.   Yes.                                                                  09:20:30

2   Q.   And there was a minor in the car?

3   A.   Yes.

4   Q.   And she was transported for prostitution?

5   A.   Yes.                                                                  09:20:38

6   Q.   Okay.  So you already admitted to that on Thursday;

7   correct?

8   A.   Yes.

9   Q.   And that was from Portland to Las Vegas and you also I

10  believe testified that you had also taken part in driving from   09:20:48

11  Vegas to LA; correct?

12  A.   I don't think from Vegas to LA but I remember from

13  Portland to Vegas, yeah.

14  Q.   And it's your understanding now that you have immunity

15  from prosecution on those charges; correct?                      09:21:09

16  A.   Yes.

17  Q.   And when did you first receive information that you were

18  going to be provided immunity?

19  A.   Well, it was talked about on Thursday and then this

20  morning is when.                                                 09:21:27

21  Q.   What was talked about on Thursday?

22  A.   That I would -- that David would try to get me immunity.

23  Q.   Who is David?

24  A.   My attorney.

25  Q.   Had you met him before Thursday?                            09:21:43

United States District Court

AMANDA GARRETT - Cross

1  A.   No.                                                          09:21:46

2  Q.   And what was your understanding about what would happen to

3  your perjury testimony as a result of that -- well, strike

4  that.

5        Did you inform your attorney that you had committed       09:22:00

6  perjury?

7  A.   Yes.

8  Q.   And you've received immunity from prosecution for both

9  child sex trafficking and interstate transportation of a minor

10 for prostitution; correct?                                       09:22:27

11 A.   Yes.

12 Q.   And any state or local offense related to prostitution;

13 correct?

14 A.   Yes.

15 Q.   So after you testified on Thursday, not only that you had  09:22:34

16 perjured yourself but the substance of what you recalled was

17 additional prostitution two weeks after this incident in Las

18 Vegas, in Los Angeles; correct?

19 A.   Yes, but it wasn't two weeks after.

20 Q.   I'm sorry?                                                   09:22:55

21 A.   Yes, but it wasn't -- it was like a month and a half

22 after.  It wasn't two weeks.

23 Q.   So when was it?

24 A.   It was in August.

25 Q.   Okay.  And your understanding is that you can now not be    09:23:10

United States District Court

AMANDA GARRETT - Cross

1   prosecuted for the prostitution you committed in those states;          09:23:16
2   is that right?
3   A.   Yes.
4   Q.   Do you know if any of those local authorities were
5   contacted on your behalf to see to it that you were not              09:23:27
6   prosecuted?
7   A.   No.
8   Q.   You don't know?
9        Your immunity agreement also does not cover false
10  information; correct?                                                09:24:14
11  A.   Yes.
12  Q.   And did you tell your attorney that you had given false
13  information to the Mesa police in this case?
14  A.   I think so.
15  Q.   So your understanding is that you could still be or you          09:24:29
16  admitted to false information and this is not covered under
17  your immunity agreement; correct?
18  A.   Yes.
19  Q.   Have you been charged since Thursday with false
20  information?                                                         09:24:45
21             MS. BARDORF:   Objection.   Asked and answered.
22             THE WITNESS:   No.
23             THE COURT:   Sustained.
24  BY MS. HULL:
25  Q.   Okay.   We didn't talk about false information before.   But    09:24:50

United States District Court

AMANDA GARRETT - Cross

| 1 | you have not been charged with anything since Thursday, have | 09:24:53 |
| 2 | you? |
| 3 | A.   No. |
| 4 | Q.   In any jurisdiction that you're aware of? |
| 5 | A.   No. | 09:24:58 |
| 6 | Q.   Okay. |
| 7 | Were you provided any reason as to why you were given |
| 8 | immunity? |
| 9 | A.   What do you mean? |
| 10 | Q.   Well, what's your understanding of why you received | 09:25:20 |
| 11 | immunity after you had already testified for two days? |
| 12 | A.   Because of some of the stuff that I said I could be |
| 13 | charged with. |
| 14 | Q.   Okay.  And did you talk to the United States Attorney or |
| 15 | FBI agents or anything like that before you testified? | 09:25:38 |
| 16 | A.   Yes. |
| 17 | Q.   And you said that you did tell them all of those things; |
| 18 | correct? |
| 19 | A.   I did not bring that up to them because I didn't think |
| 20 | that -- it didn't really have anything to do with this so I did | 09:25:49 |
| 21 | not talk to them about it, no. |
| 22 | Q.   But they knew about you prostituting in Las Vegas before |
| 23 | you testified; right? |
| 24 | A.   Yes. |
| 25 | Q.   So you had told them that beforehand? | 09:25:59 |

AMANDA GARRETT - Cross

1  A.   Yes.                                                    09:26:01

2  Q.   And they didn't offer you an attorney then?

3  A.   No.

4  Q.   And they didn't offer you immunity then?

5  A.   No.                                                     09:26:06

6  Q.   Did they inform that you I had suggested an attorney be

7  appointed to you about six months ago?

8              MS. BARDORF:  Objection.  Relevance.

9              THE COURT:  Sustained.

10 BY MS. HULL:                                                 09:26:24

11 Q.   Did you talk to the prosecutor or anyone from the

12 prosecutor's office since we met, since you took the stand or

13 left the stand on Thursday?

14 A.   No.

15 Q.   Did you talk to your attorney about what kinds of things  09:26:43

16 you could expect on cross examination?

17 A.   No.

18 Q.   You also said on Thursday that you had never been to the

19 Wild Wild West before this incident.  Do you remember that?

20 A.   Yes.                                                    09:27:28

21 Q.   Do you remember having a field interview with a security

22 officer at that location weeks prior to this incident?

23 A.   What?

24 Q.   An interview with a security officer at that location

25 weeks prior to this incident?                               09:27:40

United States District Court

AMANDA GARRETT - Cross

1   A.   No.                                               09:27:41

2   Q.   Did you tell the prosecutor or your attorney that my

3   client never forced you to do anything?

4   A.   Yes.

5   Q.   Did you tell them that you forced XXXXXXXXX to do    09:28:18

6   anything?

7   A.   No.

8   Q.   Did you force XXXXXXXXX to do anything?

9   A.   No.

10   Q.   Did you force any of the other women on the trip to do   09:28:26

11   anything?

12   A.   No.

13   Q.   Did you force Hanoi to do anything?

14   A.   No.

15   Q.   Did you tell them that you knew XXXXXXXXX was under 18?   09:28:42

16   A.   No.

17   Q.   Did you ask them why -- if you had not done any of those

18   things, why you would be even subject to transporting a minor

19   or child sex trafficking?

20   A.   No.                                               09:28:59

21   Q.   How long did you wait in Mesa before returning back to

22   Portland?

23   A.   Like a day.

24   Q.   How did you get back to Portland?

25   A.   Someone from home bought me a bus ticket.        09:29:41

666

AMANDA GARRETT - Cross

1    Q.   And on your trip a month and a half later how did you pay          09:29:54
2    for that trip from Portland to Las Vegas?
3    A.   What do you mean?  With cash.
4    Q.   I'm sorry?
5    A.   With cash.                                                          09:30:06
6    Q.   Okay.  You had cash for that trip?
7    A.   Yes.
8    Q.   And that was a bus trip?
9    A.   Yes.
10   Q.   And then how did you pay for the trip from Las Vegas to             09:30:12
11   LA?
12   A.   With the money that we made in Las Vegas.
13   Q.   How much did you make in Las Vegas?
14   A.   I'm not sure.
15   Q.   Hundreds?                                                           09:30:25
16   A.   Probably.
17   Q.   And the same with your trip from Los Angeles to Mesa?
18   A.   M'hum.
19           MS. BARDORF:  Objection.  Relevance.
20           THE COURT:  Sustained.                                          09:30:37
21   BY MS. HULL:
22   Q.   You paid for that trip with proceeds from prostitution;
23   correct?
24   A.   Yes.
25   Q.   Okay.                                                               09:30:44

United States District Court

AMANDA GARRETT - Cross

1          MS. BARDORF:  Relevance.                          09:30:45

2          THE COURT:  Overruled.

3  BY MS. HULL:

4  Q.   And that's the same way that you paid for the trip in

5  July, correct, through prostitution?                     09:30:54

6  A.   What do you mean in July?

7  Q.   Well, going back to that trip, do you know whether or not

8  any of the hotel bills or food bills or shopping sprees that

9  benefited you came from XXXXXXXXXXX prostitution fees?

10 A.   My understanding was the money was all put together so I  09:31:24

11 guess that would be yeah.

12 Q.   So it's your understanding that you benefited from

13 XXXXXXXXXXX prostituting; correct?

14 A.   Well, we all did, yeah.

15 Q.   Okay.  And XXXXXXXXX benefited, from what you understand,  09:31:37

16 from everyone else's prostitution fees; correct?

17 A.   Yes.

18 Q.   And that was the understanding?

19 A.   Yes.

20         MS. HULL:  If I could just have a moment, Your Honor.   09:32:46

21         THE COURT:  Yes.

22 BY MS. HULL:

23 Q.   Since you testified on Thursday, have you recalled any

24 other incidents of prostitution which you have engaged in other

25 than what you've already told us?                         09:33:22

AMANDA GARRETT - Cross

1    A.    No.                                                          09:33:24

2    Q.    So it's your testimony the last time you committed

3    prostitution was in August of last year?

4    A.    Yes.

5    Q.    And have you been working since?                             09:33:31

6    A.    Yeah.

7    Q.    What have you been doing?

8    A.    I had a couple of jobs.  One for customer service and then

9    one for accounting.

10   Q.    For how long?                                                09:33:44

11   A.    Well, I started in October of last year and was let go in

12   April of this year.

13   Q.    And that was enough to support yourself?

14   A.    Yes.

15   Q.    Are you living with your folks now still?                    09:34:00

16   A.    Yes.

17           MS. HULL:  No further questions.

18           THE COURT:  All right.  Redirect?

19                   **REDIRECT EXAMINATION**

20   BY MS. BARDORF:                                                    09:34:28

21   Q.    Amanda, last week you mentioned that there were two

22   incidents where you thought people were being hit.  Can you

23   describe the second incident?

24           MS. HULL:  Objection.  404.  Foundation.  Previous

25   ruling of the court.                                               09:34:41

United States District Court

AMANDA GARRETT - Redirect

1        THE COURT:  Overruled.                                    09:34:43

2        THE WITNESS:  I'm sorry.  What was the question?

3  BY MS. BARDORF:

4  Q.   Last week you talked about two incidences where you

5  thought the defendant was hitting someone.  You talked about   09:34:53

6  the incident in the hotel room in Inglewood when the defendant

7  was with XXXXXXXXX.  Can you tell us about the other incident?

8        MS. HULL:  Your Honor, objection.  It

9  mischaracterizes the testimony.

10       THE COURT:  I'm going to sustain it on foundation.      09:35:10

11  BY MS. BARDORF:

12  Q.   Last week you said there were two incidences where you

13  thought someone was being hit.  Can you explain those two

14  incidences?

15  A.   The first one was with XXXXXXXXX when her and Hanoi were   09:35:28

16  in the hotel room and me and Zuriela were standing outside the

17  door and, like I said, I heard, like, a hitting noise and then

18  the second one was --

19        MS. HULL:  Outside the scope, Judge.

20        THE COURT:  Overruled.                                  09:35:47

21        THE WITNESS:  The second one was when Zuriela and

22  Hanoi were downstairs.  They came back upstairs in the elevator

23  and Zuriela's face --

24        MS. HULL:  Objection as to statements.  Hearsay.

25        THE COURT:  Well, I'm going to sustain it so far on     09:36:02

AMANDA GARRETT - Redirect

```
 1  foundation concerning whether or not we have hearsay or not.    09:36:07
 2  BY MS. BARDORF:
 3  Q.   Did you see anything different about Zuriela's face?
 4  A.   Yes.
 5  Q.   What did you see?                                          09:36:17
 6             MS. HULL:  Objection.  Relevance.
 7             THE COURT:  Overruled.
 8             THE WITNESS:  There was blood on her face.
 9  BY MS. BARDORF:
10  Q.   Last week you mentioned that Heather and Tracey were       09:36:27
11  paying for your travel.  Is it your understanding that we're
12  paying personally for that?
13  A.   No.
14  Q.   Who is paying for your lodging while you are here?
15  A.   I guess the government.                                    09:36:40
16  Q.   Who paid for your flight here?
17  A.   The government.
18  Q.   And did anyone give you money for food?
19  A.   Yes.
20  Q.   Who did that?                                              09:36:51
21  A.   Edie gave to it me.
22  Q.   Who is Edie?  Does she work with my office?
23  A.   Yeah.
24  Q.   And is it your understanding that was government money?
25  A.   Yeah.                                                      09:37:07
```

AMANDA GARRETT - Redirect

1  Q.   When you met with us, did we tell you what to say here          09:37:15

2  today?

3  A.   No.

4  Q.   What did we ask you to do?

5  A.   To tell the truth.                                              09:37:21

6  Q.   When you were in Las Vegas in July, were you ever arrested

7  or caught by the police while you were engaged in prostitution?

8  A.   No.

9  Q.   And what about when you went on the trip with Zuriela, did

10 you ever get arrested or caught in the act?                          09:37:38

11 A.   No.

12 Q.   As far as you know, are there any charges pending against

13 you?

14 A.   No.

15         MS. BARDORF:  If I may, Your Honor.                          09:37:54

16         Nothing further for this witness, Your Honor.

17         MS. HULL:  I am asking for a sidebar.

18         THE COURT:  On what?

19         MS. HULL:  An issue that has just been brought to my

20 attention.                                                           09:38:34

21         THE COURT:  All right.

22         (At sidebar.)

23         MS. HULL:  Her attorney just informed me that one of

24 the jurors sitting in this jury was a witness for him on one of

25 his cases previously and he wanted the court to know that.           09:38:57

672
AMANDA GARRETT - Redirect

1       MR. LOGAN:  I didn't hear what counsel had to say.        09:39:00

2       THE COURT:  Apparently one of the jurors was a

3  witness for Mr. Eisenberg.  Did he explain what it was?

4       MS. HULL:  No.  He just said --

5       THE COURT:  Okay.  I'll talk to him about it then.     09:39:13

6       MR. LOGAN:  Your Honor, there was one last issue

7  before we call the juvenile to the stand.  Was it the court's

8  understanding that we would not go into the new information?

9       THE COURT:  You're not to go into the new

10 information.                                                    09:39:28

11      MR. LOGAN:  Not to go into it.

12      MS. HULL:  And I want my record to make, Judge.  I

13 have had my investigator more thoroughly reading the reports

14 and I would like to make a record on that before we proceed

15 with XXXXXXXXX.                                                 09:39:41

16      THE COURT:  We are going to take a break and I am

17 going to talk to her in any event so you can make a record.

18      (End sidebar.)

19      THE COURT:  All right.  Ladies and gentlemen, we're

20 going to take a break for about 15 minutes.  We'll see you here 09:39:57

21 at five minutes of 10.

22      And you may step down.

23      (Jury departs.)

24      (Witness excused.)

25      THE COURT:  All right.  Mr. Eisenberg, I understand     09:40:36

United States District Court

AMANDA GARRETT - Redirect

 1  that one of the jurors was a witness for you in one of your          09:40:38

 2  cases.

 3          MR. EISENBERG:  That's correct, Your Honor.

 4          THE COURT:  Which juror is that, juror number --

 5          MR. EISENBERG:  In the first row counting from left         09:40:50

 6  to right it would be the third juror.  He's wearing a polo

 7  shirt, has silver hair.

 8          THE COURT:  And, let's see, do I have those?

 9          Third from the end so that's juror number 12 and the

10  questionnaire, it's somebody who -- without saying his name, he     09:41:40

11  works for Boeing company.

12          MR. EISENBERG:  Correct.  That's the one.

13          THE COURT:  Did he recognize you?

14          MR. EISENBERG:  I don't know, Your Honor.  He didn't

15  look over very much, but I recognized him about two -- maybe        09:42:00

16  halfway through the testimony this morning.

17          He may have at some point.  I think the jurors tended

18  to look over this way at one point during the questioning.

19          THE COURT:  Okay.  What did he do for you?

20          MR. EISENBERG:  He was a witness that was an               09:42:24

21  investigator with respect to Boeing.  Boeing was the alleged

22  victim in a criminal case, a white collar criminal case, that

23  went to trial.  He was interviewed extensively by myself and as

24  well as an FBI agent and he testified a long time for -- well,

25  both sides.  It was --                                              09:42:43

United States District Court

AMANDA GARRETT - Redirect

1          THE COURT:  So he was a fact witness, not an expert          09:42:48

2    witness?

3          MR. EISENBERG:  No, he was not.  He was a fact

4    witness, correct.

5          THE COURT:  All right.  But when you say he          09:42:53

6    testified -- so he testified for both sides.  In other words,

7    he was a truthful witness?

8          MR. EISENBERG:  I would say he was, Your Honor.  The

9    other side may not have shared that opinion but I thought he

10   was.          09:43:04

11         THE COURT:  Okay.  All right.

12         Well, Counsel, I propose that I ask this gentleman

13   whether or not he actually recognized anyone in the courtroom

14   and then leave it at that unless he says yes and ask him who

15   and if he says Mr. Eisenberg, I will ask him -- he doesn't know          09:43:29

16   anything about Mr. Eisenberg but I may just leave it at that

17   point.  So we'll see.  But right now I'm not going to do that.

18   I'm going to wait until we have a break, perhaps at lunch, for

19   me to talk to him.

20         All right.  Thank you.          09:43:47

21         MR. EISENBERG:  Your Honor, do you want me to come

22   back at lunchtime then?

23         THE COURT:  No.  It won't be necessary.  He doesn't

24   need to see you again.

25         MR. EISENBERG:  Thank you, Your Honor.          09:43:58

United States District Court

675

AMANDA GARRETT - Redirect

1        THE COURT:  Thank you very much.                                    09:43:58

2        All right.  Now, let's get Ms. XXXXXXX here and her

3   attorney and let's proceed with this application for immunity.

4        MR. EISENBERG:  Your Honor, there is one more thing

5   with respect to Ms. Garrett.  Is she excused?                            09:44:13

6        THE COURT:  No, she is not.

7        Correct?

8        MS. HULL:  Correct.

9        THE COURT:  No, she is not.

10        We need Ms. XXXXXXX, not Ms. Garrett.                              09:44:44

11        And we also have --

12        Counsel, do we have Mr. Carpenter?  We have

13   Ms. XXXXXXX.  Let's get this going.  Come on.

14        (Whereupon Ms. XXXXXXXXX XXXXXXX enters the

15   proceedings with her attorney, Mr. Dana Carpenter.)                     09:45:05

16        THE COURT:  All right.  Ms. XXXXXXX, please come

17   forward to be sworn.

18                    XXXXXXXXX XXXXXXX

19   called as a Witness herein by the Government, having been first

20   duly sworn and/or affirmed by the Courtroom Deputy, testified          09:45:21

21   as follows:

22        THE COURT:  Please take the stand.

23        All right.  Mr. Carpenter, would you come forward?

24   You may be asking her some questions.

25        THE COURT:  All right.  Ms. XXXXXXX, you were here          09:45:49

United States District Court

AMANDA GARRETT - Redirect

1    last week and I asked you some questions about whether or not          09:45:54

2    you would like to talk to an attorney and then we got you an

3    attorney and Mr. Carpenter is your attorney.

4              Mr. Carpenter, will you please set forth on the

5    record why we are here today?                                          09:46:03

6              MR. CARPENTER:  Yes, Your Honor.  Again, Dana

7    Carpenter for XXXXXXXXX XXXXXXX.  Your Honor, the court

8    appointed me last Thursday I believe it was to represent the

9    witness XXXXXXXXX XXXXXXX.  At that time we determined that she

10   did have potential criminal liability and we requested that the        09:46:22

11   government seek judicial immunity which the government did by

12   filing the application pursuant to Title 18 United States Code,

13   Section 6002, and that is what we're seeking here today.

14             THE COURT:  All right.  And you've had an adequate

15   opportunity to talk to her about it?                                   09:46:47

16             MR. CARPENTER:  Yes.

17             THE COURT:  Do you understand what the Fifth

18   Amendment privilege is?

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  So you understand, then, that if there           09:46:53

21   is -- if you would give an answer to a question that might

22   incriminate you, you would have the right to take the Fifth

23   Amendment.  Do you understand that?

24             THE WITNESS:  Yes, ma'am.

25             THE COURT:  And you've talked to Mr. Carpenter about         09:47:04

United States District Court

AMANDA GARRETT - Redirect

1   that?                                                                    09:47:05

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  And I understand that your testimony in

4   this case, which relates to a variety of different things that

5   occurred over a period of time where you may or may not have      09:47:15

6   had contact with the defendant, is something -- the answers to

7   which you would probably take the Fifth Amendment.  Am I right?

8          THE WITNESS:  Right.

9          THE COURT:  So that pursuant to your conversations

10  with your attorney and perhaps even directions by your          09:47:38

11  attorney, if you were asked these questions, you would refuse

12  to answer them and you would refuse to testify based upon your

13  Fifth Amendment privilege; right?

14         THE WITNESS:  Yes, ma'am.

15         THE COURT:  And that unless I order you to testify        09:48:02

16  and answer those questions, you will continue to claim your

17  Fifth Amendment privilege.  Am I right?

18         THE WITNESS:  Can you repeat the question?  I don't

19  know if I understand it.

20         THE COURT:  Okay.  So if I ordered you, however, to       09:48:16

21  testify and give you and grant you immunity, then you would

22  testify; correct?

23         THE WITNESS:  Absolutely.

24         THE COURT:  And do you understand what immunity is?

25         THE WITNESS:  Yes, ma'am.                                 09:48:29

United States District Court

AMANDA GARRETT - Redirect

 1          THE COURT:  So you understand, then -- well, first of          09:48:30

 2   all, tell me what you think it is.

 3          THE WITNESS:  I know that it's -- okay.  Like

 4   whenever I testify in court, anything -- just basically, you

 5   know, to tell everything and I know that I won't be prosecuted    09:48:42

 6   for it.

 7          THE COURT:  Okay.  You understand this is what it

 8   means:  Your answers to those questions cannot be used against

 9   you.  Do you understand?

10          THE WITNESS:  Yes, ma'am.                                  09:48:59

11          THE COURT:  So that doesn't mean that you can't be

12   prosecuted for something.  It's just that what you say can't be

13   used against you.  Do you understand?

14          THE WITNESS:  Yes, ma'am.  That's what I meant.

15          THE COURT:  That's what you meant.                         09:49:15

16          Oh, okay.  So if you're asked were you in Las Vegas

17   in July of 2007 and you answered yes, then no one could use

18   your answer against you.  Do you understand?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  But that doesn't mean that if there was a      09:49:28

21   basis for it, that you couldn't be prosecuted for what you did

22   there.  Do you understand?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Okay.  But -- and I'm sure you've talked

25   to Mr. Carpenter about that.                                     09:49:41

United States District Court

AMANDA GARRETT - Redirect

1         THE WITNESS:  Yes, ma'am.                          09:49:44

2         THE COURT:  Do you have any questions about that

3   then?

4         THE WITNESS:  No, ma'am.

5         THE COURT:  So you understand, then, that if I grant    09:49:46

6   the application which has been made by the United States

7   government to grant you immunity, that is use immunity of your

8   testimony such that anything you say cannot be used against

9   you, you will then be ordered by me to testify?  Do you

10  understand?                                              09:50:08

11        THE WITNESS:  Yes, ma'am.

12        THE COURT:  And answer the questions.  Do you

13  understand?

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  And that none of your testimony can be    09:50:13

16  used against you except if you tell a lie.  Do you understand?

17        THE WITNESS:  Yes, ma'am.

18        THE COURT:  So you'll have to answer the questions

19  but you will have to do as everyone else has to do when they

20  take the stand which is tell the truth.  Do you understand?   09:50:31

21        THE WITNESS:  Absolutely.

22        THE COURT:  And if you don't, what will happen?

23        THE WITNESS:  Well, I'll be in trouble.

24        THE COURT:  You'll be in trouble and you could be

25  prosecuted --                                            09:50:43

United States District Court

AMANDA GARRETT - Redirect

1          THE WITNESS:  Yes, ma'am.                                    09:50:45

2          THE COURT:  -- for lying.  Do you understand?  And

3     that is called perjury?

4          THE WITNESS:  Right.

5          THE COURT:  All right.  Do you have any questions of         09:51:13

6     me?

7          THE WITNESS:  No, ma'am.

8          THE COURT:  And, Mr. Carpenter, do you have any

9     questions of me or your witness?

10         MR. CARPENTER:  Judge, I would ask that -- I assume          09:51:20

11    the court is going to formally grant it the judicial immunity,

12    that it be followed with a written order for the record.

13         THE COURT:  And I have one.

14         MR. CARPENTER:  Thank you.  And also, Judge, well, I

15    have another issue but it's not with regard to immunity.         09:51:33

16         THE COURT:  All right.  Then we will leave it at

17    that.

18         I have received an application for immunity by the

19    United States government signed by Tracey Bardorf and having

20    inquired of the witness and this is for FB, a juvenile.  She     09:51:48

21    has now testified under oath in response to my questions.  I

22    find that her testimony is necessary to the public interest of

23    the United States.  The application is based upon the good

24    faith declaration of Ms. Bardorf and that there is approval

25    from the United States Department of Justice.                    09:52:21

AMANDA GARRETT - Redirect

1          It is hereby ordered that the juvenile, FB, is          09:52:29

2   ordered to testify pursuant to 18 United States Code, Section

3   6002 and 6003 and that you give testimony and provide

4   information that you are now going to be asked even if you

5   believe that it could incriminate you.  Do you understand?     09:53:02

6          THE WITNESS:  Can you say it again?  I'm sorry.

7          THE COURT:  Yes.  You are -- I am now ordering you to

8   testify and answer the questions.

9          THE WITNESS:  Then so I have the immunity thing?

10         THE COURT:  Yes.  You have immunity.  You have the      09:53:19

11  immunity thing.

12         THE WITNESS:  Thank you.

13         THE COURT:  So you have been given use immunity for

14  your testimony.

15         Now, you understand, however, that that means only     09:53:27

16  that the government, federal government, state government or

17  local governments cannot use your testimony.  Do you

18  understand?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  So it reads no testimony or other          09:53:43

21  information required by this order or any information directly

22  or indirectly derived from your testimony, that comes from your

23  testimony, or other information may be used against you in any

24  criminal case except a prosecution for perjury or giving a

25  false statement or failing to comply with this order.          09:54:08

United States District Court

AMANDA GARRETT - Redirect

1     Do you understand now what this order is all about?          09:54:13

2     THE WITNESS:  Yes, ma'am.

3     THE COURT:  Do you understand now that you have to

4  answer the questions and give testimony?

5     THE WITNESS:  Yes, ma'am.                                    09:54:26

6     THE COURT:  All right.  So the motion is granted and

7  I am signing the order.

8     Is there anything else of this witness,

9  Mr. Carpenter, or do you just want to talk to me about

10 something?                                                       09:54:42

11    MR. CARPENTER:  No, Judge.  I just wanted to ask the

12 court -- my understanding was that a few moments ago the court

13 made an evidentiary ruling and I would ask that the court

14 advise the witness of that ruling.  Obviously I wasn't present

15 at the time.                                                     09:54:54

16    THE COURT:  Oh.  You mean concerning the recent

17 information that has been disclosed by the United States

18 government?

19    MR. CARPENTER:  Yes.  And I believe that information

20 was disclosed on Thursday of last week.                          09:55:05

21    THE COURT:  Right.  And, apparently, Ms. XXXXXXX, you

22 were interviewed by the United States government and the FBI

23 last week.

24    THE WITNESS:  Yes, ma'am.

25    THE COURT:  And you gave them additional information        09:55:22

United States District Court

AMANDA GARRETT - Redirect

1   that you thought might be relevant.                                09:55:28

2           THE WITNESS:  Yes, ma'am.

3           THE COURT:  The government is not going to ask you

4   questions about that so you are not to volunteer any

5   information concerning that.  Do you understand?               09:55:38

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  It is possible that after consulting with

8   Ms. Hull, I may allow her to ask you questions about that.  But

9   that is only after I have had an opportunity to determine

10  whether or not those questions are relevant.  Do you           09:55:56

11  understand?

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  So the long and short of it is don't say

14  anything about that until I tell you you can.

15          THE WITNESS:  Yes, ma'am.                              09:56:07

16          THE COURT:  All right?

17          Anything else, Mr. Carpenter?

18          MR. CARPENTER:  No, Your Honor, thank you.

19          THE COURT:  All right.  Then let's get the jury back

20  in here and you may step down.                                 09:56:14

21          MS. HULL:  Your Honor, I have some issues to address

22  on this as I requested prior to her testimony.

23          THE COURT:  And that was what?

24          MS. HULL:  Judge, we had an initial hearing on this

25  matter.  I brought up the issue of the 404(b) in limine and I  09:56:29

United States District Court

AMANDA GARRETT - Redirect

1   indicated to the court --                                          09:56:38

2        THE COURT:  You may step down, Miss XXXXXXX.

3   Mr. Logan and Ms. Bardorf, let's get her out of the courtroom

4   so we can discuss this matter, please.

5        (Ms. XXXXXXX departs the proceedings.)                        09:56:49

6        THE COURT:  Okay.  Go ahead.

7        MS. HULL:  Thank you, Judge.  Before we started

8   trial, the issue that I raised with the court before we even

9   started was because the government had not filed anything but a

10  609, had not filed any 404(b), that no other incidents, no       09:57:24

11  other criminal charges or criminal acts not charged could be

12  gone over because no 404 was filed.  And my recollection is the

13  court agreed.

14       THE COURT:  Right.  And the government is not getting

15  into it.                                                          09:57:45

16       MS. HULL:  Okay.  Well, the government doesn't seem

17  to recall that because I asked Mr. Eisenberg and the

18  government, prior to Amanda retaking the stand, that my

19  recollection is that these witnesses are not to be discussing

20  any of these things and the government said they didn't know     09:57:59

21  anything about that.  So I'm asking to make a record again

22  before XXXXXXXXX takes the stand because these other

23  incidents -- and this also goes, Judge, to the issue the

24  court -- when the government put Officer Vela on the stand and

25  had the photograph of Zuriela Payes put in with a cut on her     09:58:20

United States District Court

685

AMANDA GARRETT - Redirect

1   nose, I objected as to foundation and relevance and the court          09:58:25

2   inquired whether Mr. Logan was going to be able to tie it up.

3   He avowed that he could.  My understanding from that exchange

4   was the court then said words to the effect that based on

5   things the court had heard, that it was going to allow that.           09:58:39

6          Now, the only way I can see that that can be done is

7   with Miss Payes' presence because no one else saw any sort of

8   offense.  It doesn't have any relevance here now.  Now the

9   government has twice been allowed to talk about the cut on the

10  nose over my objection.  Ms. Payes is still not here and it is         09:59:02

11  a 404(b) issue.  I cannot see what other relevance that would

12  have had.  It has not been tied up as of yet.

13         This witness has already told law enforcement that

14  she didn't see anything about how that cut was caused so I'm

15  going to ask that she also be instructed to stay clear of that.        09:59:24

16         MS. BARDORF:  Your Honor, this is not 404(b)

17  evidence.  The government is required to prove the means by

18  which Ms. XXXXXXX was recruited, enticed, harbored,

19  transported, provided, or obtained.  That's the language of the

20  statute.  It says "by any means."  And in this case, part of          09:59:43

21  the means were the violence inflicted upon her in California is

22  what induced her to not -- or to continue to comply with his

23  instructions and then was subsequently transported over state

24  lines.  It also helps explain her behavior and her reaction,

25  because she was afraid of him.                                         10:00:02

United States District Court

686

AMANDA GARRETT - Redirect

| | | |
|---|---|---|
| 1 | THE COURT:  Well, what about Ms. Payes?  That's the | 10:00:06 |

THE COURT:  Well, what about Ms. Payes?  That's the
issue, is this other issue that was raised by Ms. Garrett.

MS. BARDORF:  It's the same issue really, Your Honor.
In reality, all of the witnesses, most particularly
Ms. XXXXXXX, also saw the cut on the nose and also suspected
who had done it.  There's of course hearsay evidence as to who
had done it because Ms. Payes told them --

THE COURT:  Well, the reason why I allowed it is
because Ms. Garrett raised that for the first time on
cross-examination.  That's why I allowed it.

But I'm not sure -- if you had this evidence, then I
would expect that you would have offered it in your
case-in-chief and said you offered it on redirect.  Are you
going to offer this evidence or what is going to happen with
this evidence?

MS. BARDORF:  Your Honor, there's going to be more
testimony.  Ms. XXXXXXX is going to corroborate the very same
testimony that Ms. Garrett brought up on direct about the fight
in Inglewood where Ms. XXXXXXX and the defendant were in the
hotel room and Ms. XXXXXXX is going to testify about what
transpired in the hotel room.  On direct exam Ms. Garrett
explained how she was outside the hotel room and heard the fist
sound.  That was on direct and then it was covered on redirect
to clarify because on cross she mentioned that there were two
incidences.

United States District Court

687

AMANDA GARRETT - Redirect

1    The climate of fear that was created because of the   10:01:23

2  beatings is part of how Ms. XXXXXXX --

3    THE COURT:  No.  I understand that.  I thought -- I

4  may have misunderstood the testimony.  I thought that what we

5  are talking about now is Ms. Payes.  Isn't that what we're   10:01:36

6  talking about?

7    MS. HULL:  Well, that's part of it, Judge, but,

8  again, they have not --

9    THE COURT:  With respect to Ms. XXXXXXX, that

10  evidence is already in.  That came in on direct examination.   10:01:47

11    MS. HULL:  Over my objection, Judge.

12    THE COURT:  What appeared to be new evidence was this

13  issue about Ms. Payes and about whether or not she had some

14  kind of a mark on her face.  That is something that is new that

15  came through Ms. Garrett.  But what occurred and what involves   10:02:04

16  Ms. XXXXXXX is this continuous activity involving supposedly

17  your client and whether or not he was intimidating her with

18  some type of physical activity, and that has always been part

19  of the government's case.  I don't see that as being 404(b)

20  evidence.   10:02:34

21    So she can testify -- make it clear.  She can testify

22  to what happened to her.  She can only testify to what she

23  observed.  She cannot testify to any hearsay.

24    All right.

25    MS. BARDORF:  Just for clarification, Your Honor, can   10:02:49

United States District Court

AMANDA GARRETT - Redirect

1  she testify that -- she was present when Ms. Payes leaves with        10:02:50

2  the defendant and returns with the bleeding nose that

3  Ms. Garrett testified about and that the police officers

4  testified about.

5         MS. HULL:  What is the relevance?  Judge.  I don't           10:03:00

6  understand the relevance.

7         THE COURT:  The relevance is clear.  It's overruled.

8  All right.  Let's bring in the jury and let's bring in the

9  witness.

10        MS. HULL:  Your Honor, if they are not going to             10:03:14

11  present Ms. Payes because they can not find Ms. Payes, then the

12  implication is by the testimony of these witnesses if the court

13  allows it, that my client caused that.  And, again, that's --

14        THE COURT:  Well, the problem with this issue and

15  Ms. Payes is it came out in cross-examination for the first        10:03:37

16  time.

17        MS. HULL:  No, it did not, Judge.  On direct

18  examination of Officer Vela the government stood up and put a

19  picture of her on the stand.  I objected as to relevance and

20  foundation and the court said on direct examination, "Is the       10:03:51

21  government going to tie that up?"  Mr. Logan said yes.

22        THE COURT:  Well, we now have the tie-up at least

23  through Ms. Garrett then.

24        MS. HULL:  Over my objection, again.

25        THE COURT:  Well, she testified to firsthand             10:04:03

United States District Court

AMANDA GARRETT - Redirect

1  knowledge and she didn't testify to hearsay.  It's relevant.     10:04:05

2         All right.  Let's bring the jury in.

3         (Jury enters.)

4         THE COURT:  Okay.  Thank you, ladies and gentlemen,

5  please be seated.  And --                                        10:05:01

6         MR. LOGAN:  Your Honor, the United States calls

7  XXXXXXXXX XXXXXXX to the stand.

8                    XXXXXXXXX XXXXXXX

9  called as a Witness herein by the Government, having been first

10  duly sworn and/or affirmed by the Courtroom Deputy, testified    10:05:38

11  as follows:

12         COURTROOM DEPUTY:  Please state your name for the

13  record and spell your last name, please.

14         THE WITNESS:  XXXXXXXXX XXXXXXX, B-A-L-L-A-R-D.

15         COURTROOM DEPUTY:  Have a seat right over here.          10:05:50

16         MR. LOGAN:  Your Honor, the United States would ask

17  that the judge be given Government Exhibits 1, 2, 3, and 4.

18         THE COURT:  The witness already has them.  You say

19  the judge be given?

20         MR. LOGAN:  I'm sorry.  The witness.                      10:06:24

21         THE COURT:  Yes, she has them.

22                    **DIRECT EXAMINATION**

23  BY MR. LOGAN:

24  Q.   XXXXXXXXX, if you would spell both of your names, please.

25  A.   X-X-X-X-X-X-X-X-X, X-X-X-X-X-X-X.                           10:06:33

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  Q.   And, XXXXXXXXX, as you can see, this is a very large room    10:06:39

2  so we're going to you to speak up and you can pull the

3  microphone closer to your face; okay?

4  A.   Okay.

5  Q.   How old are you?    10:06:49

6  A.   I am 17 years old.

7  Q.   And when do you turn 18?

8  A.   On July 18.

9  Q.   Do you recognize a Hanoi Acosta in this room?

10 A.   Yes, sir.    10:06:58

11 Q.   Where is he?

12 A.   He's sitting right over there, right there.

13 Q.   What's he wearing?

14 A.   He's wearing a black suit.

15 Q.   Can you describe his shirt?    10:07:07

16 A.   I can't see it right now.  I can't tell what color it is.

17 It looks gray to me.

18        MR. LOGAN:  Your Honor, let the record reflect that

19 the witness has identified the defendant, Mr. Acosta.

20        THE COURT:  It will.    10:07:21

21 BY MR. LOGAN:

22 Q.   Do you recall the first time you met him?

23 A.   Yes, sir.

24 Q.   Tell us about that.

25 A.   I had just started dating a guy by the name of Ezra and he    10:07:29

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   was really good friends with Mr. Hanoi over there and me and          10:07:33
2   Ezra ended up going to Hanoi's sister's Jacqueline's house one
3   day and he had got us acquainted with, you know, with Hanoi and
4   his wife and a few other friends that were there.
5   Q.   Do you recall -- I'm sorry.  Go ahead.                           10:08:01
6   A.   And that's how I met him.
7   Q.   Do you recall when that was?
8   A.   It was around -- like the beginning of my sophomore year,
9   like in September of -- like '06, September '06.
10  Q.   So you were in school last year?                                 10:08:20
11  A.   For a little while.
12  Q.   So it was your sophomore year of high school?
13  A.   Yes, sir.
14  Q.   Were you 15 at that point?
15  A.   Yes, sir.                                                        10:08:37
16  Q.   So that would be the fall of 2005 then?
17            MS. HULL:  Objection.  Your Honor.
18            THE WITNESS:  To tell you the truth, Your Honor, I'm
19  not really sure.  It was like -- I know it was around the
20  beginning of my sophomore year.                                      10:08:51
21  BY MR. LOGAN:
22  Q.   Okay.  Now, you testified earlier that your boyfriend was
23  Ezra.  Is that right?
24  A.   Yes, sir.
25  Q.   Do you know if the defendant knew that Ezra was in high          10:09:00

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1  school?                                                         10:09:04

 2  A.   Yes, sir, he did.

 3  Q.   How did he know that?

 4          MS. HULL:  Objection.  Speculation.

 5          THE COURT:  Sustained.                                   10:09:08

 6  BY MR. LOGAN:

 7  Q.   When you were with the defendant your sophomore year when

 8  you testified that you were also with this Ezra -- do you

 9  recall that?

10  A.   Yes, sir.                                                   10:09:19

11  Q.   Was there ever an occasion in 2005 when you told the

12  defendant what grade you were in?

13  A.   Yes, sir.

14  Q.   When was that?

15  A.   It was the second day that I had went over to actually     10:09:33

16  hang out with Hanoi and his wife Nikyea and, you know, his

17  sister and her boyfriend.  I was speaking to Hanoi and, you

18  know, basically -- I mean, he -- he pretty much had knew, you

19  know, like what grade I was in because Ezra, he was --

20          MS. HULL:  Objection.  Hearsay.  Speculation.           10:09:59

21          THE COURT:  Sustained.

22  BY MR. LOGAN:

23  Q.   Let's focus on how he knew how old you were and what grade

24  you were in.

25  A.   Okay.  Well, I was speaking to his wife, Nikyea, about my  10:10:06
```

XXXXXXXXX XXXXXXX - Direct

1  age about my age and things and I told her I am a sophomore in   10:10:13

2  high school.  Basically, I remembered telling him at one point

3  in time but I don't really, really remember the whole entire

4  conversation.  But I know that I made it known to him that --

5  of my age, you know, and I just knew -- he knows.   10:10:32

6  Q.   And it was the fall of 2005 yourself sophomore year?

7  A.   Yes, sir.

8       MS. HULL:  Objection, Your Honor.  The testimony was

9  fall of '06.

10      THE COURT:  '05 or '06?   10:10:49

11      THE WITNESS:  '06.

12      THE COURT:  Fall of '06.  All right.

13  BY MR. LOGAN:

14  Q.   Now, when you said you testified the second time you had

15  seen him he was aware of your age, how long was it between the   10:11:06

16  first time you met him and the second time were you around him?

17      MS. HULL:  Your Honor, again, I am going to object as

18  to counsel testifying.  She doesn't recall telling my client

19  that or the time.

20      THE COURT:  Well, she did say that she recalled.   10:11:20

21  Overruled.

22      THE WITNESS:  I would say it was a period of two to

23  three days in between the first time and the second time that I

24  met him.

25      THE COURT:  You need to get in front of the   10:11:33

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   microphone.  What you can do is pull it forward.  Push it down.    10:11:35

2   However it is comfortable for you.

3                THE WITNESS:  Is this okay?

4                THE COURT:  That's better.

5                THE WITNESS:  Okay.    10:11:44

6   BY MR. LOGAN:

7   Q.   Now, how did you know the defendant's wife?

8   A.   My ex-boyfriend, Ezra, he had introduced us and that's

9   pretty much how I knew her.  I just met her about the time so I

10  didn't quite know her but I did get to know her well later.    10:12:00

11  Q.   Now, when you met the defendant, were you living at home?

12  A.   Yes, I was living at home at the time.

13  Q.   And if you can describe for the jury if you had -- were

14  you involved with any extracurricular activities in high

15  school?    10:12:20

16  A.   Well, I had some honors classes and I was going to get

17  into dance but I didn't get into dance.  So not really.  I

18  didn't have -- well, except for, you know, an honors class.

19  Q.   And during your free time, what did you do?

20  A.   For the most part, I liked to hang out with my friends,    10:12:47

21  you know, just do typical teenage things, you know, like go out

22  to the movies, just go out and have a good time.

23  Q.   When you say "go out and have a good time," what does that

24  mean?

25  A.   Well, you know, to be totally honest with you, sometimes    10:13:05

United States District Court

695

XXXXXXXXX XXXXXXX - Direct

1   we would go out and we would smoke pot and, you know, hang out                    10:13:09

2   and drink, you know, just that kind of stuff.  And then we

3   would go out to like -- there was a teenage club out there

4   called The Zone.  We would go there Saturdays, you know, and we

5   would do house parties.  Just kind of really hanging out, being   10:13:30

6   a teenager and things.

7   Q.   Now, when you say you would drink and things, you would

8   drink what?

9   A.   Alcohol.

10  Q.   And that was your sophomore year?                            10:13:45

11  A.   Yes, sir.

12  Q.   What kind of student were you at that point?

13  A.   At that point, you know, school was basically just

14  starting up so I was kind of doing good but, you know, like as

15  I was just, you know, hanging out and doing things that I         10:14:00

16  wasn't supposed to do, my grades started to drop a little bit

17  but I was trying to pick them back up but then I kind of

18  started skipping school.

19  Q.   What do you mean by doing things you weren't supposed to

20  do?                                                               10:14:17

21  A.   Like as far as drinking alcohol, smoking pot, you know,

22  and just being out all hours of the night.  I know I wasn't

23  supposed to do that.  I know I was supposed to just be at home,

24  go to school, kind of kick that other stuff out of the way and

25  just take care of my business.                                    10:14:36

United States District Court

696
XXXXXXXXX XXXXXXX - Direct

1   Q.   Did your mother allow you to stay out late and drink and    10:14:38

2   smoke marijuana?

3   A.   No, she didn't.  She was very strict.

4   Q.   Now, how long did you date Ezra, if you recall?

5   A.   I'm not sure.  It could have been about four to five    10:14:55

6   months.  I know it was less than six months, though.

7   Q.   Did you complete the 10th grade?

8   A.   No, sir.

9   Q.   Why not?

10  A.   Because I got into -- like I said, I was smoking a lot of    10:15:10

11  weed.  I was drinking.  I wasn't focused on school and I just

12  didn't put my best foot forward and it -- so, you know,

13  eventually your grades are going to drop and you won't be able

14  to pick them back up by the time it's actually time for you to

15  progress to the next grade level and it just didn't happen for    10:15:29

16  me.

17  Q.   And do you recall when you actually dropped out of school?

18  A.   I'm not even sure because I know that I did so much

19  skipping school.  Like whenever I dropped out of school, it

20  didn't make too much of a difference.  I wasn't really sure.    10:15:43

21  I'm not really sure.

22  Q.   Do you know if it was in the fall of your sophomore year?

23            MS. HULL:  Objection.  Leading.

24            THE COURT:  Sustained.

25

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   BY MR. LOGAN:                                                10:15:51

2   Q.   Do you have any idea of what time of the year it was?

3            MS. HULL:  Asked and answered.

4            THE COURT:  Overruled.

5            THE WITNESS:  It could have been -- I'm thinking    10:15:59

6   maybe toward -- I don't know, maybe like November, October,

7   November-ish.

8   BY MR. LOGAN:

9   Q.   That's when you dropped out of school?

10  A.   Yeah.  That's pretty much just when I stopped going.     10:16:18

11  Q.   Now, when you started going to school your sophomore year,

12  were you working?

13  A.   Yeah.  I had a little job.  It was -- I was working for a

14  place called Project Hope and it was -- I was working for a

15  lady named Mrs. Reba.  My momma had set me up with the job     10:16:43

16  because it was her friend.  That's kind of how I got the job.

17  I quit after like two days.  I quit after like maybe four days.

18  Q.   Now, when you stopped going to school, did you continue to

19  live at home?

20  A.   No, I didn't.  Actually, you know -- I'm trying to think.  10:17:05

21  It's like I was running away a lot because my mother was so

22  strict.  She -- you know, and I could understand her being

23  strict and some of the things that I was doing.  Hey, she was

24  being too strict and I had to have it my way.  I guess I just

25  left plenty of times.                                         10:17:36

XXXXXXXXX XXXXXXX - Direct

1   Q.   Now, XXXXXXXXX, did you get back into high school at some       10:17:39

2   point?

3   A.   Yes.  I got back into high school at some point.  I got

4   into an alternative school.  I think it was -- I'm not sure,

5   maybe the beginning of '07.  I'm not sure but I know at some       10:17:55

6   point in time I did get into an alternative school to try to

7   change my life and actually try to get my GED or something

8   because I was too far back in school.

9   Q.   And did you restart the 10th grade?

10  A.   No.  Actually, what they do in Portland, Oregon, is they       10:18:15

11  actually send you up to the next grade regardless of you

12  passing the last grade or not.  You just go to the next grade

13  and then if you get to 12th grade and you still haven't

14  finished the 10th grade you are going to repeat the 12th grade

15  as many times as you can in order for you to graduate.          10:18:33

16  Q.   And do you recall when you started the next grade or the

17  same grade, whatever you described there, were you living at

18  home?

19  A.   To tell you the truth, I don't know where I was.  I really

20  don't.  I'm not sure right now.                                 10:18:52

21  Q.   Now, you testified earlier that you had stopped going to

22  high school your sophomore year.  When you quit going to

23  school, did you ever see the defendant?

24  A.   Yes, I did.

25  Q.   And tell us about that.                                    10:19:15

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Well, first off, I know that I remember, you know, talking        10:19:19

2   to Hanoi's wife for a while.  After that, you know, we had

3   exchanged numbers after the first time we had met and we had

4   kept in contact pretty much and we were just pretty cool.  She

5   used to call me and we used to talk all the time and then she     10:19:37

6   was telling me about --

7               MS. HULL:  Objection.  Hearsay.

8               THE COURT:  Sustained.

9               THE WITNESS:  Okay.

10  BY MR. LOGAN:                                                       10:19:45

11  Q.   Now, tell the jury, once you dropped out of high school,

12  do you recall the next time you saw the defendant?

13  A.   I seen him whenever -- I'm trying to think.  I seen him

14  back over at Jacqueline's house, his sister's house, and it was

15  whenever I went to go and do his wife's hair whenever we were    10:20:10

16  getting ready to go to Vegas the first time.

17               MS. HULL:  Objection.

18               THE COURT:  Overruled.

19  BY MR. LOGAN:

20  Q.   Now, the beginning of your junior year when you were         10:20:28

21  talking about the alternative school, did you have any school

22  friends?

23  A.   Yes, I did.  I had a friend by the name of Tasha who, you

24  know, I had pretty much came to an agreement with my mother

25  that I went to live with her and her grandmother and all          10:20:44

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  because, you know, she was going to school like she was                    10:20:48

2  supposed to and I pretty much wanted that for myself also but,

3  you know, she was also drinking and still smoking pot but she

4  was going to school at least and she was trying to make

5  something of herself and I wasn't doing anything.                          10:21:02

6  Q.   Were you two going to the same school?

7  A.   Yes, we were.

8  Q.   Do you recall if she was working at that point?

9  A.   She was working at Project Hope after -- it was after I

10 quit, she started working there so yeah.                                    10:21:19

11 Q.   Well, when did you quit working at Project Hope?

12 A.   I quit working there whenever I was -- it was the

13 beginning of my, you know, it was the beginning of my -- the

14 beginning of my sophomore year I quit over there but, you know,

15 she started working there toward like the beginning of our --            10:21:46

16 you know, the beginning of our junior year she started working

17 there.

18 Q.   Now, the beginning of your junior year, were you dating

19 Ezra?

20 A.   No, I don't think so.                                                 10:22:00

21 Q.   Now, XXXXXXXXX, would you ever run into the defendant's

22 wife that you were talking about?

23 A.   Yes.

24 Q.   And where would you see her?

25 A.   I would see her off of 82nd Avenue in Portland.              10:22:23

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | MS. HULL:  Objection.  Relevance. | 10:22:26 |
| 2 | THE COURT:  Sustained. | |
| 3 | THE WITNESS:  I -- | |
| 4 | THE COURT:  No.  No.  Once I sustain the objection, | |
| 5 | you don't answer. | 10:22:35 |
| 6 | Go ahead and ask another question. | |
| 7 | BY MR. LOGAN: | |
| 8 | Q.   Your junior year when you testified that you had gone back | |
| 9 | to school, did you have any extracurricular activities at that | |
| 10 | point? | 10:22:46 |
| 11 | A.   No, sir. | |
| 12 | Q.   What did you do when you weren't in school? | |
| 13 | A.   Excuse me.  Can you repeat the question again? | |
| 14 | Q.   Yes.  When you were not going to the alternative school | |
| 15 | your junior year, what did you do during your free time? | 10:23:02 |
| 16 | A.   Well, during my free time I would, you know, just -- | |
| 17 | pretty much I would smoke weed and drink and do things that -- | |
| 18 | I mean some normal teenagers do it but not people that actually | |
| 19 | want to do something for themselves.  I know I was slacking a | |
| 20 | lot and I wasn't really going to school like I was supposed to. | 10:23:24 |
| 21 | Like I said, I was still caught up in the smoking and the | |
| 22 | drinking. | |
| 23 | Q.   XXXXXXXXX, your voice trails off.  I'm going to ask you | |
| 24 | to -- | |
| 25 | A.   Okay. | 10:23:39 |

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   Thank you.                                                              10:23:40

2        Your junior year did you have a cell phone?

3   A.   I went through a lot of cell phones.  I'm trying to think.

4   I think I did.  I'm not sure.  I'm not sure because I've had so

5   many cell phones, I'm not sure when I've had one in my junior     10:23:59

6   year.

7   Q.   Now, you testified earlier that I believe the beginning of

8   your junior year at the alternative school you had run into the

9   defendant.  Was that right at Jacqueline's house?

10  A.   Yes.                                                          10:24:18

11  Q.   Did you have a chance to talk to him?

12  A.   Actually, yeah.  I was talking to him and his wife,

13  Nikyea, and they were -- well, whenever I stopped by to go and

14  do Nikyea's hair because she wanted me to put some tracks in

15  her hair for her -- just so they could look longer and things.   10:24:35

16  And, basically, you know, I was there and we were all talking

17  about -- well, he was saying, okay, well, we are all getting

18  ready to go to Vegas and things like that and he was really,

19  really pumped up about it.

20            MS. HULL:  Objection.                                    10:24:53

21            THE COURT:  Objection what?

22            MS. HULL:  Previous hearing and ruling of this court.

23            MR. LOGAN:  Your Honor, request sidebar.

24            (At sidebar.)

25            THE COURT:  What previous ruling are you talking         10:25:28

United States District Court

XXXXXXXXX XXXXXXX - Direct

| | |
|---|---|
| 1 | about? | 10:25:30 |
| 2 | MS. HULL:  We're talking about the trip to Vegas, |
| 3 | Judge.  This is this new incident? |
| 4 | THE COURT:  This is isn't the new incident, is it? |
| 5 | MR. LOGAN:  Judge, there was always a trip from | 10:25:40 |

1    about?                                                        10:25:30

2          MS. HULL:  We're talking about the trip to Vegas,

3    Judge.  This is this new incident?

4          THE COURT:  This is isn't the new incident, is it?

5          MR. LOGAN:  Judge, there was always a trip from      10:25:40

6    Portland to Las Vegas but the new information was added that we

7    didn't have access to, but they took a trip from Portland to

8    Las Vegas and she provided us information about what they did

9    in Las Vegas.  It was consistent with what the other witnesses

10   testified about.                                              10:26:00

11         THE COURT:  Okay.  Let me see.  How many trips to Las

12   Vegas were there?  Two?  Two or one?

13         MR. LOGAN:  There were two.

14         THE COURT:  And the only thing I've precluded is any

15   testimony that relates to the information that was previous --  10:26:15

16   that was just provided.  This is not information that was just

17   provided.  This is previous information.

18         So what are you talking about?

19         MS. HULL:  Judge, they are talking about a trip

20   previous to this where they are talking about -- and this is   10:26:32

21   information that she had brought up in this 302 about a trip to

22   Las Vegas and the information that she gave is in these reports

23   from California that we received this morning about the

24   conversations had with my client, the purpose of the trip, that

25   sort of thing.                                                10:26:50

XXXXXXXXX XXXXXXX - Direct

 1          THE COURT:  Well, the only thing -- she cannot          10:26:51
 2    testify to anything that has recently been provided because
 3    that's going to open the door to all sorts of information.  I'm
 4    precluding that.
 5          MS. HULL:  And they are trying to open --          10:27:09
 6          THE COURT:  Wait, wait.  Let me finish.  I'm going to
 7    preclude anything than what we have prior to her testifying.
 8    If we open the door to that, we're going to be here for another
 9    three weeks because I'm going to allow her to cross-examine and
10    get into all of this and subpoena witnesses and all of the          10:27:25
11    information that she thinks is relevant; all right?
12          MR. LOGAN:  Judge, the information that the defense
13    counsel has had for months and months deals with the initial
14    2006 trip from Portland to Las Vegas when it was the juvenile,
15    the defendant, and his wife.          10:27:46
16          THE COURT:  So that's in the new?
17          MS. HULL:  But it was for her stripping.
18          MR. LOGAN:  It was for your client to take her and
19    the wife because the wife was going to prostitute and strip,
20    which you've had since August.          10:28:02
21          MS. HULL:  She said -- what since August?
22          MR. LOGAN:  You've had those reports about that
23    initial trip to Las Vegas for months.
24          MS. HULL:  And she said that she went --
25          THE COURT:  Who is "she"?          10:28:17

United States District Court

XXXXXXXXX XXXXXXX - Direct

1          MS. HULL:  XXXXXXXXX said that she went to go          10:28:18

2     stripping.

3          THE COURT:  Now wait a minute.  What is the report

4     that you have that was provided four months ago?  Let's get

5     into that.  What is it she has notice of that you're going to    10:28:29

6     ask this witness to testify to?  Set that forth on the record

7     now.

8          MR. LOGAN:  Right.  They went to Las Vegas.

9          THE COURT:  They.  Let's not use pronouns.

10         MR. LOGAN:  The defendant's wife and the victim went    10:28:43

11    to Las Vegas in 2006, fall.  The defendant's wife was going to

12    prostitute and strip.  The victim XXXXXXXXXXX understanding was

13    that she was going just to have fun in Las Vegas.

14         THE COURT:  So that information was provided

15    previously.  That's what she's going to testify to.          10:29:00

16         MS. BARDORF:  And, Your Honor, if I can just add one

17    detail.

18         MR. LOGAN:  And there was also discussion that

19    XXXXXXXXX would obtain a fake identification card with the

20    defendant's sister's personal information on it because he was    10:29:13

21    aware that she was under age.

22         THE COURT:  Okay.  So now you know.

23         (End sidebar.)

24         THE COURT:  All right.  Mr. Logan, you may proceed.

25


United States District Court

706
XXXXXXXXX XXXXXXX - Direct

```
 1    BY MR. LOGAN:                                                  10:29:35
 2    Q.   XXXXXXXXX, before we broke, you were talking to the
 3    defendant about a Las Vegas trip?
 4    A.   Yes.  You know, as I was going -- his wife's hair, Hanoi's
 5    wife's hair.  They were just like, yeah, and --                10:29:46
 6              MS. HULL:  Objection, hearsay.
 7              THE COURT:  Sustained.
 8    BY MR. LOGAN:
 9    Q.   When you were doing the defendant's wife hair, was the
10    defendant present?                                             10:29:58
11    A.   Yes, he was.
12    Q.   Did you have a conversation with the defendant?
13    A.   Yes.
14    Q.   About what?
15    A.   About going to Las Vegas.                                 10:30:06
16    Q.   Do you recall the conversation?
17    A.   Yes, I do.
18    Q.   What was it?
19              MS. HULL:  Objection.  Relevance.  Hearsay.
20              THE COURT:  Overruled.                               10:30:15
21              THE WITNESS:  He was basically -- basically, he was
22    very, very happy about going and he had asked me, "Hey, do you
23    want to come with me and my wife to Las Vegas?"
24              I said, "Sure."  It would be, like, my first time
25    even going and I don't mind and basically -- and then, you     10:30:33
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | know, me and -- me and Nikyea had started talking, which is his | 10:30:42 |
| 2 | wife, me and Nikyea had started talking about it.  And he had | |
| 3 | left the room and I don't know what he went to do but me and | |
| 4 | her continued the conversation about going. | |
| 5 | MR. LOGAN:  Do you recall if you actually went to Las | 10:30:57 |
| 6 | Vegas? | |
| 7 | THE WITNESS:  Yes, sir. | |
| 8 | MR. LOGAN:  Now, what was your understanding of what | |
| 9 | it was you were going to do in Las Vegas with the defendant? | |
| 10 | THE WITNESS:  I knew about Nikyea's -- | 10:31:08 |
| 11 | MS. HULL:  Objection as to hearsay. | |
| 12 | THE COURT:  Foundation. | |
| 13 | MS. HULL:  Foundation. | |
| 14 | BY MR. LOGAN: | |
| 15 | Q.  Did you have any idea why you were going to Las Vegas? | 10:31:21 |
| 16 | A.  I was going to -- | |
| 17 | THE COURT:  You can answer that yes or no. | |
| 18 | THE WITNESS:  Yes. | |
| 19 | BY MR. LOGAN: | |
| 20 | Q.  Why were you going? | 10:31:27 |
| 21 | A.  I was going because I was -- I was going just to hang out | |
| 22 | and just to have fun, just to go see the casinos because it was | |
| 23 | going to be my first time in Las Vegas and I wasn't going to | |
| 24 | agree to anything else -- | |
| 25 | MS. HULL:  Objection.  Your Honor, there's no | 10:31:43 |

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   question.                                                    10:31:44

2              THE COURT:  Sustained.

3   BY MR. LOGAN:

4   Q.   Now, you said your understanding is you were going to Las

5   Vegas to hang out.  What does that mean?                     10:31:49

6   A.   It's to have fun and to actually, you know, go and visit

7   places that I've never been before.

8   Q.   XXXXXXXXX, was it your plan to prostitute during that

9   trip?

10  A.   No, sir.                                                10:32:07

11  Q.   Are you sure?

12  A.   Yes.

13  Q.   Now, do you recall what year that was that you went to Las

14  Vegas for the first time?

15  A.   It was -- it was like 2006.                             10:32:20

16  Q.   Are you sure?

17  A.   Yes.

18  Q.   XXXXXXXXX, I want to focus your attention to Government

19  Exhibit Number 11.  You have it in front of you.  Can you pull

20  that out?                                                    10:32:56

21  A.   All right.

22  Q.   I would like you to take a moment and look at Government

23  Exhibit Number 11.  You can actually take it out if you need

24  to.

25  A.   Okay.                                                   10:33:35

United States District Court

XXXXXXXXX XXXXXXX - Direct

1          MR. LOGAN:  Your Honor, at this time the government                    10:34:00

2    would request permission to retrieve Government Exhibit

3    Number 11 for publishing.

4          MS. HULL:  Judge, I hadn't heard a motion for

5    admission.                                                                   10:34:13

6          THE COURT:  I don't presume that Mr. Logan is going

7    to publish it until it's admitted.

8    BY MR. LOGAN:

9    Q.   Do you still have number 11 in front of you?

10   A.   Yes, sir.                                                               10:34:36

11   Q.   Do you recognize the first page of that government

12   exhibit?

13   A.   This one?

14   Q.   Right.  The first page.

15   A.   This one right here.                                                    10:34:46

16   Q.   Can you describe it?

17   A.   Well, aren't these records?

18   Q.   I'm going to ask you to speak up, please.

19   A.   I said aren't these records?

20   Q.   Do they have any names?  Are there any names on the                     10:35:05

21   record?

22   A.   Yes.

23   Q.   Whose name?

24   A.   Jacqueline Acosta.

25   Q.   And that's on the first page of that?                                   10:35:11

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    A.    Yes, sir.                                                    10:35:13

2    Q.    Who is Jacqueline Acosta?

3    A.    It was Hanoi's sister but, you know, we had went to --

4            MS. HULL:  Objection.  No question.

5            THE COURT:  Sustained.                                     10:35:26

6    BY MR. LOGAN:

7    Q.    Can you go to the second page, please?

8    A.    Sure.

9    Q.    Describe the second page.

10   A.    The second page is a picture of me with the ID of           10:35:32

11   Jacqueline Acosta.

12   Q.    And what exactly is the item, if you know?

13   A.    It's an ID.

14   Q.    Have you seen that ID before?

15   A.    I've had it in my possession before, yes, sir.              10:36:00

16   Q.    Tell us about you having the ID in your possession.

17   A.    Ask that question again.

18   Q.    Yes.  You said you had the ID in your possession but you

19   testified that it was your photograph with someone else's name;

20   is that right?                                                    10:36:18

21   A.    Yes, sir.

22   Q.    Why did you have an ID with someone else's name?

23   A.    Because in Las Vegas you have to be 21 and older to

24   actually go into the casinos and to actually do -- to actually

25   fit into the -- into the older -- I mean like with the older      10:36:35

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  people in Las Vegas.  You have to be 21 and up anywhere you go          10:36:41
2  pretty much.
3  Q.   Did you actually obtain that identification card?
4  A.   I'm not sure what the word "obtain" means.
5  Q.   Did you actually go to a government agency in Las Vegas to          10:36:54
6  get that identification card?
7  A.   Yes, sir.
8  Q.   And whose personal information is on the identification
9  card?
10 A.   Hanoi's sister, Jacqueline Acosta.                                  10:37:10
11 Q.   And where did you get that information from?
12 A.   I got the information from Hanoi.
13 Q.   Why?
14 A.   Because he said that I would need ID if we were going to
15 go out there and actually do things.  You know, we should get           10:37:23
16 an ID and he said that he was going to get the information from
17 his sister.  So he got it.  He got her Social Security card and
18 her birth certificate.
19         MS. HULL:  Objection to speculation, Judge.
20         THE COURT:  Sustained.                                           10:37:40
21 BY MR. LOGAN:
22 Q.   Let's just focus on the identification card; okay?
23 A.   Okay.
24 Q.   Is there a signature on page two of that?
25 A.   Yes, sir.                                                           10:37:49

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    Q.    Whose signature is it?                                          10:37:49

2    A.    It's me but I was doing her signature.

3    Q.    Who is her?

4    A.    Jacqueline Acosta.

5    Q.    And you are aware that you were signing someone else's          10:38:02

6    name?

7    A.    Yes, sir.

8    Q.    As well as using someone else's personal information?

9    A.    Yes, sir.

10   Q.    Can you turn to the third page of Government Exhibit            10:38:09

11   Number 11?  Describe page three.

12   A.    It's the address that I put for the ID and it's a

13   description of me, the cost of the ID, and I don't know what

14   the rest of the stuff is but it has the date that I went to get

15   the ID and ID number.                                                 10:38:44

16   Q.    Do you recall actually going to an agency and filling out

17   a form --

18   A.    Yes, sir.

19   Q.    -- for an ID?

20   A.    Yes, sir.                                                       10:38:54

21   Q.    And was it the ID that is -- that has the photograph in

22   the second page of that?

23   A.    Yes, sir.

24   Q.    Is there a fourth page?

25   A.    Yes.                                                            10:39:04

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    Q.    Describe it, please.                                              10:39:05

2    A.    This is the application that I filled out when I went to

3    the Department of Motor Vehicles in Las Vegas.

4    Q.    And is that where you actually went to obtain the

5    identification card?                                                   10:39:21

6    A.    Yes, sir.

7    Q.    Are you sure that's the application that you filled out?

8    A.    Yes, sir.

9    Q.    And did you sign the application?

10   A.    Yes, sir, I did.                                                 10:39:29

11   Q.    Now, Government Exhibit Number 11, are you familiar with

12   the contents of that document, everything that is in it?

13   A.    Yes.

14           MR. LOGAN:  Your Honor, at this point we offer

15   Government Exhibit Number 11.                                          10:39:44

16           MS. HULL:  Objection only as to foundation of date

17   this was done.

18           THE COURT:  Sustained.

19   BY MR. LOGAN:

20   Q.    Do you recall what day it was that you filled out the           10:39:50

21   application?

22   A.    It was -- it was a day in October.

23   Q.    Can you look at the application?

24   A.    Yes.  October 16, 2006.

25   Q.    And do you recall being in Las Vegas around that time?          10:40:12

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Yes, sir.                                                     10:40:14

2   Q.   And you signed off on that document?

3   A.   Yes, sir.

4           MR. LOGAN:  Your Honor, the government offers

5   Government Exhibit Number 11.                                      10:40:20

6           MS. HULL:  No objection.

7           THE COURT:  It's admitted.

8           (Exhibit Number 11 was admitted into evidence.)

9           MR. LOGAN:  Your Honor, permission to publish

10  Government Exhibit Number 11?                                      10:40:34

11          THE COURT:  Yes.

12          MR. LOGAN:  The government is publishing Government

13  Exhibit Number 11.

14  BY MR. LOGAN:

15  Q.   XXXXXXXXX, on the government exhibit, if you look at the      10:41:29

16  lower left-hand corner, do you see that, the address, mailing

17  address?

18  A.   Yes.

19  Q.   Whose address is that, if you know?

20  A.   It was Hanoi's friend who we met when we got to Las Vegas.    10:41:44

21  I forgot the man's name.

22  Q.   Now, you testified earlier that you obtained the

23  identification card on the 16th of October.  Do you recall

24  that?

25  A.   Yes, sir.                                                     10:42:02

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  Q.   Do you remember if you obtained the identification card    10:42:14

2  when you first made it to Las Vegas?

3  A.   It was the day after.

4  Q.   How long were you actually in Las Vegas?

5  A.   I stayed for about two weeks or so.    10:42:27

6  Q.   I'm going to ask you to pull out Government Exhibit

7  Number 10, please.

8  A.   Sure.  Okay.

9  Q.   Have you seen Government Exhibit Number 10 before?

10  A.   This is my birth certificate.    10:43:45

11  Q.   How do you know it's your birth certificate?

12  A.   Because it has my name, all of my information, the

13  hospital I was born at.

14  Q.   Does it have your complete name?

15  A.   Yes, it does.    10:44:03

16  Q.   What is your date of birth on that date?

17  A.   July 18, 1990.

18  Q.   Is that, in fact, your real date of birth?

19  A.   Yes, sir.

20  Q.   Does it have the correct hospital where you were born?    10:44:12

21  A.   Yes, sir.

22  Q.   Are you sure?

23  A.   Yes, sir.

24       MR. LOGAN:  Your Honor, at this point we offer

25  Government Exhibit Number 10.    10:44:19

United States District Court

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | MS. HULL:  Foundation. | 10:44:21 |
| 2 | THE COURT:  Sustained. | |
| 3 | BY MR. LOGAN: | |
| 4 | Q.   Describe exactly where the hospital was for the live birth | |
| 5 | on that document. | 10:44:37 |
| 6 | A.   The hospital was in Dallas, Texas.  I'm not sure exactly | |
| 7 | where. | |
| 8 | Q.   Have you ever had any discussion with any family members | |
| 9 | about where you were born? | |
| 10 | A.   I was born in Texas, in Dallas, Texas. | 10:44:52 |
| 11 | Q.   How do you know that? | |
| 12 | A.   Because my mom told me. | |
| 13 | Q.   Okay.  Are you confident that you were actually born in | |
| 14 | that location? | |
| 15 | A.   Yes. | 10:45:04 |
| 16 | Q.   And does it actually -- the information provided on that | |
| 17 | exhibit, is that consistent with what you've learned from your | |
| 18 | family members? | |
| 19 | A.   What's -- | |
| 20 | Q.   Does it give a description of sex of the individual that | 10:45:19 |
| 21 | was born? | |
| 22 | A.   Yes. | |
| 23 | Q.   What's the sex? | |
| 24 | A.   Female. | |
| 25 | Q.   Again, I'm going to ask you to speak into the microphone, | 10:45:31 |

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    please.                                                          10:45:34

2    A.    Female.

3    Q.    And does it give a race for the individual?

4    A.    Black.

5    Q.    Does it give a name of a female parent?          10:45:41

6    A.    Yes, sir.  Adrienne Ruchard.

7    Q.    And who is that?

8    A.    My mother.

9    Q.    Are you sure?

10   A.    Yes, sir.                                                  10:45:50

11   Q.    Does it give the name of a father on the document?

12   A.    Yes, it does.

13   Q.    And who is that?

14   A.    Nathaniel XXXXXXX.

15   Q.    And is that actually your father?              10:45:59

16   A.    Yes, sir.

17   Q.    Does it give a description of how the baby looks?

18   A.    Hold on.

19         I don't think so.

20   Q.    Does it give an address for the parents?       10:46:38

21   A.    Yes.

22   Q.    Are you familiar with that address?

23   A.    No.  I don't know it.

24   Q.    But it's your testimony that that is your birth

25   certificate?                                                    10:46:57

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Yes, sir.                                                          10:46:57

2          MR. LOGAN:  Your Honor, again, we would offer

3   government Exhibit 10.

4          MS. HULL:  No objection.

5          THE COURT:  It's admitted.                                       10:47:04

6          (Exhibit Number 10 was admitted into evidence.)

7   BY MR. LOGAN:

8   Q.   XXXXXXXXX, I would like you to look at Government Exhibit

9   Number 12, please.

10  A.   Okay.                                                              10:47:51

11  Q.   Have you seen that identification before?

12  A.   I haven't seen the identification before but I know who

13  that is.

14  Q.   Who is it?

15  A.   Hanoi's sister Jacqueline Acosta.                                  10:48:02

16  Q.   Now, you testified earlier that you provided the Nevada

17  authorities with some identification information in the name of

18  Jacqueline Acosta; is that right?

19  A.   Yes, sir.

20  Q.   Is the date of birth on Government Exhibit Number 12 the          10:48:17

21  same as the Nevada license you obtained?

22  A.   Yes, sir.

23  Q.   I'm sorry?

24  A.   Yes, sir.

25  Q.   You actually testified earlier that you had gone to Las           10:48:50

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Vegas to have fun.  Do you remember that?                    10:48:54

2   A.   Yes, sir.

3   Q.   Did you, in fact, have any fun?

4   A.   Yes, I did.

5   Q.   Doing what?                                             10:48:59

6   A.   Going to casinos, going to -- yeah, just casinos and

7   gambling.

8   Q.   And you testified earlier that you were there about two

9   weeks?

10  A.   Yes, sir.                                               10:49:11

11  Q.   Did you do anything else when you were there?

12  A.   Do you mean -- well, yeah.  I mean I did -- yeah, sure.

13  Q.   Did you go out to eat?

14  A.   Yeah.

15  Q.   Did you go out -- did you go out to eat with the        10:49:25

16  defendant?

17  A.   Yes, I did.

18  Q.   Did you go to the movies?

19  A.   I don't think we went to the movies.

20  Q.   So you just went out to eat and gambled?                10:49:41

21  A.   Yeah, for the most part, and occasionally I had sex.

22  Q.   With who?

23  A.   With Hanoi.

24          MS. HULL:  Objection.  Relevance.

25          THE COURT:  Overruled.                               10:49:59

United States District Court

XXXXXXXXX XXXXXXX - Direct

| 1 | BY MR. LOGAN: | 10:50:02 |
|---|---|---|

1   BY MR. LOGAN:

2   Q.   You had sex in Las Vegas with the defendant?

3   A.   Yes, I did.

4   Q.   Now, you testified earlier that his wife was with the two

5   of you.

6   A.   Yes, but whenever we would, she would be out working.

7   Q.   Do you know where she was working?

8         MS. HULL:  Objection.  Relevance.  Speculation.

9         THE COURT:  Sustained.

10  BY MR. LOGAN:

11  Q.   Now, you testified that you were having sex with the

12  defendant and had gone to casinos.  Did you do anything else?

13  A.   No.

14  Q.   So you just stayed in Las Vegas for two weeks and you just

15  went to casinos?

16  A.   No.  No.  I mean, it was a little while ago so, you know,

17  I'm probably not even all sure about everything that I did.

18  But I know for the most part we were in casinos and going --

19  you know I'm saying going out to eat.  We were staying at a

20  hotel -- actually we moved to another hotel after about like

21  four or five days at one hotel.  You know, we were just -- I

22  know I was having fun and I wasn't really sure exactly of

23  everything that we've done out there.

24  Q.   Did you prostitute when you were in Las Vegas?

25  A.   No, I didn't.

10:50:02
10:50:10
10:50:23
10:50:41
10:51:02
10:51:24

United States District Court

721

XXXXXXXXX XXXXXXX - Direct

1   Q.   Are you sure?                                                    10:51:25

2   A.   Yes.

3   Q.   The first time trip you never prostituted?

4   A.   Not to my knowledge.

5   Q.   Do you recall when you went back to Oregon?                      10:51:49

6   A.   Yes, I do.

7   Q.   When was it?

8   A.   I'm trying to think.  I'm not sure.  It was maybe -- it

9   was probably toward -- like toward the end of October.  Just

10  about the end of October I came back home.                           10:52:10

11  Q.   And that was after a two-week trip to Las Vegas?

12  A.   Yes.

13  Q.   Now, when you made it back home, did you go back to

14  school?

15  A.   Actually, I did make an effort to try to go back to school      10:52:31

16  and that was pretty much whenever I had went back to the

17  alternative school.

18  Q.   Do you recall the name of that school?

19  A.   I started the alternative school whenever I was in the

20  11th --                                                              10:52:49

21             MS. HULL:  I'm sorry.  I can't hear, Judge.

22             (Phone ringing.)

23             MS. HULL:  My apologies.

24             THE WITNESS:  Can you repeat the question, sir?

25


                    United States District Court

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | BY MR. LOGAN: | 10:53:08 |
| 2 | Q.   What was the name of the alternative school? | |
| 3 | A.   It was called POIC Rosemary Anderson High School. | |
| 4 | Q.   Now, did you complete that year in school? | |
| 5 | A.   No, I didn't.  I was still having troubles with -- | 10:53:17 |
| 6 | actually attending class.  I just wanted to -- it was like | |
| 7 | since I had went to Las Vegas, I just wanted just to hang out | |
| 8 | all the time and I wasn't even worried about school.  I thought | |
| 9 | okay.  I'll be able to do it another day.  I'll be able to do | |
| 10 | it another time. | 10:53:40 |
| 11 | Q.   At that point were you living at your mother's house? | |
| 12 | A.   Yes.  At that point I was back at my mother's house. | |
| 13 | Q.   Did you have a boyfriend? | |
| 14 | A.   Let me think. | |
| 15 | I'm not sure if I had a boyfriend at that time.  I | 10:54:03 |
| 16 | probably was just friends like with a guy but I probably didn't | |
| 17 | consider him as my boyfriend. | |
| 18 | Q.   Do you recall if the fall of your junior year if you ever | |
| 19 | had a boyfriend? | |
| 20 | A.   Yes.  The fall of my junior year? | 10:54:21 |
| 21 | Q.   Correct. | |
| 22 | A.   Yes, sir.  I had a boyfriend by the name of Damafi. | |
| 23 | Q.   And where did you meet him? | |
| 24 | A.   I met him at the Shell gas station where he worked at off | |
| 25 | of interstate and Lombard in Portland, Oregon. | 10:54:33 |

XXXXXXXXX XXXXXXX - Direct

1   Q.   Do you recall the time of the year that you met him?   10:54:42

2   A.   It was maybe toward the -- I'm not sure.  Maybe like the

3   middle of, like, August I would say.  Maybe like the middle of

4   August or so.

5   Q.   So you met him at a gas station the middle of August?   10:55:07

6   A.   It could have been then or -- I'm not sure.  It was just

7   around that time.  I mean, I know that I had -- I had started

8   school.  So it was maybe around like September or so.  I'm not

9   really sure.

10  Q.   Do you recall if it was before or after you went to Las   10:55:23

11  Vegas?

12  A.   When, the first time?

13  Q.   Correct.

14  A.   It was after I went to Las Vegas the first time.

15  Q.   Now, you testified that you made it back from Las Vegas   10:55:36

16  the end of October of 2006?

17  A.   Right.

18  Q.   But you said that you met Damafi August of 2006?

19  A.   Actually, I know I had met Damafi in -- I'm sorry.  I'm

20  trying to just recall this.  Let me see.  I don't know.  I'm   10:56:02

21  not really sure right now.

22  Q.   And, again, I'm going to ask you to speak up so everyone

23  can hear you; okay?

24  A.   I'm not really sure right now.

25  Q.   So you don't know if it was before or after your trip to   10:56:21

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Las Vegas?                                                          10:56:23

2   A.   I'm pretty sure it was after my trip to Las Vegas.

3   Q.   And do you recall how long you dated Damafi?

4   A.   I dated him for maybe -- I know it was under ten months.

5   It had -- I know it was under a year.  I mean, it wasn't a          10:56:42

6   whole year or anything.  It was probably about eight months,

7   eight to nine months maybe.

8   Q.   Did you ever live with Damafi?

9   A.   Yes.  We stayed together at one point in time.

10  Q.   Do you recall how long it was from the time that you met        10:56:59

11  Damafi before you moved in with him or started living with him?

12  A.   It was a month after I met him.

13  Q.   And how do you know that?

14  A.   Because -- I mean, I don't really remember the exact date

15  that we had met but I'm pretty sure it was, like, maybe a          10:57:19

16  little well over a month, you know, after, you know, we had met

17  that I moved in with him.

18  Q.   And do you recall which city he lived in?

19  A.   He lived in Portland.

20  Q.   So you moved in with him in Portland?                          10:57:33

21  A.   Yes, I did.

22  Q.   Now, you testified earlier that Damafi worked at a gas

23  station; is that right?

24  A.   Yes, sir.

25  Q.   Did he have any other jobs?                                    10:57:45

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Yeah.  I later found out that he was actually in the

2   same -- okay.  He was actually doing -- well, he was pimping.      10:57:47

3   Q.   He was what?

4   A.   Pimping.

5   Q.   What is pimping?                                              10:57:59

6   A.   He had female -- he had prostitutes working for him that I

7   did not know about and I thought that he was actually cheating

8   on me.  And whenever he told me like the facts of the matter, I

9   was just, like, wow.  I can't believe this is going on again.

10  You know, this is crazy.  But, yeah, I later found out that he    10:58:20

11  was a pimp.

12  Q.   Now, was he pimping in Portland?

13  A.   Yes, he was.

14  Q.   Do you recall where?

15  A.   I mean, there was not just a specific place that you pimp.    10:58:37

16  It's like -- I mean, he was in Portland.  The ladies were

17  working off of 82nd, either of off of 82nd -- and one of the

18  ladies had a job at a strip club.

19  Q.   Is 82nd one of the main streets in Portland?

20  A.   Yes, it is.                                                   10:58:55

21  Q.   Describe what, if anything, you know about businesses

22  around 82nd.

23  A.   I know that you have the -- you have like the Safeway.

24  You have the Cricket.  You have all kind of gas stations up and

25  down.  They have residential areas, places to go eat -- and I     10:59:14

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    mean farther down, if you keep going down, you can run into the          10:59:22
2    mall.  There's a lot of things out there.
3    Q.   Now, when you found out Damafi was a pimp, what did you
4    do?
5    A.   For the simple fact that I thought that I loved him, I              10:59:39
6    just decided I said, hey, you know, as long as I don't have to
7    do any of this, it would be fine.  And he said, "Okay.  Well,
8    you know, all they are doing is they are just working just to
9    better us, just to help us, and they think that we're a family
10   and we're not.  So I mean if you just stay by my side, I'll          10:59:56
11   just take care of you."  And me being naive, I believed it.
12   Q.   Did you actually continue to live with Damafi?
13   A.   Yes, I did.
14   Q.   Did you get to know any of the ladies that were working
15   for him?                                                             11:00:13
16   A.   Yes, I did.
17   Q.   Describe that.
18            MS. HULL:  Objection.  Relevance.
19            THE COURT:  Sustained.
20   BY MR. LOGAN:                                                        11:00:19
21   Q.   At any point did you become one of Damafi's prostitutes?
22   A.   Yes.  After a little while of actually, you know, seeing
23   what they do and basically I know that he had needed -- I know
24   that we had needed money for the simple fact that they weren't
25   going out and making the money that they needed to make.  And        11:00:39

United States District Court

727
XXXXXXXXX XXXXXXX - Direct

1   me, I said, okay, well, since I'm a part of this also, like        11:00:43
2   since -- like since I'm here for you, I'm going to go out here
3   and I'm going to try to make ends meet because they are not
4   doing their part.  So I need to pick up the slack and try to do
5   something because I'm also living up in the situation, too.        11:00:57
6   Q.   When you say "living up in the situation," what does that
7   mean?
8   A.   I'm actually, you know, a part of the situation.  I mean
9   it was me, Damafi and the two other ladies and they weren't
10  doing their job so I had to actually get up and pick up the       11:01:12
11  slack as far as getting our bills paid.
12  Q.   So whose idea was it for you to start prostituting?
13  A.   It was his idea.
14          MS. HULL:  Objection.  Speculation.  Hearsay.
15          THE COURT:  Sustained on hearsay.                          11:01:30
16  BY MR. LOGAN:
17  Q.   Did you, in fact, start prostituting?
18  A.   Yes, I did.
19  Q.   Do you recall what time of the year that was?
20  A.   To tell you the truth, sir, I really don't remember          11:01:41
21  exactly what time of year it was.
22  Q.   Now, you testified earlier that you made it back from Las
23  Vegas late October.  Do you recall that?
24  A.   Yes, sir.
25  Q.   And then you said you met Damafi after that; right?          11:01:54

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Yes, sir.                                                           11:01:58

2   Q.   And I believe you stated that you started living with him

3   after about a month?

4   A.   Yes, sir.

5   Q.   And how much time transpired between the time you were    11:02:07

6   living with Damafi and you started acting as a prostitute?

7   A.   It was a period of I would say about two and a half to

8   three months.

9   Q.   When you were actually living with Damafi, did you ever

10  run into the defendant?                                                 11:02:31

11  A.   Actually, I don't think I did.  I don't think I ran into

12  him while I was living with Damafi.

13  Q.   Now, did you have any -- were you required to make a

14  certain amount of money?

15  A.   No.  I was just -- I was just required just to bring in   11:02:54

16  what I could, to actually contribute to what we were doing.

17  Q.   Do you know if there was any pricings for different acts?

18  A.   Sure.  There's always pricing for any act that you do.

19  Q.   And how would you know this?

20  A.   Because I've actually been in this line of business       11:03:14

21  before, you know, in previous experiences.  You always have to

22  have a set price for what are you going to do.

23  Q.   Now, you said that you started prostituting for Damafi;

24  right?

25  A.   Yes, sir.                                                           11:03:30

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  Q.   And now you just testified that you had been a part of

2  this business before.   When?

3  A.   Oh, I'm talking about now.   Like in the now.   I know that

4  previously the stuff that I've been through before sitting here

5  today that, you know, I'm not saying anything previous to

6  Damafi.   He was the first time that I had ever done anything

7  like that.

8  Q.   Tell us about the pricing.

9  A.   Okay.   Well, in Portland I know that it was $60 -- No.   It

10 was $80 for oral sex.   It was $150 for sex, well, for

11 intercourse, and for a fetish of any kind, it would be

12 either -- it would range from like $180 to $200.

13 Q.   And did you have experience with all three of those?

14 A.   Yes, during the time I was working for Damafi.

15 Q.   I'm sorry.   I didn't hear what you said.

16 A.   I said, yes, during the time that I was working for

17 Damafi.

18 Q.   Now, how did you and the other prostitutes find your

19 clients?

20 A.   I mean, there would be Craigslist and that's a website

21 that you go on and you actually post your pictures and the

22 message that you want to give to the guys that are actually

23 looking at you and that's just basically -- and then you put

24 your phone number and they give you a call and, you know, you

25 guys discuss whatever you're going to discuss about what the

11:03:31
11:03:46
11:04:08
11:04:39
11:04:53
11:05:16

XXXXXXXXX XXXXXXX - Direct

1    acts are going to be, well, what acts are going to be done and      11:05:19

2    how much it's going to be and, you know, things like that.

3           So it's pretty much instead of driving up and down

4    the street trying to find a prostitute, you can go online and

5    look it up and call.                                                11:05:34

6    Q.   Now, did you, in fact, go online before to help with this

7    Craigslist?

8    A.   Yes, I had.

9    Q.   And how did you do that?

10   A.   How did I do it?  You go online, go to Craigslist.com and     11:05:49

11   you go to the city that you're working in or the city that you

12   would like to post in and from there you say that you post

13   under erotic services and from there you -- like an actual page

14   will show up to where you have to put your headline in one box.

15   You have to put your age in one box.  You have to put your         11:06:16

16   message in one box and you put your pictures in the uploaded

17   part of the page.

18          And once you fill that out, once you put your

19   pricing, once you put -- once you put your message, once you

20   put your pictures, your age, and your headline, you can post       11:06:33

21   it.

22   Q.   And how do you know so much about this Craigslist?

23   A.   Because, for one, I know that I'm very computer savvy and

24   it's not hard to actually do that.  And I've had some

25   experience in actually doing that and working for Damafi and       11:06:55

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  working for the defendant.                                              11:07:00

2  Q.   Now, who actually taught you how to access Craigslist if

3  you recall?

4  A.   I don't really recall who actually taught me how to do it.

5  But, I mean, like I said, with me actually having the knowledge  11:07:17

6  that I know about computers now or even back then, you know, I

7  mean it's not too hard.  But I know that I didn't really know

8  exactly what to say up in like the body of the actual posting.

9        So I would get tips from Damafi and he would tell me,

10  okay, you should put things like sexy lady, new in town and     11:07:40

11  things like that and that right there would actually attract

12  guys to call.

13  Q.   So you actually posted some of these ads before for

14  Damafi?

15  A.   Yes, I had.                                                  11:07:57

16  Q.   Okay.  Did you ever upload any photographs to the

17  Craigslist?

18  A.   Yes, I had.

19  Q.   While you were prostituting for Damafi?

20  A.   Yes, I had.                                                  11:08:06

21  Q.   You testified earlier that you had been dating Damafi for

22  I believe you said eight or ten months.  Do you remember that?

23  A.   Yes.

24  Q.   In the spring of 2007 were you dating Damafi?

25  A.   Yes, I was.                                                  11:08:40

XXXXXXXXX XXXXXXX - Direct

1   Q.   How do you recall that you were still dating him?                        11:08:41

2   A.   I remember Easter had passed and we were still together so

3   that's pretty much it.

4   Q.   And, again, XXXXXXXXX, I need to ask you to speak up so

5   everyone can hear you okay.                                                   11:08:54

6   A.   Sorry.   Because, like, Easter had passed and I mean I kind

7   of pay attention to the holidays and stuff like that because I

8   call my mom and things like that, Happy Easter and things.

9           We were together then so I mean we were still

10  together.                                                                     11:09:13

11  Q.   Was your mom aware that you were living with Damafi during

12  that period of time, the spring of '07?

13  A.   Actually, I told her that we were living together.   She

14  didn't approve of it at all but I didn't let her know where we

15  were.                                                                         11:09:32

16  Q.   Did she know he was a pimp?

17  A.   No.

18  Q.   Did she know that you were prostituting?

19  A.   No, sir.

20  Q.   Did you ever travel out of state with Damafi?                            11:09:37

21  A.   No.

22  Q.   You never --

23  A.   Well, actually, yes, I did.   We had went and moved to Las

24  Vegas because his uncle owns houses and things out there and

25  his uncle is also a pimp, too, but he makes other money on the                11:09:49

XXXXXXXXX XXXXXXX - Direct

1   side.   And he had a house that we could have rented south of
2   Las Vegas Boulevard off of Cactus and it was in a place called
3   Tierra Linda and it's pretty much kind of a gated community and
4   we were paying like $2600 a month on it.   It was two-story
5   house with a pool in the back.
6   Q.   And you actually went to Las Vegas with Damafi?
7   A.   Yes.
8   Q.   And this was after Easter of 2007?
9   A.   Actually, it was, I would say, around that time.   It was
10  around maybe February I do believe, February or March we moved
11  out to Las Vegas.   It was one of those months.   I'm not quite
12  sure exactly when we had moved but I know it was either
13  February or March.   I'm not sure.
14  Q.   And when you moved with Damafi to Las Vegas, did you
15  continue to prostitute?
16  A.   Yes, I did.
17  Q.   And do you recall where?
18  A.   We were actually in the casinos because in the casinos you
19  can make a lot of money instead of working out on Tropicana
20  Avenue.
21  Q.   The pricing that you testified about earlier, did you have
22  the same pricing in Las Vegas?
23  A.   No.   It was way more expensive.
24  Q.   Why?
25  A.   Because in Las Vegas you have tourists that just come to

11:09:53

11:10:13

11:10:27

11:10:53

11:11:08

11:11:26

XXXXXXXXX XXXXXXX - Direct

1   blow money and why not have them blow it on you?                    11:11:29

2   Q.   Were you posting Craigslist ads when you were in Las Vegas

3   with Damafi?

4   A.   Yes, I was.

5   Q.   Now, you stated earlier that there were two other ladies        11:11:49

6   that were working with you in Portland.  Do you recall that?

7   A.   Yes.

8   Q.   Did they make it out to Las Vegas with you when were you

9   with Damafi?

10  A.   Actually, they did.  One of the ladies did.  The other         11:11:59

11  lady just stayed behind because she had a child with her baby's

12  father so she kind of stayed back.  But the other lady did come

13  with me and Damafi.

14  Q.   When you were in Las Vegas with Damafi, did you ever get

15  arrested for prostitution?                                          11:12:26

16  A.   Yes.

17  Q.   Tell us about that.

18  A.   The first time I got arrested it was in the MGM Grand off

19  of Las Vegas Boulevard.  I was walking in the casino and I seen

20  a -- he was kind of a big guy and he actually looked like a        11:12:37

21  potential client and he called me over to him to come and talk

22  to him.  So I went and talked to him and he was just like,

23  "Hey, like, I have $4,000 and it's my birthday and I just want

24  to have fun and can you show me a good time?"

25            And I know that I remember that the day before I made    11:13:00

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  like $5700 so I was like okay.  This man has $4,000.  There's        11:13:04
2  probably no doubt that he's going to spend it.  So I said,
3  "Okay.  Well, where do you want to go?"  And he said that he
4  had a room and he said that we were going to -- he said he had
5  to go to the restroom.                                                11:13:20

6         And whenever he went to the restroom, I had two guys
7  come out and they were just like, "Hey, you know what?  We're
8  officers and you are going to go to jail for solicitation."
9  Q.   Did you get arrested at any other times when you were with
10 Damafi in '07?                                                        11:13:40
11 A.   Actually, let me think about where else I got arrested.  I
12 know I got arrested at the Rio because I was trespassing and,
13 let me see -- I'm not sure exactly which casinos it was but I
14 know that I had got arrested I would say a couple of times
15 after that.                                                           11:14:18
16 Q.   Now, do you recall how long you were in Las Vegas with
17 Damafi?
18 A.   I was in Las Vegas with Damafi, it was maybe about a month
19 and a half, two months, if that.
20 Q.   When you left Las Vegas, was Damafi with you?                    11:14:35
21 A.   No.  I left him.  I left him out there.
22 Q.   When you left, where did you go?
23 A.   I went home.
24 Q.   Where is home?
25 A.   With my mom.                                                     11:14:48

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   And do you recall around the time of year that was?      11:14:50

2   A.   I think it was after I left him.   It could have been in --

3   maybe May I think.

4   Q.   And was that 2007?

5   A.   Yes.      11:15:07

6   Q.   When you made it back to Portland, Oregon, did you ever

7   see the defendant?

8   A.   No, because I wasn't really -- I wasn't trying to find him

9   and, you know.   It's kind of like whenever you're in Portland,

10  you can just be walking around and look and there's somebody      11:15:24

11  you know.   You may look around again and there's plenty of

12  people that you know.   I didn't see him because they were

13  actually living in Mount St. Helens or something at that point,

14  him and his wife.

15  Q.   Do you recall if there was ever a time when you saw him      11:15:44

16  again in 2007?

17  A.   Yes.

18  Q.   When?

19  A.   I seen him, it was sometime -- it was like towards the end

20  of June or maybe the beginning of July or so.      11:16:01

21  Q.   Now, when you made it back to Portland, Oregon, you said

22  that you went home alone.   Do you recall that?

23  A.   Yes.

24  Q.   Were you still dating Damafi?

25  A.   Actually, yeah, we were still dating at the time.      11:16:16

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    Q.   Tell us about the next time you saw the defendant.          11:16:28

2    A.   I was walking down Martin Luther King Boulevard, which is

3    another Main Street in Portland, and I know I was walking down

4    there and I had seen -- there was like a grayish, like a

5    Silver-ish mini SUV with the little bubble lights that look,     11:16:47

6    like, circles.  I had seen -- I had looked to my left and like

7    normally, you know, you'll be looking at the traffic or

8    whatever, like whenever you're walking down the street and, you

9    know, I had seen Hanoi in the car and he was just like, "Hey,"

10   and then he pulled over to the little gas station that was      11:17:14

11   pretty much like on the corner.

12        And he -- you know, he pretty much had like walked up

13   on me because I was going to go see him anyway but he walked on

14   me like, "Where you been?  How are you doing?  You look good.

15   It's nice to see you."  Basically, you know, he was just        11:17:37

16   like -- he was like, "Hey, I got somebody I want you to meet."

17        He brought me over to the car and he was his -- it

18   was that girl Zuriela and I met her then and he said, "Hey,

19   this is XXXXXXXXX, Zuriela."  Just a whole little acquaintance

20   thing.                                                          11:18:02

21        From then I got their new number and basically he

22   pretty much said, "Hey, keep in touch."  I know I had talked to

23   Zuriela for a while.  You know, I was kind of busy because I

24   was on my way somewhere.  They said, "Hey, look, we'll keep in

25   touch so," they left and I went my way.                         11:18:21

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   Were you still living with your mother at that point?        11:18:22

2   A.   I'm not sure where I was living.   I know I was running

3   away a lot, though.   So I'm not sure where I was at that time.

4   I could have been with my mom because I know that there were

5   several times where I tried to make it right with her and        11:18:38

6   actually do things according to like -- to actually do things

7   according to --

8                MS. HULL:   Judge, there's no question.   I object.

9                THE COURT:   Sustained.

10  BY MR. LOGAN:                                                     11:18:53

11  Q.   When was the next time you saw the defendant?

12  A.   The next time I saw him was maybe a week and a half, two

13  weeks later.

14  Q.   And describe where you saw him?

15  A.   I met them back at the gas station.                         11:19:09

16  Q.   Met who?   Who is "them"?

17  A.   It was him and Zuriela but he also had two other females

18  in the back seat.

19  Q.   Now, when you say "him," are you talking about the

20  defendant?                                                       11:19:26

21  A.   Yes, sir.

22  Q.   Did you talk to him on that occasion?

23  A.   Actually, I'm not sure.   I think I did but, I mean, there

24  was other times where, like, I talked to him up in the car

25  but -- yeah, yeah, I did speak with him at that time.   I'm      11:19:41

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    sorry.                                                              11:19:46

2    Q.   Again.  It's very difficult to hear you.  If you can

3    just --

4    A.   Okay.  I'll move it up.  Is that fine?

5    Q.   Thank you.                                                     11:19:54

6    A.   Okay.

7              Now, what was the question again?

8    BY MR. LOGAN:

9    Q.   The next time you had seen the defendant.

10   A.   Okay.  The next time I had seen them, I remember met them     11:20:04

11   back at the gas station because during, like, that period of

12   the two weeks that I -- that, like, I didn't see him me and

13   Zuriela and I were talking about, you know, going to Las Vegas

14   and actually, you know, just going out again to actually, you

15   know --                                                            11:20:25

16             MS. HULL:  I would object as to any hearsay, Judge.

17             THE COURT:  All right.  I'm going to sustain the

18   objection.

19             You may ask another question.

20   BY MR. LOGAN:                                                      11:20:38

21   Q.   When you described seeing the defendant two and a half

22   weeks later, did you have a conversation with him?

23   A.   Not with him.  I had a conversation with -- well, yeah,

24   actually, we did talk.  We had talked one time but it was very,

25   very brief.  It was just about going to Las Vegas again and we     11:20:57

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1   didn't talk about, you know, what we were going to do out        11:21:04
 2   there.  We didn't talk about that.  It was just like, "So, are
 3   you coming?"
 4             I was just like, "Yeah."  Because I remember the last
 5   time that me and him went out, we had a really good time and I    11:21:15
 6   was pretty much looking forward to that.
 7   Q.   Did you like the defendant?
 8   A.   Yeah, at that point I did.
 9   Q.   And did you subsequently go to Las Vegas again with him?
10   A.   What is subsequently?                                        11:21:32
11   Q.   I'm sorry.  On another occasion did you go to Las Vegas
12   with the defendant?
13   A.   Well, in July, yeah.
14   Q.   Tell us about that.
15   A.   I knew that -- like I said, he had picked me up, him,        11:21:47
16   Zuriela, and two other females had picked me up and we were at
17   the gas station.  We had went from the gas station I guess to
18   their apartment.  I forgot where.  Over there we're basically
19   getting ready and I had had some of my things packed and we had
20   just basically got up in the car and headed out to Las Vegas.    11:22:10
21   Q.   And what was your understanding of what you were going to
22   Las Vegas to do?
23   A.   My understanding is that I was coming to actually keep him
24   company.  I didn't have any knowledge of what his plans were
25   whenever we got there.  All I knew is that the other ladies --   11:22:29
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1   I knew for sure that Zuriela was going to be prostituting.        11:22:35
 2            MS. HULL:  Object as to hearsay, Judge.
 3            THE COURT:  Sustained.
 4            Ladies and gentlemen, you are to ignore the answer to
 5   the last question.                                               11:22:43
 6   BY MR. LOGAN:
 7   Q.   Did you in fact make to it Las Vegas with the defendant
 8   and the other ladies you described?
 9   A.   Yes.
10   Q.   Do you recall when that was?                                11:22:52
11   A.   No.  I know that it was after my -- well, I think it was
12   after my 17th birthday.  So it was after July 18.  I'm not sure
13   exactly what day but I know it was after July 18.  It would
14   have been like the 28th or the 27th, maybe around there.
15   Q.   The 28th or 27th of what?                                   11:23:25
16   A.   July.
17   Q.   When you made it to Las Vegas, were you still with the
18   defendant?
19   A.   Yes.
20   Q.   What did you do when you got to Las Vegas?                  11:23:39
21   A.   Whenever we first got to Las Vegas, we checked into the
22   Wild Wild West and we had went to our room and we got our stuff
23   together and, well, we basically had just got settled in.
24            MS. HULL:  Judge, I'm going to object as to
25   relevance.                                                      11:23:59
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

1        THE COURT:  Overruled.                                    11:24:00

2        THE WITNESS:  And, you know, we had got our things

3   settled in and after that he was like, "Hey, do you guys want

4   to go get something to eat?"  We were, like, yeah because I

5   remember the time before whenever me, Hanoi, and Nikyea went,  11:24:09

6   we were staying at the same exact hotel.  We ate at the same

7   place and he got these $3 meals that are so big and really

8   good.  So, you know, we had went and we went and ate there

9   because it was of course cheaper.

10  BY MR. LOGAN:                                                  11:24:37

11  Q.   What else did you do, if anything?

12  A.   You mean like the whole trip?

13  Q.   Yes.  After you finished eating, what happened?

14  A.   After -- okay.  After I finished eating, we -- oh, okay.

15  Yeah, I remember this.  It's like after I had finished eating,  11:24:54

16  we had went back to the room and -- actually, no.  Whenever

17  everybody was eating, I remember I got up and I had went to

18  the -- I had went to the bathroom and I don't like to use

19  public bathrooms because it's gross, unless I just necessarily

20  have to, and I'm not close to somewhere where I'm comfortable,  11:25:19

21  you know.  So I walked to the room and I went to the bathroom

22  and, you know, being that I was in there alone, I left the door

23  cracked because I didn't feel no need to actually close it when

24  no one else was in the room.

25        As I was using the bathroom, I thought I heard the      11:25:40

United States District Court

743

XXXXXXXXX XXXXXXX - Direct

```
 1   next door actually close.  I didn't think no one was up in my        11:25:43
 2   room or our room and, basically, how like you feel whenever
 3   someone is there, like you feel like there's a presence
 4   somewhere around you but you just don't know where.
 5         And, basically, Hanoi came into the bathroom and            11:25:58
 6   whenever he came into the bathroom, he was just like, "You are
 7   the only one that I" -- excuse my language but he said, "You're
 8   the only one I ain't fucked yet."  Basically -- my pants were
 9   already down and I just remember him being really, really
10   violent and he just basically had sex with me then and I did     11:26:26
11   not want to do it for the simple fact that I am -- I remember
12   that, you know.
13         MS. HULL:  Objection.  No question.
14         THE COURT:  Sustained.
15         Ladies and gentlemen, we're going to take a 10-minute      11:26:44
16   break.
17         All right.  We're in recess.
18         (Jury departs.)
19         THE COURT:  And you may step down and take a break.
20         (Witness excused.)                                          11:27:13
21         THE COURT:  Counsel, we are going to take -- we are
22   going to try to get the lunch orders for the jurors so we
23   can -- they can eat lunch in about -- hopefully not more than
24   45 minutes so that's why we're taking a break.  We'll be back
25   here, start again at 20 minutes of 12 and we are in recess.      11:27:37
```

XXXXXXXXX XXXXXXX - Direct

1      MS. HULL:  I'm sorry.  20 minutes to 12?                    11:27:43

2      THE COURT:  20 minutes to 12.

3      (Recess at 11:27; resumed at 11:45.)

4      (Jury enters.)

5      (XXXXXXXXX XXXXXXX retakes the stand.)                      11:45:28

6      (Court was called to order by the courtroom deputy.)

7      THE COURT:  Please be seated.

8      Mr. Logan?

9      MR. LOGAN:  Thank you, Your Honor.

10 BY MR. LOGAN:                                                   11:45:56

11 Q.   XXXXXXXXX, before we broke, you described an incident back

12 in the room.  Do you recall that?

13 A.   Yes.

14 Q.   And what happened after that?

15 A.   You mean after the situation in the room?                  11:46:02

16 Q.   Correct.

17 A.   You know, I stayed in there when he had left and everybody

18 came back into the room and people were getting ready to go to

19 sleep and things like that.

20 Q.   And was the defendant in the room?                         11:46:24

21 A.   Yes, he was.

22 Q.   And when you say everybody, who are you talking about?

23 Who is everybody?

24 A.   Zuriela, Amanda, Philysia, me, and Hanoi.

25 Q.   So you all stayed in the same room?                        11:46:35

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    A.    Yes.                                                           11:46:37

2    Q.    Did everyone actually go to sleep that night?

3    A.    Yes.

4    Q.    Now, when you were actually traveling to Las Vegas on this

5    trip with the defendant and the other ladies, was there any        11:46:52

6    discussion about prostitution?

7    A.    I was -- for the most part, I was sleeping so the little

8    conversation that I did hear, I mean, you know, I heard --

9    actually, I heard Philysia --

10            MS. HULL:  Objection as to hearsay.                        11:47:16

11            THE COURT:  Sustained.

12   BY MR. LOGAN:

13   Q.    Did you have any conversation with the defendant about

14   prostitution during this trip to Las Vegas?

15   A.    No.                                                           11:47:29

16   Q.    So it's your testimony that after this incident where you

17   went to the bathroom, everyone made it back to the room and

18   went to sleep?

19   A.    Actually -- no.  No.  No.  No.  I'm sorry.  I'm sorry.  I

20   was thinking about whenever we were in LA.  We had been so many    11:47:47

21   places together.  I'm sorry about that.

22            Actually, when everybody went into the room, he said,

23   "Everybody needs to get dressed.  You need to get ready because

24   everybody is going to work tonight.  You all are going to make

25   me some money.  Get dressed."                                      11:48:11

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   And who said this?                                          11:48:13

2   A.   Hanoi.

3   Q.   Are you sure?

4   A.   Yes, sir.

5   Q.   What was your understanding of "everyone needs to get       11:48:15

6   dressed"?

7   A.   I didn't think that I would have to get dressed so I asked

8   him, I said, "Hey, now, I know you're not talking about me,"

9   and he gets very -- very, very aggressive and he says, "You

10  know, yeah, bitch, I'm talking about.  You F'ing get dressed.   11:48:36

11  You F'ing are doing it."  I was scared for the simple fact

12  that --

13            MS. HULL:  Objection.  No question.

14            THE COURT:  Sustained.

15  BY MR. LOGAN:                                                    11:48:53

16  Q.   When the defendant told you and the other ladies to get

17  dressed, did you get dressed?

18  A.   I felt like I had to.

19  Q.   Why did you feel like you had to?

20  A.   Because I know that Hanoi is a violent person and I did     11:49:01

21  not want anything to happen to me because he seemed very, very,

22  very serious with what he was saying and he's a man and I know

23  what he's capable of.

24            MS. HULL:  Objection.

25            THE COURT:  Sustained.                                 11:49:16

United States District Court

XXXXXXXXX XXXXXXX - Direct

BY MR. LOGAN:                                                          11:49:17

Q.   Did you, in fact, put on some clothing to go out that

night?

A.   Yes, I did.

Q.   And was it because he told you to, the defendant?          11:49:23

A.   Yes.

Q.   What were you required to wear, if you recall?

A.   I can tell you what I had on.

Q.   Please do.

A.   I had on a pair of very, very short shorts that were blue   11:49:35

jeans.  I had a red and white polka dotted top and some red

platform heels.

Q.   Were you, in fact, taken out to actually prostitute?

A.   Yes.  Everybody was.

Q.   Where did you go?                                          11:50:04

A.   It was on Tropicana Avenue in Las Vegas.

Q.   And who took you to Tropicana Avenue?

A.   Hanoi.  Well, no.  Actually, we were -- we was right on

Tropicana because the Wild Wild West is on Tropicana and,

basically, he had came outside and he was watching from -- like   11:50:24

from the front of the hotel and we had all went outside and

outside is where ladies work at because we're right near the

truck stop, right next to the truck stop.

Q.   What do you mean it's next to the truck stop where ladies

work?  What does that mean?                                      11:50:48

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   A lot of the prostitutes target the truck stop and            11:50:51

2   Tropicana because there's a lot of men that just come in from

3   out of town that are lonely, that wouldn't mind paying money

4   for sexual favors.

5   Q.   XXXXXXXXX, were you ever told how much money you were        11:51:03

6   supposed to make that night?

7              MS. HULL:  Objection.  Leading.

8              THE COURT:  Sustained.

9   BY MR. LOGAN:

10  Q.   Did you have any idea how much money you were supposed to   11:51:11

11  make?

12  A.   I believe it was a thousand dollars if I'm not mistaken.

13  Q.   And who told you you were supposed to make a thousand

14  dollars that night?

15  A.   Hanoi Acosta.                                                11:51:37

16  Q.   Who?

17  A.   Hanoi Acosta.

18  Q.   Are you sure?

19  A.   Yes, sir.

20  Q.   Did you, in fact, make that amount of money?               11:51:41

21  A.   No.  Nobody did.

22  Q.   Were you given any instructions about what you were

23  supposed to do in terms of how you were making your money?

24  A.   Like instructions on what I was supposed to do as far as

25  making the money?                                                11:52:05

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   Correct.                                                              11:52:06

2   A.   I know that -- well, I had knew at that point, you know,

3   to watch out for, like, certain cars.

4              MS. HULL:   Nonresponsive, Judge.

5              THE COURT:   Overruled.                                         11:52:21

6   BY MR. LOGAN:

7   Q.   That means you can answer.

8   A.   Okay.   Basically, you know, we were all told to watch out

9   because I know that it was either vice night because vice night

10  is on a Tuesday or a Thursday.   I think it was vice night and    11:52:35

11  just to, basically, be careful in whose cars that you get in

12  because vice are very, very, very heavy anywhere where there's

13  prostitution in Las Vegas.

14  Q.   And who was the one that told to you watch out?

15  A.   Hanoi, Hanoi and Zuriela.                                     11:52:55

16             MS. HULL:   Objection.   Hearsay.

17             THE COURT:   Overruled.

18  BY MR. LOGAN:

19  Q.   You testified earlier that the girls didn't make the

20  thousand dollars; is that right?                                  11:53:17

21  A.   Yes.

22  Q.   Did you ever go back to the hotel that night or early

23  morning hours?

24  A.   Yes.

25  Q.   What happened when you got back to the hotel?                 11:53:26

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Whenever we got back, he was really, really -- Hanoi was   11:53:29

2   very, very, very mad and, I mean, he was going crazy.  I don't

3   know what was wrong with him.  He was mad because nobody made

4   no money that night.  It was crazy because I had never seen him

5   like that before.   11:53:54

6   Q.   Were you scared?

7   A.   Yes.  I was really scared because I know -- okay, well,

8   I'm one of the girls that didn't make the money so he just

9   might flash on me.

10   Q.   What does flash mean?   11:54:04

11   A.   Flash means he might just attack me and actually hurt me.

12   Q.   Do you know if any of the ladies made any money?

13         MS. HULL:  Objection.  Speculation.

14         THE COURT:  Sustained.

15   BY MR. LOGAN:   11:54:17

16   Q.   Did you make any money?

17   A.   I didn't.  No.  I didn't.  No.  Actually, wait a minute.

18   I had to -- one date and that was with Zuriela in the car and

19   it was for I do believe like $240 or $250.

20   Q.   And what happened to the $240 or $250?   11:54:38

21   A.   It was given to Hanoi.

22   Q.   Why?

23   A.   Because at that point he was pimping all of us and a

24   pimp's job is to receive from prostitutes.

25         MS. HULL:  Objection to the question.  Foundation.   11:54:55

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1              THE COURT:  Sustained.                          11:54:57
 2   BY MR. LOGAN:
 3   Q.   When you gave the defendant your money, was it your
 4   understanding that it was going to be his money?
 5   A.   Yes.                                                  11:55:04
 6              MS. HULL:  Objection.  Leading.
 7              THE COURT:  Sustained.
 8              Well, I'm going to sustain it on foundation.
 9   BY MR. LOGAN:
10   Q.   What was your understanding of where the money would be  11:55:16
11   going?  And when I say "the money," I'm talking about the money
12   that you and the other ladies were making.
13              MS. HULL:  Same.  Foundation.
14              THE COURT:  Sustained on foundation.
15   BY MR. LOGAN:                                              11:55:28
16   Q.   You testified that the defendant received the money?
17   A.   Yes.
18   Q.   Did you ever get your $240 back from him?
19   A.   Never.
20   Q.   Earlier during your direct examination you provided  11:55:44
21   information about the Craigslist.  Do you remember that?
22   A.   Yes.
23   Q.   Do you know if there was any -- did you talking about the
24   Craigslist when you were in Las Vegas?
25   A.   Not really sure.  I'm not remembering us talk about it.  11:56:04
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | I'm not sure. | 11:56:08 |
| 2 | MR. LOGAN:  Your Honor, permission to retrieve | |
| 3 | Government Exhibit Number 33, please. | |
| 4 | THE COURT:  Yes. | |
| 5 | MR. LOGAN:  Government counsel is publishing | 11:56:56 |
| 6 | Government Exhibit Number 33. | |
| 7 | BY MR. LOGAN: | |
| 8 | Q.   XXXXXXXXX, who is in the photo? | |
| 9 | A.   That is me. | |
| 10 | Q.   And do you recall where that was taken? | 11:57:22 |
| 11 | A.   Yes.  That was taken at the Wild Wild West in Las Vegas. | |
| 12 | Q.   When? | |
| 13 | A.   The morning after we arrived there. | |
| 14 | Q.   Who took the photo? | |
| 15 | A.   Hanoi. | 11:57:36 |
| 16 | Q.   What was the purpose of the defendant taking this photo? | |
| 17 | MS. HULL:  Objection.  Speculation. | |
| 18 | THE COURT:  Sustained. | |
| 19 | BY MR. LOGAN: | |
| 20 | Q.   Did the defendant tell you why he was taking this photo? | 11:57:43 |
| 21 | A.   Yes, to actually put the pictures on Craigslist. | |
| 22 | Q.   Do you know if the photo was actually posted on | |
| 23 | Craigslist? | |
| 24 | A.   Yes. | |
| 25 | Q.   And when I say "the photo," I'm talking about the one you | 11:58:08 |

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    just saw of yourself?                                          11:58:10

2    A.   Yes.

3    Q.   Tell us about how it was posted.

4    A.   I mean, it was posted like any other -- just like any

5    other posting.  You would upload it to -- you would upload the    11:58:21

6    picture onto your Craigslist ad and you put the message that

7    you want as far as what's going to attract the guys to call you

8    and your telephone number and prices and things just like I

9    said before.  That's pretty much how it got posted on there.

10   Q.   Who posted it?                                              11:58:44

11   A.   I do believe it was Hanoi or it could have been Zuriela.

12   Q.   Now, after you and the other girls made it in for the

13   night, what happened next?

14   A.   That morning -- you mean like after we had made it in for

15   the night?  Do you mean like after we went to bed?              11:59:18

16   Q.   Right.  After you prostituted and made it back to the Wild

17   Wild West, correct.

18   A.   He -- like I said earlier, he was actually being really,

19   really -- he was very, very upset.  He was mad because I

20   mean --                                                         11:59:36

21             MS. HULL:  Objection.  Speculation.

22             THE COURT:  Sustained.

23   BY MR. LOGAN:

24   Q.   What happened after you prostituted when you made it back

25   to the Wild Wild West?  What happened next?  Did you go         11:59:45

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   anyplace?                                                    11:59:50

2   A.   No, we didn't go anywhere.  The next -- well, like, for

3   that night we didn't go anywhere but we had went to sleep and

4   then the next day he was just like, "Hey, look, we need to get

5   ready to go because we're going to be on our way to LA.  Nobody   12:00:07

6   is making money here.  It's just time to go."

7   Q.   Who said that?

8   A.   Hanoi.

9   Q.   Did you, in fact, make it to LA?

10  A.   Yes, we did.                                            12:00:26

11  Q.   Who was with you?

12  A.   It was the same people that were up in the car before:

13  Me, Hanoi, Zuriela, Philysia, and Amanda.

14  Q.   And what was your understanding of why you were going to

15  LA?                                                          12:00:43

16  A.   To actually prostitute.

17  Q.   Do you recall when you made to it LA?

18  A.   I'm not sure of the day but I know that after that night

19  up in Las Vegas we made it to LA the same day after leaving Las

20  Vegas -- I mean, we left -- okay.  The same day that we left    12:01:05

21  Las Vegas was the same day we got to LA because LA and Las

22  Vegas is nothing but about three hours apart.

23  Q.   Once you reached LA, what happened?

24  A.   We -- first off, we went and got some shrimp from this one

25  place and I forgot what street it was on but then we had        12:01:29

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   checked in to Microtel off of Century and Inglewood Avenue in          12:01:34

2   the LAX area in Los Angeles.  We got there and we got settled

3   in once again.  And whenever we had went upstairs, he just had

4   basically put us to work then -- no.  As a matter of fact, we

5   had started posting at first.  We started posting up on             12:02:01

6   Craigslist.

7   Q.   Now, when you say "we started posting," what do you mean

8   by that?

9   A.   I mean, like, okay, he was taking pictures of Amanda.  He

10  was taking pictures of Zuriela.  He took pictures of both of        12:02:16

11  them together.

12  Q.   Who is "he"?

13  A.   Hanoi.  Yeah, well, Hanoi took pictures of Amanda

14  separately, Zuriela separately.  He took a picture with them

15  together and, I mean, he was taking some pictures of me and we      12:02:33

16  were going to put them on Craigslist and we did put them on

17  Craigslist.

18          MR. LOGAN:  Your Honor, may I have a brief moment?

19  BY MR. LOGAN:

20  Q.   XXXXXXXXX, you were just talking about posting on              12:03:14

21  Craigslist, do you recall that?

22  A.   Yes, sir.

23  Q.   I want you to pull out Government Exhibit Numbers 2, 3,

24  and 4, please.

25          MR. LOGAN:  Your Honor, sidebar, please.                    12:03:45

United States District Court

XXXXXXXXX XXXXXXX - Direct

1        (At sidebar.)                                                    12:03:56

2        MR. LOGAN:  Your Honor, Government Exhibits 2, 3, and

3    4, they had writing on them.  We have color clean copies with

4    no writing and they have already been placed in the official

5    exhibit folders and we just wanted to notify the court that the    12:04:12

6    items that you actually admitted into evidence have been

7    changed and basically redacted and there's no objection from

8    the defense.

9        THE COURT:  Okay.

10       MS. HULL:  Well, I have the objection as to                     12:04:24

11   foundation and that they were going to establish the dates and

12   they were indicated -- Ms. Bardorf indicated that they were on

13   the digital copies, the dates as you recall, from Miss Marinos.

14   Unless those are on the original, I still don't know the dates.

15       MS. BARDORF:  What I said was we would get the color           12:04:42

16   copies from Miss Marinos.  There are no dates on two of them.

17   The reason that the redaction is there is because it's Ms.

18   Payes' handwriting.

19       THE COURT:  So that's out of there so that the date

20   issue is still left to be resolved.                                 12:04:54

21       MR. LOGAN:  Well, the three items have been admitted

22   into evidence.

23       THE COURT:  They have been.

24       MS. HULL:  Over objection, Judge.

25       THE COURT:  They have been.  There is supposed to be           12:05:03

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1    foundation concerning the dates and you're going to establish    12:05:05
 2    that?
 3              MR. LOGAN:  I can establish that through the one
 4    photo.  It's close in time that the other ones were posted.
 5              MS. BARDORF:  One of them has a date on it already.    12:05:16
 6              MS. HULL:  Your Honor, I don't know how they are
 7    going to do it without Craigslist.  I will tell the court and
 8    counsel I have a certified copy now that I received yesterday
 9    of all of them.
10              THE COURT:  Well, they don't come in unless we've got    12:05:30
11    foundation.
12              MS. BARDORF:  One of them has the date on it just for
13    clarification.  As you can see, that one has a date on it as
14    discussed by Miss Marinos.
15              THE COURT:  I thought you said the agent has the    12:05:40
16    dates.
17              MS. BARDORF:  No.  No.  No.  What she said was we
18    would look at them to see if they looked any different which
19    they do not.  What was admitted into evidence was what they
20    looked like.    12:05:50
21              THE COURT:  So you don't have the dates?
22              Can you lay the foundation through this witness?  Can
23    she identify them?
24              MS. BARDORF:  Yes, Your Honor.
25              THE COURT:  This is redacted.    12:05:59
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

1          MS. BARDORF:  Correct.  Just for clarification,          12:06:01

2    Miss Marinos also laid the foundation that they were on

3    Craigslist.  The second thing is we've also cleaned up

4    Ms. Hull's Exhibit Number 142.  If you remember, it was the

5    Netherlands telephone report that she admitted into evidence          12:06:13

6    with her personal notes.  And I provided a clean copy this

7    morning and we've already replaced that in the evidence just so

8    we don't have to do this later.

9          THE COURT:  We do have Miss Marinos' testimony that

10   they were that date even though they are not.  We have her          12:06:26

11   testimony so there should be a sufficient foundation for that.

12   All right.

13          (End sidebar.)

14   BY MR. LOGAN:

15   Q.   XXXXXXXXX, have you had a chance to look at Government          12:06:47

16   Exhibits 2, 3, and 4?

17   A.   Not yet.

18   Q.   I'm sorry.  I didn't hear what you said.

19   A.   I said not yet.

20          Yes, sir.          12:07:36

21   Q.   Have you looked at all three?

22   A.   Yes.

23   Q.   Have you seen Government Exhibit Number 2 before?

24   A.   Yes, I have.

25   Q.   Describe it.          12:07:46

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   This was supposed to be a posting for me on Craigslist                12:07:50

2   and -- yeah.

3   Q.   Now, what do you mean it's supposed to be a posting?

4   A.   Well, it is a posting of me on Craigslist.

5   Q.   Do you recall if it was actually posted?                              12:08:05

6   A.   Yes.

7   Q.   And do you know who actually posted it?

8   A.   Hanoi.

9   Q.   How do you know that?

10  A.   Because I know that -- I know that he was the one to run             12:08:18

11  the computer.  I know he was the one who had posted this

12  because I remember him calling me over to the computer like,

13  "Hey, what do you think about this?"

14          I don't even speak like this.  I don't -- it's like.

15  Okay, like up in my postings.  I would put something like a               12:08:38

16  paragraph.  And Hanoi is very short and simple and to the point

17  because he has to post a lot of women.

18          MR. LOGAN:  Your Honor, the government requests

19  permission to publish Government Exhibit Number 2.

20          THE COURT:  Yes.                                                  12:09:01

21  BY MR. LOGAN:

22  Q.   XXXXXXXXX, I've published Government Exhibit Number 2.  I

23  want to focus your attention where it says Los Angeles

24  Craigslist, what does that mean?

25  A.   That means that's the Craigslist for the Los Angeles area.           12:09:42

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   Where it provides the date, what exactly does that mean?          12:09:55

2   A.   It's the day that it was made.  Well, the day that it was

3   posted.

4   Q.   The day that it was posted on the computer?

5   A.   Yes.                                                              12:10:14

6   Q.   Have you read the "sexy mama new in town W4M 18"?

7   A.   Yes.

8   Q.   Do you know what that means?

9   A.   Yes.

10  Q.   What does that mean?                                              12:10:27

11  A.   It means sexy mama, new in town, women for men, age 18.

12  Q.   What's woman for men?

13  A.   Woman for man.  Like a woman for a man.

14  Q.   And 18 means what?

15  A.   The age.                                                          12:10:42

16  Q.   Now, why would 18 be posted?

17  A.   To actually show that you're legal.

18  Q.   Had you seen Government Exhibit Number 2 before?

19  A.   Yes.

20  Q.   And you had seen the 18 before?                                   12:11:02

21  A.   Yes.

22  Q.   Were you 18 at that point?

23  A.   No.

24  Q.   Was this referring to you?

25  A.   Yes.                                                              12:11:09

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    Q.    How do you know that?                                    12:11:10

2    A.    Because, you know, my name was Miss Delicious.

3    Q.    The next line where it says, "Hey sweetie come play with

4    your own personal sex kitty, 200 kisses gets you what you

5    want," what does that mean?                                    12:11:56

6    A.    That means $200 gets you whatever you want.  Like if you

7    want everything, you can get it for $200.  If you want it anal,

8    you can get it for $200.  Anything goes for $200.

9    Q.    And where it says below that, "Ask for Ms. Delicious," you

10   said that was your name?                                       12:12:19

11   A.    Yes, sir.

12   Q.    You've testified that your name is XXXXXXXXX XXXXXXX.  Why

13   wouldn't you put your name on it?

14   A.    Because it's not good to put your government name on a

15   posting because they have people who actually -- and plus      12:12:32

16   Miss Delicious is more catchy, you know.  And I wouldn't want

17   to use my real name for something like that that could

18   actually, you know, like seriously incriminate me now if I was

19   to put XXXXXXXXX XXXXXXX on there and the cops find it, oh,

20   XXXXXXXXX XXXXXXX, then it -- no.  I just put my pet name.      12:12:54

21   Q.    Did anyone tell you to put your pet name?

22         MS. HULL:  Objection, Your Honor.  She just said I

23   put my pet name.

24         THE COURT:  Overruled.

25

United States District Court

XXXXXXXXX XXXXXXX - Direct

| | | |
|---|---|---|
| 1 | BY MR. LOGAN: | 12:13:06 |
| 2 | Q.   Did anyone tell you to use a pet name and not your real | |
| 3 | name? | |
| 4 | MS. HULL:  Leading. | |
| 5 | THE COURT:  Overruled. | 12:13:13 |
| 6 | THE WITNESS:  Actually, yes because my name -- | |
| 7 | because my real name didn't need to be involved in anything and | |
| 8 | a pet name was just to protect your identity, at least your | |
| 9 | identity to like all the guys who actually look on Craigslist | |
| 10 | that don't know you from nothing. | 12:13:36 |
| 11 | MR. LOGAN:  Who told you to use a pet name? | |
| 12 | MS. HULL:  Asked and answered. | |
| 13 | THE COURT:  Sustained. | |
| 14 | BY MR. LOGAN: | |
| 15 | Q.   Do you recognize the photo? | 12:13:53 |
| 16 | A.   That's not me. | |
| 17 | Q.   Do you know if it was actually on the posting? | |
| 18 | A.   Yes. | |
| 19 | Q.   Now, you testified earlier that these postings go out to | |
| 20 | basically advertise; is that right? | 12:14:07 |
| 21 | A.   Yes. | |
| 22 | Q.   But you just said that was not a picture of you. | |
| 23 | A.   That wasn't a picture of me but the picture under it was. | |
| 24 | Q.   Well, if you're advertising, why wouldn't you use your own | |
| 25 | picture? | 12:14:23 |

XXXXXXXXX XXXXXXX - Direct

```
 1   A.   Because it's, like, sometimes people don't have pictures          12:14:24
 2   of their own and, you know, it's, like, there will be, like,
 3   other appealing pictures up on Craigslist that, hey, you may
 4   want to use for yourself one day.
 5        I mean, like, if a lady looks like you and has some           12:14:37
 6   of the same features, you can actually use her picture and it
 7   will be more appealing and it will be a professional picture,
 8   saves a lot of money and it still gets the job done as far as
 9   it's advertising.
10   Q.   Now, once the postings were made, did you and the other          12:15:03
11   girls ever go out in LA and work?
12   A.   Yes, we did.
13   Q.   Tell us about that.
14   A.   It was -- because I didn't know we were working in the
15   daytime.  We would post in the daytime and more toward the           12:15:18
16   night.  We got dressed and it's like out there you don't have
17   to wear platform heels just like you do up in Vegas.  It's
18   totally different.  You would rather go out there in pants and
19   a cute shirt and tennis shoes because -- and in the Microtel
20   was right on Century which is the -- which is the ho stroll.         12:15:41
21   Q.   Did you actually prostitute in LA?
22   A.   Yes, I did.
23   Q.   Did you actually make any money in LA?
24   A.   Yes, I did.
25   Q.   How much did you make?                                          12:15:53
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  A.   I'm not sure.  I mean, Hanoi got all the money so I'm not                12:15:55

2  sure exactly how much money --

3          MS. HULL:  Objection.  Nonresponsive.

4          THE COURT:  Overruled.

5          THE WITNESS:  Well, Hanoi got all the money so I'm               12:16:05

6  not sure exactly how much money I made and plus it was a little

7  while ago and I was trying to get over that.  But I'm not

8  really sure.

9  BY MR. LOGAN:

10 Q.   Do you recall if you had any clients that actually came in        12:16:17

11 from the postings?

12 A.   Yes.  I had --

13         MS. HULL:  That's the answer.  There was no question.

14         MR. LOGAN:  Your Honor, I didn't understand the

15 objection.                                                              12:16:35

16         THE COURT:  Well, she answered the question.  Do you

17 have another question?

18         MR. LOGAN:  I didn't hear the response to the

19 question.

20         THE COURT:  She said yes.                                       12:16:41

21 BY MR. LOGAN:

22 Q.   When they answered the postings, do you recall where you

23 would meet?

24 A.   We would meet at the hotel room.

25 Q.   And did you, in fact, meet anyone at the hotel room?              12:16:59

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   A.   Yes.                                                          12:17:02

2   Q.   Tell us about that.

3   A.   There was a call that we had got in and it was for

4   Miss Delicious and it was two guys that had actually wanted

5   to -- that had wanted to engage in, you know, sexual          12:17:11

6   intercourse and oral sex and things at the same time with me.

7   Basically, you know, whenever they were on their way, Hanoi got

8   everybody out of the room and the guys went up there and they

9   gave me the money up front and, you know, we had started to

10  actually engage in the activities that I was supposed to engage  12:17:42

11  in for the money.

12        Basically, you know, one guy was finished and I know

13  where I put my money and I guess --

14        MS. HULL:   Objection.   No question is asked, Judge.

15        THE COURT:   Sustained.                                    12:18:01

16  BY MR. LOGAN:

17  Q.   You testified about the two guys that you were having sex

18  with.   Do you recall that?

19  A.   Yes.

20  Q.   How much money did you receive?                            12:18:09

21  A.   I believe it was -- it could have been about -- it was

22  about -- I think it was around like $360 or $400.

23  Q.   Where did the money go?

24  A.   The money didn't get to Hanoi because we wasn't finished

25  with the act and like the money never got to Hanoi because one   12:18:32

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   of the guys had took the money back while I was with the other        12:18:36
2   guy trying to finish with him.  I had already finished with one
3   guy and I guess he seen where I put the money and he took it.
4   And me, thinking that I still had it hidden, I thought that I
5   still had the money.                                                  12:18:51
6   Q.   When did you find out that you didn't have the money?
7   A.   Whenever the guys left.  Whenever the guys had left, I was
8   putting on my clothes again and I was getting ready to go
9   downstairs and give Hanoi his money.  And as I was looking, I
10  couldn't find it and I looked everywhere.  I mean, I turned the       12:19:08
11  room upside down trying to find it and then I ran down the
12  stairs trying to find the guys and the guys were gone.
13  Q.   Now, you stated that you were looking for the money to get
14  it to Hanoi?
15  A.   Yes.                                                             12:19:29
16  Q.   But you just testified that you were the one with the two
17  guys.  Why would you give your money to the defendant?
18  A.   Because -- because I was prostituting for him and the
19  money was supposed to go to him.
20  Q.   Well, what happened after you couldn't find the money?          12:19:47
21  A.   After I couldn't find the money I just said okay.  Well,
22  you know what, I'm just going to have to go down here and tell
23  him.  I know he's going to be mad but I'm going to have to let
24  him know.  There's no way I'm going to be able to make $400
25  just pop up.  So I said you know what, I need to go down there       12:20:03

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  and tell him the truth and just let him know what happened and          12:20:07

2  hopefully he understands.

3          I went downstairs and I went down to the lobby.

4  Everyone was sitting in the lobby.  Philysia was sitting in the

5  lobby, Amanda, Zuriela, and Hanoi.  And Hanoi was just like,           12:20:18

6  "Man, you had us down here waiting for so long.  So where is

7  the money?"

8          I told him -- I looked at him for a long time and I

9  said, "The men took the money."

10          And he said, "So you're going to tell me you ain't          12:20:33

11  got no money?"

12          And I said, "No, I don't.  I don't have any money."

13          And that's whenever he said, "Yeah, bitch, you F'ing

14  get your ass whooped.  That's what's fixing to happen," which

15  means he was actually going to harm me, hurt me because I           12:20:54

16  didn't make his money.  Actually, I made the money but the

17  money got taken.

18  Q.   And what happened after he told you that?

19  A.   After he told me that, we got -- he said, "We F'ing go

20  upstairs."  And then whenever we got on the elevator, because I      12:21:23

21  didn't want to make a scene in front of the office lady, I got

22  on the elevator because I was scared and I just didn't know

23  what to do and he had basically full-fledged slapped me on the

24  elevator.  I mean, he slapped like I was a man or somebody.  He

25  was just like, "Yeah, I'm really going to beat your ass because     12:21:45

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    you had us down there waiting," and then he said something        12:21:50

2    about, "It was two black men, wasn't it," when it wasn't.

3    Q.    What happened when you made it to the room?

4    A.    Whenever I made it to the room with him, we got off the

5    elevator and I was trying to fight and actually not go inside     12:22:11

6    the room because I knew what was going to happen to me; okay?

7              And I was trying to pull on the door because it's

8    like at first he was putting the key inside the door and the

9    door just wouldn't open and I was like, okay, that's good.  We

10   are going to have to go back downstairs and then whenever we go   12:22:36

11   back downstairs, I can just leave.  But then the light had

12   flashed green and then he opened the door and I kept crying and

13   I told him, "No.  No.  I don't want to do it.  I don't want to

14   go inside the room."

15             And he said, "Well, you know what, bitch, you should    12:22:49

16   have thought about that."

17             And what he did was he pulled me inside the room and

18   he beat the mess out of me.  He really, really hurt me.  I

19   mean, I'm saying, like, punching me in the face, slapping me.

20   I was up in the corner and, you know, he kept pulling me back     12:23:13

21   up, like, standing me back up and punching me back down and I

22   mean it's like he just kept hitting me and just kept hitting me

23   and just kept hitting me.  Whenever I hit the floor, he was

24   kicking me and he just was kicking me and he kept telling me he

25   was like, "You need to stop feeding me fishheads, too.  I'm not   12:23:33

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   one of these young niggers," and he just kept beating me and my       12:23:39
2   face was red.  My face was messed up.

3                MS. HULL:  Objection, Your Honor.  No question.

4                THE COURT:  Overruled.

5                MR. LOGAN:  Your Honor, permission to retrieve           12:23:53
6   Government Exhibit s 16 through 19.

7                THE COURT:  Yes.

8                MR. LOGAN:  Government counsel is publishing
9   Government Exhibit Number 17.

10  BY MR. LOGAN:                                                         12:25:15

11  Q.   Do you recognize this person?

12  A.   Yes.

13  Q.   I'm going to ask you to speak into the microphone, please.

14  A.   Yes, I do.

15  Q.   Who is it?                                                       12:25:22

16  A.   That's me.

17               MR. LOGAN:  Government counsel is publishing
18  Government Exhibit Number 18.

19  BY MR. LOGAN:

20  Q.   XXXXXXXXX, describe what is depicted in this photo.             12:25:58

21  A.   That was some bruising on my eye from Hanoi beating me.

22  Q.   Are you sure?

23  A.   Yes.  Yes.

24               MR. LOGAN:  Government counsel is publishing
25  Government Exhibit Number 19.                                        12:26:40

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   BY MR. LOGAN:                                                    12:26:49

2   Q.    XXXXXXXXX do you recognize who is in this photo?

3   A.    Yes.

4   Q.    Who is it?

5   A.    It's me.                                                   12:26:53

6   Q.    Describe what is shown in this photo.

7   A.    On the side of my face there was some more bruising from

8   when he was beating me.

9   Q.    And was this from the beating you described in LA?

10  A.    Yes.                                                       12:27:09

11          THE COURT:  All right.  Ladies and gentlemen, we're

12  going to take a lunch break.  We'll see you back here at 10

13  minutes after one.

14          We're in recess.

15          (Jury departs.)                                          12:27:20

16          COURTROOM DEPUTY:  All rise.

17          (Recess at 12:27; resumed at 1:14.)

18          (Jury enters.)

19          (Court was called to order by the courtroom deputy.)

20          THE COURT:  Please be seated.                            01:15:19

21          Mr. Logan?

22          MR. LOGAN:  Thank you, Your Honor.

23  BY MR. LOGAN:

24  Q.    XXXXXXXXX, when we broke for lunch, we were showing you a

25  photograph of yourself.  Do you recall that?                     01:15:33

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    A.   Yes.                                                                   01:15:35

2    Q.   Now, after the LA incident that you described and we

3    discussed the photos, what happened after that?

4    A.   After that the police were called and they had came up to

5    our room and at that point everyone was upstairs which means    01:15:55

6    all of the other girls were there, Zuriela, Amanda, and

7    Philysia.  They were all upstairs and the police had came and

8    they wanted to know what had happened.

9         I had ran to the bathroom so I can try to put some

10   makeup on but it didn't work and the police were knocking on    01:16:20

11   the bathroom door and I took a while to open the door and then

12   they seen my face.  They wanted to know what had happened to my

13   face.  Amanda -- well, it was Amanda or Zuriela, one of them

14   had spoke up and were just like --

15              MS. HULL:  Objection.  Hearsay.                       01:16:41

16              THE COURT:  Sustained.

17   BY MR. LOGAN:

18   Q.   After the police made it to the room, did you stay in the

19   room?

20   A.   Yes.                                                        01:16:51

21   Q.   How long did you stay in the room?

22   A.   Well, I stayed in the room until we got kicked out of the

23   hotel to leave and go to Arizona.

24   Q.   Who kicked you out of the hotel?

25   A.   The people at the front desk.                               01:17:07

United States District Court

XXXXXXXXX XXXXXXX - Direct

1  Q.   And how long was it after police had talked to the group

2  of you that you actually had to leave the hotel?

3  A.   I would say it was about maybe an hour, if that.

4  Q.   And when you, like you described, were kicked out of the

5  hotel, what happened after that?

6  A.   After that we had to quickly get our things from upstairs

7  and bring them on downstairs and load up the car and we had to

8  leave.

9  Q.   And who was actually in the car when you were leaving the

10  hotel?

11  A.   Zuriela, Hanoi, Amanda, and Philysia.  Well, no.  I think

12  we had -- we had went and dropped -- I guess Hanoi had dropped

13  Philysia off earlier in the day so Philysia wasn't with us.  It

14  was just Zuriela and, you know, Hanoi and Amanda.

15  Q.   So when you were leaving the Microtel, where were you

16  headed?

17  A.   We were headed to Phoenix, Arizona.

18  Q.   Why?

19  A.   So that we can get out of the area and go somewhere where,

20  I guess, nobody has ever been and to go make some money.

21  Q.   And whose idea was it to go to Phoenix?

22  A.   Hanoi's.

23  Q.   Are you sure?

24  A.   Yes.

25  Q.   Do you recall when you actually made to it Phoenix?

01:17:12
01:17:27
01:17:44
01:18:12
01:18:24
01:18:35

United States District Court

XXXXXXXXX XXXXXXX - Direct

```
 1   A.   Well, we made to it Phoenix the next day.  Because we left        01:18:41
 2   and it was really, really, really late whenever we had left.
 3   I'm not really sure what time we got to Phoenix but I know it
 4   was somewhere toward -- like toward the evening of the next
 5   day.                                                                   01:18:59
 6   Q.   Now, did you ever reach Phoenix?
 7   A.   Yes.
 8   Q.   How do you know you were actually in Arizona?
 9   A.   Because we had stopped at a water front and it was out
10   here and -- I mean -- I mean, we seen, like, Phoenix.  Whenever        01:19:10
11   you're in a city and there's a sign that says you're in
12   Phoenix, you know you know where you are.
13   Q.   Now, did you stay in a hotel in Arizona?
14   A.   Yes.
15   Q.   Do you recall where?                                             01:19:30
16   A.   It was somewhere.  I really don't remember exactly where
17   the hotel was, but I know we had went and got a hotel.
18   Q.   Now, when you got this hotel, do you recall if it was
19   actually in Arizona?
20   A.   Yes.                                                             01:19:46
21   Q.   And when you got the hotel room, was everyone in one room?
22   A.   Yes.
23   Q.   Are you sure?
24   A.   Yes.
25   Q.   What happened once you reached Arizona?                          01:19:54
```

United States District Court

XXXXXXXXX XXXXXXX - Direct

1    A.    Once we reached -- well, once I reached -- once we reached      01:19:57

2    Arizona, we had -- like I said, we want to the water front and

3    then we went to the hotel and Zuriela and Hanoi went into the

4    little office and checked into the hotel.  We got up to the

5    hotel room and everybody was upset because the air-conditioning    01:20:18

6    wasn't working and it was really, really, really hot.

7            I was trying to cool off Hanoi.  Hanoi had his shirt

8    off and he had on boxers and I had got -- I got a wet towel and

9    I was trying to cool him off and I was trying to stop him from

10   actually getting really violent because he said that Zuriela      01:20:43

11   was --

12           MS. HULL:  Objection, Your Honor.  No question.

13   Relevance.

14           THE COURT:  Overruled.

15   BY MR. LOGAN:                                                      01:20:55

16   Q.    You can continue to answer the question.

17   A.    Okay.  And I was trying to keep Hanoi cool because I know

18   it was hot and he was getting aggravated and he was really

19   upset with Zuriela because Zuriela -- she was making what he

20   would say stupid comments.                                        01:21:10

21           MS. HULL:  Objection as to hearsay.

22           THE COURT:  Overruled.

23           THE WITNESS:  And -- what were you going to ask?

24   BY MR. LOGAN:

25   Q.    Now, you just testified that you went to one room and the   01:21:23

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   AC wasn't working?                                                    01:21:27

2   A.    Yes.

3   Q.    Did you end up going to another room?

4   A.    No.

5   Q.    So you stayed in the room with no AC?                           01:21:31

6   A.    Yeah.

7   Q.    And at that point what happened?

8   A.    At that point Zuriela and Hanoi, I do believe they went

9   downstairs and -- no, actually they didn't go downstairs.  They

10  stayed upstairs and they had gotten into an altercation, you         01:21:49

11  know, and I guess he took her outside --

12              MS. HULL:  Objection.  Speculation.

13              THE COURT:  Sustained.

14  BY MR. LOGAN:

15  Q.    When you got to the hotel, what did you do?                     01:22:01

16  A.    Okay.  Well, whenever I got to the hotel, I went upstairs

17  and, like I said, I was trying to cool Hanoi off from actually

18  going off on everybody and I did what he told me to do.  He

19  told me to -- well, I went and I took the computer and I went

20  downstairs to the car and because we couldn't get a signal in       01:22:27

21  there for us to post on Craigslist.

22  Q.    Who told you to take the computer to the car?

23  A.    Hanoi.

24  Q.    Are you sure?

25  A.    Yes.                                                            01:22:39

United States District Court

XXXXXXXXX XXXXXXX - Direct

1   Q.   And it was to post what?                                          01:22:41

2   A.   It was to post ads on Craigslist for all of the girls that

3   were in the room.

4   Q.   To do what?

5   A.   To prostitute.                                                    01:22:48

6           MR. LOGAN:  May I have a moment, Your Honor?

7           THE COURT:  Yes.

8           MR. LOGAN:  Nothing further, Your Honor.

9           THE COURT:  All right.  Cross?

10                      **CROSS EXAMINATION**                              01:23:06

11  BY MS. HULL:

12  Q.   Good afternoon.

13  A.   Good afternoon.

14  Q.   My name is Barbara Hull.  You were here last week.  Do you

15  recall?                                                               01:23:36

16  A.   Yes.

17  Q.   And after your appearance in court last week, were you

18  appointed an attorney?

19  A.   Yes.

20  Q.   When was that?                                                   01:23:46

21  A.   On Thursday.

22  Q.   And you were given an immunity agreement; correct?

23  A.   Yes, ma'am.

24  Q.   When was that?

25  A.   Today.                                                           01:23:57

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.    When did you first get wind that you were going to be          01:24:00

2   provided immunity?

3   A.    On Thursday.

4   Q.    And when on Thursday?

5   A.    When I spoke to my attorney, he said that he would put in      01:24:13

6   something for --

7   Q.    Can you please speak up and into the microphone?

8   A.    Sorry about that.  I spoke to my attorney on Thursday and

9   he said that he would put in some -- a form for the immunity

10  thing and that's how he was helping me.                              01:24:30

11  Q.    You got two.  You first got one immunity letter and then

12  you got another, didn't you?  Do you remember that?

13  A.    I only remember the immunity letter from today.

14  Q.    Okay.  Well, let me see if I can -- okay.

15          You were ready to take the stand last week.  Do you          01:24:58

16  remember that?

17  A.    Yes.

18  Q.    And then you talked to an attorney; correct?

19  A.    Yes.

20  Q.    And was it your understanding that you were going to take       01:25:03

21  the stand that day and talk under an immunity agreement with

22  the government?

23  A.    It wasn't my understanding that I would talk that day

24  because I knew that I wasn't going to be going back on the

25  stand.                                                               01:25:18

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   Okay.  And do you remember having a discussion with the

2   government about immunity on Thursday before you left?

3   A.   Who do you mean by "the government"?

4   Q.   Well, I have been provided two different agreements.  One

5   was on Thursday which said --

6              THE COURT:  Ask her a question.

7   BY MS. HULL:

8   Q.   Do you remember getting an immunity agreement on Thursday

9   and reviewing it with your attorney?

10  A.   I remember signing an immunity agreement.

11  Q.   On Thursday?

12  A.   Yes, ma'am.

13  Q.   And another one -- and then you received another immunity

14  agreement today?

15  A.   I received an immunity letter today.

16  Q.   Okay.  So there were two different writings; correct?

17  A.   No.  I'm not sure what you mean by that, ma'am.

18  Q.   Two different letters?

19  A.   Yes.

20  Q.   Okay.  And what did the first one cover?

21  A.   The first one covered, you know, all of the guidelines

22  that I should follow if I were to get the immunity letter.

23  Q.   Immunity from what?  What was your understanding at that

24  time?

25  A.   At that time, you know, I was getting immunity because I

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    know that I've done some things in the past that I'm not proud          01:26:33

2    of that I don't --

3    Q.   No.  What did the immunity agreement itself give you

4    immunity for?  What was your understanding?

5    A.   Really use immunity.                                               01:26:47

6    Q.   For what?

7    A.   So that whatever I say in this court under oath, as long

8    as it's the truth, I can't be prosecuted for it right now.

9    Q.   But not perjury?

10   A.   No.  Perjury is lying.  And as long as I tell the truth.          01:27:06

11   Q.   And you signed the first agreement on the 15th, last

12   Thursday; correct?

13   A.   Yes, ma'am.

14   Q.   And you agreed to give full cooperation with law

15   enforcement; correct?                                                   01:27:23

16   A.   Yes, ma'am.

17   Q.   Did you sign that agreement before you talked to Heather

18   Bergey from the FBI last Thursday?

19   A.   Yes, I did.

20   Q.   Okay.  And in that agreement you were given immunity for         01:27:56

21   any information derived from your testimony in any criminal

22   case except for perjury, obstruction of justice, or making a

23   false statement after the date of the agreement; correct?

24   A.   Yes, ma'am.

25   Q.   And that agreement changed yesterday; correct?                    01:28:23

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   I'm not sure.  I can't explain.                          01:28:30

2   Q.   Well, there weren't any warrants covered under this

3   agreement, were there?

4   A.   Well, no, I don't think.

5   Q.   Okay.  You had warrants last Thursday when you signed this   01:28:38

6   first agreement, didn't you?

7   A.   I think so.

8   Q.   Okay.  Where were those warrants for your arrest?

9   A.   In Washington County.

10  Q.   Where else?                                               01:28:51

11  A.   In Portland, Oregon.

12  Q.   Where else?

13  A.   And in Las Vegas.

14  Q.   And where else?

15  A.   And I think that was it -- at least that's all the        01:29:00

16  warrants that I --

17  Q.   And what were those warrants for?

18  A.   For shoplifting and trespassing and --

19  Q.   Prostituting?

20  A.   Yes.                                                      01:29:13

21  Q.   Okay.  And when did you receive -- were the warrants

22  issued for your arrest out of Portland?

23  A.   I'm not sure.  My mom would know.

24  Q.   Do you remember being arrested in Portland?

25  A.   I remember being -- well, I haven't been arrested for any  01:29:30

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  warrants in Portland.                                          01:29:33

2  Q.   No.   Were you arrested -- in order for there to be a

3  warrant for your arrest, do you understand what that is?

4  A.   M'hum.

5  Q.   That's a yes?                                             01:29:42

6  A.   Yes, ma'am.

7  Q.   So in order for a warrant to be issued for your arrest,

8  you have to fail to appear for court; correct?

9  A.   Right.

10 Q.   That's your understanding?                                01:29:52

11 A.   Yes, ma'am.

12 Q.   Okay.   What did you fail to appear for?   What charges did

13 you fail to appear for in Portland?

14 A.   I do believe it was the shoplifting.

15 Q.   Only one?                                                 01:30:00

16 A.   Two.

17 Q.   Two shopliftings.   What else?

18 A.   I think that's it.

19 Q.   When did those occur?

20 A.   I'm not sure, ma'am.   It's been a very long time since    01:30:15

21 then.

22 Q.   Years?

23 A.   About a year and change.

24 Q.   How old were you when you were arrested for shoplifting?

25 A.   I think I was about 15 and then the other time was maybe   01:30:23

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    whenever I was about 16.                                              01:30:27

2    Q.   Okay.  And where were you arrested?

3    A.   At the Fred Meyer off of interstate and Lombard.

4    Q.   What were you arrested for?

5    A.   I was arrested for shoplifting there.                           01:30:43

6    Q.   What did you shoplift?

7    A.   One time I was shoplifting baby clothes for my friend

8    because he was going to pay me some money to actually do him a

9    favor because it was his son's birthday.

10   Q.   And did you tell the police that you were shoplifting for      01:30:58

11   your own child?

12   A.   Yes, ma'am.  I said that, ma'am, just so I could cover

13   myself.

14   Q.   You do that a lot, don't you?

15   A.   Well, no, not all the time.                                     01:31:07

16   Q.   Okay.  But do you that sometimes, don't you?

17   A.   Very rarely, ma'am.

18   Q.   In fact, you use other people's identities, very often,

19   don't you?

20   A.   I did with Hanoi.                                               01:31:25

21   Q.   Before that.  Do you remember using different names?

22   A.   Oh, yes, ma'am.

23   Q.   Okay.  Tell us some of the names you've used other than

24   Miss Delicious.

25   A.   Chiyna.                                                         01:31:35

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    Q.   When did you use Chiyna?                                        01:31:36

2    A.   I used Chiyna whenever I was in Portland, and a lot of

3    people use aliases.

4    Q.   I'm not asking about a lot of people.  I'm asking about

5    you.  When you used Chiyna, did you use that also in an e-mail    01:31:45

6    address?

7    A.   Yes, ma'am.

8    Q.   What was your e-mail address?

9    A.   Chiyna, underscore, dollkiss69@yahoo.com.

10   Q.   Okay.  And when did you open that account?                    01:31:57

11   A.   I'm not sure, ma'am.  It's been a while.

12   Q.   Why did you open that account?

13   A.   I opened it because I needed an e-mail address.

14   Q.   For what?

15   A.   For just my own personal business because I'm off on the      01:32:06

16   Internet and I do have a MySpace account; and in order for you

17   to have a MySpace account, you have to have an e-mail address,

18   ma'am.

19   Q.   When did you open a MySpace account?

20   A.   I have two MySpace accounts and I've had both of them for     01:32:21

21   a while now.

22           MS. HULL:  One moment, please.

23   BY MS. HULL:

24   Q.   Do you remember when you first opened a Craigslist

25   account?                                                          01:33:30

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   I'm not sure, ma'am.                                    01:33:32

2           MR. LOGAN:  Your Honor, objection.  Relevance.

3   Request sidebar, please.

4               (At sidebar.)

5           MR. LOGAN:  Judge, the defense counsel just handed us   01:33:51

6   this 265 pages.  We have no idea what this is.

7           MS. HULL:  This is what I referred to before that I

8   just received.  This is -- 90 percent of that is the exhibit

9   that they refused to admit because Ms. Bergey subpoenaed it and

10  they didn't get certification.  The court instructed me to get   01:34:06

11  certification.  I got certification.  It goes past the date of

12  July 3.

13          THE COURT:  Forward -- behind or forward?

14          MS. HULL:  Both.  The ones that they have went from

15  April of 2007 through in to July of 2007.  Her account actually   01:34:22

16  went in to October of 2007.

17          THE COURT:  So what's contained in the document?

18          MS. HULL:  Well, it's Chiyna_dollkiss.  It's postings

19  from April 2007.  She was posting for certainly exotic services

20  using personal sexy mama, new girl in town through October   01:34:47

21  2007.

22          MS. BARDORF:  Your Honor, what we provided previously

23  was 55 pages, not 265.  We haven't had a chance to look through

24  any of this.  Anything that is the events in question.  I don't

25  see how it's relevant.                                       01:35:03

United States District Court

XXXXXXXXX XXXXXXX - Cross

1        THE COURT:  Well, apparently it's prior to the events
2   in question.  Prior to the events in question is in April so
3   that would be relevant.  What else is there?

4        MS. HULL:  Well, she continues to post.  She's
5   posting in Las Vegas in July of 2007 which is when she said
6   that she was -- all of this happened after her 17th birthday on
7   direct.

8        THE COURT:  Did you provide this information pursuant
9   to Rule 16?

10       MS. HULL:  I did.  I just got it, Judge.

11       THE COURT:  Well, you're supposed to provide it in
12  advance of trial.

13       MS. HULL:  I understand that.  I was told that
14  this -- that the Craigslist was not going to be objected to
15  because it was their information from their subpoena and they
16  provided it and Bates stamped it.

17       This is their evidence, Judge.  I just supplemented
18  it.

19       MS. BARDORF:  Well, Your Honor, first of all, it's
20  five times larger.  Second of all, again, it goes to items
21  after the offense in question.

22       THE COURT:  Well, I'm going to allow it for right
23  now.

24       MS. BARDORF:  The other question I have about this is
25  what we provided, 33 pages of -- 32 pages of what we provided

786

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | related to Miss Payes' account.  Only 23 related to | 01:36:12 |
| 2 | Ms. XXXXXXXXX account, so I would like to know whether | |
| 3 | Miss Payes's material is in here. | |
| 4 | MR. LOGAN:  Judge, there's 18 pages.  This right here | |
| 5 | is the first -- I'm sorry, the ninth of July.  The rest of this | 01:36:28 |
| 6 | is after the event.  This is in -- | |
| 7 | THE COURT:  If it's after the event, I'm not going to | |
| 8 | allow it right now.  We can talk about it later. | |
| 9 | (At sidebar.) | |
| 10 | MS. HULL:  Your Honor, may I sidebar? | 01:37:26 |
| 11 | THE COURT:  No.  We've had a sidebar on this issue. | |
| 12 | BY MS. HULL: | |
| 13 | Q.   You started using Craigslist in April of 2007; correct? | |
| 14 | A.   That's a possibility, ma'am. | |
| 15 | Q.   Okay.  Using the chiyna_dollkiss69@yahoo.com; correct? | 01:37:37 |
| 16 | A.   Yes.  That was my e-mail address. | |
| 17 | Q.   And how many times have you posted to Craigslist? | |
| 18 | A.   I'm not sure, ma'am.  I know that I may have posted a lot. | |
| 19 | Q.   397, does that sound right? | |
| 20 | A.   It's a possibility, ma'am. | 01:38:02 |
| 21 | Q.   Okay.  When is the last time that you posted on | |
| 22 | Craigslist? | |
| 23 | MR. LOGAN:  Objection.  Relevance. | |
| 24 | THE COURT:  Overruled. | |
| 25 | THE WITNESS:  It's been almost -- I would say it | 01:38:09 |

XXXXXXXXX XXXXXXX - Cross

1   would be a year in July I haven't posted on Craigslist.  Maybe            01:38:11
2   a year.
3   BY MS. HULL:
4   Q.   So you are not still posting for erotic services in
5   October of 2007?                                                          01:38:22
6   A.   That could be a possibility.  Well, I know that I haven't
7   been posting since this year I started, my new year's
8   resolution is to actually --
9   Q.   I'm sorry.
10  A.   I said I haven't posted at all this year in 2007.  I               01:38:37
11  actually quit that line of business because I need to be
12  something better than that.
13  Q.   Okay.  And you posted through October of 2007; correct?
14  A.   I may have, ma'am.
15  Q.   And for erotic services; correct?                                  01:38:52
16  A.   Correct.
17  Q.   In fact, your very first posting was for a car.  Do you
18  remember that?
19  A.   Ma'am, what kind of a car?
20  Q.   Let me ask you this.  Did anybody else have access to --          01:39:10
21          THE COURT:  Wait, wait, wait.  Slow down, Ms. Hull.
22  Let her answer the question.
23          Again, you need to speak into the microphone, pull it
24  close to you and speak up.
25          THE WITNESS:  Okay.                                             01:39:23

United States District Court

XXXXXXXXX XXXXXXX - Cross

BY MS. HULL:                                                          01:39:24

Q.   Do you recall the first time you posted in, let's say,

April 28, 2007?

A.   Ma'am, it has been so long I do not remember.

Q.   And have you seen the Craigslist postings from your      01:39:38

account?

A.   I'm sure I've seen them all.

Q.   Okay.  And did you -- before testifying, did you review

the Craigslist records of your account?

A.   No, ma'am.  I didn't feel there was a need for that.      01:39:54

Q.   Okay.  And before testifying, were you made aware that

there were postings on your account from Craigslist back in

April of 2007?

A.   I'm pretty sure that I had postings on there.  I'm not

sure from which date.                                         01:40:11

Q.   And of the postings to Craigslist, I believe you said

under direct examination that the one exhibit that you looked

at, the web page that you said was of you, I believe it was

Government Exhibit Number 2.  Did you post that?

A.   No, ma'am.                                               01:40:40

Q.   You didn't post that?

A.   I don't think so.  Where is it?

Q.   The one that you said that was --

          THE COURT:  Let her look at it.  Do you see it there?

It's Exhibit Number 2.                                        01:40:53

                    United States District Court

789

XXXXXXXXX XXXXXXX - Cross

1    COURTROOM DEPUTY:  Judge, I believe Mr. Logan had it.    01:40:57

2    THE COURT:  Mr. Logan, do you have Exhibit Number 2?

3    MR. LOGAN:  I do, Your Honor.

4    May I approach?

5    THE COURT:  Thank you.                                   01:41:08

6    MR. LOGAN:  You're welcome.

7    THE WITNESS:  I did not post this one.

8  BY MS. HULL:

9  Q.    Okay.  So if other witnesses had already testified that

10 you did, they would be -- they told a lie?                  01:41:26

11 A.    Yes, ma'am.

12 Q.    And what about you posting constantly from the time from

13 LA on Craigslist?

14 A.    Well, I was still in that line of work then so, I mean,

15 it's a possibility.  I could have been posting constantly; and  01:41:50

16 on top of that, I actually let them have some of my Craigslist

17 account information so they may have been posting.

18 Q.    Who is that?

19 A.    Hanoi and Zuriela.  No telling.

20 Q.    Don't you have to have a user ID?                      01:42:09

21    THE COURT:  Wait.  Wait.  Wait.  Let her answer,

22 Miss Hull.

23    THE WITNESS:  I provided them with my e-mail address

24 and my actual log-in password just so that they could have it

25 for their records because we were posting under my e-mail       01:42:23

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    address.                                                        01:42:25

2    BY MS. HULL:

3    Q.    Whose records?

4    A.    For them.

5    Q.    Who is "them"?                                            01:42:28

6    A.    Hanoi and Zuriela.

7    Q.    What records?

8    A.    Okay.  Now, whenever you are actually working, you would

9    like to keep track of the postings because whenever you log in,

10   it let's you know whether or not you're still posted on the    01:42:41

11   Internet and people actually need to see that, especially like

12   a pimp that actually would want to see that would want to see

13   if his girls' postings are still on the Internet, so I did

14   provide them that information, ma'am.

15   Q.    And did you provide that information to Damafi also?      01:43:00

16   A.    Yes, I did also.

17   Q.    And what names did you use on Craigslist other than

18   Miss Delicious?

19   A.    I used Miss Delicious and the other girls, like -- as far

20   as Damafi, I know that he had a couple of females like from Las  01:43:14

21   Vegas and they just pretty much flew in and flew out.  It was

22   kind of like a one-day thing.  A female would call herself

23   trying to come home to us --

24   Q.    I'm sorry.  I didn't hear your response.

25   A.    I said -- okay.  Now, there was an occasion where they had  01:43:36

United States District Court

791

XXXXXXXXX XXXXXXX - Cross

```
 1   a lady -- no, it was a couple of women and we were up in Las    01:43:42
 2   Vegas and there's something called choosing up and it means
 3   that, you know, if a prostitute sees a pimp that she likes, she
 4   can go home with that person and Damafi may have posted some
 5   postings for her.                                               01:44:00
 6              THE COURT:  She just asked about you.  So why don't
 7   you stop for a second and let's get another question?
 8              MS. HULL:  Thank you.
 9   BY MS. HULL:
10   Q.   Are you finished with that answer?                        01:44:17
11   A.   Yes, ma'am.
12   Q.   Okay.  And so you used names -- who did you post for after
13   July 3, 2007?
14   A.   Actually, Damafi had that and I don't believe that I
15   posted anytime after that because like after -- it's like after 01:44:29
16   this incident with Hanoi and things like that, you know, I
17   pretty much vowed to myself that I wasn't going to do it again.
18              Now --
19   Q.   Without talking about things that are not responsive to my
20   question, if your account is still open and posting for erotic  01:44:48
21   services after July, did you do anything to stop that from
22   happening?
23   A.   No, because Damafi had the actual account information and,
24   really, I mean, the account is nothing big.  It's just an
25   account that actually keeps records of all of your postings.    01:45:10
```

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    I mean, you can give the information to anybody and                    01:45:14

2  they can actually post under your e-mail if they don't have an

3  e-mail address and things like that.

4    So, I mean, Damafi was already posting under my

5  e-mail address and I just let him keep it because I wasn't          01:45:28

6  going to use it anymore.

7  Q.   Did you use it in Las Vegas when you were with him?

8  A.   Yes, I did use it whenever I was in Las Vegas with him.

9  Q.   Were you using it when you were in Las Vegas and you got

10  arrested for prostitution?                                              01:45:41

11  A.   Yes, ma'am.

12  Q.   Explain that to us, please.

13  A.   I actually didn't get arrested for prostitution off of

14  Craigslist.  I didn't meet anybody there that actually was vice

15  that took me to jail.  I was in the casino and I had met a vice   01:45:53

16  and, you know, he said that he was going to have $4,000 for me

17  and I wasn't going to let down the offer because $4,000 is a

18  lot of money for something less than an hour.

19  Q.   And he was going to pay you the whole $4,000 for an hour?

20  A.   Yes, ma'am, but it was a vice and vice, they tend to lie      01:46:19

21  to try to catch you.

22  Q.   But you didn't know that at the time, did you?

23  A.   I didn't know that he was a vice.  I thought he was a

24  potential client, ma'am.

25  Q.   And on that particular occasion, what hotel was that?          01:46:30

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.    It was the MGM Grand.                                    01:46:34

2    Q.    Okay.  And you were using Craigslist at that time?

3    A.    I wasn't using Craigslist right then because it's like

4    once you go into the casinos, you no longer need Craigslist.

5    Q.    I don't mean at that particular moment.  I mean during   01:46:57

6    that particular time.  During that week, let's say.

7    A.    Oh, yes, ma'am.

8    Q.    So your testimony was you didn't use Craigslist after this

9    incident on July 3?

10   A.    Yes, ma'am.                                              01:47:12

11   Q.    And have you had an opportunity to review the reports for

12   which you've given -- were given a warrant out of Las Vegas,

13   this prostitution you talked about?

14   A.    I haven't viewed that.  I figured that because it's not

15   under my name that I really wouldn't have to worry about it.    01:47:32

16   Q.    How do you know it's not under your name?

17   A.    Because I used his sister's -- well, Hanoi's sister's name

18   because I did have an ID in Las Vegas and it would be easier

19   for them to look it up if I just gave them the information.

20   Q.    All right.  And so when you were arrested for prostitution  01:47:53

21   at the time, you were using Craigslist in Las Vegas, you used

22   the Jacqueline Acosta ID; correct?

23   A.    Yes, ma'am.

24   Q.    And this is while you were -- not the same moment but

25   during a period of time when you were using Craigslist;        01:48:07

United States District Court

XXXXXXXXX XXXXXXX - Cross

 1  correct?                                                              01:48:10

 2  A.   Ma'am, can you repeat the question?  I'm sorry.

 3  Q.   You were using the Jacqueline Acosta ID when you were

 4  arrested this time for prostitution; correct?

 5  A.   Yes, ma'am.                                                      01:48:20

 6  Q.   And this was while you were still -- at a time when you

 7  were still posting to Craigslist; correct?

 8  A.   Yes, ma'am.

 9  Q.   You were arrested for prostitution on Craigslist at the

10  MGM Grand August 16, 2007; correct?                                  01:48:37

11  A.   I wasn't arrested for prostitution on Craigslist.  I was

12  arrested for prostitution being in the casino.

13  Q.   Right.  I didn't say anything about Craigslist.

14          THE COURT:  Yes, you did.

15  BY MS. HULL:                                                         01:48:54

16  Q.   I apologize.  You were arrested for prostitution at the

17  MGM Grand?

18  A.   Yes.  I was actually arrested for solicitation.  I didn't

19  commit an act of any kind.  It was just soliciting, ma'am.

20  Q.   And that was the $4,000 incident?                               01:49:09

21  A.   Yes, ma'am.

22  Q.   Okay.  Do you know that that was after this?  This

23  occurred on August 16, 2007.

24  A.   I'm not sure.  I really don't remember.

25          MR. LOGAN:  Your Honor, I would ask that the witness        01:49:53

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   be shown Exhibit 119, please.                                01:49:55

2   BY MS. HULL:

3   Q.   Have you had a chance to look at that?

4   A.   I'm looking at it now, ma'am.

5   Q.   I'm sorry.                                              01:50:32

6   A.   I said I'm looking at it now, ma'am.

7   Q.   Okay.  Take your time.

8   A.   Okay.

9   Q.   Have you had a chance to look at that?

10  A.   Yes, ma'am.                                             01:52:32

11  Q.   Does that refresh your recollection at all?

12  A.   The first one does.  I'm not really sure about the second

13  one.

14  Q.   How does the first one refresh your recollection?

15  A.   Because I know that I remember going -- I was going back   01:52:40

16  to visit with, you know, Damafi and I was going to a casino and

17  I forgot that, you know, I wasn't supposed to be in, like, that

18  line of casinos because MGM, it has like -- it owns several

19  casinos on the strip and I happened to be in one of those

20  casinos and they just got me for trespassing.               01:53:10

21  Q.   Not only trespassing.  The trespassing was on August 26.

22  A.   M'hum.

23  Q.   Do you see where it talks about August 16?

24  A.   August 16.  Where is that?

25  Q.   Yes, ma'am.  There's actually two reports.             01:53:23

United States District Court

796

XXXXXXXXX XXXXXXX - Cross

```
1         THE COURT:  Well, what page are you talking about so      01:53:27
2    we can move this along?  Which page do you want her to look at?
3         MS. HULL:  I am looking at --
4         THE COURT:  Come down here and show her what page to
5    look at.                                                       01:53:52
6         MS. HULL:  Absolutely.
7         THE WITNESS:  Is this the one that you're talking
8    about?  Hold on because I don't think I have that page.
9         THE COURT:  Have you finished reading it?
10        THE WITNESS:  Yes, ma'am.                                 01:55:05
11        THE COURT:  All right.  You may ask her a question.
12   BY MS. HULL:
13   Q.   Does that refresh your recollection?
14   A.   Yes, ma'am.
15   Q.   Tell us about that.                                       01:55:10
16   A.   Obviously, ma'am, I may have had the dates mixed up on
17   when I was out there because it's been -- like I said, ma'am,
18   it has been a while since I've been out there.  And this was
19   just one of the times where I had been arrested for
20   prostitution, but there was other times before that I had been 01:55:26
21   arrested, ma'am, and it was before --
22   Q.   Where?
23   A.   It was in Las Vegas.
24   Q.   Okay.  What other times were you arrested in Las Vegas for
25   prostitution?                                                  01:55:41
```

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   Well, it was just the times that I told you.  Yeah, I was          01:55:43

2   talking about other times besides this which means like the

3   other -- no, it wasn't for prostitution.  It was for

4   trespassing.  I remember I got arrested -- no.  I got arrested

5   for one trespassing and then the other trespassing, they just       01:55:56

6   wrote me a ticket and let me go.

7   Q.   Let's talk about this one from August 16.  This is for

8   soliciting prostitution; correct?

9   A.   That's what it says, ma'am.

10  Q.   And, in fact, you used a false name, didn't you?               01:56:14

11  A.   Yes, I did.

12  Q.   And you used the name of Alicia Grant; correct?

13  A.   Alicia Grant.  Oh, yeah, that was whenever I was talking

14  to the officer.

15  Q.   With a date of birth 9-11-84?                                  01:56:28

16  A.   Yes, ma'am.

17  Q.   So you gave false information to that officer?

18  A.   Yes, ma'am.

19  Q.   And then you said you were Jacqueline Acosta; correct?

20  A.   Yes, ma'am.                                                    01:56:41

21  Q.   And this was, again, August 16, 2007, in Las Vegas;

22  correct?

23  A.   Right.

24  Q.   And this is the one for solicitation with the undercover

25  police officer; correct?                                           01:56:58

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   Yes, ma'am.                                          01:56:59

2   Q.   Is this a different one than the one for $4,000 that you

3   talked about?

4   A.   Actually, I don't know where he got -- I don't know about

5   the 160 but I told him -- he said that he was going to pay    01:57:10

6   $4,000 whenever he had came up to me.

7            THE COURT:  Okay.  Is this one a different one than

8   what you were talking about?

9            THE WITNESS:  Yeah.  I mean, hey, it could -- hold

10  on.  Wait.  I'm sorry.  I didn't read all of the stuff in   01:57:26

11  quotation, ma'am.  Excuse me.  Yeah, this is a different one --

12  yes, ma'am, this is a different one because the guy at the MGM,

13  because I may have gotten arrested twice there for that -- the

14  first time it was --

15           THE COURT:  Okay.  Why don't you stop for a second?  01:57:55

16           Ask another question.

17  BY MS. HULL:

18  Q.   Do you know how many times you've been arrested at the

19  MGM in Las Vegas for prostitution or prostitution-related

20  offenses?                                                   01:58:07

21  A.   It could be two times because, like I said, ma'am, it has

22  been a while since that has happened and I haven't really been

23  focused up on that part of my life.  I have been trying to move

24  on, so I haven't really been worried about the times whenever

25  I've been arrested.                                         01:58:23

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    Q.   But you said that you didn't do any of that after this           01:58:26
2    incident and this is clearly a month and a half at least after
3    that incident; correct?
4    A.   Right, ma'am.  And I do remember actually telling you that
5    I may have had the timeline actually mixed up because since        01:58:39
6    then I've actually been trying to do things to actually better
7    myself and I haven't been worried about that, ma'am, and I do
8    apologize if I had the timeline messed up.
9    Q.   And the trespass was actually -- the man you were with for
10   trespassing, that was also for prostitution; correct?            01:59:01
11   A.   Actually, this vice had actually seen me up at another
12   casino and all of the vice that work up in the casinos are
13   pretty much the same, ma'am.  And he seen me up in this other
14   casino and he just came.  I didn't even look at him.  I looked
15   at him and I turned and started to walk the other way and he     01:59:22
16   came and he got me and he just said I was here for prostitution
17   whenever I was just walking around the casino with one of my
18   friends.
19   Q.   Mr. Kaufman?
20   A.   Yes.  I'm not sure what his name is, ma'am.                 01:59:34
21   Q.   But he was a friend of yours?
22   A.   No, not him.
23   Q.   Okay.  Mr. Kaufman, the man that you were with, was
24   arrested for soliciting prostitution; correct?
25   A.   The man I was with was arrested for soliciting             01:59:46

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    prostitution.                                                    01:59:49

2    Q.   According to this report, the second one -- I'm referring

3    to the same exhibit.

4              THE COURT:   Come down here and show her so she knows

5    where you're talking about.                                      02:00:00

6              Can you see it on the one that you have there?   Can

7    you read it?   Is it clear enough?

8              All right.   Now, you may go back and ask her

9    questions.

10             So take a look at it and read it first and then ask    02:00:27

11   her a question.

12             THE WITNESS:   Ma'am, I can't read this last part.

13             THE COURT:   Okay.   She can't read -- is that the last

14   paragraph?

15             THE WITNESS:   Yes.                                     02:01:08

16             THE COURT:   All right.   So, then, help her out.

17   BY MS. HULL:

18   Q.   All right.   Well, you can read the part that says August

19   26, 2007, at the top; correct?   About the fourth line down.

20   A.   Even that is kind of messed up but I do understand what     02:01:28

21   you're saying, that it was August 26.

22   Q.   Right, and at the top it also says date of arrest, August

23   26, 2007.   Do you see that?

24   A.   Okay.   Yeah, I can vaguely see it, yeah.

25   Q.   You can see the time of 4:15 a.m.?                           02:01:42

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  A.   Ma'am, if you were to look at this, I could barely see the        02:01:47

2  numbers.

3            MS. HULL:  May I, Judge?

4            THE COURT:  She can't see it.  Ask her a question.

5  BY MS. HULL:                                                           02:01:57

6  Q.   Would you agree that you were arrested that day at about 4

7  clock in the morning, about 4:15 in the morning?  Does that

8  sound right to you?

9  A.   Ma'am, it could have been.

10 Q.   And were you working for Damafi at that time?                     02:02:08

11 A.   I do believe so.  I may have been, yes.

12 Q.   Okay.  And that time you also used the name Jacqueline

13 Acosta; correct?

14 A.   Yes, ma'am.

15 Q.   Did you have a Jacqueline Acosta ID with you?                     02:02:24

16 A.   Actually, I didn't.

17 Q.   Does the officer not -- is the officer not telling the

18 truth when you identified yourself as Jacqueline Acosta?

19 A.   I didn't have a Jacqueline hard copy ID but I did tell him

20 all of the information that would be on the ID and that he can        02:02:42

21 call up to the DMV and actually get that information and it

22 could be clarified.

23 Q.   And did you give him a fake ID because you had warrants

24 outstanding?

25 A.   I didn't know I had warrants outstanding, ma'am.                  02:02:55

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   Then why did you not give your real name?                    02:02:57

2   A.   Because I know -- because I knew how old I was and I did

3   not want to be -- I didn't want my mother to get called because

4   if she would have gotten called about what I was doing, she

5   would have been very, very disappointed in me and she probably   02:03:13

6   would have let me stay in some kind of juvenile facility and I

7   didn't want to do that, ma'am.

8   Q.   Okay.  And was Damafi there with you in Vegas that trip?

9   A.   Yes, he was.

10  Q.   Was he arrested?                                             02:03:27

11  A.   I think he was arrested one time but he wasn't arrested on

12  this occasion.

13  Q.   Okay.  Was he arrested when you were with him?

14  A.   It was after I had left he had got arrested because he

15  kept calling me from jail.                                        02:03:44

16  Q.   Let's go back to the warrants that you had last Thursday.

17  You said you had warrants out of Portland, Oregon?

18  A.   Yes, ma'am.

19  Q.   What were those for?

20  A.   For -- I'm sorry.  For shoplifting.                          02:04:03

21  Q.   How many times?

22  A.   Two.

23  Q.   And when were those from?

24  A.   When?

25  Q.   Yes.  When did they occur?                                   02:04:20

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.    Ma'am, I do not remember.  I remember when they were          02:04:28

2    happening but I just don't remember the exact days.

3              MS. HULL:  Your Honor, can this witness be provided

4    Exhibit Number 128, please.

5              COURTROOM DEPUTY:  Just 128 or all of the letters?       02:05:58

6              THE COURT:  That is A through K.

7              MS. HULL:  I believe so, yes, ma'am.

8    BY MS. HULL:

9    Q.    Do you recognize any of those documents?

10             THE COURT:  There are a number.  Do you want to ask      02:06:36

11   her something?

12             MS. HULL:  Yes.  And I'm looking for it, Judge.  If I

13   could have just a second.

14   BY MS. HULL:

15   Q.    Have you seen any of those reports?                          02:07:56

16   A.    No, ma'am.

17             MS. HULL:  Could I have a moment, Judge.  These are

18   not . . .

19   BY MS. HULL:

20   Q.    Let me ask you this:  Do you remember being arrested at     02:08:33

21   Fred Meyer for shoplifting on April 8, 2007?

22   A.    Yes, ma'am.

23   Q.    And do you remember using a name that is not your own on

24   that date?

25   A.    I couldn't tell you right now.  I'm not sure.               02:08:51

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | Q.   Do you remember using the name Chiyna Gibson? | 02:08:56 |
| 2 | A.   That's a possibility, ma'am. | |
| 3 | Q.   How many times have you used that name? | |
| 4 | A.   Maybe twice. | |
| 5 | Q.   How many times? | 02:09:11 |
| 6 | A.   I said maybe twice. | |
| 7 | Q.   Okay.  And why did you use that name? | |
| 8 | A.   It was just something made up. | |
| 9 | Q.   Why? | |
| 10 | A.   So I can keep -- so that I can keep myself from -- well, | 02:09:20 |
| 11 | so I can keep my mom from actually knowing what I was doing. | |
| 12 | Q.   Okay.  And to keep yourself out of trouble? | |
| 13 | A.   Yes, ma'am. | |
| 14 |         THE COURT:  Ms. Hull, why don't you go on to another | |
| 15 | question because it's taking too much time. | 02:09:41 |
| 16 |         MS. HULL:  I apologize. | |
| 17 | BY MS. HULL: | |
| 18 | Q.   Do you remember getting arrested -- you talked about the | |
| 19 | incident, and this is the same incident where you took the 200 | |
| 20 | some dollars worth of children's clothes? | 02:09:57 |
| 21 | A.   Yes, ma'am. | |
| 22 | Q.   And you used another name on that date; correct? | |
| 23 | A.   I'm not sure. | |
| 24 | Q.   Crystal Hayes, do you remember that name? | |
| 25 | A.   It doesn't really ring a bell, ma'am.  I may have used it, | 02:10:13 |

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   though.  I'm not sure.                                          02:10:16

2   Q.   Do you remember using, in fact, her Social Security card

3   with that name on it?  Do you remember that?

4   A.   Okay.  Yeah.  Yes, ma'am.  Now I remember.

5   Q.   Where did you get that Social Security card?              02:10:26

6   A.   Damafi.

7   Q.   Damafi?

8   A.   Yes.  I had -- you know, it's like he had an ex-girlfriend

9   and he said, "If you ever get in trouble, you should use this,

10  you know."  And he gave it to me.                             02:10:44

11  Q.   It wasn't yours, was it?

12  A.   No, ma'am.

13  Q.   Did you ask him where got it?

14  A.   I mean, he had already told me where he got it.  He said

15  it was his ex-girlfriend's.                                   02:10:54

16  Q.   And you knew that was not your name?

17  A.   Yes, ma'am.

18  Q.   And when you showed your name, the Social Security card,

19  you knew that you were using someone else's identity; right?

20  A.   Yes, ma'am.                                              02:11:06

21  Q.   How long did you have that Social Security card?

22  A.   I'm not sure.  Maybe about a week.

23  Q.   How many times did you use it?

24  A.   Just that time.

25  Q.   When did you live in Texas?                              02:11:41

United States District Court

806

XXXXXXXXX XXXXXXX - Cross

1   A.   All the way up until I was 15.         02:11:43

2   Q.   And are you a documented gang member there?

3          MR. LOGAN:  Objection.  Relevance.

4          THE COURT:  Sustained.

5   BY MS. HULL:         02:11:56

6   Q.   Have you -- were you ever arrested in Texas?

7   A.   Yes, ma'am.

8   Q.   What were you arrested for in Texas?

9   A.   Verbal threat.

10   Q.   In fact, it was a terrorist threat, wasn't it?   02:12:11

11   A.   Oh, yeah, maybe terrorist threat.

12   Q.   When was that?

13   A.   I'm not sure what date it was.

14   Q.   Do you remember what year it was?

15   A.   I know I was probably about 14 so it was probably in 2004.  02:12:24

16   Q.   Where were you living?  Who were you living with?

17   A.   I was living in Arlington, Texas, with my mother.

18   Q.   And what was that incident about?

19   A.   I know that me and my mother weren't seeing eye to eye

20   and, you know, mothers and daughters, they can often, you know,  02:12:51

21   argue over things because, like, they never agree on some

22   things, you know.  Me and my mother were having a hard time

23   communicating.

24   Q.   Tell us what happened, please.

25   A.   Okay.  Well, I can just tell you what I remember.  I just  02:13:08

United States District Court

1   remember my mother telling me that I couldn't go out to this          02:13:12

2   party that I had like been anticipating for a while, and I was

3   outside with some friends who were getting ready to leave and

4   go to the party and my mother came out and pretty much

5   embarrassed me and I told her, I said, "You make me so mad.          02:13:27

6   You make me -- I'm going to kill you if you don't leave me

7   alone," and then I stormed off and I went somewhere else so I

8   could vent and then the police came and then they picked me up.

9         By that time I had already apologized to my mother

10  for that because I didn't have no reason to conduct myself in        02:13:45

11  that manner because she is my mom and she does make the

12  decisions for me whenever I'm under 18.

13  Q.   Does she still?

14  A.   No, ma'am.

15  Q.   So you're still under 18?                                        02:13:57

16  A.   Yes, ma'am.  She was making the decisions for me then.

17  Q.   And did you threaten her in front of the police?

18  A.   No, I didn't.

19  Q.   When was it that you threatened to kill her in front of

20  the police?                                                          02:14:13

21  A.   As a matter of fact, ma'am, now that you said something, I

22  may have said that out of anger because she was letting the

23  police actually take me away and I thought that she didn't care

24  about me anymore because she was letting the police just take

25  me to jail.  So I said I think I told her I was going to beat        02:14:29

1    her ass and I didn't mean to actually say that but I did.      02:14:33

2    Q.   And you did say that -- is that the same time that you

3    threatened to kill her?

4    A.   Yes.  It was after -- it was after I had threatened to do

5    that and the police had came and after I apologized, she still   02:14:48

6    let them go and they I just got really upset.

7    Q.   And you threatened to kill her?

8         THE COURT:  It's been asked and answered now.

9    BY MS. HULL:

10   Q.   Were you high on drugs at the time?                        02:15:02

11   A.   I may have been because I was actually trying Ecstasy

12   because I had friends who were actually doing it who had sold

13   it and I was just trying things, experimenting.

14   Q.   And how old were you then?

15   A.   Ma'am, I was only 14.                                      02:15:26

16   Q.   And you were already using drugs?

17   A.   Yes, ma'am.

18   Q.   Okay.  We've covered the warrants that you had out of Las

19   Vegas.  Did we cover all of the warrants out of Portland?

20   A.   I believe so, ma'am.                                       02:16:02

21   Q.   Okay.  And you said that there were warrants out of

22   Washington County as well?

23   A.   There may have been.  I'm not sure because my mother keeps

24   like -- she keeps up with all of those records so I'm not

25   really sure, ma'am.                                             02:16:16

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   How many times have you been arrested in Washington                02:16:20
2   County?
3   A.   I don't know, ma'am.  I'm really not sure.  That's all I
4   can say.  I'm not really sure -- okay.  Washington County is
5   Beaverton.  I think I've only been arrested there once.            02:16:38
6   Q.   For what?
7   A.   Like I said, ma'am.  I'm not sure.  Maybe for runaway.
8   I'm really not sure but I know that I may have been arrested up
9   in Beaverton because Beaverton and Portland are very, very
10  close to each other.  Ma'am, to tell you the truth, I'm not         02:16:58
11  sure.
12  Q.   Have you ever been charged with being a fugitive?
13  A.   Can you define that, please.  What's a fugitive?
14  Q.   Well, if you are reported as a fugitive, it's different
15  than being a runaway.                                               02:17:14
16           THE COURT:  Well, she doesn't understand.
17           THE WITNESS:  I don't know the difference.
18           THE COURT:  Ask her a more specific question.  She
19  doesn't know what it is.
20  BY MS. HULL:                                                        02:17:24
21  Q.   A fugitive is somebody who is wanted by the police.
22  A.   Okay.
23  Q.   Have you ever been arrested for being a fugitive?
24  A.   I don't remember being arrested for being a fugitive.
25  Q.   So you don't know what other warrants you had out of          02:17:42

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Washington County?                                          02:17:44

2   A.   No.  My mother, she keeps all of those records, and I

3   wasn't at home to even know like that.  I was still trying --

4   just trying to do things on my own?

5   Q.   And after you got this first immunity agreement, is it    02:17:56

6   your understanding that the second immunity agreement took care

7   of all of these warrants?

8   A.   Can you ask the question again, ma'am.

9   Q.   Okay.  Well, when we first spoke about the first agreement

10  that you signed last week, Thursday, it didn't cover the        02:18:14

11  warrants, did it?

12          THE COURT:  Ms. Hull, you've asked her this question.

13  She's already answered this.

14          MS. HULL:  All right.

15  BY MS. HULL:                                                    02:18:37

16  Q.   Then your second one covers warrants; correct?

17          THE COURT:  She said she didn't know.

18          THE WITNESS:  Yeah.  I don't know.

19  BY MS. HULL:

20  Q.   Well, this one covers narcotics use, doesn't it?          02:18:50

21  A.   I'm not sure, ma'am.  Can I take a look at it?  Would that

22  be all right?

23  Q.   Sure.  I only have my one copy.

24          MR. LOGAN:  Your Honor, is there a way that the

25  government can see that before the witness?  We don't know what  02:19:17

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    she's talking about.                                          02:19:19

2              THE COURT:  Well, is there a copy of it?  Have you

3    provided it to the government?

4              MS. HULL:  They gave to it me.  Judge.  This is the

5    one for her that was filed last night.                       02:19:27

6              THE COURT:  Well, come forward and take a look at it.

7    Let's get the exhibit here.

8              MS. HULL:  Judge, if I can give her both while we're

9    at it.

10             THE COURT:  What are you showing her?               02:20:48

11             MS. HULL:  Your Honor, for the record, these are the

12   two copies, one copy each, of the two agreements that she was

13   presented.

14             THE COURT:  Agreements.  Let me see what -- I have no

15   idea what you're talking about.                              02:20:59

16             Well, one of them -- they are not agreements.

17   There's no agreement.  There's one that apparently she signed.

18   The other one is not an agreement.  It's a declaration from the

19   government.  So what do you want to have her see?

20             MS. HULL:  I would like her to see both of them      02:21:35

21   because they are different.

22             THE COURT:  Well, they are different but what does

23   she have to do with the one that was signed by the government?

24   Why are we giving her that one?

25             MS. HULL:  Because it covers more than the first.    02:21:44

United States District Court

XXXXXXXXX XXXXXXX - Cross

```
 1          THE COURT:  Well, why should she know about this one?   02:21:46
 2    Let's give her the one that she signed and you can ask her
 3    questions about that one first.  The other one she did not
 4    sign.  I'm not sure what you mean by what you intend to give
 5    her.                                                           02:22:02
 6    BY MS. HULL:
 7    Q.   Have you seen that document that's in front of you?
 8    A.   Yes, ma'am.
 9    Q.   It's a two-page letter dated from last Thursday; correct?
10    A.   Yes.                                                      02:22:12
11    Q.   Does it bear your signature on the second page?
12    A.   Yes.
13    Q.   And your attorney's signature?
14    A.   Yes.
15    Q.   Did you read it before you signed it?                     02:22:20
16    A.   Yes.  We went over it.
17    Q.   Who is "we"?
18    A.   Me and my attorney.
19    Q.   Did he answer all of your questions?
20    A.   Yes.  Ma'am.                                              02:22:30
21    Q.   Okay.  Was it your understanding that that particular
22    agreement covered narcotics use?
23    A.   I'm sorry, ma'am, but a lot has been on my mind since
24    Thursday.  I'll just go over it again.
25    Q.   Please do.                                                02:22:48
```

XXXXXXXXX XXXXXXX - Cross

1   THE COURT:  We're going to take a 10-minute break,

2   ladies and gentlemen.  We'll see you back here at about 25

3   minutes of three.

4            (Jury departs.)

5            THE COURT:  All right.  Let me see counsel at the.

6            (At sidebar.)

7            THE COURT:  First of all, Miss Hull, I am sure that

8   it was just your lack of recall for some reason, which really

9   escapes me, but I told you under no circumstances were you to

10  ask questions concerning the documentation that I turned over

11  to you unless I deemed it admissible.  In particular, you were

12  not to ask any question about gang affiliation and you went

13  ahead and you asked that question.

14           Now, tell me how in the world you could have decided

15  that you could ask that question when I ordered you not to do

16  so.

17           MS. HULL:  I don't recall being recalled ordered to

18  do it.

19           THE COURT:  Well, you're going to tell me after this

20  trial is over because it was clear on the record that if I

21  turned this over, that that did not mean it was admissible and

22  that you had to seek admissibility before you asked that

23  question.  Frankly, if the government had asked that, I would

24  have had to grant a mistrial.  But in this case, obviously, the

25  government doesn't want me to grant a mistrial.

XXXXXXXXX XXXXXXX - Cross

1          Now, what are we doing with these documents?  And      02:24:43

2   what are you guys doing?  Why don't I hear from you about

3   whether or not you're going to object to these?  What's the

4   background of them?  Why in the world is this admissible?  It's

5   not.                                                            02:24:57

6          MR. LOGAN:  It's admissible, Judge.  I have no idea

7   what she's doing?

8          THE COURT:  Well, this one maybe.  Did you talk to

9   her?  Did somebody talk to her about this?

10         MR. LOGAN:  Right.  We initially sought this immunity    02:25:07

11  document.

12         THE COURT:  You signed this one.  This one has been

13  signed by the United States Attorney.

14         MR. LOGAN:  That's correct.  And then we sought

15  formal immunity because we had some additional time and we      02:25:21

16  obviously --

17         THE COURT:  Okay.  What's the difference between

18  these two?

19         MR. LOGAN:  With this document, since it's not, per

20  se, formal, it doesn't bind the state courts.  This is a formal 02:25:30

21  immunity document where the state courts can't go forward.

22         THE COURT:  Well, the state courts -- they can't use

23  it with this formal document.

24         MR. LOGAN:  That's right.

25         THE COURT:  But this one -- this is merely use           02:25:43

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | immunity with your office, the U.S. Attorney's Office, whatever | 02:25:46 |
| 2 | you could prosecute. | |
| 3 | MR. LOGAN:  That's right. | |
| 4 | THE COURT:  So what's the difference between the two | |
| 5 | of us?  What are you talking about with the warrants?  What do | 02:25:53 |
| 6 | the warrants have to do anything with this?  This witness has | |
| 7 | no clue of what you're talking about. | |
| 8 | MS. HULL:  I received an e-mail last evening from | |
| 9 | Ms. Bardorf and my understanding -- because this is what | |
| 10 | happened.  Last Thursday I was handed this May 15 document, | 02:26:11 |
| 11 | letter, right before Ms. XXXXXXX was about to take the stand | |
| 12 | and I approached Mr. Carpenter because I had informed him that | |
| 13 | he might want to talk to me about having his client take the | |
| 14 | stand on behalf of the government. | |
| 15 | He asked me -- when I got this letter, I approached | 02:26:34 |
| 16 | him and I said, "Have you read the reports?"  He said no.  I | |
| 17 | said, "I think you might want to consider looking at those | |
| 18 | before you proceed."  Ms. Bergey was standing right there. | |
| 19 | I said -- he said, "Well, is anything pending?" | |
| 20 | And I said, "She has warrants." | 02:26:50 |
| 21 | And that is when he stopped and he told you he had | |
| 22 | received new information and he didn't want to proceed, if you | |
| 23 | recall, on Thursday. | |
| 24 | Then yesterday I received this document and this is | |
| 25 | talking about drug use, and the e-mail that I got from | 02:27:02 |

XXXXXXXXX XXXXXXX - Cross

 1  Ms. Bardorf is that apparently the FBI also took -- as part of        02:27:06
 2  that took care of her warrants that were outstanding in
 3  Washington County, Portland, and in Las Vegas.
 4          THE COURT:  Well, then, she knows about all of this.
 5  She knows essentially -- you've already asked her about it,           02:27:22
 6  that she knows that anything that she says won't be used
 7  against her.  So what is the difference between the two?  I
 8  mean, what are you trying to convey to the jury?  She knows --
 9  she's testified to what she did.  She's testified that she
10  understands most likely she's not going to be prosecuted for          02:27:45
11  it.  It can't be used against her.
12          What's the difference between Thursday and today?
13          MS. HULL:  Drug use, warrants.  They are all being
14  taken care of.
15          THE COURT:  Ask her.  She's already said that.              02:28:00
16          MS. HULL:  She said she didn't understand.
17          MR. LOGAN:  What my confusion is what is in the
18  record?  What do you have that she has something pending for
19  drug use?
20          MS. HULL:  Your NCIC records, drugs, nothing.              02:28:11
21          MR. LOGAN:  How can you go into that?  There is
22  nothing pending about drug use?
23          MS. HULL:  It's in your declaration.  Narcotics use.
24          MR. LOGAN:  There's nothing pending as it relates to
25  drug use.                                                         02:28:26

XXXXXXXXX XXXXXXX - Cross

1           THE COURT:  Well, it says -- here is what she's

2    getting to:  Any local offense related to prostitution or

3    narcotics use.  So she doesn't have to have something pending.

4    You can ask her.

5           Now I see where you're going.  Okay.  So you're going

6    to ask her whether or not she understands nothing can be used

7    against her for drug use, prostitution, anything that exists

8    now; right?

9           MS. HULL:  Yes.

10          THE COURT:  And not in the future?

11          MS. BARDORF:  Right.  And I think that was covered in

12   the first five minutes of the testimony, Your Honor.

13          THE COURT:  She has already gone through that.

14          And that is the point.  I don't want to object if

15   something has been asked and answered, Counsel.  It is your

16   obligation to do so.  And, Ms. Hull, as I've told you, don't go

17   back over everything.  You're losing the jury.  You have

18   certainly some substantive things, maybe a lot of substantive

19   things to get out; but if you keep going back over it, I'm

20   going to sustain the objections and you're not going to get

21   anywhere.  You're going to lose them.  She's already admitted

22   she can't be prosecuted.  Her testimony can't be used for

23   anything that exists already, whether it's drugs, alcohol,

24   prostitution, who knows, money laundering, anything that she

25   may have done.  She's testified to that.

United States District Court

XXXXXXXXX XXXXXXX - Cross

 1           So if you want to have these admitted into evidence,    02:29:49

 2    the government agrees to it, stipulate it, get it into

 3    evidence.

 4           MS. HULL:  The other thing, Judge, the Craigslist

 5    records that we have start in April of 2007, not July 2007.  He   02:29:57

 6    misread that.

 7           MS. BARDORF:  No.  He said they started April.

 8           MR. LOGAN:  I said they started April of 2007.  The

 9    first 18 pages.

10           MS. HULL:  Okay.  So they do cover the time frame    02:30:11

11    we're talking about, Judge.  He -- I thought he said --

12           MR. LOGAN:  No.  I said April 2007.

13           THE COURT:  No.  You said July.

14           MR. LOGAN:  Page 18 is July.

15           THE COURT:  So prior to 18 is --    02:30:24

16           MR. LOGAN:  That's correct.  Started in April.

17           THE COURT:  Then -- and you have the record.

18           And if you have something else you're going to use,

19    don't -- just get it out.  Ask her the question and move on.

20    You've got the records there.  Use them.  And we are bringing    02:30:37

21    the jury back in five minutes and we're moving on.

22           (End sidebar.)

23           (Recess at 2:30; resumed at 2:48.)

24           (Jury enters.)

25           (Court was called to order by the courtroom deputy.)    02:48:53

United States District Court

XXXXXXXXX XXXXXXX - Cross

BY MS. HULL:                                                    02:49:33

Q.   Miss XXXXXXX, have you ever been pregnant?

A.   No, ma'am.

Q.   Have you ever told someone that you are pregnant?

A.   Yes, ma'am, because I thought that I was expecting.    02:49:45

Q.   And when did you do that?

A.   I'm not sure.  It's been -- I would say a couple of times

before where I was hoping to have a baby and tried to have a

baby and wasn't sure.  There was a few times before.

Q.   And have you ever used -- have you ever told anyone that   02:50:08

you were pregnant in order to get sympathy from them?

A.   I do believe I may have told Hanoi that I was pregnant at

one point in time.

Q.   When did you appear on the Dr. Phil show?

A.   I'm not sure.  It was like November.                     02:50:29

Q.   I'm sorry?

A.   It was around November.

Q.   How much were you paid to be on the show?

A.   I wasn't paid anything to be on the show.

Q.   Did you get tickets to go to the show?                   02:50:41

A.   We were guests on the show, ma'am.

Q.   Did you get plane tickets?

A.   Yes, ma'am.

Q.   From where?

A.   We were leaving from Texas.  Both of us were flying from  02:50:51

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    Texas.                                                        02:50:59

2    Q.    Who is "both of us"?

3    A.    Me and my mother.

4    Q.    And did you say on that show -- strike that.

5          Did you know that you were going to be on national    02:51:07

6    television on that show?

7    A.    Yes, ma'am.

8    Q.    Okay.  And in November when you appeared on the show, you

9    said that you were a month pregnant.  Do you remember that?

10   A.    Yes, ma'am.  I do remember.                            02:51:19

11   Q.    And, in fact, you said that you were sure because you had

12   been to a clinic.  Do you remember that?

13   A.    Yes, ma'am.

14   Q.    But you lied?

15   A.    Yes, ma'am, I did.                                     02:51:31

16   Q.    And why did you lie?

17   A.    Actually, I had lied about going to the clinic but, you

18   know, that was only because I wanted people to think that I was

19   sure.  But, you know, when all actuality I wasn't really sure

20   but I was hoping to actually have a baby so I can -- to like    02:51:48

21   actually have something that will never separate from me that I

22   can love and care until they get old enough.  And I wanted that

23   for myself and I wasn't really sure on the tests and things

24   like that and I was just waiting to actually go.

25   Q.    So you lied about going to the clinic?                 02:52:07

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   Yes, ma'am.                                                    02:52:09

2   Q.   Would you consider yourself a liar?

3   A.   I wouldn't consider myself a liar but everybody has at

4   least lied at least one time in their life or maybe a few times

5   at that, ma'am.  If I fell short, then, yeah, I would have been  02:52:33

6   a liar at that time.

7   Q.   How about a compulsive liar?

8             MR. LOGAN:  Objection.  Relevance.

9             THE COURT:  Overruled.

10            THE WITNESS:  I don't consider myself a compulsive     02:52:46

11  liar, ma'am, because I don't lie all the time.  I don't.

12  BY MS. HULL:

13  Q.   Have you ever heard your mother call you a compulsive

14  liar?

15  A.   Well, yeah, but that was whenever we were, you know, into   02:52:58

16  it as mother and daughter.  You know, she called me a lot of

17  things that she actually didn't mean and has already apologized

18  to me for and I've already forgiven her.

19  Q.   And were you present when she told the police you were a

20  compulsive liar?                                                 02:53:18

21  A.   Yes, ma'am, but I believe that that was just for her to

22  actually, you know, try to seek some punishment for me and what

23  I had did.  I'm not really sure what I did that day so no

24  telling.

25  Q.   No telling what?                                            02:53:33

United States District Court

822
XXXXXXXXX XXXXXXX - Cross

1   A.   I said no telling on what she was meaning by me being a          02:53:35

2   compulsive liar.  But she had already -- I remember after that,

3   you know, we had a conversation and she did apologize to me for

4   actually calling me that because she knows that I don't conduct

5   myself in that manner, ma'am.                                         02:53:51

6   Q.   Let's go back to July of 2007.

7            How long were you in Mesa before you went back to

8   Portland?

9   A.   I was in the juvenile thing for maybe about 14 days if not

10  give or take a day.                                                   02:54:16

11  Q.   And how soon after -- well, and then where did you go?

12  A.   I went home.

13  Q.   To Portland?

14  A.   Yes, ma'am.

15  Q.   How soon after you got back to Portland did you start           02:54:30

16  posting on Craigslist?

17  A.   After that I don't believe I was posting anymore after

18  that because I said that I was going to get my life together.

19  Mind you, ma'am, Damafi did have all of the information to the

20  thing and he was still pimping at that time, so he may have          02:54:47

21  used it.  I'm not sure what you have on your records.

22  Q.   Can you look at number -- Exhibit 143, please.  It's that

23  large binder in your hands.

24  A.   Which page?

25  Q.   Can you see what it is?                                          02:55:33

United States District Court

XXXXXXXXX XXXXXXX - Cross

1          Let me abbreviate this.  Have you ever seen that

2     document before?

3     A.   No.  Ma'am.

4     Q.   Do you see the certification on the front page,

5     certification of authenticity for that document?  It's signed

6     by a Clint Powell.

7     A.   Oh, okay.  Yes, ma'am.

8     Q.   And it shows all records of posting from

9     chiyna_dollkiss69@yahoo.com.

10          MR. LOGAN:  Objection, Your Honor.  Counsel

11     testifying.

12          THE COURT:  Sustained.

13     BY MS. HULL:

14     Q.   Okay.  Can you tell us what it is for?

15     A.   It looks like postings, yeah, from Craigslist under my

16     email address.

17     Q.   And can you turn to the very first page of those listing?

18     Do you see the date of the very first posting, April 28, 2007,

19     do you see that?

20     A.   Yes, ma'am.

21     Q.   Okay.

22          And that is your account; correct?

23     A.   Yes, ma'am.

24     Q.   And look at the very last page, page 265.  Do you see the

25     last posting?

United States District Court

02:55:50

02:55:56

02:56:19

02:56:24

02:56:53

02:57:07

XXXXXXXXX XXXXXXX - Cross

1      MR. LOGAN:  Objection.  Relevance, Your Honor.                02:57:11

2      THE COURT:  What was the page now?

3      MS. HULL:  265.

4      THE COURT:  She can identify it.

5  BY MS. HULL:                                                     02:57:25

6  Q.  Can you see the date there, October 6, 2007, is the last

7  posting?

8  A.  Yeah, I see that but this posting doesn't ring a bell,

9  ma'am.

10     Okay.  But would you agree that this is a list of the       02:57:38

11 postings from that chiyna_dollkiss, which is your address?

12 A.  Yes, ma'am, and it's --

13     MR.LOGAN:  Objection.  Your Honor.  Foundation.  She

14 hadn't looked through the 265 pages.

15     THE COURT:  Well, maybe she can answer it.  Maybe she        02:57:56

16 can't.

17     Are you unable to answer that question or can you?

18     THE WITNESS:  I'm unable to answer the question

19 because I don't see all of the e-mail addresses that are on

20 here.  But I do have about three e-mail addresses and I no     02:58:07

21 longer use this one.

22 BY MS. HULL:

23 Q.  When did you stop using it?

24 A.  I actually stopped using this e-mail address, it was

25 around -- I know it was after the things that had transpired    02:58:16

United States District Court

825

XXXXXXXXX XXXXXXX - Cross

1   with Hanoi and I and the other ladies the second time we were        02:58:27
2   in Vegas.  It was after that, just shortly after.  I'm not
3   really sure when, ma'am, but I know that I had let Damafi
4   actually use that e-mail address.

5            THE COURT:  She's answered it.  She can't identify          02:58:46
6   it.
7   BY MS. HULL:
8   Q.  But you indicated that you were posting when you were in
9   Las Vegas and arrested in August?

10            MR. LOGAN:  Objection.  Asked and answered.                 02:59:00
11            THE COURT:  Sustained.
12            MS. HULL:  Your Honor I would move this in as
13   self-authenticating.  She has established relevance under the
14   e-mail address of hers.

15            MR. LOGAN:  Objection.  Foundation and relevance.           02:59:15
16            THE COURT:  Well, certainly it cannot be identified
17   and it isn't self-authenticating, then the objection is
18   sustained.
19   BY MS. HULL:
20   Q.  Have you looked at Exhibit Number 100, please.  Have you         02:59:36
21   seen that document before?
22   A.  Which one?  Which page?
23   Q.  Well, let me ask you to look beginning at page number
24   four.  Do you recognize any of the phone numbers listed there?
25   On page four it begins with area code 503-995-2973.  Do you see      03:00:18

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   that under the search results?                                    03:00:32

2   A.   Which one?

3   Q.   Page number four.

4   A.   Yes, ma'am.

5   Q.   Do you recognize that phone number?                          03:00:38

6   A.   The phone number is 503-839-4301?

7   Q.   Yes, ma'am.

8   A.   That's my mother's cell phone number.

9   Q.   Tell us what it is again?

10  A.   503-839-4301.                                                03:00:57

11  Q.   That's the second number.

12  A.   No.  That's my mother's cell phone number.  I think that

13  the 445 you're talking about, ma'am, is the account number.

14  Q.   Okay.  I'm looking at the very top number, 503-995-2973,

15  do you recognize that number?                                     03:01:15

16  A.   No.  Ma'am, I'm not sure.

17  Q.   The second one is your mother's number?

18  A.   Yes, ma'am.

19  Q.   Do you recognize any of the other telephone numbers listed

20  there?  How about the 9309?                                       03:01:35

21  A.   Yes.  That's Damafi's number.  And, excuse me, but the

22  first one it kind of rings a bell because I know that Damafi

23  had two phones and I don't know who the other person's name is

24  that the phone was under.

25          So, I don't know.  I know that he did have two phones    03:02:06

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   and 2973 kind of does ring a bell, ma'am.                        03:02:10

2   Q.   Okay.  So you think that that may be Damafi's but you're

3   not sure?

4   A.   That may be his number but I'm not sure because he's had

5   plenty of cell phones since then and plenty of numbers.          03:02:22

6   Q.   Okay.  Do you remember talking to the police about Damafi?

7   A.   I'm not sure.  When would that have been, ma'am?

8            THE COURT:  She's answered that no.  So do you have

9   another question?

10  BY MS. HULL:                                                      03:02:47

11  Q.   Do you remember asking the officers not to get Damafi in

12  trouble?

13           MR. LOGAN:  Objection.  Asked and answered.

14  Relevance.

15           THE COURT:  I'll allow her to answer that yes or no.     03:02:58

16           THE WITNESS:  What was the question again, ma'am?

17  BY MS. HULL:

18  Q.   Do you remember telling Mesa police detectives that you

19  didn't want to get Damafi in trouble?

20           MR. LOGAN:  Objection.  Misstates the evidence.          03:03:08

21           THE COURT:  Do you remember that?

22           THE WITNESS:  Yes, actually -- yeah, I do remember

23  talking to Mesa police about that.

24  BY MS. HULL:

25  Q.   And why did you want them to not get Damafi in trouble?      03:03:21

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  A.   Because I care for him and he had never mistreated me and    03:03:25

2  I just care for him.  Being me I have -- I care about him and

3  didn't want to see him hurt.

4  Q.   But you told them that you were prostituting for him?

5  A.   Yes, ma'am, but I wasn't forced to actually prostitute.  I    03:03:45

6  was -- I did it up on my own will and I did it because I wanted

7  to.  I didn't have to.

8  Q.   When you were on the trip, in this case from Portland to

9  Las Vegas, did you show the other women in the car pictures of

10 two young children and say that they were your children?        03:04:03

11 A.   Actually, yes, I did.

12 Q.   Did you tell them that you were 23 years old?

13 A.   No, I didn't.

14 Q.   Did you tell them that you were 22 years old?

15 A.   No, ma'am.                                                   03:04:16

16 Q.   Did you tell them that you were any age over 18?

17 A.   I may have told them I was 19.

18 Q.   Who did you tell that to?

19 A.   I think I told that to Amanda.

20 Q.   Why did you tell that to Amanda?                             03:04:29

21 A.   Because I didn't know whether or not -- if Hanoi had

22 wanted the other girls to actually know my age, you know,

23 because I know that we were going on a grown-up trip and, you

24 know, you have to be grown to actually go and I didn't want the

25 other girls to treat my any different.                          03:04:48

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   Did you tell them that you had prostituted in Las Vegas          03:04:49
2   before?
3   A.   Actually I really don't remember.  I don't remember all of
4   the conversations in the car, ma'am, because half the time I
5   was asleep so I'm not really sure.                                    03:04:58
6   Q.   You drove part of that trip; correct?
7   A.   No, I didn't.
8   Q.   So if another witness said that you drove part of that
9   trip, that would not be true?
10  A.   I don't believe that I drove none of the trip.  It was          03:05:09
11  only Hanoi and Zuriela that drove during that trip.
12  Q.   So Amanda never drove?
13        MR. LOGAN:  Objection.  Asked and answered.
14        THE COURT:  Sustained.
15  BY MS. HULL:                                                          03:05:20
16  Q.   If Amanda said that she drove, that would be a lie?
17        MR. LOGAN:  Objection.  Asked and answered.
18        THE COURT:  Sustained.
19  BY MS. HULL:
20  Q.   Whose car was it?  Zuriela's; correct?                          03:05:27
21  A.   I'm not sure whose name was -- whose name the car was in.
22  I'm not sure, ma'am.
23  Q.   And did you tell the people on the way from Portland to
24  Las Vegas that you had been a stripper from Las Vegas?
25  A.   No, ma'am.  I don't remember saying that.                       03:05:50

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   When you got to Las Vegas, did you show the other women          03:05:52

2   where you should go to get the most money?

3   A.   I'm not sure.

4   Q.   Is it possible?

5   A.   I mean, there is a possibility.  I'm not really sure,           03:06:05

6   though.

7   Q.   Because you had worked as a prostitute in Las Vegas

8   before; correct?

9   A.   Yes, ma'am.

10  Q.   And you knew the good spots; correct?                            03:06:14

11  A.   Yes, ma'am.

12  Q.   And you knew what prices to charge?

13  A.   Yes, ma'am.

14  Q.   Okay.  So you didn't need anybody to tell you any of those

15  things?                                                              03:06:21

16  A.   Well, actually, I wasn't sure what prices Hanoi had wanted

17  us to work for so I had to wait on -- and, actually, to tell

18  you the truth, ma'am, I really thought that I was going out

19  there not to prostitute.  I wasn't sure that I was going to

20  prostitute at any minute even driving there, you know.  But.        03:06:37

21  When we got there, I was enlightened that that was what I was

22  going to do.  But I knew the other girls was going to work but

23  I was kind of letting them know, hey, they have this area.  You

24  can get a lot of money here.  If you stay working at this area

25  for a little while, you can make some money here also.  So I        03:06:58

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | was just basically -- yes, ma'am, I was giving them guidelines | 03:07:01 |
| 2 | on where they should work and where they shouldn't because I | |
| 3 | had experience out there before. | |
| 4 | Q.   So you were giving them pointers? | |
| 5 | A.   Yes, ma'am. | 03:07:11 |
| 6 | Q.   And you talked on direct examination about smoking pot? | |
| 7 | A.   Yes, ma'am. | |
| 8 | Q.   How many times did you smoke pot on this trip? | |
| 9 | A.   I don't remember smoking at all on this trip. | |
| 10 | Q.   How about did you smoke or ingest cocaine at any time | 03:07:39 |
| 11 | during the trip? | |
| 12 | A.   Yes, ma'am. | |
| 13 | Q.   When? | |
| 14 | A.   I remember we were in Los Angeles and we were -- it was me | |
| 15 | and Zuriela -- me, Zuriela, and Amanda, and it was in the | 03:07:54 |
| 16 | daytime.  We were outside and we seen this big dope dealer guy | |
| 17 | and he was like, "Hey.  Do you want to try this?"  And I was, | |
| 18 | like, well, since I am in so much pain, I should.  I want | |
| 19 | something to actually take this away from me right now because | |
| 20 | I was going through a lot, ma'am, and I did try it. | 03:08:19 |
| 21 | Q.   You took cocaine because you were in pain? | |
| 22 | A.   I was going through a lot of emotional distress at the | |
| 23 | time, ma'am, and normally whenever you do a drug, you are doing | |
| 24 | that to like pretty much block your mind of what's really | |
| 25 | happening in life. | 03:08:38 |

United States District Court

832

XXXXXXXXX XXXXXXX - Cross

1   Q.   Okay.  And did you use cocaine at any other time that

2   trip?

3   A.   No, ma'am.

4   Q.   Any other drugs that trip?

5   A.   No, ma'am.

6   Q.   How many times did you drink on that trip?

7   A.   I would say no more than two times, ma'am.

8   Q.   Did you drink with Amanda?

9   A.   Yes, ma'am.

10  Q.   Did you take nude pictures of Amanda?

11  A.   No, ma'am.

12  Q.   On this trip were you ever alone in the room with Amanda

13  drinking?

14  A.   Ma'am, I may have been.  I may have been alone in the room

15  with Amanda.

16  Q.   Did you have a cell phone with you at all times on this

17  trip?

18  A.   I'm not sure but all I know is that -- all I know is that

19  Hanoi had a cell phone and --

20  Q.   No.  I'm asking about you.  Did you have a cell phone?

21  A.   I don't think I had a cell phone of my own.  No.  I don't

22  believe that, no.  No, ma'am.

23  Q.   Did you take any pictures with a cell phone on this trip?

24  A.   Did I take any pictures?  I may have taken one picture.

25  It could have been just one picture because they were just

United States District Court

03:08:39

03:08:46

03:08:57

03:09:14

03:09:30

03:09:52

1   like, hey, because Hanoi was getting ready to go somewhere and    03:09:56

2   he was the one taking pictures at first and I know that he was

3   telling me, he was like, "Hey, I need you to take just this one

4   pic for me because I got to go run somewhere and go take care

5   of something really fast and I'll be right back up."             03:10:12

6           And I said, "Okay.  Sure."  I just took the picture

7   for him.  And as a matter of fact, ma'am, I do believe it was a

8   picture of Amanda.  I just had to think about it.  I'm sorry if

9   I misled you in any way.

10  Q.   She was nude?                                               03:10:32

11  A.   Yes.

12  Q.   Who told her to get naked?

13  A.   Hanoi.

14  Q.   Before he left?

15  A.   Hanoi.                                                      03:10:38

16  Q.   So it wasn't your idea for her to get naked?

17  A.   No, ma'am.

18  Q.   And it wasn't her idea for her to get naked?

19  A.   No, ma'am.

20  Q.   Did she take pictures of you on that phone?                03:10:52

21  A.   No.

22  Q.   Do you know what phone you used?

23  A.   Hanoi's phone.

24  Q.   Do you know the number?

25  A.   The number is on one of these Craigslist ads up here from  03:10:55

834

XXXXXXXXX XXXXXXX - Cross

1   Los Angeles.                                                          03:10:58

2   Q.   And you were not old enough to drink on this trip, were

3   you?

4   A.   No, ma'am.

5   Q.   Who is Tasha?                                                    03:11:19

6   A.   Tasha is a friend that I met from school from the

7   alternative school that I was attending called POIC.

8   Q.   Did you see her at any time on the trip?

9   A.   No.  I -- wait a minute.  There was another Tasha in Las

10  Vegas that is I guess Hanoi's friend from the last time.  Not    03:11:37

11  the last time we went but I guess they have known each other

12  for a while.  She's kind of a big -- kind of a big lady.  She's

13  really light-skinned.

14  Q.   So the Tasha that you were talking about on direct

15  examination that you went to live with her, this is a different   03:11:59

16  Tasha?

17  A.   Yes, it's a different Tasha.  It's the Tasha in Portland,

18  not the Tasha that I met in Las Vegas.

19  Q.   Did your mom know when you were living with her you were

20  drinking and smoking pot?                                         03:12:13

21  A.   No, ma'am.  I would never let her know what I was doing.

22  Q.   On direct examination you looked at a Nevada

23  identification that was yours; correct?

24  A.   Yes, ma'am.

25  Q.   And you filled out that application; correct?  Can you      03:12:32

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | look at number 11 again, please. | 03:12:34 |
| 2 | A.    Exhibit 11? | |
| 3 | Q.    Yes, ma'am.  Do you remember talking about that? | |
| 4 | A.    Yes, ma'am. | |
| 5 | Q.    Who was with you at the DMV when you filled out that | 03:12:57 |
| 6 | application? | |
| 7 | A.    It was a guy that Hanoi had got to actually take me to the | |
| 8 | DMV because at that point we had just met someone the night | |
| 9 | before or maybe -- no.  It was the night whenever we got to Las | |
| 10 | Vegas, we had met someone and he actually gave us a ride to the | 03:13:15 |
| 11 | hotel that we were going to be in.  It was just me, Hanoi and | |
| 12 | Nikyea at the time.  Hanoi and he made friends -- | |
| 13 | Q.    Did he take you? | |
| 14 | A.    Yes. | |
| 15 | Q.    What was his name? | 03:13:31 |
| 16 | A.    I'm not sure what his name was.  I really don't remember. | |
| 17 | I wasn't really paying attention to his name.  I just knew I | |
| 18 | needed to get this ID. | |
| 19 | Q.    But you didn't need an ID to get into the clubs; correct? | |
| 20 | A.    Yes, you would need an ID to get into the clubs, ma'am. | 03:13:44 |
| 21 | Q.    You could get into these clubs without that ID; correct? | |
| 22 | A.    I highly doubt it. | |
| 23 | Q.    Did you tell Detective Pringle that you could get into | |
| 24 | clubs without a fake ID? | |
| 25 | A.    That was after -- that was after I had showed my ID. | 03:14:01 |

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  Well, it was after I showed this ID a few times that they          03:14:03
2  actually knew my face and if I didn't have it, I didn't
3  necessarily need it.
4  Q.   At the clubs -- okay.  Let me rephrase.  Did you tell
5  Detective Pringle that you told my client before getting that      03:14:18
6  ID that you didn't need an ID to get in the clubs?
7  A.   No.
8  Q.   You didn't tell Detective Pringle that?
9  A.   I really don't remember even saying that and I'm not
10 really sure, ma'am.  But I know that I did not tell Hanoi that      03:14:30
11 I can get into the clubs without having ID because if that was
12 the case, he wouldn't have never gotten his sister's
13 information, ma'am.
14 Q.   Isn't it true that you stole that information from his
15 sister?                                                            03:14:45
16 A.   No, ma'am.  I would never know where to find her Social
17 Security card and her birth certificate.
18 Q.   You had been to her house several times, hadn't you?
19 A.   Yes, I have been to her house several times.  I never
20 really went upstairs except for with Hanoi the first time that     03:14:57
21 we had had sexual intercourse.
22 Q.   What makes you think the ID was upstairs?
23 A.   I said I had never been upstairs.  I'm sure it would
24 probably be amongst all of her possessions and her room was
25 upstairs.  I know that that is probably where I would keep my       03:15:13

XXXXXXXXX XXXXXXX - Cross

1  personal things amongst all of my things to where nobody else          03:15:18
2  would be able to get into it.
3  Q.   When you signed this and you signed on the name, are you
4  aware you committed forgery?
5  A.   Yes, ma'am.                                                        03:15:30
6  Q.   And you swore under oath on that document that that was
7  all of your correct information; correct?
8  A.   Yes, ma'am.
9  Q.   And you knew that when you signed it?
10 A.   Yes, ma'am.                                                        03:15:39
11 Q.   Nobody forced you to do that, did they?
12 A.   Nobody forced me to sign it.
13 Q.   How many times did you use it?
14 A.   I only used it -- I'm not sure how many times I used it
15 but I only used it just like when security would walk up to you         03:15:58
16 at a casino and make sure you're the right age so that happens
17 all the time so, ma'am, I'm not sure.
18 Q.   Did you still have that fake ID in July of 2007 of
19 Jacqueline Acosta's?
20 A.   No, ma'am.                                                         03:16:20
21 Q.   Can you please look at Exhibit Number 2?
22       Do you remember talking about that?
23 A.   Today?
24 Q.   Yes.
25 A.   Yes, ma'am.                                                        03:16:55

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.    Okay.                                                              03:16:56

2             MS. HULL:  May I please have that exhibit.

3             Permission to publish?

4             THE COURT:  Yes.

5   BY MS. HULL:                                                             03:17:23

6   Q.    I'm showing you and publishing what has been marked as

7   Exhibit Number 2 and into evidence.  Is this the exhibit that

8   you talked about this morning?

9   A.    Yes, ma'am.

10  Q.    And you testified this morning that that was not you in   03:17:31

11  the red outfit with the red bow in your hair.

12  A.    Right.

13  Q.    Do you remember telling Detective Pringle that that was

14  you?

15  A.    I may have but I'm not sure, ma'am.                       03:17:48

16  Q.    Why would you do that?

17  A.    I don't know whether or not I told him that, he or she.  I

18  don't know.

19  Q.    Have you seen this before?

20  A.    Yes, I have seen that before.  That's not me.            03:18:01

21  Q.    I'm sorry?

22  A.    And I said that's not me.

23  Q.    And the picture underneath it you say is you?

24  A.    Yes, ma'am.

25  Q.    When was that taken?                                     03:18:11

XXXXXXXXX XXXXXXX - Cross

1    A.    That was taken when I was with Damafi.          03:18:12

2    Q.    Where was that picture?

3    A.    Huh?

4    Q.    Where was that picture?

5    A.    That picture was in Damafi's computer.          03:18:21

6    Q.    And when was this posting posted?

7    A.    It was posted sometime whenever we were up in LA.

8    Q.    You see the date on it and you already testified to the

9    date of posting, June 30, 2007?

10   A.    Yes, ma'am.                                       03:18:39

11   Q.    Where did you get that picture?

12   A.    I actually got that picture because whenever you log on to

13   your -- to your actual account, if you have postings that are

14   still up, which I did, you know, because postings can last for

15   like a series of days and it's like whenever they -- like      03:18:55

16   whenever the postings go off of the site, you can still pull

17   up -- you can still pull up your -- you can still pull up the

18   posting and the pictures will still be on there and all you

19   have to do is copy and paste it to the other computer.

20         Then from there you can browse and put it on the ad.      03:19:15

21   Q.    Is that what you did on this one?

22   A.    Yes, ma'am.

23   Q.    So you brought up -- where did you get the picture in the

24   red outfit?

25   A.    It was from some other city.  I'm not sure what city it    03:19:27

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   was from but like whenever you go onto Craigslist, if you want          03:19:31

2   to find another picture that kind of looks like you that can

3   actually substitute for you if you don't have the money to get

4   professional pictures taken, you can look somewhere all the way

5   across the world and actually find someone that looks like you          03:19:44

6   and copy and paste that and browse it and put it on the

7   posting, ma'am.

8   Q.   Where did you find those other two images?

9   A.   I'm not sure.  You just actually, like, browse through all

10  of the -- like all of the -- you can browse through, like, all          03:19:58

11  of the ads in, like, some cities and if you see, like, a

12  different little, like, pictures that are sort of like discreet

13  or sexy or gorgeous or something like that, you can actually

14  take that and put that on there also.  It's just pretty much

15  making a collage of your own pictures that you want to put on            03:20:18

16  there.

17  Q.   And is that what you did in this case?

18  A.   I didn't necessarily put the pictures on there.  But I

19  made sure that those pictures were actually in the computer to

20  actually will be used, ma'am.                                            03:20:32

21  Q.   For this posting?

22  A.   Yes, ma'am, but I didn't put them on the posting.  I

23  didn't post this one.  I do believe that Hanoi posted them.  I

24  didn't post these pictures but I had already had these pictures

25  on this computer so that, you know, whenever you -- like          03:20:49

United States District Court

XXXXXXXXX XXXXXXX - Cross

```
 1   whenever you click "browse" on the computer and then you go to   03:20:55
 2   your pictures, it actually pulls up just a series of pictures
 3   and these pictures were already on there along with everybody
 4   else's pictures.
 5   Q.   So you collected them for this posting?                      03:21:06
 6   A.   I collected them for posting, period, not specifically for
 7   this posting, ma'am.
 8   Q.   Do you remember posting this particular exhibit?
 9   A.   No, I don't remember posting this exhibit.
10   Q.   But you got the pictures together for it?                    03:21:25
11           MR. LOGAN:  Objection.  Asked and answered.
12           THE COURT:  Sustained.
13   BY MS. HULL:
14   Q.   What is the difference between collecting all of the
15   pictures for the posting and making the actual posting?          03:21:37
16   A.   The difference is with, like, actually getting the picture
17   for the posting, you are just putting pictures on the computer
18   and that is it.  And whenever you post something, you're
19   actually putting pictures to a posting and putting it on the
20   Internet for everyone to see.                                    03:21:51
21   Q.   Did you tell the police officers that you posted this?
22   A.   I don't remember.  And, ma'am, to tell you the truth, I
23   may have because I've done plenty of postings up in the past
24   and I may have said that.  But it's definitely not the truth
25   and if I lied to them --                                         03:22:11
```

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    Q.   Which one is a lie?                                        03:22:13

2    A.   Ma'am?

3    Q.   Which one is a lie?

4    A.   I said that I may have possibly said that I posted this

5    and I didn't post this because I've posted a lot of postings in    03:22:20

6    the past, ma'am, and I know that I may have accidentally said

7    that, yeah, I did that whenever that is not the case.

8    Q.   How do you know?

9    A.   I know that because Hanoi actually posts a lot of our

10   postings whenever we worked in Los Angeles because, ma'am, if     03:22:38

11   you actually look at one of my postings versus one of his

12   postings, you'll see the total difference in every single

13   posting that I do and the posting that he does.

14   Q.   What's the difference?

15   A.   The difference is that, ma'am, I use a lot of stars up in    03:22:53

16   my posting.  I use roses up in my postings and I actually -- I

17   get very creative.  His is very simple and with mine, it's

18   really hard to actually detect like -- it's hard to, like, see,

19   like, the number, like I say, like, my cell phone number

20   because it's, like, you have to put it through a system before    03:23:21

21   it gets approved.  And sometimes, like, whenever you write the

22   number like that just, like that just like the 323-747 -- just

23   like that, like whenever you write it like that, it can

24   actually be -- like it won't be used up on the computer if they

25   can actually detect that you're just using your phone number     03:23:39

United States District Court

843

XXXXXXXXX XXXXXXX - Cross

1   and putting it up there.                                    03:23:43

2           Me, I'm more creative and I could show you in one of

3   these postings, ma'am, if you would like to see.

4   Q.   I would.  Do you have them in front of you?

5   A.   I'll see if I can find one.                            03:23:52

6   Q.   Let me stop you --

7   A.   This wouldn't be it.

8   Q.   Do you have Exhibits 3 and 4 in front of you?

9   A.   I may have.

10          THE COURT:  Do you have three and four in front of    03:24:44

11  you?

12          THE WITNESS:  Yes, ma'am, I do.

13          THE COURT:  So go ahead and ask her a question.

14  BY MS. HULL:

15  Q.   Have you seen those before?                           03:24:50

16  A.   Yes, ma'am.

17  Q.   Are those postings yours?

18  A.   No.  Exhibit Number 4 is definitely not mine and Exhibit

19  Number 3 is mine.  It has my picture.

20  Q.   And you posted it?                                    03:25:05

21  A.   No, ma'am, I didn't post it.

22  Q.   Can I see Exhibit Number 3?

23  A.   Sure.

24  Q.   Here you go.  Exhibit number 3 you said is yours or is of

25  you?                                                       03:25:37

United States District Court

844

XXXXXXXXX XXXXXXX - Cross

1    A.    It's of me.                                                03:25:40

2    Q.    And how do you know that?

3    A.    Because the one picture I had taken, one of the pictures

4    on there I had taken.

5    Q.    I'm sorry?                                                 03:25:49

6    A.    I said one of the pictures on there I had taken.

7    Q.    You took?

8    A.    No.   One of the pictures was taken of me.   You know, like

9    someone took a picture of me.

10            MS. HULL:   Judge, I believe number three is already    03:26:03

11   in evidence.

12            THE COURT:   It is.

13            MS. HULL:   May I post?

14   BY MS. HULL:

15   Q.    I'm showing you what has been marked as Exhibit Number 3.  03:26:12

16   Which picture is of you.

17   A.    The one in the top left-hand corner.   The girl touching

18   the wall.

19   Q.    When was that taken?

20   A.    That was taken when -- actually -- I might have taken that 03:26:24

21   one with Hanoi.   I'm not sure.   It may have taken whenever I

22   was with Damafi.

23   Q.    Okay.   And do you remember when before this?

24   A.    I'm not sure when.

25   Q.    Was that something that you had on your computer that you  03:26:49

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   had stored as a picture of you for posting?                      03:26:51

2   A.   It could have been.  I've had a lot of pictures stored on

3   my computer.

4   Q.   Okay.  And you think that Damafi took that?

5        MR. LOGAN:  Objection.  Asked and answered.              03:27:02

6        THE COURT:  Sustained.

7   BY MS. HULL:

8   Q.   And do you have a tattoo on your back?

9   A.   Actually, ma'am, I don't.  What I did was I had bought,

10  you know, like you can go and buy the henna tattoos and they    03:27:12

11  can come off with a little paper and you just put it on your

12  back kind of like a child tattoo but it will last a lot longer

13  because it is made for adults.  I had actually purchased a

14  tattoo like that.

15  Q.   Did you put it on your back like that for that picture?   03:27:29

16  A.   I had my best friend Melody actually help me in putting it

17  there.

18  Q.   And you don't know when that was or was it right before

19  the picture was taken?

20  A.   No.  It was maybe a day or so before I think.             03:27:42

21  Q.   Okay.  And do you remember where you were when that

22  picture was taken.

23  A.   I'm not sure where I was, ma'am, because I know that I've

24  been to a lot of places and I'm not really sure where I was at

25  that point in time because I don't know what day that picture   03:28:06

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  was actually taken.                                            03:28:08

2  Q.   What is the tattoo of because it's such a small picture?

3  What was on it?

4  A.   It's just kind of like a -- it is like not like a tribal

5  tattoo but it has a lot of swirls and different little things  03:28:19

6  and has a heart in the middle and swirls on the outside.

7  Q.   No words?

8  A.   No.

9  Q.   You're certain?

10 A.   Yes, ma'am.                                              03:28:29

11 Q.   Have you ever seen that exhibit before?

12 A.   Yes.

13 Q.   Do you remember talking to Detective Pringle about that

14 particular posting?

15 A.   I don't remember talking to any detective about that.    03:28:45

16 Q.   Do you remember telling Detective Pringle that that was a

17 photograph taken by my client of you?

18         MR. LOGAN:  Objection.  Asked and answered.

19         THE COURT:  Sustained.

20 BY MS. HULL:                                                  03:28:58

21 Q.   Did you tell Detective Pringle that my client put that

22 tattoo on you for that picture?

23         MR. LOGAN:  Objection.  Asked and answered.

24         THE COURT:  You can answer that one.

25         THE WITNESS:  Okay.  Can you ask that question again,  03:29:11

                    United States District Court

847

XXXXXXXXX XXXXXXX - Cross

1   ma'am?                                                          03:29:17

2   BY MS. HULL:

3   Q.   Did you tell Detective Pringle in your interview that my

4   client put that tattoo on you for that picture?

5   A.   I'm not sure what I said.  No telling, ma'am.  I may have   03:29:26

6   said it because I know that Hanoi --

7            THE COURT:  That's okay.  You've answered it.

8            Go ahead and ask another question.

9   BY MS. HULL:

10  Q.   Did you tell Detective Pringle that that was actually my   03:29:38

11  client's name written on your back?

12  A.   I don't think so.  No, ma'am.

13  Q.   Do you remember being interviewed by the Mesa police on

14  video?

15  A.   On video?  I'm not sure, ma'am.  I know I was on video if   03:29:51

16  it was a video interview, ma'am.

17  Q.   Do you remember being interviewed?

18  A.   Yes, I remember being interviewed.

19  Q.   For a long time?

20  A.   Yes.                                                        03:30:06

21  Q.   Have you had an opportunity to review either the video or

22  the transcript of that interview?

23  A.   No, I'm not sure.  No, I don't think so.

24  Q.   Did you tell Detective Pringle that you gave that fishnet

25  outfit to the nurse the who did your exam?                       03:30:19

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.   Ma'am, to tell you the truth, I vaguely remember the      03:30:27

2    conversation that I had between me and the detective.  I really

3    don't even know the detective's name like that, so I'm not

4    really fond of who the detective is now.  I barely remember.

5    Q.   You're not fond?  I'm sorry.  I don't understand.         03:30:43

6    A.   Okay.  I really didn't know the detective like that so I

7    don't really remember our conversation.

8    Q.   If you told Detective Pringle that my client put that

9    tattoo on you, that would be a lie?

10            MR. LOGAN:  Objection.  Asked and answered.           03:31:01

11            THE COURT:  Sustained, relevance.

12            MS. HULL:  Again, permission to post?

13            THE COURT:  Yes.

14   BY MS. HULL:

15   Q.   The other two images of the other three, where are those  03:31:22

16   pictures from?

17   A.   Those pictures are from other ads on Craigslist and the

18   one picture with the glass you seen on the previous posting and

19   it says discreet.  This one picture in the bottom with the

20   really curvy lady, that is an animation.  It's not real.  And   03:31:45

21   this other one, I forgot where I got that.

22   Q.   Okay.  But you got the picture.  Did you put it in this

23   posting?

24   A.   No, I didn't put it in that posting.

25   Q.   Did you tell the detectives at your interview that my      03:32:47

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   client took your ID?                                                    03:32:50

2   A.   It's a possibility because I'm not sure whether he took

3   it.  I think he did, though.  I'm not really sure.  I can't go

4   back to that moment like that, ma'am.

5   Q.   He didn't take your ID in Las Vegas, did he?                       03:33:06

6   A.   I'm not sure.

7   Q.   Have you been -- have you been instructed as to how to

8   answer questions at any time prior to today?

9   A.   Well, I mean, it just depends.  Well, yes, ma'am.

10  Q.   Okay.  How were you instructed?                                    03:33:22

11  A.   Like if I don't -- like if I don't understand a question,

12  I can ask for it to be repeated.  You know, if I -- if I am not

13  sure, then I'm not sure.  If I don't know, then I don't know.

14  If I don't remember, then I don't remember, ma'am.

15  Q.   How about the possibility that you possibly said            03:33:46

16  something, any instruction on that?

17  A.   I don't know.  I don't remember.  Since then a lot has

18  been on my mind, ma'am.

19  Q.   I'm sorry?

20  A.   I said since then a lot has been on my mind, ma'am, and     03:34:01

21  I'm not really sure.

22  Q.   As far as the tattoo is concerned on your back, did you

23  tell Detective Pringle that it had washed off since the

24  photograph was taken?

25            MR. LOGAN:  Objection.  Relevance.                            03:34:30

United States District Court

XXXXXXXXX XXXXXXX - Cross

```
1          THE COURT:  Overruled.                              03:34:36
2          MS. HULL:  I'm sorry?  What was the answer?
3          THE COURT:  Overruled.
4          THE WITNESS:  Yes, ma'am.
5   BY MS. HULL:                                               03:34:37
6   Q.   You did tell Detective Pringle that?
7   A.   Yeah.  I told him it was washed off before -- it was
8   washed off like after -- like after the picture was taken
9   because like --
10         THE COURT:  Okay.  You've answered that question.  03:34:51
11         THE WITNESS:  Okay.  I'm sorry, ma'am.
12  BY MS. HULL:
13  Q.   When you were in Los Angeles and you claimed this incident
14  happened in the hotel and the police came, I believe your
15  testimony was that your face was really messed up.  Do you    03:35:07
16  remember that?
17  A.   Yes, ma'am.
18  Q.   Do you still have photographs 17, 18, and 19 in front of
19  you, the exhibits?  Those are the three photographs of you.  Do
20  you have those?                                               03:35:29
21  A.   Yes, I have them.
22  Q.   And you can't even see any swelling in those photographs,
23  can you?
24  A.   Let me see.  Well, not exactly because it was sometime
25  afterwards and I was putting ice on my face to try to stop the 03:36:01
```

United States District Court

851

XXXXXXXXX XXXXXXX - Cross

1  swelling and whenever you do that, you do it constantly, the               03:36:06
2  swelling will go down.
3  Q.   Had you put ice on it before the police arrived?
4  A.   I was actually trying to put makeup on it to try to cover
5  it up, ma'am.                                                              03:36:16
6  Q.   And what did you tell the police officers when they came
7  in Inglewood?
8  A.   I actually told them -- I lied to them and said that -- I
9  said that I had been drinking and that -- I forgot what else I
10 told them, but I told them that I had been drinking and that,              03:36:36
11 darn, and pretty much that, like, he didn't do anything because
12 I was just trying to -- I wouldn't say like protect him.  I was
13 just scared because -- I was just scared at the time and I just
14 didn't want to -- I just didn't want anything to pop off
15 with -- I didn't want anything to happen between me and the                03:36:55
16 other girls because I thought that something would maybe happen
17 to me if he went to jail.
18 Q.   Say that again?  I'm sorry.
19 A.   I said I thought that maybe something would happen to me
20 if he would have went to jail if I would have said something               03:37:07
21 then like, "Oh, yes, well, he hit me.  He put his hands on me,"
22 just like right then and there.
23 Q.   How many police were there?
24 A.   Two.
25 Q.   Did they have guns?                                                   03:37:16

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   I believe all police officers have guns, ma'am.   03:37:19

2   Q.   And did they interview you -- where did they interview

3   you?

4   A.   They interviewed me in front of -- in front of the other

5   two girls which was Zuriela and -- it was Zuriela and Amanda   03:37:29

6   who were right there whenever I was being interviewed.

7           THE COURT:   Okay.  You've answered the question.

8           Ms. XXXXXXX, let me tell you.  You answer the

9   questions yes or no if you can.

10          THE WITNESS:   Okay.   03:37:47

11          THE COURT:   And don't give explanations unless they

12  are asked for.

13          THE WITNESS:   Right.

14          THE COURT:   Go ahead.

15  BY MS. HULL:   03:37:53

16  Q.   My client wasn't there, was he?

17  A.   Yes, he was.

18  Q.   He wasn't there when you were being interviewed.

19  A.   No.

20  Q.   You just said that Amanda and Zuriela were there and they   03:38:00

21  were the only two.

22  A.   Yes.

23          THE COURT:   Okay.  You've answered yes or no.

24  BY MS. HULL:

25  Q.   Do you know where my client was?   03:38:12

United States District Court

853

XXXXXXXXX XXXXXXX - Cross

1    A.    Yes, ma'am.                                          03:38:13

2    Q.    Where was he?

3    A.    He was in the hallway laying down on the floor with one

4    officer by his side just so that the officer can come and talk

5    to us.                                                     03:38:22

6    Q.    My client was lying on the floor?

7    A.    Yes.  The officer had him on the floor, ma'am.

8    Q.    Did he have a gun drawn?

9    A.    I don't believe so but he still had him on the floor.  He

10   was in handcuffs.                                          03:38:33

11   Q.    Did you tell the officers that you were 22 years old?

12   A.    No, ma'am.  I told them I was 20.

13   Q.    Do you remember telling Detective Pringle that you told

14   them that you were 22?

15   A.    I may have told that detective that I was 22 but --     03:38:46

16            THE COURT:  Okay.  But no more.

17   BY MS. HULL:

18   Q.    Did you tell Detective Pringle that my client was not with

19   you when you left Portland?

20   A.    I don't believe so.                                  03:39:15

21   Q.    How many times did you talk to your mom on the phone on

22   the way to Vegas?

23   A.    From one to three times.

24   Q.    And who else got on the phone with your mother at that

25   time as well other than you?                              03:39:50

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   Zuriela.                                              03:39:52

2   Q.   Who else?

3   A.   And Amanda.

4   Q.   This was on the way to Vegas?

5   A.   Yes, ma'am.                                          03:39:57

6   Q.   And did you ask your mom to come get you at that point?

7   A.   No.

8   Q.   When you got to Las Vegas, how many times did you call

9   your mom?

10  A.   I'm not sure, ma'am.                                 03:40:21

11  Q.   You had a phone; right?

12  A.   Well, it wasn't my phone.

13  Q.   Okay.

14          THE COURT:  No.  Again, answer yes or no and if you

15  can't answer it yes or no, you tell Miss Hull; okay?       03:40:32

16          THE WITNESS:  M'hum.

17          THE COURT:  It's Miss Hull.  If you can't her

18  question yes or no, you say, "I can't answer it yes or no."

19          THE WITNESS:  Okay.

20          THE COURT:  And if you don't understand it, you ask  03:40:45

21  her and then you don't give any explanation; okay?

22          MS. HULL:  Thank you.

23  BY MS. HULL:

24  Q.   You had access to a phone during the trip; right?

25  A.   Yes, ma'am.                                          03:40:59

United States District Court

855

XXXXXXXXX XXXXXXX - Cross

1   Q.   Nobody ever kept you from your access to any phone?          03:41:00

2   A.   No, ma'am.

3   Q.   How many phones were on the trip?

4   A.   I'm not sure.

5   Q.   When you were alone in the room at any time while you were    03:41:11

6   ever alone, did you ever have a cell phone with you?

7   A.   No.

8   Q.   You never had a cell phone?

9   A.   No, I never had a cell phone with me alone.

10          THE COURT:  You need to get in front of the              03:41:27

11  microphone again.  We can't hear you.

12          THE WITNESS:  I never had a cell phone with me when I

13  was just by myself.

14  BY MS. HULL:

15  Q.   How about when you were alone in the room with Amanda?       03:41:35

16  A.   Ma'am, I don't recall when this was.

17  Q.   Okay.  Did Amanda have her own phone with her?

18  A.   Yes.

19  Q.   And Philysia had her own phone with her?

20  A.   I don't know.  I don't remember.                            03:41:50

21  Q.   If at any time you needed a phone, could you ask -- did

22  you feel free to ask anyone if you could use it?

23  A.   No.

24  Q.   Did you ask people on a regular basis if you could use

25  their phone?                                                     03:42:04

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   No, ma'am.                                                    03:42:05

2   Q.   How did you call your mother?

3   A.   I remember on the way, on the way to Las Vegas, I said

4   that I had needed to call her but -- and I said that would be

5   the last time I would need to call her.                            03:42:23

6            THE COURT:  So she asked you how did you call her?

7            THE WITNESS:  Okay.  Yeah, right.

8            I had used someone's phone that was in the car.  I'm

9   not sure exactly whose phone I used but I used someone's phone.

10  BY MS. HULL:                                                       03:42:36

11  Q.   Did you use the same phone every time you called your mom?

12  A.   I believe so.

13  Q.   Did you tell Detective Pringle that you're not the sort of

14  girl that would prostitute?

15  A.   Yes, I did.                                                   03:43:08

16  Q.   And did you tell her that you told my client it was

17  against your religion to prostitute?

18  A.   Yes, I did, ma'am.

19  Q.   You called Damafi -- I'm sorry.  When you got to Los

20  Angeles and after this incident that you claimed where my         03:43:38

21  client had you in the room alone, how shortly after that did

22  you call Damafi?

23  A.   Maybe less than a day or so after that.

24  Q.   In fact, it was the same day, wasn't it?

25  A.   It could have been.                                          03:44:03

United States District Court

857

XXXXXXXXX XXXXXXX - Cross

1    Q.    And what was Damafi's birthday?                          03:44:05

2    A.    September 12 or the 22nd.  It was either the 12th or the

3    22nd.

4    Q.    Of September?

5    A.    Yes.                                                     03:44:19

6    Q.    Was he having a party while you were gone on this trip?

7              MR. LOGAN:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    BY MS. HULL:

10   Q.    When you talked to him, did you ask him to come and get  03:44:28

11   you?

12   A.    No.

13   Q.    Did you ask him to call your mom?

14   A.    At one point, yes.

15             THE COURT:  You need to get in front of the          03:44:39

16   microphone, again.  Pull the microphone forward.  I believe you

17   can pull it all the way forward and then lean forward.

18             Okay.  Go ahead.

19   BY MS. HULL:

20   Q.    When did you ask Damafi to call your mom?                03:44:52

21   A.    It was after Hanoi had beat me that time up in the room.

22   It was after that.

23   Q.    Was it after the police left or before the police left?

24   A.    After the police left.

25   Q.    So after the police left, you called Damafi and asked him 03:45:10

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    to do what?                                                          03:45:13

2    A.   I asked him just to call my mother and just to let her

3    know that basically I'm not happy where I am and just to tell

4    her that I miss her and if I ever get to see her again, then

5    just basically that I love her and I had to hurry up and get    03:45:31

6    off the phone, ma'am.

7    Q.   Why did you call him and not your mom?

8    A.   Because I didn't want -- because at that point in time,

9    you know, I know that they were keeping track of, like, the

10   phone numbers and things and I remember he told me specifically   03:45:52

11   not to call my mom.  So I called someone else to actually relay

12   the message to my mother because up at this point, I'm actually

13   scared and I didn't want nothing to happen to me.

14   Q.   Who else did you call to call your mother?

15   A.   I called Damafi to call my mother for me.            03:46:08

16   Q.   Okay.  And was Damafi angry that you were prostituting for

17   somebody else?

18   A.   He was upset.  He was very upset because he felt like I

19   put myself in a situation.

20   Q.   Did he ask you to send him money?                 03:46:26

21   A.   No.

22   Q.   Did he tell you to call the police?

23   A.   No.

24   Q.   Did you call the police?

25   A.   When?                                                         03:46:53

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   You never called the police this whole trip, did you?   03:46:55

2   A.   Yes, I did.

3   Q.   When did you call the police?

4   A.   When we were in Mesa, Arizona.

5   Q.   Did you call or did your mother call?   03:47:03

6   A.   Oh, yeah, that's right.  I didn't call the police.  Yeah,

7   I called my mother and told her to call for me.

8   Q.   Why did you call your mother and tell her to call?

9   A.   Because I knew that Hanoi was very upset upstairs and if

10  he was to come downstairs and know that I snuck his phone from   03:47:20

11  upstairs to downstairs and in the car and if he would have seen

12  me making a call, I would be scared that he would hurt me again

13  so I hurried up and called my mother and hung up the phone and

14  gave her the information about the hotel and where it was.  And

15  I just stayed up in the car.  She told me to stay in the car.   03:47:41

16  Q.   So you talked to her for how long?

17  A.   I talked to her for about two or three minutes.  I just

18  briefly told her what I was going through and I gave her the

19  address and that.

20  Q.   How many times did you call her that night?   03:47:55

21  A.   I think I only called her one time that night.

22          MS. HULL:  Can I ask this witness to look at Exhibit

23  Number 9, please.

24          THE COURT:  Yes.

25          Do you remember it?   03:48:09

United States District Court

XXXXXXXXX XXXXXXX - Cross

1        MS. HULL:  I believe she has it.                    03:48:10

2        Judge, can I inquire as to whether that has been

3   admitted?

4        COURTROOM DEPUTY:  It has.

5        THE COURT:  It has.                                 03:48:25

6        MS. HULL:  Okay.  Thank you.

7        That's already been admitted into evidence.  I'm

8   sorry.  May I have that, please.

9   BY MS. HULL:

10  Q.   Let go to when you were in Mesa.  What time did you arrive    03:48:46

11  in Mesa?

12  A.   I'm not sure but I know it was sometime during the night.

13  It was dark outside.

14  Q.   And how long after you arrived did you take the phone down

15  to the car?                                              03:49:06

16  A.   Maybe an hour or two.

17  Q.   How long were you down in the car with the phone?

18  A.   I was down in the car with the phone for about maybe 25 to

19  30 minutes, ma'am.

20  Q.   And what were you doing at that time?               03:49:16

21  A.   At that time I was sent downstairs for me to actually post

22  because --

23  Q.   No, ma'am.  Again, the question is what were you doing in

24  the car for 25 minutes.

25  A.   I was -- from when I was talking to my mother and then I    03:49:30

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | | |
|---|---|---|
| 1 | was waiting on the police for like the rest of the time. | 03:49:36 |
| 2 | Q.   So what did you do when you first got to the car with the | |
| 3 | phone?  What's the first thing you did? | |
| 4 | A.   The first thing I did, I had -- I started up the car and I | |
| 5 | drove it to the front of the hotel. | 03:49:55 |
| 6 | Q.   And then what? | |
| 7 | A.   And then after I turned the car off, ma'am, I was looking | |
| 8 | around to see if anyone was coming around the corner and then I | |
| 9 | got on the phone and called my mother and I called her and told | |
| 10 | her that I was doing really bad and that I needed her to do me | 03:50:12 |
| 11 | a favor because I was scared that the person like who I'm with | |
| 12 | was going to come out. | |
| 13 | Q.   I'm sorry? | |
| 14 |       And you said you only called her one time that night. | |
| 15 | A.   ?Ma'am, it may have been one time and I'm not sure how | 03:50:33 |
| 16 | many times I may have called her that night, to tell you the | |
| 17 | truth, ma'am. | |
| 18 | Q.   So your earlier testimony that you only called one time, | |
| 19 | you're changing that? | |
| 20 | A.   Ma'am, yes, because I'm not really sure right now.  I'm | 03:50:46 |
| 21 | not sure how many times I called her.  I know I called her at | |
| 22 | least one time. | |
| 23 | Q.   I'm sorry? | |
| 24 | A.   I said I know that I called her at least one time, ma'am. | |
| 25 | Q.   Do you remember what time it was that you got down to the | 03:51:01 |

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   car?                                                           03:51:03

2   A.   I don't remember the time.

3   Q.   Do you remember how long it took for the police to arrive

4   after you hung up with your mother?

5   A.   No, ma'am.  I wasn't -- no, ma'am.                        03:51:15

6           MS. HULL:  Permission to post?

7           THE COURT:  Yes.

8   BY MS. HULL:

9   Q.   I'm showing the last page of Exhibit Number 9.  Do you see

10  any of the phone numbers on there that are in the             03:51:48

11  third-to-the-last column.  Can you see those?

12  A.   Where?

13          THE COURT:  Do you have Exhibit 9 in front of you?

14  All right.  You need to look up on the screen.

15          Direct her attention to what you're speaking of.      03:52:11

16  BY MS. HULL:

17  Q.   Looking at this last page, in this column here, can you

18  see where I am pointing?

19  A.   Yes, ma'am.

20  Q.   Do you recognize any of those phone numbers?              03:52:18

21  A.   Yes.

22  Q.   Do you recognize this first number at the very top.

23  541-548-1115?

24  A.   No, ma'am.

25  Q.   Here is the first number that I would assume that you     03:52:34

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   recognize.                                                    03:52:36

2   A.    Yes.   That's my mom's.

3   Q.    And that is the call at 9:42 p.m.

4   A.    M'hum.

5   Q.    What did you talk about on that call?                   03:52:44

6   A.    Actually, but that -- about that time, me and my mom -- I

7   told her, I said I'm doing okay because I remember Hanoi told

8   me to talk to her because I hadn't talked to her in a while.

9   Q.    Where were you when you made this call?

10  A.    I was right in front of him.   I was right in front of   03:53:04

11  Hanoi and I basically told my mother, I said I'm doing fine and

12  all of that because at that point I couldn't say nothing right

13  in front of him.

14  Q.    Is this the call where Amanda joined in the call and

15  talked to your mother?                                        03:53:19

16  A.    Ma'am, I'm not sure.

17  Q.    Do you remember what else you talked about for 19 minutes?

18  A.    No, not really.   I really don't remember.

19  Q.    How about the next call, 933-3309, who is that?

20  A.    That was Damafi.                                        03:53:37

21  Q.    And you were on the phone for three minutes with him.

22  What did you talk about?

23  A.    I'm not sure.   I'm really not sure what we talked about,

24  ma'am.

25  Q.    In fact, that lists an incoming so he would have called   03:53:48

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  you.  Do you remember that?                                    03:53:51

2  A.   I don't remember the incoming call.

3  Q.   He had the number where you were though.  He could reach

4  you at any time?

5  A.   Right.                                                    03:54:00

6  Q.   How about your mom, could she reach you at any time?

7  A.   I don't think so.

8  Q.   Do you know what phone carrier service she has on her

9  phone?

10  A.   Cricket.                                                 03:54:10

11  Q.   It is Cricket and that's the one that we looked at

12  earlier; correct?

13  A.   Yes, ma'am.

14  Q.   Okay.  And have you seen her phone?

15  A.   We actually have new phones.                             03:54:19

16  Q.   But at the time.  Did you see the phone that she had at

17  the time?

18  A.   No, I didn't see it.

19  Q.   So you don't know if she could tag taller ID on that

20  phone?                                                        03:54:32

21  A.   Oh, I'm sure she had caller ID.

22  Q.   So when you called her, you didn't block any of your calls

23  to her, did you?

24  A.   I may have.  I'm not sure.

25  Q.   Do you remember if you blocked any of the calls from that  03:54:45

United States District Court

865

XXXXXXXXX XXXXXXX - Cross

1    night?                                                                      03:54:46

2              MR. LOGAN:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4    BY MS. HULL:

5    Q.   How about this next number, 503-841-4473, who is that?              03:54:55

6    A.   I don't know that number.

7    Q.   Here's another one at 10:01 p.m.  That's to your mother

8    again; correct?

9    A.   Yes, ma'am.

10   Q.   For ten more minutes?                                                03:55:11

11   A.   Yes, ma'am.

12   Q.   What did you talk about then?

13   A.   Ma'am, let me think.  I'm not sure.

14              Ma'am, I'm really not sure what we talked about.  I'm

15   not sure --                                                              03:55:32

16              THE COURT:  That's all right.  You answered the

17   question.

18   BY MS. HULL:

19   Q.   Do you remember where you were when you made that call?

20   A.   Once again, ma'am, I'm sorry --                                     03:55:42

21              THE COURT:  We can't hear you.

22              THE WITNESS:  I said once again, ma'am, I'm sorry but

23   I'm really not sure.

24   BY MS. HULL:

25   Q.   You were in Mesa by then; right?                                    03:55:49

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.    Yes.                                                              03:55:53

2   Q.    Okay.  Your testimony was that, in fact, you got in to

3   Mesa the evening hours of July 2; right?

4   A.    Yes, ma'am.

5   Q.    Okay.  How about the next number, 503-890-4068, do you           03:56:02

6   recognize that?

7   A.    No, ma'am.

8   Q.    443, the next line, whose number is that?

9   A.    I'm not sure of number.  I don't know that number, ma'am.

10  Q.    How about the next one, 890-4068?                               03:56:24

11  A.    I don't know that number.  I don't remember it.

12  Q.    Do you know this number I'm pointing to, 841-4473?

13  A.    I don't remember that number.

14  Q.    Next line, 503-933-9309, who is that?

15  A.    Damafi.                                                          03:56:46

16  Q.    Okay.  Do you see where that phone call took 19 minutes?

17  A.    Yes, ma'am.

18  Q.    And you called him.  Do you remember what you talked

19  about?

20  A.    I was talking to him about what I was going through out         03:56:53

21  there.

22  Q.    Where were you when you called him?

23  A.    I'm not sure where I was.  I think I had stepped outside

24  for a second whenever I talked to him.  I think I was by the

25  pool before I went back up to the room and before he told me to      03:57:06

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  go downstairs to the car.  I remember I was walking around the          03:57:10
2  hotel and I had a phone with me.
3  Q.   And do you remember what you talked about?
4  A.   I was telling him about everything like that has been
5  going on and that I miss him and just typical things that you          03:57:22
6  would talk to your loved one about whenever are you far away
7  from them.
8  Q.   Did you tell him to call the police?
9  A.   Not then.
10 Q.   Did you ask him to call your mother?                               03:57:37
11 A.   Yeah.  Up at that point I did tell him to call my mom.
12 Q.   In this 19-minute phone call?
13 A.   Yes, ma'am.
14 Q.   Okay.  And this 19-minute phone call occurred at 10:35
15 p.m.; correct?                                                          03:57:49
16 A.   Yes, ma'am.
17 Q.   I'm sorry, 10:25 p.m.  Do you see where I'm pointing?
18 A.   M'hum.
19 Q.   Okay.  And the next number -- do you recognize this
20 number, 702-557-8922?                                                  03:58:01
21 A.   No, ma'am.
22 Q.   What did you do with the phone after you talked to Damafi
23 at 10:25?
24 A.   After that I had went back upstairs and that was whenever
25 a lot of the commotion was going on upstairs and Zuriela and           03:58:17

1   Hanoi was upset with each other.                          03:58:23

2   Q.   What did you do with the phone?

3   A.   I put it on the bed.

4   Q.   Okay.  How about this next number from 10:35, 933-9309, is

5   that Damafi again?                                         03:58:37

6   A.   I think so but it could have been an incoming call.  I

7   don't know.  I'm not sure.

8   Q.   Eight minutes, do you remember what you talked about?

9   A.   I don't remember.

10  Q.   Again, this is a call to your mother, right, 4301?      03:58:53

11  A.   Yes, ma'am.

12  Q.   And that's at 10:44 p.m. for 15 minutes?

13  A.   Right.

14  Q.   What did you talk about on that call?

15  A.   Ma'am, to tell you the truth, I'm not really sure.      03:59:05

16  Q.   Do you remember if you asked her to call the police?

17  A.   I don't remember if he asked her to call the police.

18  Q.   No.  Did you ask her to call the police in that call?

19  A.   No, I didn't ask her that in that call.

20  Q.   And you don't remember what you talked about?          03:59:20

21  A.   No.

22  Q.   How about this next number, mobile to mobile, do you

23  recognize that number, 480-457-0281?

24  A.   No, ma'am.

25  Q.   Here again, 839-4301, that's your mom again?           03:59:40

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.   Yes, ma'am.                                              03:59:43

2    Q.   At 12:13 a.m.

3    A.   Yes, ma'am.

4    Q.   Where were you when you made that call?

5    A.   I was in the car.                                        03:59:48

6    Q.   And you talked for two minutes?

7    A.   Yes, ma'am.  And that's when I told her what was going on

8    and that she should call the police.

9    Q.   And then you hung up the phone and you didn't make any

10   more calls?                                                   03:59:55

11   A.   I may have made some more calls.

12   Q.   To whom to?

13   A.   My mom.  Just to actually see whether or not she had

14   called for me.

15   Q.   Okay.  After you made that call and you asked her to call  04:00:06

16   the police, did you remain in the car until the police arrived?

17   A.   Yes, I did.

18   Q.   And did you call 911?

19   A.   No, I didn't.

20   Q.   Did you call for a local police number?                  04:00:14

21   A.   No, ma'am.

22   Q.   12:15 a.m., 933-9309, who is that?

23   A.   That is -- that's Damafi.

24   Q.   Do you remember was talked about there three minutes?

25   A.   Yes.  He basically -- he was asking me whether or not I   04:00:33

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    had got some help on the way and I told him, yes, I did.   I      04:00:39
2    called my mother and told him what we had talked about and then
3    I told him I had to hurry up and get off the phone before I get
4    in trouble and I just need to wait on these police.
5    Q.   Why did you think that you had to get off the phone?         04:00:52
6    A.   Because I didn't know when Hanoi was going to come around
7    the corner and see me on it.
8    Q.   Did you have the keys?
9    A.   Yes, I did have the keys.
10   Q.   Do you know how to drive a car?                              04:01:02
11   A.   I do know how to drive a car.
12   Q.   Why didn't you drive the car away?
13   A.   Because, like, I -- I don't know.  I probably wasn't
14   thinking at the time but I just -- I didn't want to drive his
15   car off of the -- just, you know.                                04:01:16
16        And, like, why would I do that because, like -- at
17   that time I wanted the police to get involved because I was,
18   like, enough is enough so I was waiting in the car in front of
19   the hotel for the police to get there.
20   Q.   But if you were afraid that he was going to come out, that   04:01:37
21   being my client, why didn't you just drive away to a police
22   station or something else?  Wouldn't that make more sense?
23   A.   No, ma'am, because I didn't know the area and I only knew
24   where I was.
25   Q.   Could you have driven away and then called the police?      04:01:50

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   A.   I could have, ma'am.  That could have been an option.                    04:01:52

2   Q.   And 12:25 a.m., there's that 4473 number you said you

3   couldn't identify.  Who is that?

4   A.   Ma'am, I really don't know what number that is.

5   Q.   You talked for two minutes.                                              04:02:10

6   A.   I don't know what number that is?

7   Q.   Do you remember calling anybody else?

8   A.   No, I really don't remember.

9   Q.   And the last number on here at 12:28 a.m. for five

10  minutes, your mom again?                                                      04:02:26

11  A.   Yes.

12  Q.   What did you talk about in that conversation?

13  A.   She was telling me that the police were coming and just to

14  be patient and just to wait in the car and not to get out, not

15  to do anything, just to wait and just pray.                                   04:02:39

16  Q.   So your testimony is that this 15-minute call at 10:44

17  p.m. is when you told your mom or your mom indicated she was

18  going to call the police?

19            MS. BARDORF:  Objection.  Misstates the testimony.

20            THE COURT:  Sustained.                                              04:02:58

21  BY MS. HULL:

22  Q.   Do you remember which call it was?

23  A.   Yes, ma'am.

24            MS. BARDORF:  Asked and answered.

25            THE COURT:  Sustained.                                              04:03:06

United States District Court

XXXXXXXXX XXXXXXX - Cross

BY MS. HULL:                                                          04:03:06

Q.   The one at 12:13; right?

A.   Yes, ma'am.

Q.   So according to this, you were still making calls 25

minutes later; correct?                                              04:03:24

A.   Yes, ma'am.

Q.   And how long after that last call did the police arrive?

A.   Whenever I hung up -- like whenever I hung up the phone,

like as I was talking to my mother, she was telling me that

they were on the way.  I said, "Hey, mom, look.  They are        04:03:44

already here.  I've got to go," and I got off the phone.

Q.   And did your mom tell you to -- did you tell your mom you

were in a car with keys?

A.   Yes, I told her.

Q.   Did she tell you to drive somewhere?                            04:04:02

A.   No.  She told me to stay in the car and not go anywhere

and to wait for the police, ma'am.

Q.   When the police came, you had a phone with you; correct?

A.   Yes.

Q.   Did you tell the police why you hadn't called the police    04:04:44

yourself?

A.   I don't remember, ma'am.

Q.   Do you remember talking to the police about that?

A.   No.

Q.   Do you remember telling the police that you never told      04:05:04

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  Damafi to call anyone?                                              04:05:06

2  A.   I don't think I would have said that.

3  Q.   Where were you when my client took Philysia to the bus

4  station in LA?

5  A.   I was in the car with him the whole time when he took her   04:05:47

6  to the Greyhound.

7  Q.   I'm sorry?

8  A.   I said I was in the car the whole time with them when he

9  took her to the Greyhound.

10 Q.   So you didn't stay back in the room with Amanda?          04:05:56

11 A.   No, ma'am.

12 Q.   Did Damafi offer to send you money to come home?

13 A.   Yes, but I didn't have my ID at that time.

14 Q.   You said on direct examination that when you were in Las

15 Vegas my client came in while you were in bathroom.  Do you   04:06:35

16 remember that testimony?

17 A.   Yes, ma'am.

18 Q.   And you said that my client said something to the effect

19 that you are the only one that he hadn't had sex with.

20 A.   Yes, ma'am.                                                 04:06:46

21 Q.   Okay.  And do you remember testifying that you had had sex

22 with him before?

23 A.   Yes, ma'am.

24 Q.   Did that make any sense to you?

25 A.   Yes, it does.                                               04:06:59

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    Q.    How so?                                                    04:07:00

2    A.    Because like the first time whenever we were out together

3    up in Las Vegas, we had had sex then but it had been a while

4    and he had already had sex with those other ladies prior to me

5    even going out --                                               04:07:16

6    Q.    Did you see that?

7    A.    I didn't see it but I heard it.

8    Q.    Okay.  Without telling us what other people told you, did

9    you see anything like that?

10   A.    No.  No.  Ma'am.                                          04:07:26

11   Q.    The two men in the hotel in Los Angeles or Inglewood, did

12   you get money and drugs for that?

13   A.    Yes, ma'am.

14   Q.    What drugs did you got?

15   A.    I got some tangerine kush.                                04:07:59

16   Q.    What is that?

17   A.    It's marijuana.

18   Q.    How much did you get?

19   A.    Like a dime.

20   Q.    So when you -- when the two men came to the room, isn't it 04:08:16

21   true that Hanoi and Zuriela were at the store?

22   A.    I'm not sure where they were whenever they came up to the

23   room.  I don't know where they went.  I was upstairs so I

24   wouldn't know where they were.

25   Q.    I thought you said on direct examination that my client   04:08:36

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  made everyone leave the room?                                          04:08:39

2  A.   Actually, yeah, did he make everyone leave the room before

3  those guys had gotten there.   Now, whenever they left the room,

4  I don't know where they went.

5  Q.   Isn't it true that Zuriela remained in the room with you    04:08:52

6  because the original deal that you set up was for the two of

7  you?

8  A.   No, ma'am.

9  Q.   When these two men took the money, did they take the

10 marijuana as well?                                                     04:09:06

11 A.   Yes, ma'am.

12 Q.   Where was that?

13 A.   That was right with the money.

14 Q.   You told the government on direct examination that the

15 first time that you went out in Las Vegas you had red            04:09:33

16 high-heeled shoes.   Do you remember that?

17 A.   Yes, ma'am.

18 Q.   Why did you have those with you?

19 A.   Actually, they weren't mine.   They were for Nikyea.   They

20 weren't mine.   I was borrowing her shoes.                             04:09:47

21 Q.   When did you borrow her shoes?

22 A.   The first night that -- actually, it was -- actually, to

23 tell you the truth, I'm trying to think because I was thinking

24 that it was that first night whenever we were --

25 Q.   I believe your direct examination -- on direct examination   04:10:05

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  you said that on this trip when you got to Las Vegas and you                04:10:07

2  went out you said you wore short shorts, a shirt and some

3  high-heeled shoes.

4  A.   Oh.  Yes, ma'am.  Yes, ma'am.

5  Q.   And those you had borrowed from Nikyea?                               04:10:18

6  A.   Yes, ma'am.

7  Q.   And you had borrowed them before the trip?

8  A.   Yes, ma'am.  I had them from the last trip.

9  Q.   Okay.  And how would you describe your outfit?

10  A.   Okay.  Now, my outfit started off with -- I had some blue            04:10:35

11  jean short shorts, really short shorts, and I had on -- it was

12  kind of like a red blouse with -- it may have been white either

13  stripes or polka dots.  I'm not sure exactly.  And then I had

14  the red platform heels and the heels kind of looked like a

15  little ball and a bigger ball and a bigger ball and a bigger             04:11:04

16  ball that led up to the shoe.

17  Q.   Did you think were you dressed appropriately to go out

18  prostituting?

19  A.   Yes, ma'am.

20  Q.   Nobody told you what to wear, did they?                             04:11:15

21  A.   Actually, yeah.  Hanoi was going around critiquing

22  everybody on what they should wear.

23  Q.   I didn't ask what the critique was.  Nobody told you what

24  to wear, that outfit, did they?

25  A.   Yes.                                                                 04:11:27

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   Who told you to wear that outfit?                          04:11:28

2   A.   Hanoi.

3   Q.   And you had brought those clothes with you?

4   A.   Actually, ma'am, I had brought some -- yeah.  I brought

5   some clothes, yeah, for me to go to the club with at that time.   04:11:41

6   Q.   Had you ever worn that outfit out before to go

7   prostituting?

8   A.   No.

9   Q.   How about the shoes?

10  A.   No.                                                        04:11:57

11  Q.   Did you write a statement about this incident for the

12  police, Mesa police?

13  A.   Ma'am?

14  Q.   Did you write -- do you remember writing a handwritten

15  statement of your version of the events for the police?         04:12:37

16  A.   Yes, I remember.

17  Q.   Did you tell the police that you had photos, naked photos,

18  of the other girls on your phone in addition to the phone you

19  had handed over?

20  A.   No, ma'am.  I probably -- I may have wrote that down but    04:12:55

21  that was not what I meant.  I meant to say that those pictures

22  were on the phone that like -- that they had, the phone that

23  like, they had taken from me, the phone that I had up in the

24  car.

25  Q.   And you called it "my phone" in a handwritten statement;    04:13:15

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    correct?                                                          04:13:18

2    A.   Well, yes, that's what I called it but it wasn't my phone.

3    Q.   There was never a gun on this trip, was there?

4    A.   Ma'am, to tell you the truth, I'm really not sure.  At one

5    point in time I thought that there was one.  I'm not sure.        04:13:36

6    Q.   You thought that there was a gun on the trip?

7    A.   Yes.

8    Q.   When did you think there was a gun on the trip?

9    A.   You know, whenever Hanoi was going around acting really,

10   really -- he was being very, very mad at one point in time and    04:13:50

11   he was saying, "Oh, well, I'll kill you.  I'll kill you," this,

12   that.

13   Q.   Did you see a gun?

14   A.   No.

15   Q.   Did you tell anyone that you saw a gun on this trip?          04:14:06

16   A.   I may have.

17   Q.   Did you tell your mom you saw a gun on this trip?

18   A.   No.

19   Q.   Who did you tell you saw a gun on this trip?

20   A.   I'm not sure who I told.                                      04:14:23

21   Q.   Let me ask you this:  Do you remember talking to the FBI

22   on December 4, 2007?

23   A.   On December 4?

24   Q.   Yes, ma'am, when you were in Texas.

25   A.   Yes.                                                          04:14:46

United States District Court

879

XXXXXXXXX XXXXXXX - Cross

1   Q.   Do you remember telling the FBI agent then that my client   04:14:46

2   had a gun at the Microtel?

3   A.   Yes, ma'am.  Yes, ma'am, I may have said that.

4   Q.   I'm sorry?

5   A.   I said yes, ma'am, I may have said that.   04:14:58

6   Q.   But you never saw a gun.  Why would you tell them that?

7   A.   Because that's what I thought, because I knew that --

8   okay.  Because, like, whenever you hear someone say that they

9   are going to kill somebody, automatically me -- because I was

10  scared, I thought that there was a gun involved.   04:15:18

11  Q.   Did you tell the police that you actually saw a gun?

12  A.   I don't remember telling the police that.

13  Q.   Do you remember telling the police that you saw Zuriela

14  sitting next to a gun?

15  A.   I don't remember saying that.   04:15:31

16  Q.   My client didn't show you how to create the ads on

17  Craigslist, did he?

18  A.   He didn't show me how to create them but he told me what

19  to put in them.

20  Q.   Did you tell the FBI on December 4, 2007, that my client   04:16:05

21  had shown you how to create the ads and put text in the

22  headlines?

23  A.   Yes, ma'am.

24  Q.   Is that true or not?

25  A.   He showed me which texts to, like, put in them which can   04:16:18

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    actually mean creating an ad or whatever but -- what was the          04:16:24
2    question again?  I'm sorry.
3    Q.   The question was:  Did you tell the FBI agent that my
4    client had shown you how to create the ads and how to put text
5    in the headlines?                                                      04:16:46
6    A.   Okay.  Yes.  Ma'am.
7    Q.   That's not true, is it?
8    A.   I think that it was misunderstood on what I meant by that.
9    Q.   It was a pretty clear statement, would you agree?
10   A.   He didn't necessarily teach me how to create the ads            04:17:03
11   because I knew how to create the ads but he just told me what
12   to put in the ads which is a text and a text that will be up in
13   the headline.
14   Q.   I'm sorry?
15   A.   I said it was a text and things like that.  That would be       04:17:15
16   up in the headline and as well as being up in the ad.
17   Q.   Isn't it true that you were trying to blame my client for
18   your conduct on this trip?
19   A.   Yes, ma'am.
20   Q.   And isn't it true that you were trying to blame my client       04:17:30
21   for the postings of the Craigslist?
22   A.   Yes, ma'am.
23   Q.   And isn't it true that you were trying to blame my client
24   for showing you how to create postings on Craigslist?
25   A.   Yes, ma'am.                                                      04:17:49

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   Q.   And those were not true; correct?                           04:17:50

2   A.   I think it was misunderstood, ma'am.

3   Q.   Why did you think that the police thought you were running

4   away from them when they showed up in Mesa?

5   A.   Because I ran toward them.  Because I was running to them.   04:18:22

6   Q.   Okay.  Could you explain why you thought that that would

7   make them think that you were running away from them?

8   A.   They probably thought that I was running away from them

9   because I was trying to go more toward the back of the building

10  like -- like I would say more toward the side of the building   04:18:40

11  to where this guy wouldn't come out and actually see me out

12  here and things like that and I just didn't want nothing to

13  happen to me.  So I thought maybe if I would have ran around

14  the corner and then the police could have came and talked to me

15  there.  I didn't want nothing to happen to me at that point and 04:19:01

16  I was still scared of him.

17  Q.   And, in fact, in one of your previous arrests you had to

18  be subdued because you tried to run; correct?

19  A.   Yes, ma'am.

20  Q.   Shoplifting at least; correct?                              04:19:16

21  A.   Yes, ma'am.  I remember that.

22  Q.   On direct examination, you said that while you were in Las

23  Vegas the first time, Mr. Logan asked you if you prostituted on

24  that trip and your response was, "Not to my knowledge."  Do you

25  remember that statement?                                        04:19:57

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.   Yes, ma'am.  That meant no.                                    04:19:58

2    Q.   It would be something you would remember.  Would you

3    agree?

4              MR. LOGAN:  Your Honor, request sidebar.

5              THE COURT:  Concerning that last question?              04:20:12

6              MR. LOGAN:  Yes, Your Honor, and the -- Yes, Your

7    Honor.

8              (At sidebar.)

9              MR. LOGAN:  Your Honor, I believe this is the area

10   that the court was concerned about and we discussed on two        04:20:29

11   different occasions at this point about the new reports that

12   the defense counsel was complaining about.

13             MS. HULL:  Judge, I'm cross-examining on the

14   statements that she made on his.

15             THE COURT:  That was an answer she gave to your         04:20:48

16   questions.

17             MS. BARDORF:  I just wanted the court to be clear if

18   there's any follow-up in this area, if she tries to impeach her

19   on that, the impeachment comes from the new reports because the

20   new reports --                                                    04:21:00

21             MR. LOGAN:  The next question if she goes down the

22   road, isn't it true you prostituted before, then we're right in

23   the middle of exactly what she didn't want to get into.

24             MS. HULL:  While we're speaking of it, Judge, on that

25   issue, in those reports she told the officer -- she told the      04:21:15

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  officers in this other incident that she gave that Jacqueline
2  Acosta ID to this man --                                          04:21:22
3          THE COURT:  Well, wait a minute.  Let's take care of
4  this first issue.  Now, you asked her whether or not she
5  prostituted before and she said she didn't think so; right?      04:21:35
6          MS. HULL:  That was in Las Vegas I believe.
7          THE COURT:  Right.  She didn't --
8          MR. LOGAN:  She said, "Not to my knowledge."
9          THE COURT:  You're not going to go into this other
10  information?                                                     04:21:58
11          MS. HULL:  No, not at this point unless I can get a
12  continuance to investigate it.
13          THE COURT:  Then let's go on.  We're not going to go
14  into this.
15          (End sidebar.)                                            04:22:09
16  BY MS. HULL:
17  Q.   You said on direct examination that after you went back to
18  Oregon after this first trip to Las Vegas that you tried to get
19  back into school; correct?
20  A.   Yes, ma'am.                                                  04:22:38
21  Q.   And that's when you met Damafi?
22  A.   Yes, ma'am.
23  Q.   And you were still with Damafi after this July trip that
24  we've been talking about?
25  A.   Yes, ma'am.                                                  04:22:45

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  Q.    On direct examination, you said that you found out that          04:22:52

2  Damafi was a pimp?

3  A.    Yes, ma'am.

4  Q.    And that was before this trip; correct?

5  A.    Yes, ma'am.          04:23:10

6  Q.    And then you moved to Las Vegas with him again before this

7  trip?

8  A.    Yes, ma'am.

9  Q.    And when you found out about it when you talked about it

10 in direct examination, you said that when you found out, you          04:23:21

11 thought -- and I think this is a quote, I can't believe this is

12 happening.  Do you remember that?

13 A.    Yes, ma'am.

14 Q.    Then why did you start working for him?

15 A.    I started working for him because I thought that I cared          04:23:41

16 about him at the time and I knew that we were living together

17 and that I just wanted to keep our household up.  I wanted to

18 keep the household together.  I didn't want us to fall apart.

19 Q.    So you thought that you could keep the relationship going

20 by prostituting?          04:24:00

21 A.    That and so that I can also, you know, just, like, take

22 care of bills and things like that because, you know, the other

23 girls wasn't making the money that they needed to make so yes,

24 ma'am, I did pick up the slack for him.

25 Q.    And that was your idea, wasn't it?          04:24:18

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  A.   Well, actually it was his idea but I did agree on it.  I      04:24:21

2  did agree to do it.

3  Q.   Because you had $2600 a month rent; correct?

4  A.   Yes.

5  Q.   That's a big rent.  You would agree?      04:24:34

6  A.   Yes, ma'am.

7  Q.   Did you have to put a deposit on that house?

8  A.   Actually, no because his uncle was the owner.

9  Q.   And, in fact, you benefited from the proceeds of this

10 prostitution, didn't you?      04:24:55

11 A.   Somewhat.

12 Q.   You lived in a $2600 a month home.  You would say more

13 than somewhat, wouldn't you?

14 A.   Oh, yes, ma'am.

15 Q.   What kind of fine things were you able to buy?      04:25:07

16 A.   Well, he bought, you know a car.  We had a car and I was

17 able to go and get money to get my hair done all the time and I

18 was able to go shopping whenever I needed to.  I was able to,

19 you know, actually just go out and just splurge some of the

20 time.      04:25:31

21 Q.   Did you travel?

22 A.   No, I didn't travel.  I was only in Las Vegas at that

23 moment.

24 Q.   So when you say that you were prostituting for him, you

25 were really prostituting for yourself, weren't you?      04:25:41

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    A.   Well, I mean, of course you want to benefit yourself also.    04:25:45

2    But my -- I mean my objective was just to benefit everybody,

3    like just to benefit me to, like, benefit him, to benefit us.

4             So I wasn't just doing it for him.  I was doing it

5    for me also.                                                       04:26:02

6    Q.   And that's the same on the trip from Portland with my

7    client and the three other women; correct?

8    A.   No, ma'am.

9    Q.   How did you pay for your trip from Portland to Las Vegas?

10   A.   Actually, they paid for it.  Hanoi paid for it.  You mean    04:26:12

11   the first trip with Nikyea and him?

12   Q.   No.  I'm talking about the one from last July.

13   A.   We rode in the car together.

14   Q.   I know.  But who paid for all of this?

15   A.   I do believe Hanoi had all of the money.                     04:26:31

16   Q.   And did you have -- you anticipated being gone for a

17   while?

18   A.   Yeah, just for a little while.

19   Q.   And you didn't take any money with you?

20   A.   Actually, I did but I wasn't going to spend it on things     04:26:42

21   that -- on things that were going to already be taken care of

22   on the trip there.

23   Q.   What were you going to spend them on?

24   A.   I was going to spend the money just on basically, you

25   know, if I had needed a way back, you know or something, then I    04:26:59

United States District Court

XXXXXXXXX XXXXXXX - Cross

```
 1   would have some emergency money, just there for me.        04:27:05
 2   Q.   How much emergency money did you have?
 3   A.   I had like $200.
 4   Q.   And you still had that after the trip; right?
 5   A.   No, I didn't.                                          04:27:17
 6   Q.   Where did that go?
 7   A.   Actually, I really don't know where it went.  I remember I
 8   had it up in my wallet one day and I left my wallet up in the
 9   room and the next day -- I mean, like, later on I came back and
10   my money was gone and I didn't want to raise the issue about   04:27:33
11   the money being gone because I wasn't supposed to have any
12   money anyway.
13   Q.   At what point during the trip the did you find your $200
14   missing?
15   A.   When we were in Los Angeles.                          04:27:45
16   Q.   So up until that time you had $200 to go home with;
17   correct?
18   A.   Yes, ma'am.
19   Q.   So any emergency, you could have paid for the trip home up
20   until the point you're in Los Angeles and found your money   04:27:57
21   missing; correct?
22   A.   Yes, ma'am.
23   Q.   When you posted -- I believe your direct examination was
24   that Damafi is the one who first -- you first posted for where
25   he told you to put things like "sexy lady new in town."  Do you   04:28:42
```

United States District Court

888

XXXXXXXXX XXXXXXX - Cross

1   remember that?                                                           04:28:45

2   A.   Can you repeat that question again?

3   Q.   When you talked about Damafi and when you first were

4   posting to Craigslist working as a prostitute, you talked about

5   what kinds of things to put in the ads.  Do you remember         04:29:00

6   talking about that?

7   A.   Yes, ma'am.

8   Q.   Do you remember Damafi telling you talking about how

9   Damafi told you to put sexy mama, new in town, things of that

10  nature?                                                           04:29:15

11  A.   Well, yes.

12  Q.   Again, publishing Exhibit Number 2, "sexy mama new in

13  town"; right?

14  A.   Yes, ma'am.

15  Q.   And you're saying you didn't post that?                       04:29:42

16  A.   No, I didn't post that.

17  Q.   Did you pick out those words?

18  A.   No, ma'am.

19  Q.   When you talked about making $5,700 the day before, when

20  was that?                                                         04:30:10

21  A.   It was the day before I had got arrested at the MGM the

22  first time.

23  Q.   And how about -- you said you were arrested at the Rio

24  trespassing.  You don't know when that was?

25  A.   No.  I'm not really sure when that was, ma'am.              04:30:26

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  Q.   When you said that you left Damafi in Las Vegas in May of        04:30:36

2  2007, you went home with your mom.  Do you remember that

3  testimony?

4  A.   Yes, ma'am.

5  Q.   And but you didn't break up with Damafi, did you?            04:30:45

6  A.   No, ma'am.

7  Q.   You were still dating him on this trip?

8  A.   Yes, ma'am.

9  Q.   Did you tell him where you were going?

10 A.   Well, kind of, sort of.  I kind of told him that -- I told   04:30:56

11 him that I was leaving with some friends to go out of town and

12 I didn't tell him what I was going for.

13 Q.   Why not?

14 A.   Because -- because of the simple fact that I knew that he

15 would be mad that I even made -- he would be mad that I even      04:31:13

16 made this decision to even up and leave with anybody because he

17 just wanted me to be with him all the time.

18 Q.   So you told him before you left that your purpose of going

19 to Las Vegas was to prostitute, didn't you?

20 A.   No.                                                          04:31:37

21 Q.   You said when you saw my client -- this is again going

22 through direct examination you said were you going to go see my

23 client anyway before you left Portland.  Do you remember that?

24 A.   Ma'am?

25 Q.   On direct examination you said that you saw my client when   04:31:54

United States District Court

XXXXXXXXX XXXXXXX - Cross

| | |
|---|---|
| 1 | you were out on MLK.  Do you remember talking about that? | 04:31:56 |

1    you were out on MLK.  Do you remember talking about that?     04:31:56

2    A.   Yes.

3    Q.   And my client came up and you said you were going to look

4    for him anyway.  Do you remember that testimony?

5           MR. LOGAN:  Objection.  Misstates prior testimony.     04:32:06

6           THE COURT:  Sustained.

7    BY MS. HULL:

8    Q.   Do you remember that you were going to see Hanoi?

9           MR. LOGAN:  Objection.  Same objection.  Misstates.

10          THE COURT:  Overruled.     04:32:17

11          THE WITNESS:  What was the question again?

12   BY MS. HULL:

13   Q.   Okay.  Let me go back to your direct examination.  You

14   said that you saw a Silver SUV or something and you saw my

15   client -- you were walking down the road and kind of I think     04:32:28

16   you said you were normally looking at traffic.  Do you remember

17   that?

18   A.   Yes.

19   Q.   And you saw my client in the car?

20   A.   M'hum.     04:32:35

21   Q.   And you waved at him?

22   A.   Actually yes.

23   Q.   And you said were you going to see him anyway.  Do you

24   remember that testimony?

25   A.   I don't remember saying I was going to see him anyway.  I     04:32:49

1   said that I was going to keep in touch.  I said that I would     04:32:52

2   keep in touch.

3   Q.   And your testimony is that this trip took place after you

4   turned 17; correct?

5   A.   Yes, ma'am.     04:33:17

6   Q.   And you turned 17 on July 18, 2007?

7   A.   As a matter of fact, ma'am, I was just thinking about

8   something.

9   Q.   What were you thinking about?

10  A.   I was thinking about -- No.  It didn't happen.  It     04:33:31

11  happened whenever I was 16.  I wasn't 17 quite yet.  You know,

12  I had like -- I know I had like either like another two weeks

13  before I turned 17, ma'am, and I apologize if I misled you.

14  Q.   When did you remember that?

15  A.   Actually, I was just thinking about it whenever you had     04:33:52

16  asked the question but I answered it too fast and I didn't

17  think.  I apologize.

18  Q.   And Mr. Logan, in fact, asked you, "Are you sure?"  And

19  you said you were sure.  Do you remember that?

20  A.   Yes, ma'am.     04:34:05

21  Q.   What were you talking about when you said it was vice

22  night?

23  A.   Vice night is the night where all, like, undercover police

24  officers go out and actually try to find prostitutes at work.

25  Q.   And you told the other women that you knew what to look     04:34:38

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   for?                                                              04:34:41

2   A.   No, I didn't tell them that I knew what to look for.

3   Q.   Did you know what to look for?

4   A.   No because -- each vice night is different.  You look for

5   different cars on different days and I wasn't.                    04:34:54

6   Q.   So you testified that it was my client who wanted to go to

7   Los Angeles from Las Vegas?

8   A.   Yes, ma'am.

9   Q.   And how do you know that?

10  A.   Because -- because, like, after that first night in Las     04:37:34

11  Vegas, the morning after he basically made an announcement,

12  "Hey, you guys.  You all need to get packed.  We need to get

13  ready to go.  We're going to Los Angeles because nobody is

14  making money out here in Las Vegas."

15  Q.   Were you supposed to go Las Vegas on Craigslist before you   04:37:40

16  went to Las Vegas on this trip?

17  A.   I'm sorry, ma'am.  I didn't quite understand what you.

18  Q.   Before you left Portland, were you posting on Craigslist

19  looking for work in Las Vegas in erotic services?

20  A.   I'm not sure, ma'am.  I'm not sure whether or not I did      04:37:46

21  that.

22  Q.   How about before you left Las Vegas?  Is it possible you

23  were looking for Craigslist looking for work in Los Angeles for

24  erotic services?

25  A.   No, ma'am.  I know who that was who actually did that        04:37:50

United States District Court

XXXXXXXXX XXXXXXX - Cross

1  because they wanted to do -- well, okay, ma'am.  Actually,          04:37:51
2  Hanoi had did that, him and Zuriela, to actually figure out
3  what kind of calls that we would be getting coming from Los
4  Angeles since we were fixing to go there.
5  Q.   How about from Portland to Las Vegas?                          04:37:56
6  A.   I don't know.  I know that I -- I know that I've never
7  done any from Portland to Las Vegas.
8  Q.   Okay.  You said you may have when you just answered the
9  question.  Are you changing your testimony?
10 A.   Okay.  Well, ma'am, I may have and to tell you truth, I'm      04:38:01
11 not really sure.
12          THE COURT:  All right.  Ladies and gentlemen, we are
13 concluding for the day and we are going to start a half an hour
14 earlier tomorrow.  We're going to start at 8:30.  We will start
15 at 8:30 and begin proceedings and we are in recess.  We are      04:38:07
16 adjourned for the day.
17          (Jury departs.)
18          THE COURT:  And you may step down.
19          (Witness excused.)
20          THE COURT:  All right.  Counsel, I'm going to talk to    04:38:16
21 you now about the -- about what we're going to do tomorrow and
22 about some of the sidebar conferences in about five minutes.
23 There's no need for the defendant to be present.  So --
24          (Recess at 4:38; resumed at 4:48.)
25          THE COURT:  Counsel, Miss Hull, how much more time do    04:48:18

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   you need with Miss XXXXXXX?                                    04:48:21

2           MS. HULL:  I don't expect more than 30 minutes maybe.

3           THE COURT:  Okay.  Now, let me just make sure I

4   understand this issue about her prior activity in Las Vegas.  I

5   have reread what you have provided to me that I turned -- that  04:48:50

6   I had turned over to Miss Hull and I don't see anything other

7   than at the very beginning a reference to her being in Las

8   Vegas previously and that is with reference to July of 2007

9   where she says that the defendant wanted her to prostitute and

10  she didn't want to and that the defendant hit her.  It doesn't  04:49:22

11  appear here that she did prostitute.  So I am a bit confused

12  about what, Mr. Logan, you're concerned about when you asked

13  her whether or not she had prostituted before and she said that

14  she didn't think -- or as far as she knows, she didn't.  Where

15  is the problem here?                                            04:49:55

16          MR. LOGAN:  Well, Your Honor, on page 9 of 15 of the

17  Antioch police report --

18          MS. HULL:  Judge, I don't have that.  If I could have

19  a second so I could see what we're referring to.

20          Oh.  Got it.  Thank you.  The second.                   04:50:20

21          MR. LOGAN:  The second paragraph, Your Honor.

22          THE COURT:  Second?

23          MR. LOGAN:  Fearing she was going to be seriously

24  hurt.

25          THE COURT:  Okay.  She went to the casino.  Where are   04:50:45

United States District Court

XXXXXXXXX XXXXXXX - Cross

1   we?  So I've read that.  What else is there?                        04:50:54

2          MS. BARDORF:  Perhaps I misunderstood the question,

3   Your Honor.  I thought it sounded like Ms. Hull was winding up

4   to try to impeach her.  Technically speaking, that paragraph

5   would constitute solicitation of prostitution if she went there  04:51:07

6   and was trying.  It doesn't appear that she actually completed

7   and act of prostitution.  But we wanted to be clear before

8   should Ms. Hull be -- were she on the way towards trying to

9   impeach her that she, in fact, did go to the casino for the

10  purpose of prostitution, we wanted to make sure that she was     04:51:26

11  aware that that is what was going to be the response if the

12  juvenile was pressed on the issue.

13         THE COURT:  All right.  Well, her answer is the same

14  then.  She didn't lie under oath.

15         MS. BARDORF:  No, Your Honor.  We just wanted to make     04:52:06

16  sure -- I know Ms. Hull was concerned at the beginning of the

17  trial this morning that she hadn't had enough time to review

18  this report and she wanted to make sure she hadn't missed that

19  and wasn't trying to press her into any more details on that

20  issue.                                                            04:52:21

21         THE COURT:  All right.  So now I understand, because

22  the conversation I had with you at the sidebar was, well, if we

23  open up this door, then we know where we're going so that's

24  what you meant by what you said?

25         MS. BARDORF:  Correct.  I wanted to make sure            04:52:35

United States District Court

1  Miss Hull knew where it was going to go if she pressed her.  It       04:52:36

2  is a lengthy report.  We obviously have been very clear that we

3  were not to go into that and I wanted to make sure if Ms. Hull

4  got into that, it was intentional.

5           THE COURT:  Okay.                                            04:52:52

6           Any other witnesses?

7           MR. LOGAN:  No, Your Honor.  Unless Zuriela is found

8  overnight, this witness will be our last one.

9           THE COURT:  Okay.  And on that topic, the question of

10  whether or not the government was going to be able to connect       04:53:22

11  up the testimony involving the photograph of Zuriela and

12  whether or not that indicated some type of injury to her

13  potentially caused by the defendant, the -- you'll have to both

14  remind me but the evidence, the picture was admitted and the

15  evidence that we have connecting it up is that Amanda Garrett       04:54:01

16  said that it looked -- remind me, that it looked as if she had

17  an injury.  What was it that she testified to exactly?

18           MS. BARDORF:  Your Honor, Amanda Garrett testified

19  that Zuriela left with the defendant and came back and her nose

20  was bleeding.  The two officers also testified that that is        04:54:23

21  what Zuriela looked like when they arrived and XXXXXXXXX also

22  testified to the same.  And also on cross-examine was

23  questioned and got -- testified about the commotion and the

24  argument between Zuriela and the defendant.

25           THE COURT:  All right.  So whether the jury believes       04:54:43

XXXXXXXXX XXXXXXX - Cross

1   it or not is up to the jury but it is -- and perhaps Zuriela,          04:54:46

2   Ms. Payes, would testify otherwise but she's not here.  The

3   government has subpoenaed her.  Everybody has made an effort to

4   get her here.

5           So I'm not going to strike the testimony merely             04:55:07

6   because she is not here so I am not going to ask the jury to

7   assume that or disregard it as if it didn't occur.

8           MS. HULL:  May I make a record on that?

9           THE COURT:  You may.

10          MS. HULL:  Judge, these photographs are the                 04:55:24

11  equivalent of testimony of testimonial evidence because -- and

12  subject to *Crawford* because what they have done is they brought

13  in a photograph over my objection that is irrelevant, lacks the

14  foundation, and then had Amanda testify that that is what she

15  looked like after coming back from a walk with my client.          04:55:53

16          Judge, there is no other purpose of that evidence

17  coming in but for the implication that my client did something

18  and caused that.  It is testimony.  It is subject to *Crawford*.

19  It denies him his right to confront and cross-examine the

20  evidence because this woman is not here and the government knew     04:56:21

21  that when they put that photograph in front of the court and

22  over my objection it was admitted.  I don't know how this court

23  expects to be able to cure that by leaving it in and what

24  guidance would be offered to the jury, since it was admitted

25  over my objection, what relevance it has.                          04:56:52

United States District Court

XXXXXXXXX XXXXXXX - Cross

1       THE COURT:  The relevance is the reason it's      04:57:01

2  prejudicial.  She has been identified.  She's been identified

3  as having marks on her face and then there was testimony

4  connecting that up with your client.

5       I don't see how in any way *Crawford* applies.  It's    04:57:20

6  not testimony.  It's real evidence and the witnesses have

7  testified that that's what she looked like.

8       So you have made your record and the objection is

9  overruled.  It's admitted and it will -- my decision is

10  perpetuated.                                       04:57:36

11       All right.  What other evidence do you have to offer?

12       MS. BARDORF:  Your Honor, we expect to, again, with

13  the caveat that on the very slim chance that Ms. Payes appears

14  tomorrow, assuming she doesn't, we expect to rest after

15  Miss XXXXXXXXX testimony is concluded.            04:57:53

16       THE COURT:  And how much redirect?

17       MR. LOGAN:  Your Honor, not more than 20 minutes.

18       THE COURT:  All right.  So we will likely be finished

19  with XXXXXXX at 9:30 and we will start sharply at 8:30 and then

20  there will be time for motions and then I know, have some idea  04:58:11

21  I believe who you're going to call and you have them ready to

22  testify?

23       MS. HULL:  Judge, that would be the mother and we do

24  not have her.  I would ask that the government bring her in

25  tomorrow morning.                                     04:58:32

XXXXXXXXX XXXXXXX - Cross

1    THE COURT:  All right.  Let's have the order so that   04:58:33

2    there's no problem getting whoever is here here and then we

3    need to have them on the stand exactly when they are supposed

4    to testify.

5    So first it's the mother and she will be available   04:58:44

6    tomorrow first thing in the morning.  Then who?

7    MS. HULL:  My understanding -- I'm not certain but I

8    believe we'll have our computer expert after that.

9    THE COURT:  Well, when you say you're not certain.

10   You'll have a witness next?   04:59:07

11   MS. HULL:  We will have a witness, Judge.

12   THE COURT:  And it will likely be, if she's here,

13   your expert and then who?

14   MS. HULL:  Well, Your Honor.  We will keep -- again,

15   we're not done with XXXXXXXXX so I'm not sure who else I am   04:59:19

16   going to need, but we will keep a constant flow of witnesses.

17   THE COURT:  Well, I need to know who we're going to

18   call because I don't want any delays.  Who is next?

19   MS. HULL:  Well, I am not going to avow as to order

20   but --   04:59:35

21   THE COURT:  Well, you are going to avow as to order.

22   MS. HULL:  Well, Judge, I don't believe --

23   THE COURT:  I need the order now so there's no

24   misunderstanding.  You don't have to call them but you have to

25   tell me who you are going to call if you call them.   04:59:47

XXXXXXXXX XXXXXXX - Cross

1          MS. HULL:  And I have to give you the order?                    04:59:50

2          THE COURT:  And in the order.

3          MS. HULL:  And the government was not required to do

4     that?

5          THE COURT:  Absolutely they were.                              04:59:55

6          MS. HULL:  I was not even told the evening before who

7     they would have been.

8          THE COURT:  Well, they should have told you and if

9     you had asked me, they would have told you.  They are supposed

10    to tell you 24 hours in advance.  Who are we going to have?        05:00:07

11         MS. HULL:  The rest of the officers and the rest of

12    the witnesses on my trial.

13         THE COURT:  Okay.  I feel like I'm dealing with

14    somebody on the stand that I have to tell to answer the

15    questions.  Who is going to be called number three?  Not "the     05:00:22

16    rest of the officers."  Who will be next?

17         MS. HULL:  I believe it will be Pringle and Lawes

18    after that.

19         THE COURT:  Then who next?

20         MS. HULL:  If I can have my list, Judge.  Just a              05:00:46

21    moment.

22         Again, Judge, I don't have the benefit of the

23    pleading I have just filed.

24         THE COURT:  Well, I have the benefit.  We have Lawes,

25    Pringle, and then Burnside, Shields, Shock, Seitz, and are you    05:01:14

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    calling Ms. Roquez again?                                              05:01:25

2              MS. HULL:  I anticipate doing that, yes.

3              THE COURT:  Are you going to?  Is she here?

4              MS. BARDORF:  She is still here, Your Honor, until

5    Your Honor releases her from the subpoena.                            05:01:36

6              THE COURT:  So in what order are you calling these

7    people?

8              MS. HULL:  Again, it's going to be Adrienne Moreland.

9    Tami Loehrs, probably officers -- or Detectives Pringle and

10   Lawes in no particular order, probably Pringle and then Lawes.        05:01:49

11   And then we will probably next go to Officer Burnside, Officer

12   Shields, Nurse Seitz, Officer Bina.  I said Shock and

13   Ms. Roquez.  I think that's everyone, Judge.

14             THE COURT:  All right.  You have asked for an awfully

15   long period of time for each and every one of these officers.        05:02:35

16   You're going to have to provide me some reason as to why you

17   need this much time, an hour, two and a half hours with the

18   mother on direct.

19             MS. HULL:  Probably total I would say, Judge, direct

20   and recross -- or redirect, I apologize.                             05:02:55

21             THE COURT:  Are you going to play the tape?

22             MS. HULL:  We anticipate playing the tape.

23             THE COURT:  I need to know now.  I need for you to

24   give me better than a guess how much time you're going to take.

25   By now you should know.                                              05:03:19

United States District Court

XXXXXXXXX XXXXXXX - Cross

```
 1        MS. HULL:  Well, I can play the tape either for          05:03:20

 2   XXXXXXXXX or for --

 3        THE COURT:  XXXXXXXXX is off the stand.  She's going

 4   to be off the stand.  You finished your cross-examination.

 5        MS. HULL:  I have not finished my cross-examination.     05:03:31

 6        THE COURT:  Well, you have another half-hour.

 7        MS. HULL:  Yes, ma'am.

 8        THE COURT:  Ms. Hull, I want an answer.  Half an

 9   hour.  Are you going to play the tape in that half an hour?

10   How long is that half an hour and, frankly, you've already    05:03:45

11   spent almost five hours cross-examining her.  The government

12   finished at what time today?

13        MR. LOGAN:  I believe it was 1:10, Your Honor.

14        COURTROOM DEPUTY:  She started at 1:22.

15        THE COURT:  Okay.  It just felt like it's five hours.    05:04:10

16   All right.  You've had three hours.  You have another hour with

17   her total.

18        MS. HULL:  Okay.  Does that include the Dr. Phil

19   video?

20        THE COURT:  It includes the entire thing.  I don't       05:04:25

21   care how you do it but two hours with the mother is too long.

22   We're finishing this trial by the end of the day tomorrow.

23        MS. HULL:  Tomorrow?

24        THE COURT:  So we can do jury instructions and the

25   jury can start deliberating Thursday.                         05:04:48
```

United States District Court

XXXXXXXXX XXXXXXX - Cross

1      MS. HULL:  My anticipating was that we had through

2  Thursday.

3      THE COURT:  The trial is supposed to be over on

4  Thursday.  That means the closing arguments, everything is done

5  on Thursday so the jury can begin deliberations and that is          05:04:57

6  what they were told so that they wouldn't have to stay over

7  except if necessary.  Six-day trial is a six-day trial.

8      MS. HULL:  Tomorrow is number five, Judge.  Well,

9  then, I misunderstood.  I thought that we would have testimony

10  on Thursday.                                                         05:05:16

11      THE COURT:  We shouldn't have any testimony on

12  Thursday because it's possible deliberations on the third.

13  Through the 22nd we're supposed to have closing arguments and

14  the jury should begin deliberations and that's what I've said

15  from the beginning and that's the way it is.                        05:05:52

16      So now we have to -- does the government believe

17  you're going to have any rebuttal witnesses?

18      MS. BARDORF:  The only potentially, Your Honor, would

19  be a possible witness to rebut the expert testimony depending

20  on when it is.                                                      05:06:05

21      THE COURT:  And who is that expert?

22      MS. BARDORF:  That would be Andrea Price-Lace if we

23  need to recall her.

24      Your Honor, if I may --

25      THE COURT:  Let me stop you.                                    05:06:16

United States District Court

05:04:51

XXXXXXXXX XXXXXXX - Cross

1    What is it you intend to ask Officer Bina, Officer          05:06:23

2    Shields, Officer Shock, that's going to take an hour for each

3    of them and 45 minutes for -- an hour for Burnside and 45

4    minutes on direct examination for Shields and Bina and half an

5    hour for Shock?                                             05:06:49

6         MS. HULL:  Again, Judge, when I prepared this list, I

7    had with me the substance of what needed to be done for

8    purposes of what was left anticipating what XXXXXXXXX said or

9    did not say or admitted to because she hadn't even taken the

10   stand when I prepared this document.  It may well be that I can  05:07:13

11   use less time but since she's still not done, I can't --

12        THE COURT:  Well, the only -- you have -- I'm opening

13   the door and giving you an hour and that is it with her, with

14   XXXXXXXXX.

15        What is it that you believe you need to ask Officer       05:07:34

16   Burnside that's going to take an hour today?  What are you

17   going to ask him?

18        MS. HULL:  Officer Burnside was the first individual

19   on the scene.

20        THE COURT:  Why is it going to take an hour?            05:07:48

21        MS. HULL:  Because he was the first individual on the

22   scene and he talked to XXXXXXXXX.  He talked to the mother.  He

23   is the one who was involved in her first contact with her at

24   the scene.

25        THE COURT:  You know, rather than -- at this point       05:08:06

United States District Court

XXXXXXXXX XXXXXXX - Cross

1    you shouldn't be taking his deposition.  You should be prepared    05:08:07

2    to ask him questions.  Why is it that you think you're going to

3    have to ask him an hour of questions?

4                 MS. HULL:  That's my best estimate, Judge.

5                 THE COURT:  Well, I don't want an estimate.  This    05:08:21

6    case will be finished tomorrow and I am trying to organize

7    this, Ms. Hull, so that I am giving you as much opportunity as

8    you're entitled to prepare your case but also to constrain you

9    so we're not wasting a lot of time.

10                Now, unfortunately, it just hasn't been that way.  So    05:08:42

11   tomorrow for Burnside, unless you can show me otherwise, you're

12   going to have half an hour with him.  You're going to have no

13   more than 30 minutes with each of officers Shields and Bina and

14   no more than 15 minutes with Officer Shock and no more than

15   half an hour with Nurse Seitz.  And I don't understand why we    05:09:18

16   need an entire hour for Philysia Roquez; but after we finish

17   that, then you can persuade me, if you can, that you need that

18   much time with Ms. Roquez.

19                And for the mother, you have an hour and a half.

20                So let's go through this.    05:09:45

21                You have one hour with XXXXXXXXX, assuming that you

22   need it, and that is half an hour more than you asked for and

23   you have an hour and a half with the mother.  You have half an

24   hour for Officer Burnside.  You have 30 minutes for Officer

25   Shields and Officer Bina.  You have 15 minutes with Officer    05:10:16

United States District Court

| | | |
|---|---|---|
| 1 | Shock.  You have an hour and a half with Ms. Moreland.  You | 05:10:22 |
| 2 | have 30 minutes for Nurse Seitz. | |
| 3 |      MS. HULL:  Three minutes? | |
| 4 |      THE COURT:  30 minutes.  And Philysia Roquez, | |
| 5 | assuming you're going to call her, once you get to that point. | 05:10:45 |

Shock.  You have an hour and a half with Ms. Moreland.  You
have 30 minutes for Nurse Seitz.

     MS. HULL:  Three minutes?

     THE COURT:  30 minutes.  And Philysia Roquez,
assuming you're going to call her, once you get to that point.

     MS. HULL:  Judge, I can tell you right now Officer
Shields was the sex crime detective who was responding and we
also have Officers -- or Detectives Pringle and Lawes who are
just lengthy impeachment witnesses and my expert.

     THE COURT:  You haven't said how much time.

     MS. HULL:  Yes, I did.

     THE COURT:  Well, when you say lengthy, an hour each.
It's not going to be an hour each on those and I don't know
what you mean by lengthy impeachment witnesses because I'm not
sure what you have to impeach at this point.  She's admitted
most everything and if she hasn't, then you've got the -- you
just ask them statements.

     So an hour for each of them, I don't see it.  So you
have half an hour for each of them.

     MS. HULL:  Your Honor, I'll just make a record.  I
know what the ruling is but I would object to the time
constraints being carried on the back of the defense.

     MS. BARDORF:  Your Honor, to --

     THE COURT:  Wait, wait, wait.  I'm not finished.

     Okay.  That should get us through the day and I am

XXXXXXXXX XXXXXXX - Cross

```
 1   going to keep a clock.  Now, if we run over into Thursday, then    05:13:43
 2   what we'll do is we will settle instructions tomorrow.  We'll
 3   stay here as late as we have to get them settled so that if we
 4   have to run into Thursday, we'll do that and then we will take
 5   a break and I will read the instructions to the jury and then    05:14:10
 6   you will do your closing arguments.
 7            So what I'm going to do is I'm going to have an order
 8   issued which will set forth the timing for the remaining
 9   witnesses and not including the witnesses necessary for
10   rebuttal, assuming the government offers rebuttal testimony.    05:14:35
11            Okay.  What else?
12            MS. BARDORF:  Just for clarity sake, Your Honor, one
13   item is that we will arrange to have Miss Moreland and of
14   course Miss XXXXXXX here at the beginning of the day tomorrow.
15   None of the other witnesses -- we will not take responsibility    05:15:08
16   for scheduling them since they are not our witnesses, and we
17   can certainly contact Miss Roquez to let her know when to be
18   here?
19            THE COURT:  You'll make sure she's here.
20            MS. BARDORF:  Yes.  I just want to make sure that    05:15:20
21   we're not going to be coordinating any of the other defense
22   witnesses.
23            THE COURT:  It doesn't appear.  The rest of them have
24   been subpoenaed; right?
25            MS. HULL:  Yes, ma'am.    05:15:28
```

United States District Court

908

XXXXXXXXX XXXXXXX - Cross

1      THE COURT:  Anything else from the government?                    05:15:31

2      MS. BARDORF:  No, Your Honor.

3      MS. HULL:  No, Your Honor.

4      THE COURT:  All right.  We are adjourned until

5   tomorrow at 8:15.                                                    05:15:37

6           (Whereupon, these proceedings recessed at 5:15 p.m.)

7                    *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

XXXXXXXXX XXXXXXX - Cross

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 30th day of June, 2008.

s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP

I certify that the foregoing is a true and correct copy of the transcript originally filed with the Clerk of the Court on July 10, 2008, and incorporating redactions of personal identifiers requested by the following attorney(s) of record:  Tracey Bardorf, in accordance with Judicial Conference policy. Redacted characters appear as blanks or a black box in the transcript.

s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP

United States District Court